ACCEPTED
01-15-00266-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
9/15/2015 11:43:07 AM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00266-CV

**IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

9/15/2015 11:43:07 AM

CHRISTOPHER A. PRINE
Clerk

**UNOCAL PIPELINE COMPANY**
*Appellant,*

**v.**

**BP PIPELINES (ALASKA) INC., ET AL.**
*Appellees*

**AMENDED APPENDIX
TO BRIEF OF APPELLANT UNOCAL PIPELINE COMPANY
PART ONE OF TWO: APPENDIX TABS A-F**

*ORAL ARGUMENT REQUESTED*

**GIBBS & BRUNS, L.L.P.**
Mark A. Giugliano
mgiugliano@gibbsbruns.com
TBA No. 24012702
Anthony N. Kaim
akaim@gibbsbruns.com
TBA No. 24065532
J. Benjamin Bireley
bbireley@gibbsbruns.com
TBA No. 24076086
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

**ATTORNEYS FOR APPELLANT,
UNOCAL PIPELINE COMPANY**

# CERTIFICATE OF SERVICE

I certify that on the 15th day of September, 2015 I served a copy of the foregoing document upon the following attorneys of record via electronic filing:

Michael V. Powell
Elizabeth L. Tiblets
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Fax: (214) 756-8520
mpowell@lockelord.com
etiblets@lockelord.com

Steven G. Reed
Lara E. Romansic
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
Fax: (202) 429-3902
sreed@steptoe.com
lromansic@steptoe.com

*/s/ Mark A. Giugliano*
Mark A. Giugliano

# AMENDED APPENDIX
## TO BRIEF OF APPELLANT UNOCAL PIPELINE COMPANY

A.    Final judgment of the trial court, CR629-630

B.    Trial court order regarding DR&R, SCR4:2415-2417

C.    Trial court order regarding "Shall Pay Claim," SCR6:3687-3688

D.    TAPS Agreement, CR60-164

E.    TAPS Operating Agreement, CR524-571

F.    Federal Right-of-Way, CR166-305

G.    Alaska Right-of-Way, CR307-442

H.    Trial court order striking evidence, SCR4:2529-2538

I.    Remaining Owners' Motion for Partial Summary Judgment Regarding DR&R, CR39-58

J.    Unocal's Cross-Motion for Partial Summary Judgment Regarding DR&R, SCR3:1074-1109

K.    Remaining Owners' Summary Judgment Reply Regarding DR&R, CR464-522

L.    Unocal Motion for Partial Summary Judgment Regarding "Shall Pay Claim," SCR4:2539-2549

M.    Remaining Owners' Motion to Dismiss the "Shall Pay Claim," SCR3:2665-2674

N.    Remaining Owners' Opposition to Unocal's Motion for Partial Summary Judgment on the "Shall Pay Claim," SCR6:3645-3650

O.    Final Environmental Impact Statement for Renewal of the Federal Grant of the Trans-Alaska Pipeline System Right-of-Way, SCR3:1477-1480

P.    Trial court order severing and consolidating into one action the DR&R claims and Unocal's "Shall Pay Claim," CR622-627

Q.    Mobil 1999 Sales Solicitation, SCR3:1482-1488

R.    1980 proposed amendment, SCR3:1519-1521

S.    Sept. 10, 1980 Exxon letter regarding proposed amendment, SCR3:1523-1525

T.    Dec. 19, 1980 Exxon letter regarding proposed amendment, SCR3:1527-1528

U.    *In re Mobil Alaska Pipeline Co.*, Dkt. No. P-00-8, Order No. 1 (RCA June 20, 2000), SCR3:1769-1776

V.    *BP Pipelines (Alaska) Inc., et al.*, 134 FERC ¶63020 (March 10, 2011), SCR3:1798-1804

W.    Internal Revenue Service Closing Agreement, SCR3:1718-1733

X.    Trial court order denying motion to compel arbitration, SCR3:1060

Y.    Remaining Owners' First Amended Counterclaim, SCR5:2689-2709

Z.    2010 Alyeska DR&R estimate, SCR5:2947-2953

AA.   2003 Fluor Daniel DR&R estimate, SCR6:3280, 3285, 3397, 3424, 3426, and 3427

APP. A
Final judgment of the trial court
(CR629-630)

2/26/2015 3:54:02 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 4302740
By: CHEVALIER, BEVERLY
Filed: 2/26/2015 3:54:02 PM

CAUSE NO. 2013-06244**A**

| | | |
|---|---|---|
| UNOCAL PIPELINE COMPANY, | § | |
| | § | |
| Plaintiff, | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| | § | |
| BP PIPELINES (ALASKA) INC., | § | 165th JUDICIAL DISTRICT |
| CONOCOPHILLIPS TRANSPORTATION | § | |
| ALASKA, INC., and | § | |
| EXXONMOBIL PIPELINE CO., | § | |
| | § | |
| Defendants. | § | |

## PROPOSED FINAL JUDGMENT

For the reasons set forth in this Court's May 14, 2014, Order, this Court hereby ADJUDGES, DECLARES, AND DECREES as follows:

1. The Trans-Alaska Pipeline System ("TAPS") Agreement does not transfer Plaintiff Unocal Pipeline Company's dismantlement, removal or restoration ("DR&R") obligations (as described in the Right of Way Leases for TAPS with the United States of America and the State of Alaska) to the Defendants BP Pipelines (Alaska) Inc., ConocoPhillips Transportation Alaska, Inc., or ExxonMobil Pipeline Co. when Plaintiff Unocal Pipeline Company discontinues operations.

2. Plaintiff Unocal Pipeline Company's claim seeking a declaratory judgment that "[t]he Remaining Owners are required to assume unconditionally the obligations to perform or pay for the Dismantlement, Removal, or Restoration of TAPS arising from the undivided interest in TAPS the Remaining Owners are acquiring from withdrawing Owner, [Unocal Pipeline Company]" is DENIED and DISMISSED WITH PREJUDICE.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

629

3. For the reasons set forth in this Court's November 10, 2014, Order, Plaintiff Unocal Pipeline Company's claim for declaratory relief that "[t]he Trans-Alaska Pipeline System Agreement entitles the Departing Owners to receive their proportion of Net Salvage Value if it is determined to be positive, but does not obligate them to pay any portion of Net Salvage Value to the Remaining Owners if it is determined to be negative" is DISMISSED WITHOUT PREJUDICE.

4. All relief not expressly granted herein is DENIED. This judgment is final, disposes of all parties' claims in this cause number, and is immediately appealable. Costs are taxed against the party incurring same.

SIGNED this the __27__ day of __February__ __2015__.

_____
JUDGE PRESIDING

2

APP. B
Trial court order regarding DR&R
(SCR4:2415-2417)

UNOCAL PIPELINE COMPANY, §
    *Plaintiff,* §
  §
v. §
  §
BP PIPELINES (ALASKA) INC., §
CONOCOPHILLIPS TRANSPORTATION, §
ALASKA, INC., AND §
EXXONMOBIL PIPELINE CO., §
    *Defendants.* §

IN THE DISTRICT COURT

HARRIS COUNTY, TEXAS

165TH DISTRICT COURT

## ORDER GRANTING DEFENDANTS' FIRST AMENDED
## MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING DR&R OBLIGATIONS and
## ORDER DENYING PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court considered the First Amended Motion for Partial Summary Judgment of BP Pipelines (Alaska) Inc., ConocoPhillips Transportation Alaska, Inc., and ExxonMobil Pipeline Company (collectively, "Defendants" or "Remaining Owners") and the Cross-Motion for Partial Summary Judgment of Unocal Pipeline Company ("UPC"), the materials contained therein, all papers filed in response thereto, all evidence admitted in connection therewith, all pleadings on file, and the oral arguments of counsel. After considering the law in connection with all of the above, the Court finds that Defendants' First Amended Motion for Partial Summary Judgment should be granted and UPC's Cross-Motion for Partial Summary Judgment should be denied.

In 1970, a group of major oil companies entered into agreement(s) to construct and maintain the Trans-Alaska Pipeline System ("TAPS"). In 1974, the parties entered into lease agreements with the State of Alaska, the United States and private individuals to secure easements and rights of way to build the pipeline and its accompanying roads and facilities.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

2415

Today, UPC wants to discontinue operations and revert its interest in the pipeline to the Remaining Owners. The question before the Court is, when the pipeline ceases operations, at some unknown time in the future, who will have the financial burden to pay to dismantle and remove the pipeline and restore the rights-of-way ("DR&R obligations), an amount which may cost millions of dollars. In order for UPC to receive a release from the United States and Alaska for its proportionate share of the DR&R obligations, UPC seeks a ruling from this Court that, when it ceases operations and reverts its ownership back to the Remaining Owners, it also transfers its DR&R obligations. The Remaining Owners argue that, under the terms of the TAPS Agreement, only UPC's ownership and obligations transfer to the Remaining Owners and not its DR&R obligations. By its ruling here, this court holds that the TAPS Agreement does not transfer the DR&R obligations from UPC to the Remaining Owners when UPC discontinues operations.

The DR&R obligations do not transfer from UPC to the Remaining Owners because the TAPS Agreement does not transfer the DR&R obligations when a party discontinues its operations. The parties primarily argue over the application of §§7.8 and 8.2(e) of the contract.[1] Section 8.2(e) requires the Remaining Owners to "assume the obligations accruing under this Agreement" when UPC discontinues its operations. Section 8.2(e) does not contain the additional express language of Section 7.8 that "all commitments made pursuant hereto" also transfer. Since Section 8.2(e) fails to include provisions expressly incorporating the Right-of-Way leases that give rise to the DR&R obligations, the DR&R obligations do not transfer to the Remaining Owners when UPC discontinues operations.

---

[1] The parties also refer to Section 8.3 but that is inapplicable here because 8.3 contemplates complete termination of the entire project and how salvage, sale, or cleanup would occur under those inapplicable circumstances.

It is therefore **ORDERED** that Defendants' First Amended Motion for Partial Summary Judgment is **GRANTED**.

It is further **ORDERED** that Plaintiff UPC's Cross-Motion for Partial Summary Judgment that the Remaining Owners must Assume UPC's DR&R Obligations is **DENIED**.

SIGNED on this _14th_ day of _May_, 2014.

_____
JUDGE PRESIDING

APP. C
Trial court order regarding "Shall Pay Claim"
(SCR6:3687-3688)

| | | |
|---|---|---|
| UNOCAL PIPELINE COMPANY | ( | IN THE DISTRICT COURT |
| | ( | |
| Plaintiff, | ( | |
| | ( | |
| v | ( | |
| | ( | HARRIS COUNTY, TEXAS |
| BP PIPELINES (ALASKA) INC., | ( | |
| CONOCOPHILLIPS TRANSPORTATION | ( | |
| ALASKA, INC., AND EXXONMOBIL | ( | |
| PIPELINE CO., | ( | |
| | ( | |
| Defendants. | ( | 165th JUDICIAL COURT |

## ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (on Plaintiff's Motion for Declaratory Judgment – Net Salvage Value) and DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Lack of Jurisdiction)

On September 24, 2014, the Parties argued the Plaintiff's Motion for Partial Summary Judgment relating to Net Salvage Value. The Defendants argue that because the issue is not ripe, the Court does not have jurisdiction to consider it. The basis for the jurisdictional challenge is not complicated.

This case involves the contractual obligations surrounding a joint venture entered into by 5 major oil companies to build and operate the Alaska pipeline [1] The fundamental issue in this case is whether the Plaintiff remains contractually obligated to pay its proportionate share of the DR&R costs[2] after it withdraws from the joint venture Through a myriad of motions and machinations, the parties continue to litigate that premier issue, and it is this issue that drives the entire case. The parties have estimated that the DR&R costs will be in the billions of dollars, if and when they are required to pay.

"Net Salvage Value" may or may not include DR&R costs. This cannot be known until the Arbitration Panel is convened and can consider whether to include

---

[1] Trans Alaska Pipeline System Agreement, executed in 1970 ("TAPS Agreement") and the Amended and Restated Agreement for the Operation and Maintenance of the Alaska Pipeline System, updated December 1977 ("OA")

[2] DR&R is, in essence, the costs associated with the dismantling of the pipeline

3687

DR&R costs. Meanwhile, this Court entered an order on May 14, 2014, currently on appeal, which held that the Plaintiff was not relieved of its DR&R obligations by initiating the withdrawal process provided for in Section 8.2 of the TAPS Agreement.

Plaintiff argues that it might be subject to double penalty in the event the Court of Appeals upholds this Court's ruling from May 14, 2014 AND the Arbitration Panel includes DR&R costs in its calculations.

Defendants respond (in open court and on the record) that, if the Court of Appeals upholds this Court's May ruling, it will not seek DR&R costs in the arbitration hearing.

The issue is not ripe for determination by this Court, and, for this reason, the Plaintiff's Motion for Summary Judgment on the issue of Net Salvage Value must be denied. It is, therefore,

ORDERED, ADJUDGED and DECREED that the Plaintiff's Motion for Partial Summary Judgment on the issue of Net Salvage Value is DENIED and it is further ORDERED, ADJUDGED and DECREED that the Defendants' Motion to Dismiss the Plaintiff's Motion for Partial Summary Judgment on the issue of Net Salvage Value is GRANTED.

SIGNED the _10_ day of _November_, 2014.

_____
JUDGE ELIZABETH RAY

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

3688

APP. D
TAPS Agreement
(CR60-164)

TRANS ALASKA PIPELINE SYSTEM AGREEMENT

BY AND AMONG

ATLANTIC PIPE LINE COMPANY

BP PIPE LINE CORPORATION

HUMBLE PIPE LINE COMPANY

AMERADA HESS CORPORATION

HOME PIPE LINE COMPANY

MOBIL PIPE LINE COMPANY

PHILLIPS PETROLEUM COMPANY

AND

UNION OIL COMPANY OF CALIFORNIA

# TRANS ALASKA PIPELINE SYSTEM AGREEMENT

## TABLE OF CONTENTS

| | Page |
|---|---|
| Index of Definitions | vi |
| Parties | 1 |

### ARTICLE I
#### DESCRIPTION OF PIPELINE SYSTEM

SECTION

| | | |
|---|---|---|
| 1.1 | Description | 1 |
| 1.2 | Design Capacity | 1 |

### ARTICLE II
#### DESIGN AND CONSTRUCTION

SECTION

| | | |
|---|---|---|
| 2.1 | Design and Construction Contract | 1 |
| 2.2 | Construction Committee | 2 |
| | (a) Members and Alternates | 2 |
| | (b) Meetings | 2 |
| | (c) Action Without Meeting | 2 |
| | (d) Committee Secretary | 2 |
| | (e) Certificates | 3 |
| | (f) Other expenses | 3 |
| 2.3 | Powers and Functions of the Construction Committee | 3 |
| 2.4 | Effect of Construction Committee Action on Parties | 3 |

### ARTICLE III
#### OWNERSHIP OF TAPS

SECTION

| | | |
|---|---|---|
| 3.1 | Ownership of TAPS | 3 |
| 3.2 | Ownership of Terminal Tankage | 4 |
| 3.3 | Payment of Costs of Initial Design Capacity and Terminal Tankage | 5 |
| 3.4 | Record Title | 5 |
| 3.5 | Form of Conveyance | 6 |

### ARTICLE IV
#### OPERATION AS INDIVIDUAL COMPANIES

SECTION

| | | |
|---|---|---|
| 4.1 | Individual Common Carriers | 6 |
| 4.2 | Tariffs | 6 |
| 4.3 | Other Plans of Operation | 6 |

i

## ARTICLE V

### OPERATION AND MAINTENANCE

SECTION | Page
--- | ---

5.1 Operating Agreement ......................................... 6

5.2 Powers Reserved to the Parties ............................... 6

5.3 Selection of a Successor Operator ........................... 6

## ARTICLE VI

### EXPANSION

SECTION

6.1 Total Expansion Capacity ..................................... 7

   (a) Total Expansion Capacity ............................... 7

   (b) Determination of Expansion Stages ...................... 7

   (c) Revision of Expansions ................................. 7

6.2 Expansion Rights of the Parties ............................. 7

   (a) According to Percentage of Ownership .................... 7

   (b) Revision of Table II .................................... S

   (c) Remaining Expansion Capacity ........................... S

   (d) Initiation of Expansions ............................... S

6.3 Commencement of the Construction of an Expansion ........... 9

   (a) Proposal of an Expansion ............................... 9

   (b) Insufficient Participation — Apportionment — Withdrawal of Proposal ............................................. 9

   (c) Insufficient Expansion Capacity — Apportionment ......... 9

   (d) Reinstatement of Withdrawn Proposal .................... 9

   (e) Elimination of Excess Capacity ......................... 9

   (f) Construction of Expansion ............................. 10

   (g) Adjustment of Percentages of Ownership ................ 10

6.4 Distribution of Costs in Expansion ......................... 10

   (a) Initial Payment of Cost of New Facilities .............. 10

   (b) Redistribution of Expansion and Pre-Expansion Costs .... 10

   (c) Redistribution of Terminal Tankage Costs .............. 11

   (d) Payment ................................................ 11

6.5 Review and Adjustment ...................................... 11

   (a) Review and Adjustment .................................. 11

   (b) Protection of Design Capacity .......................... 12

6.6 Expansion Prior to Date of Commissioning ................... 12

   (a) Election by Certain Parties ............................ 12

   (b) Settlement ............................................. 12

| | | Page |
|---|---|---|
| (c) | Remaining Expansion Capacity | 13 |
| (d) | Payment of Costs | 13 |
| (e) | Exercise of Completion Option | 13 |
| (f) | Review of Capacity | 13 |
| (g) | Second Expansion | 14 |
| 6.7 | Additional Terminal Tankage | 15 |
| (a) | Upon Expansion | 15 |
| (b) | At Election of Parties | 15 |
| (c) | Revision of Terminal Tankage Ownership | 15 |
| (d) | Terminal Tankage Costs | 15 |
| (e) | Options Not Applicable | 15 |

## ARTICLE VII
### TRANSFER OF INTERESTS IN TAPS

SECTION

| | | |
|---|---|---|
| 7.1 | Definitions | 15 |
| (a) | Affiliate | 16 |
| (b) | Enabling Agreement | 16 |
| (c) | Enabling Party | 16 |
| (d) | Equity Security | 16 |
| (e) | New Corporation | 16 |
| (f) | Owner | 16 |
| (g) | Shareholder | 16 |
| (h) | Throughput Agreement | 16 |
| 7.2 | Preferential Right to Purchase | 16 |
| (a) | Transfer of a Direct Interest in TAPS | 16 |
| (b) | Indirect Transfers of an Interest in TAPS | 17 |
| 7.3 | Transfers not Subject to a Preferential Right to Purchase | 17 |
| (a) | Merger, Consolidation or Reorganization | 17 |
| (b) | Sale of Assets | 17 |
| (c) | Transfers to an Affiliate | 17 |
| (i) | Undivided Interest in TAPS | 17 |
| (ii) | Equity Securities | 17 |
| (d) | Formation of a New Corporation | 17 |
| (i) | New Corporation as OWNER | 17 |
| (ii) | New Corporation owns Equity Securities of OWNERS | 18 |
| (e) | Dissolution or Liquidation of a New Corporation | 18 |
| (i) | New Corporation is OWNER | 18 |
| (ii) | New Corporation Holds Equity Securities of OWNERS | 18 |
| (f) | Partial Distributions by New Corporation | 18 |
| (i) | New Corporation is OWNER | 18 |
| (ii) | New Corporation Holds Equity Securities of OWNERS | 18 |
| (g) | Increase or Reduction in the Outstanding Equity Securities of a New Corporation | 18 |

| Section | | Page |
|---|---|---|
| 7.4 | Expansions and Exercise of Preferential Rights by New Corporations | 18 |
| 7.5 | Required Terms for Sale of any Equity Security | 19 |
| 7.6 | Transfer Procedure Upon Exercise of Preferential Right Upon Sale of Equity Securities | 19 |
| 7.7 | Terms for Financing Arrangements | 20 |
| 7.8 | Successors and Assigns | 20 |

## ARTICLE VIII
### TERM OF AGREEMENT

| Section | | Page |
|---|---|---|
| 8.1 | Initial Term | 21 |
| 8.2 | Discontinuance of Operations by One or More Parties | 21 |
| | (a) Definitions and General Provisions | 21 |
| | (i) Term Notice | 21 |
| | (ii) Positive Term Notice | 21 |
| | (iii) Negative Term Notice | 21 |
| | (b) Notices of Parties' Desires | 21 |
| | (i) First Term Notice | 21 |
| | (ii) Second Term Notice | 21 |
| | (c) Readjustments | 22 |
| | (d) Rights of Parties — Determination of Salvage Value | 22 |
| | (e) Conveyance to Parties Desiring to Continue Operations | 22 |
| | (f) Sale in Lieu of Acceptance of Net Salvage Value | 22 |
| 8.3 | Disposition of Properties Upon Termination of Agreement | 23 |

## ARTICLE IX
### FEDERAL INCOME TAX ELECTION

| Section | | Page |
|---|---|---|
| 9.1 | Election to be Excluded from Partnership Regulations | 23 |

## ARTICLE X
### PAYMENT OF COSTS AND EXPENSES

| Section | | Page |
|---|---|---|
| 10.1 | Payment of Costs and Expenses | 24 |

## ARTICLE XI
### ARBITRATION

| Section | | Page |
|---|---|---|
| 11.1 | Arbitration Procedure | 24 |

iv

64

## ARTICLE XII

### TECHNICAL INFORMATION, INVENTIONS AND PATENTS

SECTION                                                                    Page

12.1   Technical Information ...........................................   25
12.2   Patent Infringement ...........................................   25
12.3   Inventions by Third Parties ....................................   25
12.4   Inventions by Parties ..........................................   26
12.5   Party Employees ..............................................   26
12.6   Loaned Employees ............................................   26
12.7   Own Operations ..............................................   27
12.8   Term .......................................................   27
12.9   Associated Companies ........................................   27

## ARTICLE XIII

### MINERAL DISCOVERIES

SECTION

13.1   Mineral Discoveries ...........................................   27

## ARTICLE XIV

### GENERAL PROVISIONS

SECTION

14.1   Notices ......................................................   28
14.2   Laws and Regulations ........................................   28
14.3   Warranties ..................................................   28
14.4   Law Governing ..............................................   29
14.5   Entirety of Agreement ........................................   29
14.6   Captions or Headings .........................................   29
14.7   Effect of Prior Agreements .....................................   29
14.8   Establishment of Date of Commissioning .........................   29
14.9   Counterparts .................................................   29

Exhibit A
    Map

Exhibit B
    Construction Committee

Exhibit C
    Enabling Agreement

v

65

## INDEX OF DEFINITIONS

| Term | TAPS Agreement Page |
|------|------|
| Agreement | 1 |
| Date of this Agreement | 1 |
| Atlantic | 1 |
| BP | 1 |
| Humble | 1 |
| Amerada Hess | 1 |
| Home | 1 |
| Mobil | 1 |
| Phillips | 1 |
| Union | 1 |
| Party and Parties | 1 |
| Owner and Owners | 1 |
| TAPS or System | 1 |
| Initial Design Capacity | 1 |
| Contract | 1 |
| Contractor | 1 |
| Construction Committee | 2 |
| Member | 2 |
| Alternate | 2 |
| Committee Secretary | 2 |
| Construction Project Budget | 3 |
| Budget Amendment | 3 |
| Percentages of Ownership | 3 |
| Operator | 6 |
| Operating Agreement | 6 |
| Alyeska | 6 |
| Total Expansion Capacity | 7 |
| Expansions | 7 |
| First Expansion | 7 |
| First Expansion Capacity | 7 |
| Second Expansion | 7 |
| Second Expansion Capacity | 7 |
| Initial Percentage | 8 |
| Remaining Expansion Capacity | 8 |
| Excess Capacity | 8 |
| Excess Party | 9 |

vi

| Term | TAPS Agreement Page |
|---|---|
| Purchasing Party | 9 |
| Date of Completion | 10 |
| Cost of all pre-expansion facilities | 11 |
| Post Expansion Percentage | 12 |
| Increasing Party | 12 |
| Allocation Factor | 12 |
| Allocation Ratio | 12 |
| Settlement | 12 |
| Reducing Party | 12 |
| Completion Option | 12 |
| Option Party | 12 |
| Final Option | 14 |
| Final Option Capacity | 14 |
| Affiliate | 16 |
| Subsidiary | 16 |
| Parent Corporation | 16 |
| Enabling Agreement | 16 |
| Enabling Party | 16 |
| Equity Security | 16 |
| New Corporation | 16 |
| Owner | 16 |
| Shareholder | 16 |
| Throughput Agreement | 16 |
| Merging Party | 17 |
| Selling Party | 17 |
| Agreement Term | 21 |
| Term Notice | 21 |
| Positive Term Notice | 21 |
| Negative Term Notice | 21 |
| Net Salvage Value | 22 |
| Saleable Value | 23 |
| Technical Information | 25 |
| Party Employee | 26 |
| Loaned Employee | 26 |
| Project Improvement | 26 |
| Own Operations | 27 |
| Associated Companies | 27 |
| Date of Commissioning | 29 |

# TRANS ALASKA PIPELINE SYSTEM AGREEMENT

THIS AGREEMENT (the "Agreement"), entered into as of August 27, 1970 (the "Date of this Agreement") by and among ATLANTIC PIPE LINE COMPANY, a Pennsylvania corporation ("ATLANTIC"), BP PIPE LINE CORPORATION, a Delaware corporation ("BP"), HUMBLE PIPE LINE COMPANY, a Delaware corporation ("Humble"), AMERADA HESS CORPORATION, a Delaware corporation ("Amerada Hess"), HOME PIPE LINE COMPANY, a Delaware corporation ("Home"), MOBIL PIPE LINE COMPANY, a Delaware corporation ("Mobil"), PHILLIPS PETROLEUM COMPANY, a Delaware corporation ("Phillips"), and UNION OIL COMPANY OF CALIFORNIA, a California corporation ("Union"), (herein sometimes individually called "Party" or "Owner" and collectively called "Parties" or "Owners");

## WITNESSETH:

WHEREAS, the respective Parties to this Agreement have previously agreed to design and construct an undivided interest forty-eight inch diameter petroleum pipeline system from a point in the Prudhoe Bay area of the North Slope in the State of Alaska to a point in or near Valdez, Alaska, including suitable pump stations, tankage, terminals, docks, communications facilities and other facilities; and

WHEREAS, the Parties to this Agreement desire to revise and amend in their entirety their existing agreements for the construction, ownership and operation of said petroleum pipeline system;

THEREFORE, in consideration of the mutual covenants herein contained, the Parties agree to the following provisions for the construction, ownership and operation of said petroleum pipeline system:

## ARTICLE I

### DESCRIPTION OF PIPELINE SYSTEM

1.1 **Description.** The pipeline system, which will be known for purposes of identification as the Trans Alaska Pipeline System (hereinafter referred to as "TAPS" or "System"), shall consist of a forty-eight (48) inch diameter petroleum pipeline extending from a point in the Prudhoe Bay area of the North Slope of the State of Alaska to a point in or near the City of Valdez in the State of Alaska, together with suitable pump stations, tankage, terminals, docks, communications facilities and other facilities as generally shown on Exhibit A attached hereto and made a part of this Agreement.

1.2 **Design Capacity.** The initial design capacity of the pipeline and pump stations will be approximately Six Hundred Thousand (600,000) barrels per day. Tankage, terminals, docks, communications facilities and other facilities will be designed so that the over-all initial design capacity of the System will be approximately Six Hundred Thousand (600,000) barrels per day ("Initial Design Capacity"). TAPS will be designed to permit expansion of capacity to approximately Two Million (2,000,000) barrels per day.

## ARTICLE II

### DESIGN AND CONSTRUCTION

2.1 **Design and Construction Contract.** By the execution and delivery of this Agreement, each Party hereby confirms that it has simultaneously executed and delivered the Agreement for the Design and Construction of the Trans Alaska Pipeline System ("Contract"), dated as of August 27, 1970, by and between the Parties hereto and ALYESKA PIPELINE SERVICE COMPANY, a Delaware corporation ("Contractor"). Pursuant to the terms of the Contract, the Parties appoint and authorize Contractor, as agent for the Parties, to engineer, design and construct the System (including all related facilities). Contractor, on behalf of the parties hereto, shall be responsible for the diligent and expeditious performance of this work, shall select all subcontractors to be employed to perform engineering, design,

68

construction and other related services and shall supervise their activities to the end that all such work is performed in the best and soundest way, all as further provided in the Contract.

2.2 **Construction Committee.** The Parties recognize that it is necessary and desirable to establish a committee for the efficient administration of the Contract on behalf of the Parties and to exercise certain of the functions reserved to the Parties thereunder. A committee to be known as the construction committee ("Construction Committee") is hereby established for these purposes.

(a) *Members and Alternates.* Each Party shall designate one representative as its member ("Member") on the Construction Committee and shall designate one representative as the Member's alternate ("Alternate") who shall represent the Party on the Construction Committee only in the absence of the Member. Each Party whose Percentage of Ownership (as defined in Section 3.1) appearing in Column (2) on Table I in Section 3.1 is at least Twenty-Five percent (25%) may designate one additional representative as a second Member and one additional representative as his Alternate. Exhibit B attached hereto contains the name, address and telephone number of each Party's Member(s) and Alternate(s) on the Construction Committee. Each Party reserves the right from time to time to change its Member(s) or Alternate(s) and their respective addresses and telephone numbers by giving written notice of any such change to the secretary of the Construction Committee ("Committee Secretary").

(b) *Meetings.* The Construction Committee may hold monthly meetings at which the Contractor shall present progress reports on the project and such other meetings as may be requested by any Member or by the Contractor. All such requests shall be made in writing, or by telephone confirmed in writing, to the Committee Secretary and shall state the matters to be considered at such meeting. The Committee Secretary shall notify each Member at least three (3) days in advance of any meeting of the date, time, place and purpose of the meeting. If such notice is given by telephone, it shall be confirmed in writing, by telegram, cable or letter to the Member so notified. Failure to give such notice shall not nullify any action taken at any meeting if each Party not represented at such meeting by its Member(s) or Alternate(s) shall waive such notice in writing signed by said Party's Member(s) or Alternate(s), either before or after the meeting. The Construction Committee shall establish rules and procedures for the conduct of meetings, including but not limited to the selection of a chairman and the attendance of advisors; provided that such rules and procedures shall not contradict any provisions of Sections 2.2 and 2.3.

(c) *Action Without Meeting.* It is recognized that matters requiring the immediate decision of the Construction Committee may arise from time to time. Any Member or the Contractor may propose that any matter upon which the Construction Committee is authorized to act be decided pursuant to the informal procedure established hereunder by giving notice to the Committee Secretary, which notice may be given in writing, by letter, telegram or cable, or by telephone, confirmed in writing. The Committee Secretary shall immediately notify each Member by telephone of the matter to be decided and shall confirm such notice by telegram. If the Committee Secretary is unable to contact a Member by telephone, he shall immediately notify that Member's Alternate, which notice shall be confirmed in writing to both the Member and his Alternate. Each Member or Alternate, as the case may be, shall notify the Committee Secretary in writing, by letter, telegram or cable, or by telephone confirmed in writing of his approval or disapproval of the matter for decision. As soon as the Committee Secretary shall ascertain that a matter has been approved or disapproved, he shall notify all Members of the result, which notification, if made by telephone, shall be confirmed in writing to each Member.

(d) *Committee Secretary.* The Construction Committee shall appoint a Committee Secretary and an Assistant Committee Secretary. In addition to the functions assigned to the Committee Secretary in subdivisions (b) and (c) of this Section 2.2, he shall prepare and retain custody of the original record book which will contain the minutes of all meetings, notices, written confirmations, certificates, and, as the Construction Committee shall direct, all other

2

documents and communications relating to the Construction Committee. Duplicate copies of all materials in the record book shall be promptly mailed by the Committee Secretary to each Member. The record book shall be kept available for inspection by duly authorized representatives of the Parties hereto at all times and, upon termination of the Construction Committee, shall be delivered to one of the Parties for safekeeping under such terms as the Construction Committee shall approve. All expenses incurred in connection with the performance of the duties of the Committee Secretary shall be borne by the Parties in proportion to their Percentages of Ownership in TAPS then appearing in Column (2) of Table I in Section 3.1 under such arrangements as the Construction Committee shall approve. The Committee Secretary shall serve at the pleasure of the Construction Committee. The Assistant Committee Secretary shall perform the duties of the Committee Secretary in the event of the absence of the Committee Secretary.

(e) *Certificates.* The Committee Secretary may issue certificates with respect to actions of the Construction Committee. The Contractor and other third parties shall be entitled to rely on such certificates if they are countersigned by any Member or Alternate (other than the Member(s) or Alternate(s), if any, representing the Party employing the Committee Secretary).

(f) *Other Expenses.* Except as provided in Subdivision (d) of this Section 2.2, each Party, shall pay all expenses incurred by it relating to its representation on the Construction Committee.

2.3 **Powers and Functions of the Construction Committee.** The Construction Committee is hereby authorized to exercise only the powers and functions specified as follows:

(a) The approval of any "Construction Project Budget" or "Budget Amendment" prepared and submitted by the Contractor pursuant to the Contract.

(b) All other matters which the Contractor is expressly required or permitted to submit to the Parties for decision or approval under the Contract.

(c) All powers and functions delegated to the Construction Committee in Articles II, III, and VI of this Agreement.

All matters properly presented to the Construction Committee for determination shall be approved upon the affirmative vote of Member(s) or Alternate(s), as the case may be, representing Three (3) or more Parties having Percentages of Ownership in TAPS then appearing in Column (2) of Table I of Section 3.1 which aggregate at least Sixty-six and Two-thirds percent (66⅔%) of the total ownership interest in TAPS.

2.4 **Effect of Construction Committee Action on Parties.** Any and all decisions which the Construction Committee is authorized to make under Section 2.3 shall be conclusively binding on all Parties to this Agreement and shall have the same effect as a separate agreement on the matter by and among the Parties hereto.

## ARTICLE III

### OWNERSHIP OF TAPS

3.1 **Ownership of TAPS.** TAPS (including but not limited to all fee titles, easements, leases, permits, rights-of-way and other interests in land) shall be owned by the Parties hereto with each Party's undivided interest in TAPS, except as provided in Section 3.2 with respect to terminal tankage, being equal to its percentage of ownership ("Percentage of Ownership") in TAPS as set forth in Column (2) of Table I below, as such Percentage of Ownership may be amended from time to time as hereinafter provided. The initial Percentage of Ownership of each Party in TAPS and the estimated initial daily barrel design capacity of each Party in TAPS are set forth opposite such Party's name in Columns (2) and (3), respectively, of Table I below, with such percentages and capacities both being those which are applicable before any expansion of TAPS capacity has been made pursuant to Article VI of this Agreement.

3

70

TABLE I

| (1) Party | (2) Percentage of Ownership | (3) Design Capacity (Bbls./Day) |
|---|---|---|
| Atlantic | 27.50% | 165,000 |
| BP | 27.50 | 165,000 |
| Humble | 25.00 | 150,000 |
| Amerada Hess | 3.00 | 18,000 |
| Home | 2.00 | 12,000 |
| Mobil | 8.50 | 51,000 |
| Phillips | 3.25 | 19,500 |
| Union | 3.25 | 19,500 |
| Totals | 100.00% | 600,000 |

Within nine (9) months after the Date of Commissioning of TAPS, the estimated capacities set forth in Column (3) of Table I above will be reviewed by the Construction Committee and adjusted to reflect changes in design capacities which are required based on line length, elevations, pipe, pumping equipment, and station spacing of TAPS as installed; and if there are any such changes, a formal amendment to the Agreement shall be prepared and circulated to the Parties by the Construction Committee, and the Parties will execute such formal amendment revising Column (3) above so as to credit to each Party its percentage, as then set forth in Column (2) above, of the revised design capacity of TAPS. It is further contemplated that Columns (1), (2), and/or (3) of Table I above will be revised to reflect changes resulting from any Expansion of TAPS pursuant to Article VI hereof, or changes of ownership in TAPS resulting from transfers made in accordance with Article VII hereof. Any reference in this Agreement to said Columns (1), (2) and/or (3) above shall, unless the context clearly requires a different meaning, constitute a reference to the latest revision of such Columns as of the time when the Agreement is to be applied. Any reference in this Agreement to the "Percentage(s) of Ownership in TAPS" shall, unless the context clearly requires a different meaning, mean such percentage(s) as determined in accordance with what is then the latest revision of Columns (1) and (2) above.

3.2 **Ownership of Terminal Tankage.** Terminal tankage (including tanks, tank farm piping, and tank farm land) shall be owned by the Parties hereto with each Party's undivided interest in terminal tankage being equal to its undivided interest percentage as set forth in Column (2) of Table IA below, as such undivided interest percentage may be changed from time to time as hereinafter provided. The total terminal tankage to be constructed as a part of the Initial Design Capacity shall be not less than Six Million (6,000,000) barrels capacity. The initial undivided interest percentage of each Party in terminal tankage and the initial tankage capacity of each Party are set forth opposite such Party's name in Columns (2) and (3), respectively, of Table IA below, with such percentages and capacities both being those which are applicable before any increase in tankage capacity has been made pursuant to this Section 3.2 or pursuant to Article VI.

TABLE IA

| (1) Party | (2) Undivided Interest Percentage | (3) Tankage Capacity (Bbls.) |
|---|---|---|
| Atlantic | 27.50% | 1,650,000 |
| BP | 27.50 | 1,650,000 |
| Humble | 25.00 | 1,500,000 |
| Amerada Hess | 3.00 | 180,000 |
| Home | 2.00 | 120,000 |
| Mobil | 8.50 | 510,000 |
| Phillips | 3.25 | 195,000 |
| Union | 3.25 | 195,000 |
| Totals | 100.00% | 6,000,000 |

4

71

Within six (6) months after the date on which the Contractor notifies the Parties the construction of TAPS has commenced, each Party, if any, desiring additional tankage capacity to be constructed as part of the Initial Design Capacity shall specify by notice to each other Party the terminal tankage capacity in addition to its capacity then set forth in Column (3) of Table IA which it desires to have constructed. If aggregate additional capacity is nominated equal to not less than One-Half (½) the capacity of a Five Hundred Ten Thousand (510,000) barrel capacity tank, additional terminal tankage capacity shall be constructed as a part of the Initial Design Capacity at least equal to such aggregate additional capacity, to the nearest whole Five Hundred Ten Thousand (510,000) barrel capacity tank, of additional terminal tankage capacity specified by all Parties nominating additional capacity. If pursuant to the foregoing more or less additional terminal tankage capacity is to be constructed than the capacity nominated in the aggregate by all of the Parties desiring additional tankage capacity, the additional terminal tankage capacity to be constructed shall be allocated among such Parties in the proportion that each such Party's additional tankage capacity nomination bears to the total additional tankage capacity nomination of all such Parties or as such Parties may otherwise agree. In the event of any change in tankage capacity to be constructed as a part of the Initial Design Capacity, the Construction Committee shall cause to be prepared and circulated to the Parties hereto, and the Parties hereto shall execute a formal amendment to this Agreement revising Columns (2) and (3) of Table IA of this Section 3.2 crediting to each Party its revised undivided interest percentage and revised tankage capacity. Columns (1), (2) and/or (3) of Table IA in this Section 3.2 will also be revised to reflect changes resulting from any Expansion of TAPS or the construction of additional tankage capacity for any Party pursuant to Article VI hereof, or changes of ownership in TAPS. No Party shall be entitled at any time, without the consent in writing of all other Parties, to have tankage capacity constructed which would result in its ownership of tankage capacity in excess of the aggregate of fifteen (15) days storage capacity for its daily System throughput capacity then constructed or under construction plus the capacity of One (1) Five Hundred Ten Thousand (510,000) barrel capacity tank.

3.3 **Payment of Costs of Initial Design Capacity and Terminal Tankage.** The total cost of the Initial Design Capacity, except terminal tankage, shall be initially paid by the Parties in accordance with their respective Percentages of Ownership in TAPS appearing in Column (2) of Table I in Section 3.1. The total cost of terminal tankage constructed as a part of the Initial Design Capacity shall be initially paid by the Parties in accordance with their respective undivided interest percentages in terminal tankage appearing in Column (2) of Table IA in Section 3.2.

3.4 **Record Title.** All land rights, including but not limited to fee titles, easements, leases, permits, rights-of-way and other interests in land, required for the design, construction, operation and maintenance of TAPS shall be conveyed to or acquired for the Parties (in all of their names or in the name of one Party as trustee for the benefit of all Parties). All instruments and conveyances evidencing such land rights or the trust instruments relating thereto shall indicate each Party's respective interest therein which interest will be the Party's Percentage of Ownership as it appears in Column (2) of Table I in Section 3.1 or its undivided interest percentage in terminal tankage as it appears in Column (2) of Table IA of Section 3.2, as the case may be, at the time the land right is acquired or conveyed to the Parties. When required or permitted under applicable law, such instruments and conveyances shall be recorded, filed or otherwise made a matter of public record as so required or permitted. The Parties will cooperate to enable each Party to receive such instruments and conveyances as may be necessary to evidence such Party's legal title to or beneficial interest in TAPS (including all land rights therein) as reflected by its Percentage of Ownership as it appears in Column (2) of Table I in Section 3.1, or its then undivided interest percentage in terminal tankage as it appears in Column (2) of Table IA of Section 3.2, as the case may be, as amended from time to time pursuant to this Agreement. Whenever a Party's Percentage of Ownership or its undivided interest percentage in terminal tankage is reduced by reason of an adjustment as provided in Article VI hereof or by agreement of the Parties hereto so that such Party holds apparent legal title to or a beneficial interest in a greater Percentage of

5

72

Ownership in TAPS or greater undivided interest percentage in terminal tankage than is then owned by such Party (except where such Party holds legal title as trustee for the benefit of the Parties hereto), such Party shall convey title to that portion of its legal or beneficial ownership in TAPS (including all land rights included therein) which exceeds the Percentage of Ownership or undivided interest percentage in terminal tankage it is then entitled to own to one or more Parties who by reason of an Expansion then own greater Percentages of Ownership or greater undivided interests in terminal tankage than that evidenced by their apparent legal title or beneficial interest.

3.5 **Form of Conveyance.** Each Party executing a conveyance as grantor of any interest in TAPS (including an undivided interest in terminal tankage) shall warrant title to the interest conveyed against claims by, through or under the grantor, but no further. Each such conveyance shall recite that the interests conveyed thereby are subject to the terms of this Agreement.

## ARTICLE IV

### OPERATION AS INDIVIDUAL COMPANIES

4.1. **Individual Common Carriers.** From and after the Date of Commissioning of TAPS, each Party, its successors and assigns, shall utilize its undivided interest in TAPS solely as an individual common carrier facility.

4.2 **Tariffs.** Each Party shall separately publish and file tariffs in its own name in accordance with any applicable state and federal laws and regulations covering its share of the capacity in TAPS and shall collect for its own account all revenues payable by shippers under such tariffs. The Operator (as defined in Section 5.1) shall not be agent for any Party in connection with acceptance from shippers of tenders for shipment of petroleum, it being understood that each Party, as to its capacity in TAPS, is the carrier.

4.3. **Other Plans of Operation.** Nothing in Sections 4.1 or 4.2 shall be deemed to prohibit any plan of operation approved by any governmental authority having jurisdiction in accordance with any valid and applicable order, rule, regulation and/or law.

## ARTICLE V

### OPERATION AND MAINTENANCE

5.1 **Operating Agreement.** The operation and maintenance of TAPS shall be performed under an operating agreement between the Parties to this Agreement and an operator ("Operator") selected by the Parties hereto. By the execution and delivery of this Agreement, each Party hereby severally confirms that it intends to execute an agreement ("Operating Agreement") in such form as shall be unanimously agreed to by the Parties hereto with ALYESKA PIPELINE SERVICE COMPANY, a Delaware corporation ("Alyeska") as agent for the operation and maintenance of TAPS.

All references to Operator in this Agreement shall mean Alyeska so long as the Operating Agreement and any extensions thereof shall remain in full force and effect or, in the event the Operating Agreement is terminated, the corporation selected as Operator pursuant to Section 5.3 of this Agreement.

5.2 **Powers Reserved to the Parties.** The Operating Agreement shall reserve certain powers and functions to the Parties. All matters required to be approved by the Parties shall be approved upon the affirmative vote of Three (3) or more Parties having Percentages of Ownership as then appearing in Column (2) of Table I of Section 3.1 which aggregate at least Sixty-six and Two-thirds percent (66⅔%) of the total ownership interest in TAPS.

5.3 **Selection of a Successor Operator.** The Operating Agreement shall provide that the Operator or the Parties to the Operating Agreement may terminate the Operating Agreement subject to the

73

conditions contained therein. In the event of such termination, a new operator may be selected by Three (3) or more Parties having Percentages of Ownership which aggregate at least Sixty-six and Two-thirds percent (66⅔%) of the total ownership interest in TAPS. The Parties selecting the new operator shall execute a written notice which shall be sent to all other Parties not executing such notice. If the person selected as the new operator shall accept this duty, such new operator shall execute and send to each Party hereto an instrument accepting such appointment as Operator under the terms and provisions of the Operating Agreement (including the termination provisions thereof) and agreeing to discharge the duties of the Operator thereunder from and after the effective date of his appointment as Operator. Such instrument shall be binding upon each Party to the Operating Agreement, and shall have the same effect as the several agreements by and between each Party and the new operator to operate and maintain TAPS under the terms and provisions of the Operating Agreement from and after the effective date of the appointment of the new operator as Operator. If the termination of the Operator is effective upon the expiration of the initial term or any renewal term of the Operating Agreement, the new operator shall serve as Operator for the next succeeding Agreement Term. If the termination shall be effective during the initial term or any renewal term, the new operator shall serve as Operator for the remainder of the current term. In either case, the new operator shall thereafter serve as Operator for each successive term unless and until such new operator shall be terminated sooner as Operator under the termination provisions of the Operating Agreement.

## ARTICLE VI

### EXPANSION

6.1 **Total Expansion Capacity.** The System will be designed for expansion in accordance with the following plan:

(a) *Total Expansion Capacity.* TAPS will be designed for and may be expanded to approximately Two Million (2,000,000) barrels per day. Accordingly, based on the estimated minimum Initial Design Capacity of Six Hundred Thousand (600,000) barrels per day, the total increase in design capacity (herein called "Total Expansion Capacity") attainable from Expansion is approximately One Million Four Hundred Thousand (1,400,000) barrels per day.

(b) *Determination of Expansion Stages.* It is the intention of the Parties hereto that the design capacity of TAPS will be increased in two economically logical stages ("Expansions"). The first Expansion ("First Expansion") will consist of the construction of three pump stations and of the related storage tanks, terminal facilities, communications system and other required facilities to result in an increase of capacity of approximately Six Hundred Thousand (600,000) barrels per day ("First Expansion Capacity"). The second Expansion ("Second Expansion") will consist of the construction of four pump stations and of the necessary associated facilities to increase the capacity of TAPS by approximately Eight Hundred Thousand (800,000) barrels per day ("Second Expansion Capacity").

(c) *Revision of Expansions.* If, as a result of a revision of Table II in Subsection (a) of Section 6.2 pursuant to Subsection (b) of Section 6.2 or an adjustment of Table I in Section 3.1 pursuant to Section 6.5 or Subsection (f) of Section 6.6, the Construction Committee shall determine that a revision is necessary in the First Expansion Capacity or Second Expansion Capacity, a formal amendment of this Agreement revising Subsection (b) of Section 6.1 shall be executed by the Parties hereto to reflect such revision.

6.2 **Expansion Rights of the Parties.** The rights of the respective Parties hereto to participate in Expansions shall be determined in accordance with the following provisions:

(a) *According to Percentage of Ownership.* The right of each Party to share in the Total Expansion Capacity shall be determined by its initial Percentage of Ownership in TAPS as

7

74

determined in accordance with Columns (1) and (2) of Table I in Section 3.1 before any revision other than a revision to record a transfer of an interest in the system of such Columns is made ("Initial Percentage"), to the end that the total increase in estimated design capacity in barrels per day initially available to each Party from all Expansions shall be as shown in Table II, as follows:

TABLE II

| (1)<br>Party | (2)<br>Expansion<br>Capacity (B/D) |
|---|---|
| Atlantic | 385,000 |
| BP | 385,000 |
| Humble | 350,000 |
| Amerada Hess | 42,000 |
| Home | 28,000 |
| Mobil | 119,000 |
| Phillips | 45,500 |
| Union | 45,500 |
| Total | 1,400,000 |

(b) *Revision of Table II.* At the time of the review of the Initial Design Capacity required under Section 3.1 the Total Expansion Capacity shall be reviewed by the Construction Committee and, if such review indicates that such quantity of Total Expansion Capacity is not accurate, Column (2) of Table II above will be revised by the Construction Committee, in which event the Construction Committee shall then prepare and circulate to the Parties hereto, and the Parties hereto will execute, a formal amendment to this Agreement revising Subsections (a) and (b) of Section 6.1 and revising Table II above to credit to each Party hereto its then Percentage of Ownership of the revised quantity of Total Expansion Capacity.

(c) *Remaining Expansion Capacity.* Except as provided in Subsection (c) of Section 6.6, Table II shall be revised at the time the First Expansion is initiated pursuant to Subsection (d) of this Section 6.2 by adding Column (3) thereto, which shall set forth the remaining increase in design capacity which is available to each Party from the Second Expansion, and the Parties shall execute a formal amendment to this Agreement revising such Table II by adding such Column (3) in which each Party shall be credited with the amount remaining ("Remaining Expansion Capacity") after subtracting the amount of expansion capacity which such Party is to receive in the First Expansion from the amount of the Total Expansion Capacity then credited to such Party in Table II. If any Party shall have a deficit in Column (3) as a result of this revision, the amount of such deficit shall be excess capacity ("Excess Capacity").

(d) *Initiation of Expansions.* For the purposes of this Article VI, an Expansion shall be deemed to have been initiated at such time as (i) it has been proposed pursuant to Subsection (a) of Section 6.3 hereof, and (ii) one of the following has occurred (x) there has been a sufficient undertaking by one Party or agreement to participate therein by two or more Parties so that the proposal therefor is no longer subject to withdrawal pursuant to the last sentence of Subsection (b) of Section 6.3, or (y) a withdrawn proposal has been reinstated pursuant to Subsection (d) of Section 6.3; provided, however, except as set forth in Section 6.6, the Second Expansion shall not be initiated unless any Excess Capacity resulting from the First Expansion has been eliminated

8

as provided in Subsection (e) of Section 6.3 and Parties then having a majority of the Remaining Expansion Capacity agree to the Expansion. The Contractor shall notify all parties of the date on which each Expansion is initiated.

6.3 Commencement of the Construction of an Expansion. (a) *Proposal of an Expansion.* Except as otherwise provided in Section 6.6, any Party may propose the First Expansion at any time after the Date of Commissioning of the Initial Design Capacity and the Second Expansion may be proposed by any Party at any time after the First Expansion has been initiated (but not necessarily commenced or completed) by giving written notice to the other Parties hereto. Within Forty-five (45) days after each such notice is given, each other Party shall notify all other Parties in writing as to whether it desires to participate in the proposed Expansion. Failure to give such notice shall be deemed an election not to participate. In the notifications provided above, each Party (including the Party proposing the Expansion) shall state the increase in design capacity, if any, desired by that Party from the particular Expansion. Any such statement that a Party desires to participate in an Expansion shall constitute such Party's agreement to participate therein, in the amount stated in the notification.

(b) *Insufficient Participation — Apportionment — Withdrawal of Proposal.* Should the aggregate of the desired increases in design capacity in the above-provided notifications be less than the increase in design capacity for the proposed stage of Expansion, the remainder of such increase shall be divided among one or more of the Parties as they may mutually agree. However, if all of the remainder is not so taken within seventy-five (75) days from the date the proposal is made, then the entire proposal shall be deemed to be withdrawn as of the end of such 75-day period, subject to reinstatement as provided in Subsection (d) of this Section 6.3.

(c) *Insufficient Expansion Capacity — Apportionment.* Should the aggregate of the desired increases in design capacity set forth in the above-provided notifications total more than the increase in design capacity for the proposed stage of Expansion, the increase in design capacity for such Expansion shall be apportioned pro rata among the Parties having the right to and desiring to participate therein on the basis of their respective Remaining Expansion Capacities. Notwithstanding the next preceding sentence, however, no Party participating in an Expansion shall be required to accept more capacity than its desired increase in design capacity, as set forth in its above-provided notification, and any design capacity made available as a result of the refusal of one or more participants in an Expansion to accept all or any portion of the capacity in excess of the capacity requested in the notification shall be apportioned among the remaining participants who agree to take such available capacity, in proportion to their respective Remaining Expansion Capacities.

(d) *Reinstatement of Withdrawn Proposal.* Whenever any proposal for any Expansion is withdrawn pursuant to the last sentence of Subsection (b) or (c) of this Section 6.3, the Party who proposed such Expansion, may, by giving written notice to the other Parties within thirty (30) days next following the expiration of the 75-day period described in said Subsection (b) or (c), reinstate such proposal, in which case the Expansion covered by such proposal shall be deemed to have been initiated. Such notice of reinstatement shall constitute the agreement of the Party giving same to take that part of the design capacity provided by such Expansion which has not been theretofore taken by any other party pursuant to Subsections (a), (b) and/or (c).

(e) *Elimination of Excess Capacity.* Except as provided in Subsection (c) of Section 6.6, if any Party ("Excess Party") shall have Excess Capacity upon the completion of the First Expansion, every Party having Remaining Expansion Capacity shall have an option to purchase from the Excess Party all or any part of such Excess Capacity, up to but not in excess of the amount of the purchasing Party's then existing Remaining Expansion Capacity, by giving written notice to the Excess Party, specifying the amount of such Excess Capacity which the Party giving the notice ("Purchasing Party") desires to purchase. Effective as of the first day of the first calendar month which begins after the elapse of thirty (30) days following the giving of such notice, (i) the Purchasing Party shall become the owner of the amount of such Excess Capacity specified in the Purchasing Party's said notice;

9

76

(ii) the Purchasing Party's Remaining Expansion Capacity shall be reduced by the amount of capacity thus purchased; (iii) the Excess Party's Excess Capacity shall likewise be reduced by such amount thus sold; (iv) the capacity thus purchased shall no longer be considered to be "Excess Capacity"; and (v) the tabulations appearing in Table I in Section 3.1 and in Table II of Section 6.2 shall be revised accordingly by a formal amendment hereto executed by all Parties. As consideration for the acquisition of the portion of Excess Capacity so purchased, the Purchasing Party shall pay to the Excess Party a sum determined by multiplying the original cost of all design capacity acquired by the Excess Party in such Expansion (including but not limited to costs incurred by the Excess Party as a result of redistributions pursuant to Section 6.4 hereof, and revisions of such redistributions), without any allowance for depreciation, by a fraction, the numerator of which shall be the design capacity thus purchased, and the denominator of which shall be the total design capacity originally acquired by the Excess Party in such Expansion, each expressed in barrels per day. Any purchase of design capacity pursuant to this Subsection (e) shall not be subject to the preferential option to purchase set forth in Section 7.2. The option provided for in this Subsection (e) may be exercised at any time and from time to time by any Party or Parties having such option, until all of the Excess Capacity has been purchased in one or more purchases by one or more Parties having the option. If two or more Parties desire to exercise such option to purchase Excess Capacity and the total capacity desired to be purchased by such Parties exceeds the amount of Excess Capacity then remaining available for purchase under the provisions of this Subsection, the right of each Party who has elected to purchase all or any portion of the Excess Capacity available for purchase shall be determined by the order in which said notices of exercise of option have been given, as determined by postmarks and/or by telegraph company records, with the notice which has been given first in time to have priority over the subsequent notices.

(f) *Construction of Expansion.* When an Expansion has been initiated, the Parties shall proceed to have such Expansion accomplished pursuant to the provisions of Article II.

(g) *Adjustment of Percentages of Ownership.* When the new facilities are completed, tested and substantially ready for operation, the Contractor shall notify all Parties of the date on which operation of such facilities will commence ("Date of Completion") which in no event shall be prior to the Date of Commissioning. Except as provided in Section 6.6, the design capacity of each Party shall be adjusted on the Date of Completion to reflect the design capacity (if any) acquired by each Party in the Expansion; and the Percentages of Ownership of the Parties shall be revised so that the Percentage of Ownership of each Party after the Expansion will be the same as the percentage which it owns of the design capacity of the System after the Expansion. The tabulations set forth in Table I in Section 3.1 shall be revised accordingly by a formal amendment to this Agreement which shall be effective as of the Date of Completion of the Expansion to which the revision relates.

6.4 **Distribution of Costs in Expansion.** Except as otherwise provided in Subsections (d), (e) and (f) of Section 6.6, costs shall be distributed among the Parties as follows:

(a) *Initial Payment of Cost of New Facilities.* The total cost of the new facilities (including, but not limited to, any related costs that may be incurred in rearranging existing facilities) required for any Expansion shall be initially paid by the Parties acquiring increases in design capacity or terminal tankage capacity as a result of the Expansion. Such total cost shall be distributed among said Parties pro rata in accordance with the distribution of the increase in design capacity or terminal tankage capacity among them.

(b) *Redistribution of Expansion and Pre-Expansion Costs.* Effective as of the Date of Completion of an Expansion, said total cost of the new facilities (including but not limited to any related costs that may be incurred in rearranging existing facilities) other than terminal tankage shall be redistributed among all Parties in accordance with the Percentages of Ownership as they appear in Table I of Section 3.1 after the adjustment pursuant to Subsection (g) of Section 6.3. Simultaneously, the cost of all pre-expansion facilities shall be similarly redistributed, and a

10

77

settlement among all the Parties with respect to all facilities shall be made. Said cost of all pre-expansion facilities to be redistributed shall be determined from the accounts of the Parties (maintained by the Contractor in accordance with the I.C.C. Uniform System of Accounts) on the basis of (i) the accumulated investment in "carrier property" under the I.C.C. Uniform System of Accounts less retirements, and before provisions for depreciation and amortization and (ii) other costs and expenses paid or incurred, incident to the planning, development, design and construction of TAPS by all Parties as provided in the next succeeding paragraph of this Subsection (b). There shall be included in investment in "carrier property" for the purpose of the above redistributions, as interest during construction for each month preceding the commencement of construction of the Initial Design Capacity and during the period of construction of the Initial Design Capacity and each Expansion interest on the accumulated balance (exclusive of interest included therein pursuant to this sentence) of investment in the "carrier property" under construction as of the end of the preceding month, calculated at an annual rate equivalent to 125% of the best rate of interest of the First National City Bank of New York, New York on ninety-day loans to substantial and responsible commercial borrowers as such rate shall change from time to time during the construction period, each such change to become effective on the date of announcement of such change by the Bank.

Each Party shall, within six months after the Date of this Agreement, submit to the Construction Committee an accounting setting forth the amount of all of the above described other costs and expenses paid or incurred by it to the Date of this Agreement for which it has not been reimbursed. All such costs and expenses which have previously been approved pursuant to prior agreements of the Parties or which the Construction Committee may approve shall be included in the accounts maintained by the Contractor. As of the time any redistribution of costs is made pursuant to this Section 6.4, the term "cost of all pre-expansion facilities" means (i) the cost of all facilities which are a part of the Initial Design Capacity, plus (ii) the cost of the First Expansion in the case of the Second Expansion.

(c) *Redistribution of Terminal Tankage Costs.* Effective as of the Date of Completion of an Expansion, the cost of all terminal tankage, including interest during construction calculated as provided in Subsection (b) of this Section 6.4, shall be redistributed so that each Party pays the portion of the total cost of all terminal tankage capacity equivalent to its then undivided interest in the total terminal tankage set forth in Table IA in Section 3.2.

(d) *Payment.* Except as otherwise provided in Section 6.6, the amounts due upon any redistribution shall be payable within thirty (30) days after the date the Contractor shall notify the Parties of such amounts and shall bear interest from the Date of Completion of the Expansion until the day payment is made at a rate equal to 125% of the best rate of interest of the First National City Bank of New York, New York, on ninety-day loans to substantial and responsible commercial borrowers as such rate shall change from time to time, each such change to become effective on the date of announcement of such change of said Bank; provided that if such rate of interest shall be unlawful under applicable law, then it shall be reduced to the highest lawful rate.

6.5 **Review and Adjustment.** (a) *Review and Adjustment.* Except as provided in Subsection (f) of Section 6.6, the design capacities then appearing in Column (3) of Table I in Section 3.1 will be reviewed within six (6) months after the construction of any Expansion has been completed and, if necessary, adjusted by the Construction Committee to reflect experience with operations of TAPS as then expanded. Such tabulations will be revised and a formal amendment hereto will be prepared by the Construction Committee and executed by the Parties hereto to reflect changes, if any, which shall be effective as of the Date of Completion of the Expansion to which such changes relate. If such adjustment is necessary, then Columns (2) and (3) of Table I in Section 3.1 and Column (3) of Table II in Subsection (a) of Section 6.2 shall be revised so that the Percentages of Ownership and Remaining Expansion Capacity available to each Party are adjusted to reflect the revision of the

11

design capacity of TAPS, as then expanded. At such time, there shall be a further review of the redistribution made pursuant to Section 6.4 and a further redistribution shall be made, if necessary, to put the Parties in the position they would have been in had the formal amendment executed pursuant to this Section 6.5 been executed prior to the time the redistribution pursuant to Section 6.4 was made. Any further redistribution payments shall be made and shall bear interest as provided in the provision of this Article VI governing the Expansion to which such further redistribution relates.

(b) *Protection of Design Capacity.* In the event a reduction in design capacity is required pursuant to Subsection (a), no Party shall be deprived of any design capacity owned by it prior to the initiation of the Expansion. Any reduction shall be borne solely by the Parties participating in the Expansion in the same proportions that they acquired design capacity in the Expansion.

6.6 **Expansion Prior to Date of Commissioning.** Subject to the terms and conditions hereinafter provided, any Party may propose that the First Expansion be initiated prior to the Date of Commissioning of the Initial Design Capacity. If the First Expansion is so initiated, then the post expansion Percentage of Ownership ("Post Expansion Percentage") shall be computed for each Party, which shall be the percentage which the sum of the design capacity set forth next to such Party's name in Column (3) of Table I in Section 3.1 and the design capacity which it has agreed to acquire in the First Expansion is of the sum of the Initial Design Capacity and the First Expansion Capacity.

Any Party whose Post Expansion Percentage exceeds its Initial Percentage is hereinafter referred to as an "Increasing Party" and the amount by which its Post Expansion Percentage exceeds its Initial Percentage is herein referred to as its "Allocation Factor". If there is more than one Increasing Party, the ratio of each Increasing Party's Allocation Factor to the sum of all Increasing Parties' Allocation Factors is herein called its "Allocation Ratio".

(a) *Election by Certain Parties.* Any Party whose Initial Percentage exceeds its Post Expansion Percentage shall elect either:

(i) to reduce its Initial Percentage in the System to its Post Expansion Percentage. (This election is herein referred to as a "Settlement" and a Party electing Settlement is a "Reducing Party"); or

(ii) to retain an option to purchase an amount of First Expansion Capacity equal to the difference between the design capacity, if any, it initially agrees to acquire in the First Expansion and an amount of design capacity not to exceed to its Initial Percentage of First Expansion Capacity, which option may be exercised in whole or in part at any time, but only once, on or prior to the Thirtieth (30th) day after the Date of Completion of the Expansion. (This election is herein referred to as "Completion Option" and any Party electing the Completion Option is herein referred to as an "Option Party".)

Each Party not electing to acquire at least its Initial Percentage of the First Expansion Capacity shall specify in its notice pursuant to Subsection (a) of Section 6.3 which of the above options it shall elect and failure to so specify shall be deemed an election of Settlement.

(b) *Settlement.* The Percentage of Ownership and the design capacity of each Reducing Party shall be reduced to its Post Expansion Percentage of the Initial Design Capacity in Columns (2) and (3) of Table I in Section 3.1. The Percentage of Ownership and design capacity of each Reducing Party in excess of its Post Expansion Percentage shall be acquired by the Increasing Parties in the proportions determined by their respective Allocation Ratios. A formal amendment of this Agreement shall be executed by the Parties to reflect the foregoing revisions in Columns (2) and (3) of Table I in Section 3.1 effective as of the date the Expansion is initiated. Each Reducing Party shall be paid an amount determined by multiplying the total amount of costs which would be includable in a redistribution pursuant to Subsection (b) of Section 6.4, as then appears in the account of the Reducing Party maintained by the Contractor on the date the Expansion is initiated, by a fraction, the numerator of which shall be the Reducing Party's Initial Percentage minus its Post Expansion

12

79

Percentage and the denominator of which shall be its Initial Percentage. This amount shall be paid by the Increasing Parties in the proportions determined by their respective Allocation Ratios, and such amounts shall be payable within the time period specified in and shall bear interest from the effective date of a redistribution until the day payment is made at the rate specified in Subsection (d) of Section 6.4.

(c) *Remaining Expansion Capacity.* Table II in Subsection (a) of Section 6.2 shall be revised by a formal amendment hereto by adding a Column (3A) in which each Party will be credited with Remaining Expansion Capacity in the Second Expansion equal to its Percentage of Ownership, after any adjustment pursuant to Subsection (b). No Party shall be deemed to have Excess Capacity pursuant to Subsection (b) of Section 6.2 after the First Expansion is initiated pursuant to this Section 6.6.

(d) *Payment of Costs.* The Parties will execute a formal amendment of the Contract to provide that all costs, other than costs for which settlement has been provided for in Subsection (b), charged or to be charged to the undivided interest accounts of the Parties by the Contractor shall be charged as follows:

(i) Costs incurred or to be incurred to complete the Initial Design Capacity shall be charged to the Parties in proportion to their Percentages of Ownership, after the amendment provided in Subsection (b) of this Section 6.6, and

(ii) The costs of the First Expansion shall be charged to the accounts of the Parties in proportion to their Post Expansion Percentages.

(e) *Exercise of Completion Option.* Any Option Party may exercise its Completion Option by notice in writing to each Increasing Party which notice shall specify:

(i) the amount of design capacity which such Option Party is electing to acquire; or

(ii) that it is electing not to acquire any design capacity pursuant to the Completion Option.

Any party failing to exercise its Completion Option on or prior to the expiration date specified in Subsection (a)(ii) of this Section 6.6 shall be deemed to have elected not to acquire any additional design capacity pursuant to its Completion Option. Any design capacity acquired by any Party exercising its Completion Option shall be acquired from all Increasing Parties in the proportions determined by their respective Allocation Ratios.

Each Option Party exercising its Completion Option prior to the Date of Completion of the First Expansion shall be deemed to be the Owner of such design capacity for purposes of utilizing such capacity as a common carrier from and after the Date of Completion. Any Option Party exercising its Completion Option after the Date of Completion shall become the Owner of any design capacity it elects to acquire upon the first day of the first calendar month which begins after the elapse of 30 days following the day the Completion Option is exercised. A formal amendment of this Agreement shall be executed by the Parties to reflect the foregoing changes in Percentages of Ownership and design capacities in Table I in Section 3.1 effective as of the Date of Completion of the Expansion. Effective as of the same date, a redistribution of costs determined as provided in and including interest during construction calculated as provided in Subsection (b) of Section 6.4 shall be made between the Parties retaining a Completion Option and all Increasing Parties. The amounts due upon distributions under Subsection 6.6(e) shall be payable within the time specified in and shall bear interest from the effective date of the redistribution until the day payment is made at the rate specified in Subsection (d) of Section 6.4; provided, however, that any Party obligated to make any such payment may elect to defer payment for a period of time, if any, of up to six (6) months after the date of the exercise of the Completion Option to which such payment relates.

(f) *Review of Capacity.* The Construction Committee shall review and adjust the design capacities appearing in Column (3) of Table I in Section 3.1 not earlier than nine (9) months and not later than nine (9) months and one (1) day after the Date of Completion of the First Expansion which review and adjustment, if any, will be in substitution for the reviews required pursuant to Sections 3.1

13

and 6.5. If an adjustment is required, each Party will be entitled to the Percentage of Ownership then appearing opposite its name in Column (2) of Table I in Section 3.1 of the revised capacity of the System, as then expanded; provided, however, that no Party shall obtain less capacity than the amount appearing in Column (3) of Table I in Section 3.1 after the adjustment, if any, pursuant to Subsection (b) of this Section 6.6. Any deficit in capacity causing the above proviso to be effective shall be borne by the Parties acquiring the Expansion Capacity in the proportion in which they have acquired such Expansion Capacity, determined after the exercise of the Completion Option. A formal amendment to this Agreement will be prepared by the Construction Committee and executed by the Parties hereto to reflect the revision of the design capacities.

(g) *Second Expansion.* Any Party may propose the Second Expansion at any time after the period for review and adjustment of design capacity required in Subsection (f) has elapsed. Any Party not agreeing to acquire its entire Remaining Expansion Capacity at the date the Second Expansion is initiated may elect to retain the right to acquire up to the amount of its Remaining Expansion Capacity (after the revision of Column (3A) in Table II has been made to reflect the acquisition of design capacity in the Second Expansion by all Parties participating therein) at any time during the two years following the Date of Completion of the Second Expansion. This right is hereafter referred to as the "Final Option". Any Party electing the Final Option shall so specify in its notification for the Second Expansion pursuant to the procedures provided in Subsection (a) of Section 6.3. The adjustment of Percentages of Ownership pursuant to Subsection (g) of Section 6.3, the redistribution of costs pursuant to Section 6.4, and the review and adjustment, if necessary, pursuant to Section 6.5 shall be made as specified in said Sections as if the Final Option did not exist, except that no Party electing the Final Option shall be entitled to a redistribution of costs until its Final Option has been exercised, has been waived or has expired. The Final Option shall be exercised or waived by notice in writing to each of the Parties whose amount of design capacity acquired in the Second Expansion exceeds its Remaining Expansion Capacity as provided in Subsection (c) of this Section 6.6. The amount of such excess is hereinafter referred to as Final Option Capacity ("Final Option Capacity") which shall be represented as a deficit in Column (3A) of Table II. Each Final Option notice shall specify:

(i) the amount of design capacity such Party is electing to acquire; or

(ii) that the exercising Party has elected to waive the right to acquire any design capacity pursuant to the Final Option.

Upon termination of the two year exercise period, any Party electing but not exercising the Final Option shall be deemed to have waived its right to acquire any additional design capacity.

Any design capacity acquired by any Party exercising its Final Option shall be obtained from all Parties then having Final Option Capacity in the proportions which each such Party's Final Option Capacity bears to the total Final Option Capacity of all Parties then having Final Option Capacity. Any Party exercising its Final Option shall become the Owner of any design capacity it elects to acquire as of the first day of the first calendar month which begins after the elapse of thirty (30) days following the day the Final Option is exercised. A formal amendment to reflect the changes in Percentages of Ownership and design capacities in Table I in Section 3.1 and changes in Remaining Expansion Capacities and Final Option Capacities in Column (3A) of Table II shall be executed by all Parties which shall be effective as of the date the Final Option is exercised or expires. Effective as of the same date, a redistribution of costs determined as provided in, and including interest during construction calculated as provided in, Subsection (b) of Section 6.4 shall be made between the Party exercising its Final Option and all Parties from which Final Option Capacity was so acquired, as if the Percentage of Ownership appearing opposite the names of the Parties in Column (2) of Table I, as amended pursuant to this Subsection, had been owned by them at the time of the redistribution upon completion of the Second Expansion. Payment of the amounts due upon distributions under this Subsection (g) of this Section 6.6 shall be payable within the time specified in and shall bear interest from the effective date of the redistribution until the day payment is made at the rate

14

specified in Subsection (d) of Section 6.4; provided that any Party obligated to make any such payment may elect to defer payment for a period of time of up to six months after the date of the exercise of the Final Option to which such payment relates.

6.7 **Additional Terminal Tankage.** (a) *Upon Expansion.* Within three (3) months after notice to the Parties that an Expansion has been initiated, each Party shall specify by notice to each other Party the terminal tankage capacity, if any, in addition to its capacity then set forth in Column (3) of Table IA, after any change therein pursuant to Section 3.2, which it desires to have constructed as a part of the Expansion subject to the tankage capacity ownership limitation set forth in Section 3.2. If additional capacity is nominated equal to not less than one-half (½) the capacity of a Five Hundred Ten Thousand (510,000) barrel capacity tank, additional terminal tankage capacity shall be constructed as a part of the Expansion equalling the aggregate amount, to the nearest whole Five Hundred Ten Thousand (510,000) barrel capacity tank, of additional terminal tankage capacity specified by all Parties nominating additional capacity. If pursuant to the foregoing more or less additional terminal tankage capacity is to be constructed than the capacity nominated in the aggregate by all of the Parties desiring additional tankage capacity, the additional terminal tankage capacity to be constructed shall be allocated among such Parties in the ratio that each such Party's additional tankage capacity nomination bears to the total additional tankage capacity nomination of all such Parties or as such Parties may agree.

(b) *At Election of Parties.* Subject to the tankage capacity ownership limitation set forth in Section 3.2, any Party or Parties may at any time cause to be constructed additional tankage capacity of not less than the capacity of one or more Five Hundred Ten Thousand (510,000) barrel capacity tanks by giving written notice to each other Party and the Contractor. Such notice shall constitute the undertaking of such Party or Parties to bear the cost of constructing such additional tankage capacity which the Contractor shall cause to be constructed for the account of such Party or Parties subject to the provisions of Subsection (d) of this Section 6.7.

(c) *Revision of Terminal Tankage Ownership.* In the event of any change in total tankage capacity as a result of the construction of additional tankage capacity pursuant to this Section 6.7, the Construction Committee shall, upon the completion of such additional tankage, cause to be prepared and circulated to the Parties hereto, and the Parties hereto shall execute, a formal amendment to this Agreement revising Columns (2) and (3) of Table IA in Section 3.2 crediting to each Party its revised ownership percentage of and revised quantity of tankage capacity.

(d) *Terminal Tankage Costs.* The cost of additional terminal tankage constructed as a part of any Expansion or constructed pursuant to the provisions of Subsection (b) of this Section 6.7 shall be borne during construction by the Parties participating in the construction of additional tankage in the proportion that each such Party's additional tankage capacity to be constructed bears to the total tankage capacity to be constructed for all such Parties. The cost of terminal tankage shall be redistributed upon the completion of each Expansion as provided in Subsection (c) of Section 6.4, and the cost of any additional tankage constructed at the election of one or more of the Parties shall be redistributed after completion as provided in Subsection (c) of Section 6.4 upon any subsequent redistribution of terminal tankage costs thereunder.

(e) *Options Not Applicable.* The Excess Capacity Option under Subsection (e) of Section 6.3, the Completion Option under Subsection (a) of Section 6.6, and the Final Option under Subsection (g) of Section 6.6 shall not include the right to acquire any terminal tankage capacity from any Party.

## ARTICLE VII

### Transfer of Interests in TAPS

7.1 **Definitions.** Wherever the following terms are used in this Article VII they shall have the meanings assigned to them in this Section 7.1.

15

82

(a) *"Affiliate"* of any corporation means (i) a company (herein sometimes called "Subsidiary") of which all of the outstanding capital stock is owned directly or indirectly by such corporation, (ii) a company (herein sometimes called "Parent Corporation") which owns directly or indirectly all of the outstanding capital stock of such corporation, (iii) a company of which all of the outstanding capital stock is owned directly or indirectly by a Parent Corporation of such corporation, or (iv) in the case of BP, any company of which all of the outstanding capital stock is owned directly or indirectly by The British Petroleum Company Limited and/or The Standard Oil Company (Ohio).

(b) *"Enabling Agreement"* means the agreement attached hereto as Exhibit C and any other similar agreement executed on behalf of persons hereafter becoming Parties to this Agreement.

(c) *"Enabling Party"* means any person executing an Enabling Agreement.

(d) *"Equity Security"* means any stock or similar security, certificate of interest or the participation in any profit sharing agreement, preorganization certificate or subscription, transferable share, voting trust certificate or certificate of deposit for an equity security, or certificate of interest in a business trust; or any bond or debenture or other security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right.

(e) *"New Corporation"* means any corporation of the types described in Subsections 7.3(d)(i) and (ii).

(f) *"OWNER"* means any Party to this Agreement owning an undivided interest in TAPS.

(g) *"Shareholder"* means any OWNER who transfers its undivided interest in TAPS to a New Corporation of the type described in Subsection 7.3(d)(i) and its successors and assigns.

(h) *"Throughput Agreement"* means any throughput agreement or other covenant or undertaking by any Affiliate of an OWNER or by any Shareholder or any Affiliate of a Shareholder or by any shareholder or any Affiliate of a shareholder of a New Corporation of the type described in Subsection 7.3(d)(ii) for the purpose of aiding the financing of an interest in the System, or any assignment thereof.

7.2  Preferential Right to Purchase.  Except as otherwise expressly provided in Sections 7.3 and 7.4:

(a) *Transfer of a Direct Interest in TAPS.*  An OWNER may sell, transfer or otherwise dispose of all or any part of its undivided interest in TAPS but only by a sale for cash and only after offering such interest to all other OWNERS who are hereby granted the preferential right to purchase such interest (but not a lesser or different interest) on the same terms offered by or to any bona fide, prospective purchaser, who is ready, willing and able to so purchase same. The OWNER desiring to sell shall promptly communicate in writing to the other OWNERS the offer made to or received by it from a purchaser ready, willing and able to purchase the same, together with the name and address of such purchaser, and the other OWNERS shall thereupon have the right for a period of forty-five (45) days after the giving of said notice to elect to purchase such interest upon the same terms, by giving written notice within such 45-day period to the OWNER desiring to sell the same. If none of the notified OWNERS so elect to purchase such interest within such 45-day period, the OWNER desiring to sell same shall have the right to complete said sale in accordance with said offer within sixty (60) days after the expiration of said 45-day period; provided, that, if the OWNER desiring to sell fails so to complete said sale within said period of sixty (60) days, the preferential purchase right of the other OWNERS under this Subsection (a) shall be considered as revived, and the OWNER who desired to sell shall not complete said sale unless and until said offer again has been presented to the other

OWNERS, as hereinabove provided, and the said other OWNERS again have failed to elect to purchase on the same terms and conditions of said offer. If more than one OWNER desires to join in the purchase of such interest then, unless otherwise agreed by the purchasing OWNERS, all such OWNERS shall purchase the same proportionately in the ratio that their Percentages of Ownership in TAPS prior to said purchase bear to each other.

(b) *Indirect Transfers of an Interest in TAPS.* The foregoing shall also apply to (i) any sale, transfer or other disposition of any Equity Security issued by an OWNER (other than a New Corporation and other than any OWNER which does not have an Enabling Party), in which event every other OWNER shall be entitled to exercise a preferential right to acquire the undivided interest in the System represented by such Equity Securities pursuant to Section 7.6; and (ii) any sale, transfer or other disposition of any Equity Security issued by a New Corporation, in which event (a) every OWNER (other than such New Corporation or any subsidiaries of such New Corporation) shall have the preferential right described in clause (i) above, and (b) every non-selling holder of Equity Securities issued by such New Corporation shall have a preferential right to purchase such Equity Securities pursuant to Section 7.5. The undivided interest in the System represented by the Equity Securities owned by any holder in a New Corporation (whether or not such New Corporation is an OWNER) shall be determined by multiplying the undivided interest in the System owned by such New Corporation and/or by all Subsidiaries of such New Corporation by the percentage of ownership of such holder of all Equity Securities issued by such New Corporation.

7.3 **Transfer not Subject to a Preferential Right to Purchase.** The following transactions shall not be subject to the preferential right to purchase granted in Section 7.2:

(a) *Merger, Consolidation or Reorganization.* Any merger, consolidation or reorganization between an OWNER or holder of Equity Securities issued by a New Corporation, or the Parent Corporation of either ("Merging Party"), and one or more of its Affiliates or third parties; provided that the preferential right shall apply to any merger, consolidation or reorganization with a third party if the Merging Party (either independently or together with any Affiliates who are also parties to such merger, consolidation or reorganization) does not have assets, other than its interest, directly or indirectly, in the assets of TAPS at least equal in value to such interest in the assets of TAPS.

(b) *Sale of Assets.* A sale, transfer, or other disposition by an OWNER or holder of Equity Securities issued by a New Corporation, or the Parent Corporation of either ("Selling Party"), of all or substantially all of its assets; provided that the preferential right shall apply if the Selling Party (either independently or together with any Affiliates who are also selling, transferring or otherwise disposing of all or substantially all of their assets to the same transferee or an Affiliate of the same transferee) does not have assets other than its interest, directly or indirectly in the assets of TAPS at least equal in value to such interest in the assets of TAPS.

(c) *Transfers to an Affiliate.*

(i) *Undivided Interest in TAPS.* The sale, transfer or other disposition to an Affiliate of all or any part of an OWNER's undivided interest in TAPS.

(ii) *Equity Securities.* The sale, transfer or other disposition of any Equity Security issued by an OWNER by or from a Shareholder or other holder of such Equity Security to an Affiliate or a trustee or trustees of a retirement plan of such Shareholder or of such other holder or of an Affiliate of such Shareholder or other holder (the ownership by such trustee or trustees not to exceed twenty percent (20%) of all Equity Securities issued by an OWNER).

(d) *Formation of a New Corporation.*

(i) *New Corporation as OWNER.* The transfer by two or more OWNERS of their entire respective undivided interests in TAPS to a New Corporation, all of the Equity

17

84

Securities of which are owned or will be owned after such transfer, by such transferors, their Affiliates and/or the trustee or trustees of such transferors or their Affiliates' retirement plan (the ownership by such trustee or trustees not to exceed twenty percent (20%) of the Equity Securities issued by such New Corporation); provided that the ownership in the aggregate of each class of Equity Securities of such New Corporation by each such transferor (and its Affiliate's and/or the trustee or trustees of its or its Affiliate's retirement plan) shall be proportionate to the undivided interest in the System transferred to such New Corporation by such transferor relative to the undivided interest in the System transferred to such New Corporation by the other transferors.

(ii) *New Corporation owns Equity Securities of OWNERS.* The transfer of the Equity Securities of two or more OWNERS by their Parent Corporations to a New Corporation, all of the Equity Securities of which are owned or will be owned after such transfer, by said Parent Corporations (and/or their Affiliates); provided that the ownership of the Equity Securities of such New Corporation by each Parent Corporation (and/or its Affiliates) shall be proportionate to the undivided interest in TAPS represented by the Equity Securities of the OWNER transferred to such New Corporation by such Parent Corporation relative to the undivided interest in TAPS represented by the Equity Securities of the other OWNERS transferred to such New Corporation by the other Parent Corporations.

(e) *Dissolution or Liquidation of a New Corporation.*

(i) *New Corporation is OWNER.* The transfer by a New Corporation of the type described in Subdivision 7.3(d)(i) to its Shareholders, in proportion to their respective Equity Security interests in such New Corporation, of the entire undivided interest in TAPS of such New Corporation in complete liquidation or dissolution thereof.

(ii) *New Corporation holds Equity Securities of OWNERS.* The transfer by a New Corporation of the type described in Subdivision 7.3(d)(ii) to its Shareholders in proportion to their Equity Security interests in such New Corporation, of all of the Equity Securities of OWNERS held by such New Corporation in complete liquidation or dissolution thereof.

(f) *Partial Distributions by New Corporations.*

(i) *New Corporation is OWNER.* The conveyance by a New Corporation of the type described in Subdivision 7.3(d)(i) to one or more of its Shareholders of the undivided interest in TAPS represented by the Equity Securities exchanged therefor or redeemed by such New Corporation; provided that the undivided interest in TAPS is acquired by the Shareholder for the purpose of sale if, after such conveyance, the Shareholder continues to own Equity Securities issued by such New Corporation.

(ii) *New Corporation holds Equity Securities of OWNERS.* The transfer by a New Corporation of the type described in Subdivision 7.3(d)(ii) to one or more of its Shareholders of the Equity Securities of an OWNER held by such New Corporation represented by the Equity Securities of the New Corporation exchanged therefor or redeemed by such New Corporation.

(g) *Increase or Reduction in the outstanding Equity Securities of New Corporation.* Except in connection with the exercise of an expansion right or preferential right by a New Corporation or one or more of its Subsidiaries, as provided in Section 7.4 hereafter, the increase or reduction by a New Corporation of its issued and outstanding Equity Securities in a manner which does not vary the proportionate interests of the Shareholders of such New Corporation of either type described in Subdivision 7.3(d) above.

7.4 **Expansions and Exercise of Preferential Rights by New Corporations.** In connection with the exercise of an expansion right or a preferential right by a New Corporation of either type described

18

85

in Subdivision 7.3(d) or one or more of its Subsidiaries, such New Corporation shall issue, repurchase or redeem its Equity Securities if necessary for the purpose of adjusting the ownership interest in such New Corporation, so that after such adjustment a Shareholder or other holder of Equity Securities in such New Corporation shall own Equity Securities in such New Corporation representing the undivided interest in TAPS that such Shareholder or other holder of Equity Securities would have owned if it had been the OWNER of its Initial Percentage of Ownership in TAPS as set forth in column (2) of Table I in Section 3.1 of this Agreement and had exercised (or failed to exercise) its preferential rights and expansion rights as an OWNER of such an undivided interest in TAPS. In making such adjustment it will not be necessary that the voting rights of a Shareholder or other holder of Equity Securities in such New Corporation be increased or decreased. The preferential right to purchase created in Section 7.2(b) shall not apply to any such issuance, repurchase or redemption of the Equity Securities of a New Corporation.

7.5  **Required Terms for Sale of any Equity Security.**  As an additional term of any sale, transfer or other disposition of any Equity Security to which a preferential right to purchase applies, the seller shall require the purchaser to assume, to the extent of the interest being acquired, the obligations and liabilities of the seller and/or its Affiliates under the terms and provisions of any Throughput Agreement theretofore executed by such seller and/or its Affiliates. If the purchaser has a Moody's Bond Rating of Aaa or better at the time of closing of such purchase (either independently, or with a guarantee by its Parent Corporation), then such assumption (together, if the Parent Corporation's guarantee is essential to such bond rating, with such further agreements of such Parent Corporation as will bind such Parent Corporation to cause and enable such purchaser to discharge the obligations and liabilities assumed) shall, if the Throughput Agreement so provides, release the seller and/or its Affiliates from such obligations and liabilities without the consent of any party to such Throughput Agreement. If the purchaser does not (either independently, or with a guarantee by its Parent Corporation) have a Moody's Bond Rating of Aaa or better at the time of closing of such purchase, then such assumption shall not release the seller and/or its Affiliates from such obligations and liabilities under any such Throughput Agreement without the consent of all parties to such Throughput Agreement and their successors and assigns and, in the absence of any such release, such purchaser shall agree to indemnify (together with such further agreements of the purchaser's Parent Corporation, if any, as will bind such Parent Corporation to cause and enable such purchaser to perform under such indemnity agreement) the seller and/or its Affiliates against any loss or liability occurring thereafter as a result of the purchaser's failure to discharge the obligations and liabilities assumed.

7.6  **Transfer Procedure Upon Exercise of Preferential Right Upon Sale of Equity Securities.**  Every OWNER exercising a preferential right to purchase an undivided interest in TAPS upon the sale, transfer or other disposition of Equity Securities shall, in addition to paying the offering price of the Equity Securities, assume that portion of the long-term indebtedness attributable, at the time of closing of such purchase, to the undivided interest in TAPS being acquired and, to the extent of the interest being acquired, the obligations and liabilities of the seller of such Equity Securities and/or its Affiliates under the terms and provisions of any Throughput Agreement theretofore executed by such seller and/or its Affiliates. If the exercising OWNER has a Moody's Bond Rating of Aaa or better at the time of closing of such purchase (either independently, or with a guarantee by its Parent Corporation), then the assumption by said OWNER (together, if the Parent Corporation's guarantee is essential to such bond rating, with such further agreements of such Parent Corporation as will bind such Parent Corporation to cause and enable such OWNER to discharge the obligations and liabilities assumed) shall, if the terms of such long-term indebtedness and the Throughput Agreement so provide respectively, release the obligor of such long-term indebtedness and the seller and/or its Affiliates under said Throughput Agreement without the consent of any holder of such indebtedness or any party to said Throughput Agreement. If the exercising OWNER does not (either independently, or with a guarantee of its Parent Corporation) have a Moody's Bond Rating of Aaa or better at the time of closing of such purchase, then such assumption shall not release the obligor of such long-term

19

indebtedness or the seller and/or its Affiliates from such obligations and liabilities under any such Throughput Agreement without the respective consents of the holders of such indebtedness and the parties to such Throughput Agreement and their successors and assigns and, in the absence of any such release, such OWNER shall agree to indemnify (together with such further agreements of the OWNER's Parent Corporation, if any, as will bind such Parent Corporation to cause and enable such OWNER to perform under such indemnity agreement) the obligor of such long-term indebtedness and the seller and/or its Affiliates which are parties to such Throughput Agreement against any loss or liability occurring thereafter as a result of the OWNER's failure to pay the long-term indebtedness or to discharge the obligations and liabilities assumed. If the long-term indebtedness can be prepaid, then the exercising OWNER may elect to prepay such indebtedness, in which event such OWNER will not be required to assume such long-term indebtedness or any obligation under a Throughput Agreement.

The seller may elect to (a) make arrangements so as to be able to convey, and to convey, directly to such OWNER an undivided interest in TAPS, or (b) cause and enable such undivided interest to be conveyed to such OWNER, or (c) transfer the appropriate number of Equity Securities to such OWNER, whereupon such OWNER shall immediately exchange such Equity Securities for such undivided interest; provided such seller shall be responsible for and shall indemnify such OWNER against any federal or state income tax liability directly resulting from such transfer or exchange in excess of any such tax liability upon such OWNER which would have been incurred as a result of transfers under (a) and (b) above.

7.7 **Terms for Financing Arrangements.** Each OWNER, for itself and its respective successors and assigns, agrees that it shall:

(a) Make reasonable efforts to exclude from any agreement provisions which would prohibit the transfer of Equity Securities or an undivided interest in the System in the manner provided herein to an OWNER exercising its preferential rights hereunder.

(b) Include in any long-term indebtedness, the proceeds of which are to be used for the purpose of financing an OWNER's undivided interest in TAPS, and in any associated Throughput Agreement terms and provisions authorizing any purchaser having a Moody's Bond Rating of Aaa or better at the time of closing of such purchase (either independently, or with a guarantee by its Parent Corporation)

(i) to assume such long-term indebtedness and thereby release the obligor without the consent of any holder of such indebtedness,

(ii) to assume the obligations and liabilities under any associated Throughput Agreement and thereby release the seller and/or its Affiliates from such obligations and liabilities in such Throughput Agreement without the consent of any party to such Throughput Agreement; and

(c) Make reasonable efforts to include as a term of all long-term indebtedness, the proceeds of which are to be used for the purpose of financing an OWNER's undivided interest in TAPS, a provision permitting such indebtedness to be payable at any time without any additional cost, penalty or other expense by an OWNER exercising a preferential right pursuant to Section 7.6.

7.8 **Successors and Assigns.** In the event that any OWNER hereafter causes all or any part of its undivided interest in TAPS to be transferred to an Affiliate or all of its undivided interest in TAPS to be transferred to a New Corporation or the Equity Securities of OWNERS are transferred by their Parent Corporations to a New Corporation, then the transferor shall execute an Enabling Agreement with respect to such Affiliate or New Corporation; provided, that any such transferor's obligations under the Enabling Agreement as to a New Corporation shall be in the proportion that its Equity Security ownership in such New Corporation bears to the total Equity Security ownership in such New Corporation.

20

87

Any transfer of an undivided interest in TAPS shall be subject to this Agreement and shall require the transferee to assume all of the obligations of an "OWNER" and a Party under this Agreement and all commitments made pursuant hereto and its proportionate part of all costs and expenses of TAPS. Any such transferee shall be deemed to be an OWNER and a Party under this Agreement upon (i) the execution by such transferee of a Ratification Agreement confirming and adopting this Agreement and (ii) the execution of an Enabling Agreement by a Parent Corporation, if any, of such transferee.

## ARTICLE VIII

### TERM OF AGREEMENT

8.1 **Initial Term.** This Agreement shall be in effect from the Date of this Agreement and until the expiration of thirty (30) years from the Date of Commissioning, with successive five (5) year renewal terms thereafter so long as at least two Parties hereto desire to continue operations hereunder. Such initial thirty (30) year term and any such successive five (5) year renewal term are each hereinafter sometimes referred to as an "Agreement Term." If, at the end of any Agreement Term, less than two Parties desire to continue operations hereunder, this Agreement shall terminate.

8.2 **Discontinuance of Operations by One or More Parties.** If at the expiration of any Agreement Term, any one or more of the Parties hereto desire to discontinue operations hereunder and any two Parties hereto desire to continue operations hereunder, then the following shall apply:

(a) *Definitions and General Provisions.* As used in this Section 8.2, the following terms shall have the respective meanings indicated:

(i) *"Term Notice"* means a written notice stating whether or not the Party giving same desires to continue or discontinue operations hereunder for the next succeeding Agreement Term,

(ii) *"Positive Term Notice"* means a written notice that the Party giving same desires to continue operations hereunder for the next succeeding Agreement Term, and

(iii) *"Negative Term Notice"* means a written notice that the Party giving same does not desire to continue operations hereunder for the next succeeding Agreement Term.

All Term Notices (whether positive or negative) given pursuant to this Section 8.2 shall be given to Operator and to all the other Parties hereto. If any Party who is required by the provisions of this Section 8.2 to give a Term Notice fails to give same within the applicable time limit herein provided for, then as of the end of the last day upon which such Party could have given such Term Notice in compliance with this Section 8.2, such Party shall be deemed for all purposes under this Section to have given a Positive Term Notice.

(b) *Notice of Parties' Desires.* Prior to the expiration of each Agreement Term, the Parties hereto shall give Term Notices in accordance with the following:

(i) *First Term Notice.* Not less than ninety (90) days prior to the expiration of each such Agreement Term, each Party hereto shall give a Term Notice. If such notice is a Negative Term Notice, it shall be final and may not be changed or revoked without the written consent of all Parties hereto.

(ii) *Second Term Notice.* If one or more Parties hereto so give a Negative Term Notice pursuant to Subdivision (i) next above, then not less than eighty (80) days prior to the expiration of the then current Agreement Term, Operator shall give written notice of such fact to the Party or Parties hereto who have given a Positive Term Notice, specifying the Party or Parties who have given a Negative Term Notice. In such event, then not less than seventy (70) days prior to the expiration of the then current Agreement Term, each Party

21

88

who has previously given a Positive Term Notice may reconsider whether or not it desires to continue operations hereunder for the next succeeding Agreement Term, and shall give to Operator another Term Notice (which may be either positive or negative, at such Party's option), and any Negative Term Notice so given by any such party shall be final and shall supersede and replace the Positive Term Notice previously given by such Party.

(c) *Readjustments.* If, as of sixty (60) days prior to the expiration of the then current Agreement Term, at least two of the Parties hereto have given Positive Term Notices which have not been replaced or superseded by Negative Term Notices pursuant to subdivision (b) of this Section 8.2, this Agreement shall continue in effect for the next succeeding Agreement Term. Upon the completion of all transfers of undivided interest in TAPS, the Parties desiring to continue operations hereunder shall formally amend Table I in Section 3.1 of this Agreement to reflect the Percentages of Ownership in TAPS each has acquired from the Party or Parties desiring to discontinue operations.

(d) *Rights of Parties — Determination of Salvage Value.* The Parties desiring to continue operations hereunder may do so following the applicable Agreement Term, but the Party or Parties who have elected not to continue operations hereunder shall not be charged with any part of the expenses, costs and liabilities thereafter incurred in the operation, maintenance and repair of TAPS except as provided in subsection (f) hereof, and such Party or Parties discontinuing operations hereunder shall not be entitled to accept any further tenders for shipment. All Parties owning an interest in TAPS shall endeavor mutually to agree within sixty (60) days after termination of the applicable Agreement Term, upon the reasonable net salvage value of the TAPS properties, including transferable interests in land, material, equipment and all other items of value (herein called "Net Salvage Value"), and if such Parties are unable to mutually agree upon such salvage value within the time fixed, then the matter shall be submitted to arbitration, using the procedure set forth in Section 11.1 hereof.

(e) *Conveyance to Parties Desiring to Continue Operations.* Upon establishing the Net Salvage Value as above provided, the Parties desiring to continue operations shall pay to the Party or Parties desiring to discontinue operations its or their proper proportion of such Net Salvage Value (such proper proportion being determined as to each Party desiring to discontinue operations hereunder by multiplying such Party's Percentage of Ownership times the Net Salvage Value) and upon receipt of such payment, such Party or Parties shall convey to the purchasing Parties all of its or their interest in TAPS and all rights in connection therewith. Such conveyance shall contain a special warranty of title, shall be made subject to this Agreement and shall require the transferees to assume the obligations accruing under this Agreement subsequent to the last day of the Agreement Term during which such Party or Parties made the election to discontinue operations hereunder as to the interest covered thereby, each transferee severally assuming such obligations insofar as they relate to the interest acquired by it. Unless otherwise agreed between them at the time, it is understood that, as between the Parties desiring to continue operation of TAPS hereunder, they shall purchase and own the interest of the Party or Parties desiring to discontinue such operation in the ratio that each purchasing Party's Percentage of Ownership in TAPS prior to the purchase bears to the total of all of the purchasing Parties' Percentages of Ownership in the System prior to such purchase.

(f) *Sale in Lieu of Acceptance of Net Salvage Value.* Any Party desiring to discontinue operations may, in lieu of accepting payment on the basis of Net Salvage Value as provided above, reserve the right for a period of six months after the expiration of the Agreement Term in which it elected to discontinue operations to negotiate for a sale of its entire interest in TAPS (subject to the option of the Parties desiring to continue operations to purchase same in accordance with Section 7.2) by so specifying in writing (i) at the time of giving its Negative Term Notice as before provided, or (ii) by notice to the Operator and all Parties hereto within ten days (10) after the Net Salvage Value is determined. If thereafter such Party is not successful

22

in effecting a sale within the six months before described, such Party shall then be obligated to accept payment for its interest in TAPS upon the basis of Net Salvage Value as before provided, less the portion of maintenance, repair and replacement expenses corresponding to such Party's Percentage of Ownership in TAPS incurred between the date of expiration of the applicable Agreement Term and the end of the six months or the earlier date when decision may be made to accept payment on the basis of Net Salvage Value; and such Party shall then be further obligated to convey its interest in TAPS to the Parties desiring to continue operations hereunder, as before provided. If such Party is successful in effecting a sale, then upon the effective date thereof the purchaser shall become entitled to utilize the capacity in TAPS representing the interest purchased, shall pay the portion of capital expenditures and maintenance, repair and replacement expenses incurred between the date of expiration of the applicable Agreement Term and the effective date of purchase corresponding to the interest acquired, and shall become obligated as of such effective date to pay the portion of all expenses, costs and liabilities thereafter incurred in operating, maintaining, repairing, and providing replacements and additions to TAPS corresponding to the interest acquired, and shall be bound to all the obligations and shall have all the rights under this Agreement of the Party from whom the interest was purchased.

8.3 **Disposition of Properties Upon Termination of Agreement.** Upon termination of this Agreement, TAPS shall be either continued in operation by the Parties under a new agreement, sold in place for continued operation or salvage by others, or salvaged by the Parties as they may agree unanimously. If they cannot so agree, TAPS shall be purged of all petroleum with each Party accepting its portion of the line fill, tank working stocks and tank bottoms, and all TAPS properties (including transferable interests in land, materials, equipment and all other items of value) shall be salvaged as necessary and divided between the Parties in accordance with their respective Percentages of Ownership, or shall be sold at public or private sale, as the Parties may agree, with proper division between the Parties of the proceeds of such sale. Each Party shall bear that share of the cost of salvaging and disposing of material and cleaning up the premises which is equal to its Percentage of Ownership. Any agreement to sell the facilities in place, as provided heretofore, shall include and be subject to a preferential option for each Party to purchase the properties by meeting the highest price offered therefor, and if more than one Party chooses to exercise such option, each shall be entitled to do so in the proportion that its Percentage of Ownership in TAPS bears to the total Percentages of Ownership in TAPS of all those desiring to exercise the option. Also if salvage and disposition of the properties between the Parties, as provided heretofore, is necessary because of inability of the Parties to agree unanimously upon any other course of action, each Party shall have a preferential option, before any salvage is begun, to purchase the properties at the salable value of the transferable interests in land plus the net salvage value of the material, equipment and other items of value (herein called "Salable Value"), such Salable Value to be determined by agreement of the Parties or by arbitration, using the procedure set forth in Section 11.1 hereof; and if more than one Party chooses to exercise such option, each shall be entitled to do so in the proportion that its respective Percentage of Ownership bears to the total Percentages of Ownership of all Parties desiring to exercise the option.

## ARTICLE IX

### FEDERAL INCOME TAX ELECTION

9.1 **Election to be Excluded from Partnership Regulations.** Each Party hereto hereby elects that it and the operations covered by this Agreement be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of such Code and the regulations promulgated thereunder or similar laws and regulations hereinafter enacted or promulgated. The Parties hereby agree to execute such evidence of the election as may be required by regulations issued under said Subchapter K. Should the regulations require each Party to execute additional evidences, each Party agrees to execute or join in the execution

23

90

thereof. The election hereby made and the other provisions of this Section shall apply in like manner to applicable state laws, regulations, and rulings now in effect or hereafter enacted that have an effect similar to the federal provisions referred to herein. In making the election, each of the Parties represents that the income derived by such Party from the operations under this Agreement can be adequately determined without the computation of partnership taxable income.

## ARTICLE X

### PAYMENT OF COSTS AND EXPENSES

10.1 **Payment of Costs and Expenses.** The Parties hereto agree that all costs and expenses incurred in the construction of TAPS, including costs and expenses as incurred prior to the Date of this Agreement (except any interest and other expenses related to the assignment of interests in TAPS between the Parties) which would have been properly chargeable to the Parties if incurred by the Contractor under the Contract, shall be paid by the Parties with each Party hereby agreeing to pay the portion of all such costs and expenses equal to its Initial Percentage. Each Party hereby agrees that it shall pay or provide for the payment of all costs and expenses properly chargeable to it under and in accordance with the Contract and the Operating Agreement and under this Agreement.

## ARTICLE XI

### ARBITRATION

11.1 **Arbitration Procedure.** The procedure set forth in this Section 11.1 shall apply whenever a determination of any of the following two matters is to be made by arbitration pursuant to the respective provisions of this Agreement shown below, in which event the Parties shall select two arbitrators in accordance with "(a)" or "(b)" below, whichever is applicable:

(a) A determination of Net Salvage Value pursuant to Subsection (d) of Section 8.2, in which event within ten (10) days after it has been determined that the Parties cannot mutually agree upon the Net Salvage Value, the Party or Parties desiring to discontinue operations shall select one arbitrator and the Parties desiring to continue operations hereunder shall select another arbitrator;

(b) A determination of Salable Value pursuant to Section 8.3, in which event within ten (10) days after it has been determined that the Parties cannot mutually agree upon the Salable Value, the Party or Parties desiring to exercise the option provided for in said Section 8.3 shall select one arbitrator, and the other Party or Parties hereto shall select another arbitrator.

The two arbitrators thus selected in accordance with subsections (a) or (b) hereof, as the case may be, shall select a third arbitrator. If any such group shall fail to choose an arbitrator within the time required heretofore or if the arbitrators chosen cannot agree upon the choice of a third arbitrator within thirty (30) days after the last one is named, then such arbitrator or arbitrators shall be appointed by the person who is then the Chief Judge of the United States District Court for the Southern District of Texas. It shall be the duty of the arbitrators promptly to arrive at a decision as to Net Salvage Value or Salable Value, as the case may be, and the decision of any two of said arbitrators in writing shall be binding upon all Parties hereto. The cost of the arbitration shall be borne by all the Parties according to their Percentages of Ownership in TAPS. A majority of the arbitrators may determine the place or places at which will be held any hearing in connection with the arbitration. Each Party hereto shall be given reasonable advance notice of the time and place of any such hearing. Each side shall have the right to be heard and to be represented by counsel at any such hearing, and it shall not be necessary to observe the rules of evidence which are applicable to an action in a court at law.

24

91

## ARTICLE XII

### TECHNICAL INFORMATON, INVENTIONS AND PATENTS

12.1 **Technical Information.** Each Party shall have access to all technical information received by the Contractor, or resulting from, or utilized in the design, construction or operation of the System ("Technical Information").

(a) Each Party shall own an undivided interest equivalent to its Percentage of Ownership in the System in all Technical Information, the cost of which is includable for the purposes of a redistribution pursuant to Subsection (b) of Section 6.4, and shall have the right to use and dispose of said Technical Information in any manner it, in its sole discretion, deems appropriate.

(b) With regard to all other Technical Information (i.e. Technical Information not within the scope of Subsection (a) of this Section 12.1), each Party shall have:

(1) the right to use said other Technical Information in its operations;

(2) the right to disclose said other Technical Information to its Associated Companies for use by them in their operations; and,

(3) the right to disclose said other Technical Information to third parties who are participants in a joint operation with such Party or its Associated Companies for use in such operation;

provided, however, that as to any such other Technical Information as is the proprietary Technical Information of one of said Parties and/or its Associated Companies and is clearly designated as proprietary, the other Parties each agree:

(i) to exercise the same degree of care in maintaining said proprietary Technical Information confidential as it exercises with regard to its own proprietary technical information;

(ii) to disclose said proprietary Technical Information referred to in this proviso only to those of its Associated Companies which are obligated to exercise the aforesaid degree of care; and,

(iii) to disclose said proprietary Technical Information referred to in this proviso only to third parties who are participants in a joint operation with said Party or its Associated Companies and who are obligated to exercise the aforesaid degree of care.

Nothing in this Section 12.1 shall grant or convey or be deemed to grant or convey any right whatsoever under any patent.

12.2 **Patent Infringement.** With reference to, but only with reference to, operations conducted pursuant to this Agreement, each Party agrees to hold each other Party free and harmless from any and all claims of patent infringement which are based on any patents owned or controlled by it or any of its Associated Companies and which are based upon inventions made prior to or during the period that it is a Party to this agreement.

12.3 **Inventions by Third Parties.** Each Party agrees that any patent or patent application covering an invention or discovery which arises out of any separate research or development program carried out for the Parties by the Contractor or by a third party for the development of equipment, facilities, or techniques needed in the System shall belong jointly to the Parties and each of said Parties shall have an undivided interest in each such patent and patent application equivalent to each Party's Percentage of Ownership in the System. The ownership interests in patent rights acquired under this Section 12.3 by any Party which ceases to be a Party shall pass to such Party's transferee, as provided in Article VII of this Agreement; provided, however, that in assigning its ownership inter-

25

92

ests in such patents the Party may reserve for itself and its Associated Companies a royalty free license to use in its Own Operations (hereinafter defined) the inventions covered by such patent rights. The Parties agree that title to any such patent or patent application may be held in the name of one Party for the benefit of all Parties.

**12.4 Inventions by Parties.** The Parties agree that any patent or patent application covering an invention or discovery which arises out of any separate research or development program carried out by one of the Parties or one of its Associated Companies, the costs and expenses of which have been paid for by the Contractor as agent for all Parties, shall belong to said Party or said Associated Company but each of the other Parties shall have:

(a) A nonexclusive, worldwide, irrevocable, royalty-free, nontransferable right under said patents and patent applications to use the inventions or discoveries covered thereby in such of its Own Operations including oil production, pipeline, and related operations; and

(b) An irrevocable right to extend to its Associated Companies a nonexclusive, worldwide, irrevocable, royalty-free, nontransferable right under said patents and patent applications to use the inventions or discoveries covered thereby in such of its Own Operations, including oil production, pipeline, and related operations.

**12.5 Party Employees.** To facilitate the procurement of an experienced staff it is contemplated that employees of the Parties and of their respective Associated Companies ("Party Employee") will be assigned to work for Contractor pursuant to service contracts between the Party and the Contractor. Each Party hereto agrees on behalf of itself and its Associated Companies that any and all of its employees who become Party Employees will be released from such portion of such Party Employees obligation to assign inventions to such Party or Associated Company as may be required to enable such Party Employee to accept the obligation imposed by Contractor upon its employees with respect to inventions made by Contractor's employees relating to or useful in the System during their term of employment by Contractor.

**12.6 Loaned Employees.** In addition to the Party Employees referred to in Section 12.5, each Party may from time to time be requested by Contractor to assign or cause to be assigned one or more of its employees or employees of an Associated Company to assist the Contractor for a temporary period and such employee or employees may be of the type that are generally subject to the obligation to disclose to, and only to, their employer any improvements or inventions that they may make or conceive relating to, or useful in, the oil business, including pipeline operations, and to assign such improvements and inventions and any patent rights based thereon to said employer. If any such employee ("Loaned Employee") so assigned to temporarily assist the Contractor makes a project improvement which is hereby defined for the purpose of this Agreement as an improvement or invention, whether or not patentable, which is (i) conceived or made by such Loaned Employee during the time he is assigned to assist the Contractor and which (ii) relates to or is useful in the design, construction and operation of the System ("Project Improvement"), then such Project Improvement shall be disclosed to the Contractor so that such Project Improvement may be considered by the Contractor for application in said operations. Each Party hereby agrees as follows:

(a) That each Loaned Employee assigned by a Party or one of the Associated Companies to temporarily assist the Contractor will be instructed that he is to disclose to the Contractor any Project Improvement, notwithstanding any agreement that such employee has entered into with his employer;

(b) That in the event a disclosure of a Project Improvement is made to the Contractor by said Loaned Employee or in the event such Project Improvement is otherwise made available to the Contractor by said Loaned Employee, said Party agrees to grant and hereby grants or will cause its Associated Company assigning the Loaned Employee to grant to the Contractor and to each of the other Parties:

(1) a nonexclusive, worldwide, irrevocable, royalty-free, nontransferable right under patents and patent applications covering said Project Improvement to use said Project

28

Improvement in operations conducted under this Agreement and in its Own Operations, including oil production, pipeline, and related operations; and

(2) an irrevocable right to extend to their respective Associated Companies a non-exclusive, worldwide, irrevocable, royalty-free, nontransferable right under patents and patent applications covering said Project Improvement to use said Project Improvement in said Associated Companies' Own Operations, including oil production, pipeline, and related operations.

12.7 **Own Operations.** For the purpose of Sections 12.4 and 12.6 of this Article XII, the term "Own Operations" means:

(a) Operations wholly owned by a Party, or by one or more Associated Companies of a Party, or by a Party and one or more of its Associated Companies; and

(b) Operations in which a Party and/or an Associated Company owns less than the entire interest, irrespective of the magnitude of said interest and irrespective of whether said interest is in the form of a stock interest or in the form of a direct ownership of physical assets, but only to the extent of such Party's and/or Associated Company's interest.

12.8 **Term.** Parties agree that nothing in the Article XII shall be deemed to grant or convey any rights in any invention or discovery, whether or not patentable or patented, which is conceived more than two years after the Date of Completion of the Second Expansion or January 1, 1978, whichever is the earlier. The Parties further agree that nothing in this Article XII shall be deemed to grant or convey any right in Technical Information of any Party or its Associated Companies developed more than two years after the Date of Completion of the Second Expansion or January 1, 1978, whichever is earlier.

12.9 **Associated Companies.** An Associated Company of a Party means (a) any company of which at least 50% of the voting stock is owned directly or indirectly by the Party in question, (b) a company which owns directly or indirectly at least 50% of the voting stock of the Party in question, (c) a company of which at least 50% of the voting stock is owned directly or indirectly by any company which also owns directly or indirectly at least 50% of the voting stock of the Party in question and (d) in the case of BP, any company of which at least 50% of the voting stock is held directly or indirectly by The Standard Oil Company (Ohio) and/or The British Petroleum Company Limited.

## ARTICLE XIII

### Mineral Discoveries

13.1 **Mineral Discoveries.** Any information or data pertaining to the existence or discovery of minerals or other natural resources which is revealed, discovered or observed in the construction of the System, or arising in connection therewith, shall be deemed the common property of all Parties and held by each and every Party for the benefit of all Parties. Any mineral rights, mining claims and other similar rights in minerals or other natural resources excepting, however, rights in oil and gas located within five (5) miles from the perimeter of any area of construction of the System, acquired, directly or indirectly, as a result of information or data obtained as above provided, by any one or more of the Parties, within three (3) years from the completion of the construction of the Initial Design Capacity, or within three (3) years from termination of any governmental withdrawal of the affected land from mineral location or leasing, whichever is the later date, shall be held for the benefit of all of the Parties in their respective Percentages of Ownership; provided, however, that in no event shall such requirement apply to any acquisition made after ten (10) years from said completion of construction. Upon request, such rights or interests shall be transferred, in undivided interests, to all of the Parties in their respective Percentages of Ownership at the time of any such discovery as soon as practicable after the time of any such acquisition, subject to reimbursement to the acquiring Party of respective, proportionate shares of acquisition costs. All core samples, survey data and other mineral and natural resource information obtained by the Contractor shall, if requested by them, be made available to each of the Parties.

27

94

## ARTICLE XIV

### GENERAL PROVISIONS

14.1 **Notices.** Except as provided in Subsections (b) and (c) of Section 2.2, all notices provided for in this Agreement shall be given by letter or telegram addressed to Party or Parties as may be required for the particular notice, at its or their addresses stated below, or such other addresses as they may hereafter provide by letter or telegram addressed to each of the Parties:

| | |
|---|---|
| ATLANTIC | Atlantic Pipe Line Company<br>600 Fifth Avenue<br>New York, New York 10020 |
| BP (Duplicate Notice) | BP Pipe Line Corporation<br>Midland Building<br>Cleveland, Ohio 44115 |
| | BP Alaska Inc.<br>270 Park Avenue<br>New York, New York 10017 |
| HUMBLE | Humble Pipe Line Company<br>P.O. Box 2220<br>Houston, Texas 77001 |
| AMERADA HESS | Amerada Hess Corporation<br>One Hess Plaza<br>Woodbridge, New Jersey 07095 |
| HOME | Home Pipe Line Company<br>304 Sixth Avenue, S.W.<br>Calgary 1, Alberta, Canada |
| MOBIL | Mobil Pipe Line Company<br>P.O. Box 900<br>Dallas, Texas 75221 |
| PHILLIPS | Phillips Petroleum Company<br>Supply & Transportation Dept.<br>Bartlesville, Oklahoma 74003 |
| UNION | Union Oil Company of California<br>P.O. Box 7600<br>Los Angeles, California 90054 |

The depositing in the United States Mail of a letter properly addressed with proper postage affixed and the filing of a telegram with the telegraph office with all charges prepaid shall each be considered proper notice to the addressee of the contents of such letter or telegram.

14.2 **Laws and Regulations.** In the event any provision hereof shall be found to be violative of any order, rule, regulation, or law, such provision shall be deemed modified to the extent necessary to comply with such order, rule, regulation, or law, but only for the period of time such order, rule, regulation, or law is in effect.

14.3 **Warranties.** Each Party hereby represents and warrants to each other Party that it is a corporation duly organized and validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to enter into this Agreement; and that there is no action or proceeding pending or threatened, and no term or provision of any charter, by-law, mortgage, indenture, contract, judgment or decree which prevents or interferes with its entering into this Agreement or the validity of this Agreement.

28

95

14.4 **Law Governing.** All matters hereunder pertaining to rights and obligations under rights-of-way and other land permits shall be governed by the laws of the State of Alaska or the laws of the United States of America, as the case may be. All other matters pertaining to this Agreement and the rights and obligations of the Parties hereunder as between themselves shall be governed by and construed in accordance with the laws of the State of Texas.

14.5 **Entirety of Agreement.** This Agreement constitutes the entire agreement among the Parties as to ownership of TAPS; and no variation, modification or change herein shall be binding upon any of them unless effectuated by an instrument in writing properly executed by all Parties hereto.

14.6 **Captions or Headings.** The headings appearing at the beginning of each Section hereof and at the beginning of various of the Subsections and subdivisions hereof are all inserted and the "Table of Contents" and the "Index to Definitions" appearing at the beginning of this Agreement are both included solely for convenience and none of them shall be considered or given any effect in construing this Agreement or any provision or provisions hereof, whether for the purpose of determining the duties, obligations or liabilities of the Parties, or their intent as to any issue, matter or question which may arise.

14.7 **Effect of Prior Agreements.** This Agreement supersedes all prior agreements, understandings, and commitments whether oral or in writing (including but not limited to agreements dated October 28, 1968, February 7, 1969, and November 18, 1969 by and among some or all of the Parties hereto), between the Parties concerning the subject matter herein, and all of such prior agreements and understandings with respect to the subject matter herein are merged into this Agreement.

14.8 **Establishment of Date of Commissioning.** As used in this Agreement, the expression "Date of Commissioning" or any words of similar import, shall mean the date, after the completion of the Initial Design Capacity of TAPS, as described in Section 1.2 hereof (before Expansion), when custody of the first petroleum tendered for shipment through TAPS, after provision for line fill and tank bottoms, is actually accepted. Promptly after such event, all Parties shall execute a supplement hereto formally establishing and recording such date for all relevant purposes.

14.9 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN TESTIMONY WHEREOF, this Agreement is executed in several counterparts, each of which shall be considered an original, as of the Date of This Agreement.

ATLANTIC PIPE LINE COMPANY

By /s/ R. G. DULANEY
Vice President

BP PIPE LINE CORPORATION

By /s/ EARL W. UNRUH
President

HUMBLE PIPE LINE COMPANY

By /s/ CHARLES E. SHAVER
Director and General
Counsel

29

96

AMERADA HESS CORPORATION

By /s/ LEON HESS
*Chairman of the Board*


HOME PIPE LINE COMPANY

By /s/ R. B. COLEMAN
*Secretary*


MOBIL PIPE LINE COMPANY

By /s/ JAMES R. KINZER
*Attorney-in-Fact and*
*General Counsel*


PHILLIPS PETROLEUM COMPANY

By /s/ C. M. KITTRELL
*Vice President*


UNION OIL COMPANY OF CALIFORNIA

By /s/ JOHN M. HOPKINS
*Attorney-in-Fact*

30



TRANS ALASKA PIPELINE
SYSTEM ROUTE

○ STAGE ONE STATIONS
□ STAGE TWO STATIONS
△ STAGE THREE STATIONS
◉ TERMINAL

98

## CONSTRUCTION COMMITTEE

| Party | Member | Alternate |
|---|---|---|
| Atlantic Pipe Line Company ... | (1) Thornton F. Bradshaw<br>Atlantic Richfield Company<br>717 Fifth Avenue<br>New York, New York 10022<br>(212) 758-2345 | (1) Louis F. Davis<br>Atlantic Richfield Company<br>P. O. Box 2819<br>Dallas, Texas 75221<br>(214) 747-6484 |
| | (2) Louis M. Ream, Jr.<br>Atlantic Richfield Company<br>600 Fifth Avenue<br>New York, New York 10020<br>(212) 246-3600 | Richard G. Dulaney<br>Atlantic Richfield Company<br>600 Fifth Avenue<br>New York, New York 10020<br>(212) 246-3600 |
| BP Pipe Line Corporation ..... | (1) J. D. Harnett<br>BP Pipe Line Corporation<br>Midland Building<br>Cleveland, Ohio 44115<br>(216) 575-4224 | (1) E. W. Unruh<br>BP Pipe Line Corporation<br>Midland Building<br>Cleveland, Ohio 44115<br>(216) 575-5352 |
| | (2) R. W. Adam<br>BP Alaska Inc.<br>c/o BP North America Inc.<br>620 Fifth Avenue<br>New York, New York 10020<br>(212) 973-8714 | (2) F. K. Rickwood<br>BP Alaska Inc.<br>270 Park Avenue<br>New York, New York 10017<br>(212) 973-8612 |
| Humble Pipe Line Company .. | T. D. Barrow<br>Humble Oil & Refining<br>  Company<br>P. O. Box 2180<br>Houston, Texas 77001<br>(713) 221-4346 | R. H. Venn<br>Humble Oil & Refining<br>  Company<br>P. O. Box 2180<br>Houston, Texas 77001<br>(713) 221-6521 |
| Amerada Hess Corporation .... | B. T. Deverin<br>Amerada Hess Corporation<br>1 Hess Plaza<br>Woodbridge, New Jersey<br>  07095<br>(201) 636-3000 | N. K. Trynin<br>Amerada Hess Corporation<br>1 Hess Plaza<br>Woodbridge, New Jersey<br>  07095<br>(201) 636-3000 |
| Home Pipe Line Company ..... | Robert W. Campbell<br>Home Oil Company Limited<br>304 Sixth Avenue, S.W.<br>Calgary, 1, Alberta, Canada<br>(403) 266-7041 | Ian M. Drum<br>Home Oil Company Limited<br>304 Sixth Avenue, S.W.<br>Calgary, 1, Alberta, Canada<br>(403) 266-7041 |
| Mobil Pipe Line Company ..... | A. E. Murray<br>Vice President-Planning,<br>  Supply and Trans-<br>  portation<br>North American Division<br>Mobil Oil Corporation<br>150 East 42nd Street<br>New York, New York 10017<br>(212) 883-3951 | E. J. Wacker, Jr.<br>Vice President<br>Mobil Pipe Line Company<br>P. O. Box 900<br>Dallas, Texas 75221<br>(214) 742-4131 |

| Party | Member | Alternate |
|---|---|---|
| Phillips Petroleum Company ... | C. M. Kittrell<br>Supply and Transportation<br>Department<br><br>Phillips Petroleum Company<br>144 Phillips Building Annex<br>Bartlesville, Oklahoma<br>74004<br>(918) 336-6600, Ext. 7248 | D. B. Taylor<br>Supply and Transportation<br>Department<br><br>Phillips Petroleum Company<br>144 Phillips Building Annex<br>Bartlesville, Oklahoma<br>74004<br>(918) 336-6600, Ext. 7022 |
| Union Oil Company of California | John M. Hopkins<br>Union Oil Company of<br>California<br><br>Union Oil Center<br>Los Angeles, California<br>90017<br>(213) 482-7600 | Loren F. Grandey<br>Union Oil Company of<br>California<br><br>Union Oil Center<br>Los Angeles, California<br>90017<br>(213) 482-7600 |

EXHIBIT C

## ENABLING AGREEMENT

THIS AGREEMENT made as of the 27th day of August, 1970, by and among ATLANTIC RICHFIELD COMPANY, a Pennsylvania corporation, BP OIL CORPORATION, a Delaware corporation, HOME OIL COMPANY LIMITED, a Canadian corporation, HUMBLE OIL & REFINING COMPANY, a Delaware corporation, and MOBIL OIL CORPORATION, a New York corporation, (hereinafter sometimes collectively referred to as the "Enabling Parties" and sometimes individually referred to as "Enabling Party");

WHEREAS, ATLANTIC PIPE LINE COMPANY, a Pennsylvania corporation ("Atlantic"), BP PIPE LINE CORPORATION, a Delaware corporation ("BP"), HUMBLE PIPE LINE COMPANY, a Delaware corporation ("Humble"), HOME PIPE LINE COMPANY, a Delaware corporation ("Home"), AMERADA HESS CORPORATION, a Delaware corporation ("Amerada Hess"), MOBIL PIPE LINE COMPANY, a Delaware corporation ("Mobil"), PHILLIPS PETROLEUM COMPANY, a Delaware corporation ("Phillips"), and UNION OIL COMPANY OF CALIFORNIA, a California corporation ("Union"), have entered into the Trans Alaska Pipeline System Agreement dated as of August 27, 1970 ("TAPS Agreement") providing for the construction, ownership and operation of the pipeline system described therein.

Now, THEREFORE, in consideration of the premises and the mutual undertakings of the parties herein contained, the parties agree that:

1. Each Enabling Party does hereby agree to exercise its rights as the owner of an Equity Security in its Subsidiaries or a New Corporation in which it or any of its Subsidiaries owns an Equity Security so as to cause and enable, only to the extent of such Enabling Party's Equity Security interest, such Subsidiaries or New Corporation or Subsidiary of a New Corporation to perform such Subsidiaries' or New Corporation's or Subsidiary's of a New Corporation respective obligations under the TAPS Agreement as that Agreement may duly be amended from time to time. Each Enabling Party further agrees that its obligations under this Enabling Agreement shall continue and extend to any subsequent transferee of such Subsidiary or Subsidiaries or New Corporation which transferee is either a Subsidiary of such Enabling Party or is a New Corporation in which such Enabling Party or any of its Subsidiaries owns an Equity Security.

2. Each Enabling Party agrees that it will not sell, transfer or otherwise dispose of any Equity Securities issued by the Subsidiary or Subsidiaries or New Corporation with respect to which it executes this Enabling Agreement so as to violate or permit the violation of the preferential rights granted pursuant to Article VII of the TAPS Agreement.

3. This Enabling Agreement is executed solely for the benefit of such persons who are now or may hereafter be (i) an Owner, (ii) an Affiliate of an Owner, (iii) a New Corporation or a Shareholder or holder of Equity Securities of a New Corporation or, (iv) the trustee or trustees of a retirement plan of an Owner or its Affiliate; and no other party shall have any rights hereunder

4. All terms used in this Agreement shall have the same meaning as set out in the TAPS Agreement.

5. This Agreement may be executed in several original counterparts, any one or more of which may be signed by all the parties hereto or by one or more of such parties. All such counterparts shall constitute but one and the same Agreement, and the aggregate of such counterparts signed by one or more of the parties shall have the same force and effect as if all the parties to the aggregate counterparts had signed the same instrument.

1

In Witness Whereof, the parties have entered into this Enabling Agreement as of the day and year first above written.

(1) With respect to ATLANTIC PIPE LINE COMPANY, a Subsidiary of ATLANTIC RICHFIELD COMPANY:

ATLANTIC RICHFIELD COMPANY

By /s/ R. W. REED
Financial Vice President

(2) With respect to BP PIPE LINE CORPORATION, a Subsidiary of BP OIL CORPORATION:

BP OIL CORPORATION

By /s/ EARL W. UNRUH
Vice President

(3) With respect to HOME PIPE LINE COMPANY, a Subsidiary of HOME OIL COMPANY LIMITED:

HOME OIL COMPANY LIMITED

By /s/ R. B. COLEMAN
Vice President

(4) With respect to HUMBLE PIPE LINE COMPANY, a Subsidiary of HUMBLE OIL & REFINING COMPANY:

HUMBLE OIL & REFINING COMPANY

By /s/ T. D. BARROW
President

(5) With respect to MOBIL PIPE LINE COMPANY, a Subsidiary of MOBIL OIL CORPORATION:

MOBIL OIL CORPORATION

By /s/ R. F. TUCKER
Executive Vice President

2

102

## FIRST SUPPLEMENTAL AGREEMENT

THIS AGREEMENT supplements the Trans Alaska Pipeline System Agreement ("TAPS Agreement") dated as of August 27, 1970, by and among ATLANTIC PIPE LINE COMPANY, BP PIPE LINE CORPORATION, HUMBLE PIPE LINE COMPANY, AMERADA HESS CORPORATION, HOME PIPE LINE COMPANY, MOBIL PIPE LINE COMPANY, PHILLIPS PETROLEUM COMPANY, and UNION OIL COMPANY OF CALIFORNIA ("Owners").

Each of the Owners under the TAPS Agreement hereby agrees that:

(1) If two or more Owners ("Owner Partners") transfer any part of their respective undivided interests (including preferential and/or expansion rights) in the Trans Alaska Pipeline System ("TAPS") to a partnership ("Partnership"),

(2) If any transfer of an undivided interest in TAPS by a Partnership is to the Owner Partners in the proportions in which they transferred undivided interests in TAPS to the Partnership,

(3) If any such transfer is otherwise consistent with the provisions of Section 7.3 of the TAPS Agreement, and

(4) If the Partnership in formation, operation and termination is otherwise consistent with the provisions of the TAPS Agreement,

then such transfers and the formation, operation and termination of the Partnership shall not be deemed to breach the TAPS Agreement.

This agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Owners have entered into this Supplemental Agreement as of August 27, 1970.

ATLANTIC PIPE LINE COMPANY

By /s/ R. G. DULANEY
Vice President

BP PIPE LINE CORPORATION

By /s/ EARL W. UNRUH
President

HUMBLE PIPE LINE COMPANY

By /s/ CHARLES E. SHAVER
Director and General
Counsel

AMERADA HESS CORPORATION

By /s/ LEON HESS
Chairman of the Board

1

HOME PIPE LINE COMPANY

By /s/ R. B. COLEMAN
Secretary


MOBIL PIPE LINE COMPANY

By /s/ JAMES R. KINZER
Attorney-in-Fact and
General Counsel


PHILLIPS PETROLEUM COMPANY

By /s/ C. M. KITTRELL
Vice President


UNION OIL COMPANY OF CALIFORNIA

By /s/ JOHN M. HOPKINS
Attorney-in-Fact


2

104

## SECOND SUPPLEMENTAL AGREEMENT

Reference is made to the Trans Alaska Pipeline System Agreement, as amended and revised in its entirety as of August 27, 1970, ("TAPS Agreement") by and among the Undersigned relating to the construction, ownership and operation of a petroleum pipeline system from the North Slope to Valdez in the State of Alaska. The TAPS Agreement provides that the initial design capacity of this pipeline system will be approximately six hundred thousand (600,000) barrels per day ("Initial Design Capacity").

The undersigned recognize that the construction of this pipeline has been substantially delayed due to a number of causes not contemplated by the parties at the time it was initially agreed to construct the pipeline system and that the commencement of the actual construction continues to be delayed for a presently indeterminable period of time.

The undersigned hereby agree to meet as soon as practicable after the necessary permits have been issued which allow the immediate construction of the pipeline system for the purpose of reviewing the Initial Design Capacity of the proposed pipeline system in light of the then existing facts and circumstances, and, if the undersigned shall unanimously agree, to amend the TAPS Agreement and any other agreements or contracts necessary to accomplish the agreed changes in the Initial Design Capacity of the pipeline system.

The undersigned also hereby agree that they shall meet on invitation of any Owner as soon as practicable after completion of the Second Expansion for the purpose of discussing the desirability of looping the TAPS pipeline.

This agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

ATLANTIC PIPE LINE COMPANY

By  /s/  R. G. DULANEY
*Vice President*

BP PIPE LINE CORPORATION

By  /s/  EARL W. UNRUH
*President*

HUMBLE PIPE LINE COMPANY

By  /s/  CHARLES E. SHAVER
*Director and General
Counsel*

AMERADA HESS CORPORATION

By  /s/  LEON HESS
*Chairman of the Board*

HOME PIPE LINE COMPANY

By  /s/  R. B. COLEMAN
*Secretary*

1

MOBIL PIPE LINE COMPANY

By  /s/ JAMES R. KINZER
                    Attorney-in-Fact and
                    General Counsel


PHILLIPS PETROLEUM COMPANY

By  /s/ C. M. KITTRELL
                    Vice President


UNION OIL COMPANY OF CALIFORNIA

By  /s/ JOHN M. HOPKINS
                    Attorney-in-Fact


2

## THIRD SUPPLEMENTAL AGREEMENT

THIS AGREEMENT supplements the Trans Alaska Pipeline System Agreement ("TAPS Agreement") dated as of August 27, 1970, by and among ATLANTIC PIPE LINE COMPANY, BP PIPE LINE CORPORATION, HUMBLE PIPE LINE COMPANY, AMERADA HESS CORPORATION, HOME PIPE LINE COMPANY, MOBIL PIPE LINE COMPANY, PHILLIPS PETROLEUM COMPANY, and UNION OIL COMPANY OF CALIFORNIA ("Owners").

Each of the Owners under the TAPS Agreement hereby agrees that:

(1) In connection with terminal tankage at Valdez, Alaska, notwithstanding anything contained in the TAPS Agreement to the contrary, the parties hereto recognize that certain of the Owners have problems of scheduling shipping and storage which are more acute as a result of their smaller interests in the System and in order to accomplish proper scheduling of shipping for such smaller interests, both in the pipeline system and in tanker withdrawals from the System, will use terminal tankage in excess of their proportionate volume of total terminal tankage from time to time.

(2) Any Owner may make such use of unused terminal tankage storage capacity as is reasonably necessary to accommodate the proper scheduling of shipments with the use of tankers of appropriate size to meet such a schedule, provided that such Owner shall not use unused capacity in such a way as to infringe on any other Owner's use of its proportionate volume of total terminal tankage.

(3) In order to avoid such infringement, a proper demurrage schedule shall be created providing for a penalty for failure to withdraw the infringing storage upon reasonable notice from the operator of the System. Further, to avoid any Owner abusing the above described right, the Operating Agreement for TAPS shall provide that the Operator may refuse to accept additional shipments by any Owner whose use of such unused terminal tankage capacity infringes on any other Owner's use of its proportionate volume of total terminal tankage.

(4) Each party hereto shall negotiate in good faith and make every reasonable effort to resolve such shipping and storage problems in accordance herewith. Meetings to negotiate and resolve the matters referred to herein shall be held at the time and place requested by any party hereto and each party shall send a properly authorized representative to each such meeting.

This agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Owners have entered into this Third Supplemental Agreement as of August 27, 1970.

ATLANTIC PIPE LINE COMPANY

By /s/ R. G. DULANEY
      *Vice President*

BP PIPE LINE CORPORATION

By /s/ EARL W. UNRUH
      *President*

HUMBLE PIPE LINE COMPANY

By /s/ CHARLES E. SHAVER
      *Director and General
      Counsel*

I

AMERADA HESS CORPORATION

By /s/ LEON HESS
Chairman of the Board

HOME PIPE LINE COMPANY

By /s/ R. W. CAMPBELL
Vice President

MOBIL PIPE LINE COMPANY

By /s/ JAMES R. KINZER
Attorney-in-Fact and
General Counsel

PHILLIPS PETROLEUM COMPANY

By /s/ C. M. KITTRELL
Vice President

UNION OIL COMPANY OF CALIFORNIA

By /s/ JOHN M. HOPKINS
Attorney-in-Fact

2

## FOURTH SUPPLEMENTAL AGREEMENT

THIS AGREEMENT supplements the Trans Alaska Pipeline System Agreement ("TAPS Agreement") dated as of August 27, 1970, by and among ATLANTIC PIPE LINE COMPANY, BP PIPE LINE CORPORATION, HUMBLE PIPE LINE COMPANY, AMERADA HESS CORPORATION, HOME PIPE LINE COMPANY, MOBIL PIPE LINE COMPANY, PHILLIPS PETROLEUM COMPANY, and UNION OIL COMPANY OF CALIFORNIA ("Owners").

Each of the Owners under the TAPS Agreement hereby agrees that:

The sale or transfer by a Shareholder in a New Corporation of the type described in subdivision 7.3(d)(i) of the TAPS Agreement to one or more of its other Shareholders of Equity Securities of such New Corporation representing not more than one-half of 1% undivided interest in TAPS, which sale or transfer is made to adjust ownership of the Equity Securities in such New Corporation between its Shareholders for the purpose of obtaining or maintaining desirable long term financing arrangements shall be an additional exception to the preferential rights provisions set forth in Section 7.3 of the TAPS Agreement.

This agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Owners have entered into this Supplemental Agreement as of August 27, 1970.

ATLANTIC PIPE LINE COMPANY

By /s/ R. G. DULANEY
　　　Vice President

BP PIPE LINE CORPORATION

By /s/ EARL W. UNRUH
　　　President

HUMBLE PIPE LINE COMPANY

By /s/ CHARLES E. SHAVER
　　　Director and General
　　　Counsel

AMERADA HESS CORPORATION

By /s/ LEON HESS
　　　Chairman of the Board

HOME PIPE LINE COMPANY

By /s/ R. W. CAMPBELL
　　　Vice President

MOBIL PIPE LINE COMPANY

By /s/ JAMES R. KINZER
　　　Attorney-in-Fact and
　　　General Counsel

I

109

PHILLIPS PETROLEUM COMPANY

By /s/ C. M. KITTRELL
Vice President

UNION OIL COMPANY OF CALIFORNIA

By /s/ JOHN M. HOPKINS
Attorney-in-Fact

2

110

# FIFTH SUPPLEMENTAL AGREEMENT

THIS AGREEMENT supplements the Trans Alaska Pipeline System Agreement ("TAPS Agreement") dated as of August 27, 1970, by and among ATLANTIC PIPE LINE COMPANY, BP PIPE LINE CORPORATION, HUMBLE PIPE LINE COMPANY, AMERADA HESS CORPORATION, HOME PIPE LINE COMPANY, MOBIL PIPE LINE COMPANY, PHILLIPS PETROLEUM COMPANY, and UNION OIL COMPANY OF CALIFORNIA ("Owners"), as supplemented and amended.

Each of the Owners under the TAPS Agreement hereby agrees that, notwithstanding the provisions of the TAPS Agreement, it will, as a part of the initial pipeline construction, cause Alyeska Pipeline Service Company ("Alyeska") to construct for Amerada Hess Corporation ("Amerada Hess") as its sole property, one million five hundred thirty thousand (1,530,000) barrels of crude oil storage tank capacity composed of three (3) 510,000 barrel tanks or such other size tanks identical to the other tanks constructed at the Valdez Terminal, provided that the total capacity of such other sized tanks shall be not less than 1,530,000 barrels, together with necessary and appropriate facilities to connect such tanks to the delivery and loading facilities at the Valdez Terminal at Valdez, Alaska.

Alyeska shall construct such tanks and facilities in accordance with generally accepted practices as in the remainder of the Valdez tank farm. Alyeska shall submit invoices for such construction to Amerada Hess which shall promptly make payment of such invoices in full.

Thereafter, Alyeska shall operate such tanks and facilities for Amerada Hess in accordance with Amerada Hess' instructions and Amerada Hess shall reimburse Alyeska monthly for its total costs incurred in operating such facilities for Amerada Hess and Amerada Hess shall pay the Owners a reasonable monthly rental for the use of land utilized by such Amerada Hess tanks.

Alyeska joins herein for the purpose of agreeing to comply with the terms hereof.

Each Owner shall have the option to elect at any time, or from time to time, to have Alyeska build up to 1,530,000 barrels of crude oil storage tank capacity as such party's sole property on the same basis as such capacity is constructed for Amerada Hess, provided such space is available for the purpose of constructing and operating said storage based upon reasonable plans and expectations for total storage capacity for the pipeline system.

This agreement shall be binding upon the successors and assigns of the respective parties hereto.

This agreement may be executed in counterparts, each of which shall be deemed to be as original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF the parties execute this agreement as of August 27, 1970.

ATLANTIC PIPE LINE COMPANY

By /s/ R. G. DULANEY
Vice President

BP PIPE LINE CORPORATION

By /s/ EARL W. UNRUH
President

HUMBLE PIPE LINE COMPANY

By /s/ CHARLES E. SHAVER
Director and General
Counsel

1

111

AMERADA HESS CORPORATION

By /s/ LEON HESS
    *Chairman of the Board*

HOME PIPE LINE COMPANY

By /s/ R. W. CAMPBELL
    *Vice President*

MOBIL PIPE LINE COMPANY

By /s/ JAMES R. KINZER
    *Attorney-in-Fact and*
    *General Counsel*

PHILLIPS PETROLEUM COMPANY

By /s/ C. M. KITTRELL
    *Vice President*

UNION OIL COMPANY OF CALIFORNIA

By /s/ JOHN M. HOPKINS
    *Attorney-in-Fact*

ALYESKA PIPELINE SERVICE COMPANY

By /s/ E. L. PATTON
    *President*

2

112

# AMENDMENT TO FIFTH SUPPLEMENTAL AGREEMENT

THIS AMENDMENT to Fifth Supplemental Agreement to the Trans Alaska Pipeline System Agreement entered into by and among Amerada Hess Corporation, ARCO Pipe Line Company, Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Sohio Pipe Line Company, and Union Alaska Pipeline Company (herein "Owners") as of July _____, 1974;

## WITNESSETH:

WHEREAS by that certain Fifth Supplemental Agreement to the Trans Alaska Pipeline System Agreement entered into as of August 27, 1970, by and between the undersigned Owners or their predecessors in interest, Owners or their predecessors in interest agreed to cause Alyeska Pipeline Service Company ("Alyeska") to construct for Amerada Hess Corporation, as its sole property, One Million Five Hundred Thirty Thousand (1,530,000) barrels of crude oil storage tank capacity at the Valdez terminal of the Trans Alaska Pipeline System and further to grant each Owner the option to elect to have Alyeska build the same quantity of crude oil storage tank capacity at the said terminal on the same basis as that constructed for Amerada Hess Corporation, and

WHEREAS Amerada Hess Corporation has notified Owners that Amerada Hess no longer desires to have Alyeska construct any crude oil storage tank capacity for it, as its sole property, at the Valdez terminal, and

WHEREAS Owners are willing to amend said Fifth Supplemental Agreement to relieve Owners of their obligation to cause Alyeska to construct crude oil storage tank capacity for Amerada Hess Corporation as its sole property and Amerada Hess Corporation desires to be relieved of its obligation to have such crude oil storage tank capacity constructe for it, as its sole property, and all parties hereto desire that any and all design and other work heretofore accomplished by Alyeska and material and equipment heretofore purchased or placed on order by Alyeska for construction of such crude oil storage tank capacity at the Valdez terminal be used by Alyeska to construct additional terminal tankage at Valdez pursuant to the provisions of sub-section 6.7 of the TAPS Agreement;

NOW THEREFORE KNOW ALL MEN BY THESE PRESENTS that for and in consideration of the mutual covenants contained herein the parties hereto agree that the Fifth Supplemental Agreement to the Trans Alaska Pipeline System Agreement shall be and is hereby amended to provide as follows:

XR-   000098

113

1) Owners are hereby relieved of any and all prior obligations to cause Alyeska to construct for Amerada Hess Corporation, as its sole property, any crude oil storage tank capacity at the Valdez terminal of the Trans Alaska Pipeline System and Amerada Hess Corporation is hereby relieved of its prior obligation to have any such crude oil storage tank capacity constructed for it, as its sole property. Owners, including Amerada Hess Corporatio. , agree that all things heretofore done by Alyeska in constructing or preparing to construct crude oil storage tank capacity at the Valdez terminal for Amerada Hess Corporation as its sole property and all materials and equipment of every kind acquired or purchased or placed on purchase order for use in construction of such crude oil storage tank capacity shall be used by Alyeska to construct additional terminal tankage at the Valdez terminal, as and when such additional tankage is properly nominated by one or more Owners in the required quantities, pursuant to subsection 6.7 of the TAPS Agreement.

2) Each Owner, including Amerada Hess Corporation, shall have the option to elect at any time, or from time to time in the future, to have Alyeska construct up to One Million Five Hundred Thirty Thousand (1,530,000) barrels of crude oil storage tank capacity at the said Valdez terminal, as such Owner's sole property, provided such space is available for the purpose of constructing and operating said storage based upon reasonable plans and expectations for total storage capacity for the System. Such crude oil storage tank capacity constructed for such Owner shall be constructed in Five Hundred Ten Thousand (510,000) barrel tanks or such other size tanks identical to the other tanks constructed at the Valdez terminal. Alyeska shall construct such tank or tanks and facilities in accordance with generally accepted practices as in the remainder of the Valdez tank farm. During design and construction, Alyeska shall submit monthly invoices for the cost of such design and construction to such Owner for whom such tank capacity is being constructed, and such Owner shall promptly make payment of such invoices in full. Thereafter, Alyeska shall operate such tanks and facilities for such Owner for whom constructed in accordance with such Owner's instructions and such Owner shall reimburse Alyeska monthly for its total costs incurred in operating such facilities for such Owners, and such Owner shall pay all other Owners a reasonable monthly rental for use of land utilized by such Owner in the operation of such tank capacity.

XR- 000099

114

- 3 -

3) Alyeska joins herein for the purpose of agreeing to comply with the terms hereof.

4) This agreement shall be binding upon the successors and assigns of the respective parties hereto.

5) This agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF each of the parties hereto has caused this instrument to be executed on its behalf by its authorized officer as of the day and date first mentioned above.

ALYESKA PIPELINE SERVICE COMPANY

By _____

AMERADA HESS CORPORATION

By _____

ARCO PIPE LINE COMPANY

By _____

EXXON PIPELINE COMPANY

By _H. S. Spangler_____

MOBIL ALASKA PIPE LINE COMPANY

By _____

PHILLIPS PETROLEUM COMPANY

By _____

SOHIO PIPE LINE COMPANY

By _____

UNION ALASKA PIPELINE COMPANY

By _____

XR- 000100

115

## SIXTH SUPPLEMENTAL AGREEMENT

This Agreement supplements the Trans Alaska Pipeline System Agreement entered into effective August 27, 1970, (Agreement) by and among the predecessors in interest of Amerada Hess Pipeline Corporation, ARCO Pipe Line Company, BP Pipelines Inc., Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Sohio Pipe Line Company and Union Alaska Pipeline Company, herein sometimes referred to individually as "Party" or "Owner" and collectively as "Parties" or as "Owners".

## W I T N E S S E T H:

WHEREAS, Section 14.8 of the TAPS Agreement requires that Owners join in executing a written supplement formally establishing and recording the date for all relevant purposes on which custody of the first petroleum tendered for shipment through the System, after providing for base inventory was actually accepted, and

WHEREAS, notice was given to Owners by Alyeska Pipeline Service Company that base inventory including pipeline base inventory and terminal tankage base inventory was provided at 2400 hours on July 30, 1977, and

WHEREAS, Section 1.1.1.7 of the Stipulations of the Agreement and Grant of Right-of-Way for the Trans Alaska Pipeline between the United States of America and Permittees therein and Section 1.1.1.7 of the Stipulations of the Right-of-Way Lease for the Trans Alaska Pipeline between the State of Alaska and Lessees therein respectively provide that written notice shall be given promptly to the Authorized Officer and to the Commissioner of Natural Resources of the State of Alaska.

NOW THEREFORE, each of the Owners under the Agreement hereby agrees that:

1.    The Date of Commissioning as defined in the Agreement is formally established and recorded for all relevant purposes as July 31st, 1977.

2.    Alyeska Pipeline Service company shall on behalf of each of the Owners promptly notify in writing both the Authorized Officer and the Commissioner of Natural Resources of the State of Alaska that first oil tendered for shipment through the pipeline after provisions for line fill and tank bottoms was accepted for custody by Owners on July 31st 1977.

This Agreement may be executed in counterparts each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

XR-   000101

116



Sixth Supplement Agreement
Page Two

      In witness whereof the Owners have entered into this Supplemental Agreement as of _Sept. 30_ , 1977

AMERADA HESS PIPELINE CORPORATION      MOBIL ALASKA PIPELINE COMPANY

By _H.W. McCollum_      By _____

Title _____      Title _____

ARCO PIPE LINE COMPANY      PHILLIPS ALASKA PIPELINE CORPORATION

By _____      By _____

Title _____      Title _____

BP PIPELINES INC.      SOHIO PIPE LINE COMPANY

By _____      By _____

Title _____      Title _____

EXXON PIPELINE COMPANY      UNION ALASKA PIPELINE COMPANY

By _____      By _____

Title _____      Title _____

XR- 000102

117

# FIRST AMENDMENT TO

## TRANS ALASKA PIPELINE SYSTEM AGREEMENT

This First Amendment to the Trans Alaska Pipeline System Agreement entered into as of the 8th day of July, 1974, by and between Amerada Hess Corporation, ARCO Pipe Line Company, Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Sohio Pipe Line Company, Union Alaska Pipeline Company and BP Pipelines Inc. (herein called "Owners"):

### WITNESSETH:

WHEREAS the parties hereto or their predecessors in interest entered into the Trans Alaska Pipeline System Agreement (herein "Agreement") as of August 27, 1970, which said Agreement provides for the design and construction of the Trans Alaska Pipeline System (herein "System") consisting of a forty-eight (48) inch diameter petroleum pipeline from Prudhoe Bay to Valdez, Alaska and its related facilities, and

WHEREAS Home Pipe Line Company, a Delaware corporation, an original party to the Agreement, has subsequently assigned its interest in the System and the Agreement to other Owners of the System which are also parties hereto, and

WHEREAS the said Agreement provides for the design and construction of the System to an initial design capacity of 600,000 barrels per day and further provides for design of the System for expansion of capacity in two economically logical stages designated "First Expansion" and "Second Expansion", respectively, all according to terms and conditions set forth in the Agreement, and

WHEREAS Owners have done all things pursuant to the Agreement necessary to initiate the First Expansion, effective as of July 8, 1974 which will increase design capacity 600,000 barrels per day (First Expansion Capacity) and result in redistribution of Percentages of Ownership in the System, and

WHEREAS pursuant to the said redistribution of Percentages of Ownership in the System, Sohio Pipe Line Company obtains from the other Owners an additional undivided 21.1% interest in the System which increases its Percentage of Ownership in the System to an undivided 49.18% interest, and

WHEREAS Sohio Pipe Line Company has assigned to BP Pipelines Inc., a Delaware corporation, an undivided 15.84% interest in the System, effective as of July 17, 1974, which said assignment has reduced the Percentage of Ownership of Sohio Pipe Line Company in the System to an undivided 33.34% interest, and

118

WHEREAS the said redistribution and assignment described above requires the Owners to amend the Agreement as provided in Sections 3.2 and 6.6 thereof in the respects set forth hereinbelow:

NOW THEREFORE KNOW ALL MEN BY THESE PRESENTS that in consideration of the mutual covenants herein contained, and other good and valuable consideration, Owners hereby covenant and agree that the said Trans Alaska Pipeline System Agreement entered into by and between them or their predecessors in interest as of August 27, 1970 shall be and the same hereby is amended as follows:

1. Table I in Section 3.1 of the said Agreement is amended to read as follows:

TABLE I

| (1)<br>Party | (2)<br>Percentage of Ownership | (3)<br>Design Capacity (Bbls./Day) |
|---|---|---|
| ARCO Pipe Line Company<br>(formerly Atlantic Pipe Line Company) | 21.00% | 252,000 |
| Sohio Pipe Line Company[a]<br>(formerly BP Pipe Line Corporation) | 33.34 | 400,080 |
| Exxon Pipeline Company<br>(formerly Humble Pipe Line Company) | 20.00 | 240,000 |
| Amerada Hess Corporation | 1.50 | 18,000 |
| Mobil Alaska Pipeline Company<br>(formerly Mobil Pipe Line Company) | 5.00 | 60,000 |
| Phillips Petroleum Company | 1.66 | 19,920 |
| Union Alaska Pipeline Company<br>(formerly Union Oil Company of California) | 1.66 | 19,920 |
| BP Pipelines Inc.[a] | 15.84 | 190,080 |
| Totals | 100.00% | 1,200,000 |

[a] With respect to the period from July 8 through July 16, 1974, Sohio Pipe Line Company's and BP Pipelines Inc.'s Percentages of Ownership and barrels of Design Capacity set forth above were held by Sohio Pipe Line Company.

- 2 -

119

2. Table II in Section 6.2 of the said Agreement is amended to read as follows:

TABLE II

| (1)<br>Party | (2)<br>Expansion<br>Capacity<br>(B/D) | (3)<br>Remaining<br>Expansion<br>Capacity |
|---|---|---|
| ARCO Pipe Line Company<br>(formerly Atlantic Pipe Line Company) | 385,000 | 168,000 |
| Sohio Pipe Line Company[b]<br>(formerly BP Pipe Line Corporation) | 385,000 | 266,720 |
| Exxon Pipeline Company<br>(formerly Humble Pipe Line Company) | 350,000 | 160,000 |
| Amerada Hess Corporation | 42,000 | 12,000 |
| Home Pipeline Company | 28,000 | |
| Mobil Alaska Pipeline Company<br>(formerly Mobil Pipe Line Company) | 119,000 | 40,000 |
| Phillips Petroleum Company | 45,500 | 13,280 |
| Union Alaska Pipeline Company<br>(formerly Union Oil Company of California) | 45,500 | 13,280 |
| BP Pipelines Inc.[b] | | 126,720 |
| Totals | 1,400,000 | 800,000 |

[b] With respect to the period from July 8 through July 16, 1974 Sohio Pipe Line Company's and BP Pipelines Inc.'s Remaining Expansion Capacity set forth above were held by Sohio Pipe Line Company.

3. All Owners agree that additional tankage with nominal or estimated capacity of 3,000,000 barrels shall be constructed at the Valdez terminal as part of Initial Design Capacity and that Table IA in Section 3.2 of the said Agreement is amended to read as follows:

- 3 -

120

TABLE IA

| (1)<br>Party | (2)<br>Undivided<br>Interest<br>Percentage | (3)<br>Tankage<br>Capacity<br>(Bbls.) |
|---|---|---|
| ARCO Pipe Line Company | 21.00 | 1,890,0C |
| (formerly Atlantic Pipe Line Company) | | |
| Sohio Pipe Line Company (c) | 33.34 | 3,000,6( |
| (formerly BP Pipe Line Corporation) | | |
| Exxon Pipeline Company | 20.00 | 1,800,0( |
| (formerly Humble Pipe Line Company) | | |
| Amerada Hess Corporation | 1.50 | 135,0( |
| Mobil Alaska Pipeline Company | 5.00 | 450,0( |
| (formerly Mobil Pipe Line Company) | | |
| Phillips Petroleum Company | 1.66 | 149,4 |
| Union Alaska Pipeline Company | 1.66 | 149,4 |
| (formerly Union Oil Company of California) | | |
| BP Pipelines Inc. (c) | 15.84 | 1,425,6 |
| | | |
| Totals | 100.00% | 9,000,C |

(c) With respect to the period from July 8 through July 16, 1974 Sohio Pipe Line Company's and BP Pipelines Inc.'s Undivided Interest Percentages and barrels of Tankage Capacity set forth above were held by Sohio Pipe Line Company.

No Owner's net usable barrels of Terminal Tankage Capacity derived from the Terminal Tankage Capacity set forth in Column (3) of Table IA shall be reduced under the Agreement upon any further Expansion of the System if such Owner elects to retain such Terminal Tankage Capacity and specifies its election to do so by proper notice to each other Owner within 45 days after it has been notified that such further Expansion has been proposed. Net usable barrels of Terminal Tankage Capacity shall be determined after the tanks are completed by strapping and by deducting total tank bottoms and total unusable capacity provided at the top of such tanks for safety purposes in the event of seismic disturbance. The capacities shown in Column (3) of Table IA are nominal or estimated barrels of capacity.

4. Section 3.3 of the said Agreement is hereby amended to read as follows:

All costs incurred or to be incurred from and after July 8, 1974 to complete the Initial Design Capacity and to complete the First Expansion Capacity shall be charged to and paid by the Parties in accordance with their respective Percentages of Ownership in the Trans Alaska Pipeline System as those Percentages of Ownership appear in Column (2) of Table I in Section 3.1 hereof, as the said Table I is amended

- 4 -

121

by this First Amendment to the Trans Alaska Pipeline System Agreement. The total cost of terminal tankage constructed as a part of the Initial Design Capacity shall be initially paid by the Parties in accordance with their respective undivided interest percentages in terminal tankage appearing in Column (2) of Table IA in Section 3.2 hereof, as the said Table IA is amended by this First Amendment to the said Agreement.

5. This First Amendment to the said Trans Alaska Pipeline System Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

IN TESTIMONY WHEREOF this First Amendment to the Trans Alaska Pipeline System Agreement is executed in several counterparts, each of which shall be considered an original, as of the day and date first appearing above.

ARCO Pipe Line Company

By _____

Sohio Pipe Line Company

By _____

Exxon Pipeline Company

By _____

Amerada Hess Corporation

By _____
Chairman of the Board

Mobil Alaska Pipeline Company

By _____
E. J. Wacker, Jr., Vice Preside.

Phillips Petroleum Company

By _____

Union Alaska Pipeline Company

By _____

BP Pipelines Inc.

By _____

- 5 -

122

SECOND AMENDMENT TO

TRANS ALASKA PIPELINE SYSTEM AGREEMENT

This Second Amendment to the Trans Alaska Pipeline System Agreement entered into as of the 15th day of December, 1976, by and between Amerada Hess Corporation, ARCO Pipe Line Company, Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Sohio Pipe Line Company, Union Alaska Pipeline Company and BP Pipelines Inc. (herein called "Parties" or "Owners"):

W I T N E S S E T H :

WHEREAS, Owners or their predecessors in interest entered into the Trans Alaska Pipeline System Agreement (herein "Agreement") as of August 27, 1970, which provides for the design and construction of the Trans Alaska Pipeline System (herein "TAPS" or "System") consisting of a 48-inch diameter petroleum pipeline from Prudhoe Bay to Valdez, Alaska, and its related facilities, and

WHEREAS, Owners desire to amend the Agreement as hereinafter pro-·ided:

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That in consideration of the mutual covenants herein contained and other good and valuable consideration, Owners hereby covenant and agree that Article XIII of the Agreement shall be and is hereby amended and restated in its entirety as follows:

"13.1 Definitions

When used in this Article XIII, the following terms shall be defined as set forth below:

(a) "Designated Area" shall mean all lands lying within five (5) miles of the centerline of the TAPS pipeline.

(b) "Acquisition Period" means the period beginning August 27, 1970, and ending on the date three (3) years from and after the Date of Commissioning of the System; excepting, however, that as to all Mineral Interests located within lands withdrawn by governmental authority from mineral location or mineral leasing, the Acquisition Period shall expire on the date three (3) years from and after termination of such withdrawal, or on the date ten (10) years from and after the Date of Commissioning of the System, whichever date is earlier.

123

(c) "Mineral" (singular or plural) means any and every mineral of any nature, metallic or nonmetallic, except oil and gas.

(d) "Mineral Interest" (singular) or "Mineral Interests" (plural) means property interests including any and all mining claims, leases, options, ownership and other rights, title or interests in, to, or of any Mineral existing in the Designated Area acquired directly or indirectly as a result of Data obtained as provided in (e) below.

(e) "Data" means any and all core samples, survey information, geological, geophysical or geochemical information and other information and data, concerning the discovery, existence, or nature of any Mineral, or oil or gas, within the Designated Area which is revealed, discovered or observed in the construction of the System or arising in connection therewith.

(f) "Prospect" means an area of limited areal extent clearly based on logical geological localization for specific Minerals within the Designated Area.

13.2  Disclosure of Data

(a) All Data revealed to or acquired, discovered or observed by any Party during the Acquisition Period, shall be the common property of all Parties and shall be revealed promptly to all Parties.

(b) All Data obtained by the Contractor at any time shall be the common property of all Parties and shall be revealed to all Parties by the Contractor promptly if requested by any Party or if such Data appears significant in the good faith judgment of the Contractor.

13.3  Mineral Interests

(a) Every Mineral Interest in a Prospect acquired by or for any of the Parties during the Acquisition Period shall be held for the benefit of all Parties in the same proportion as their respective Percentages of Ownership, subject to the election by each Party to accept or reject its respective proportionate part (herein called a "Share") of all Mineral Interests in the Prospect.

(b) Whenever, during the Acquisition Period, a Mineral Interest in any Prospect is acquired by or for any of the Parties (called the "Acquiring Party", whether one or more) the Acquiring Party forthwith shall notify all other Parties (each of which is called a "Non-Acquiring Party") in writing,

-2-

124

describing in detail the Mineral Interest, its location, and all of the consideration, costs, terms, conditions and contractual obligations for or by reason of such acquisition (other than obligations implied by law). The Acquiring Party shall furnish to each Non-Acquiring Party, along with the notice, a copy of all factual geological and other technical data concerning the Mineral Interest in the Prospect, and all information concerning the title thereto and possession thereof, which then has been obtained by or for the Acquiring Party. Each such notice shall constitute an offer, to each Non-Acquiring Party, to convey, assign or transfer to the Non-Acquiring Party its respective Share of all Mineral Interests in the Prospect; provided, however, that all Mineral Interests acquired within a Prospect shall be combined and treated in the same manner as individual Mineral Interests as to the obligations of the Acquiring Party and the rights and options of the Non-Acquiring Party.

Each Non-Acquiring Party shall have the right and option to elect to accept or reject the offer at any time during the period of one year from and after the date of receipt of the notice. If a Party elects to accept the offer, it shall do so by written notice to the Acquring Party within the one year; provided, however, that the Non-Acquiring Party shall elect to accept all or none of the Mineral Interests offered within a Prospect. Upon such election, the Acquiring Party forthwith shall assign, transfer and convey to each Party accepting the offer such Party's Share of the Mineral Interests in the Prospect. Each Party receiving a Share of the Mineral Interests shall promptly bear and pay, or reimburse the Acquiring Party for, a proportionate part of the consideration and acquisition costs described in the offer, and thereafter shall bear and pay a proportionate part of all rentals, royalties, assessment work, taxes, work obligations, and other liabilities and obligations, pertaining to the Mineral Interests in the Prospect. Each such Party's proportionate part of all such payments, liabilities and obligations shall be equal to its Share in the Mineral Interests in the Prospect.

(c) If a Party fails to accept an offer in the manner and during the period specified above, it shall be deemed to have rejected the offer, and shall have no rights or interests in or to the Mineral Interests in the Prospect as to which the offer was made. The Share rejected by such Party shall be divided among the Acquiring Party and all other Parties which have accepted their respective Shares and desire to have their Shares increased by distribution of the rejected Share. The rejected Share shall be distributed among all such Parties in the same proportion as their respective Shares bear to one another."

-3-

125

This Second Amendment to the said Trans Alaska Pipeline System Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

IN TESTIMONY WHEREOF, this Second Amendment to the Trans Alaska Pipeline System Agreement is executed in several counterparts, each of which shall be considered an orginal, as of the day and date first appearing above.

ARCO Pipe Line Company

By _____

Mobil Alaska Pipeline Company

By _____

Sohio Pipe Line Company

By _____

Phillips Petroleum Company

By _____

Exxon Pipeline Company

By _____

Union Alaska Pipeline Company

By _____

Amerada Hess Corporation

By _____

BP Pipelines Inc.

By _____

-4-

126

## THIRD AMENDMENT TO

## TRANS ALASKA PIPELINE SYSTEM AGREEMENT

This Third Amendment to the Trans Alaska Pipeline System Agreement entered into as of the 31st day of March 1977, by and among Amerada Hess Pipeline Corporation, Exxon Pipeline Company, ARCO Pipe Line Company, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Sohio Pipe Line Company, Union Alaska Pipeline Company, and BP Pipelines Inc. (herein individually called "Party" or "Owner" and collectively called "Parties" or "Owners"):

### W I T N E S S E T H:

WHEREAS, Owners or their predecessors in interest entered into the Trans Alaska Pipeline System Agreement as of August 27, 1970 which agreement as supplemented and amended from time to time is herein referred to as the "Agreement"), which provides for the design nd construction of Trans Alaska Pipeline System consisting of a 48-inch diameter petroleum pipeline from Prudhoe Bay to Valdez, Alaska and related facilities (herein "TAPS"); and

WHEREAS, Owners desire to amend the Agreement as herein provided:

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That in consideration of the mutual covenants herein contained and other good and valuable consideration the sufficiency of which is hereby acknowledged, Owners hereby covenant and agree that the Agreement shall be and is hereby amended as follows:

1. Section 7.2 of the Agreement is amended and restated in

its entirety to read as follows:

"7.2 Transferability of Interests. Except as otherwise expressly provided in Sections 7.3 and 7.4, an Owner may sell, transfer or otherwise dispose of all or any part of its un-divided interest in TAPS only by a sale for cash and only after offering such interest to all other Owners as provided in subsections (a) and (b) of this Section 7.2 and provided further that any Owner whose Percentage of Ownership in TAPS then appearing in Column (2) of Table I of Section 3.1 exceeds five percent (5%) must first receive the prior written consent to the transfer of either (i) a majority of the other Owners or (ii) Owners whose Percentage of Ownership in TAPS then appearing in Column (2) of Table I of Section 3.1 aggregate at least sixty-six and two-thirds percent (66-2/3%) of the total ownership in TAPS. Any Owner not giving notice of consent on or before the time allowed for completing a transfer pursuant to subsection (a) below shall be deemed to have withheld consent to such transfer.

"(a) Transfer of a Direct Interest in TAPS. In addition to the consent requirement as provided above, an Owner desiring to sell, transfer or otherwise dispose of all or any part of its undivided interest in TAPS shall first offer such interest to all other Owners who are hereby granted the preferential right to purchase such interest (but not a lesser or different interest) on the same terms offered by or to any bona fide, prospective purchaser, who is ready, willing and able to so purchase same. The Owner desiring to sell shall promptly communicate in writing to the other Owners the offer made to or received by it from a purchaser ready, willing and able to purchase the same, together with the name and address of such purchaser, and the other Owners shall thereupon have the right for a period of forty-five (45) days after the giving of said notice to elect to purchase such interest upon the same terms, by giving written notice within such 45-day period to the Owner desiring to sell the same. If none of the notified Owners so elect to purchase such interest within such 45-day period, the Owner desiring to sell same shall have, subject to the consent requirement as provided for above, the right to complete said sale in accordance with said offer within sixty (60) days after the expiration of said 45-day period; provided, that, if the Owner desiring to sell fails so to complete said sale within said period of sixty (60) days, the preferential purchase right of the other Owners under this subsection (a) shall be considered as revived, and the Owner who desired to sell shall not complete said sale unless and until said offer again has been presented to the other Owners, as herein-

-2-

128

above provided, and the said other Owners again have failed to elect to purchase on the same terms and conditions of said offer. If more than one Owner desires to join in the purchase of such interest then, unless otherwise agreed by the purchasing Owners, all such Owners shall purchase the same proportionately in the ratio that their Percentages of Ownership in TAPS prior to said purchase bear to each other.

"(b) Indirect Transfers of an Interest in TAPS. In addition to the consent requirement as provided for above, the foregoing subparagraph (a) shall also apply to (i) any sale, transfer or other disposition of any Equity Security issued by an Owner (other than a New Corporation and other than any Owner which does not have an Enabling Party), in which event every other Owner shall be entitled to exercise a preferential right to acquire the undivided interest in the System represented by such Equity Securities pursuant to Section 7.6; and (ii) any sale, transfer or other disposition of any Equity Security issued by a New Corporation, in which event (a) every Owner (other than such New Corporation or any subsidiaries of such New Corporation) shall have the preferential right described in clause (i) above, and (b) every non-selling holder of Equity Securities issued by such New Corporation shall have a preferential right to purchase such Equity Securities pursuant to Section 7.5. The undivided interest in the System represented by the Equity Securities owned by any holder in a New Corporation (whether or not such New Corporation is an Owner) shall be determined by multiplying the undivided interest in the System owned by such New Corporation and/or by all subsidiaries of such New Corporation by the Percentage of Ownership of such holder of all Equity Securities issued by such New Corporation."

2. The caption and first clause of Section 7.3 of the Agreement is hereby amended to read as follows:

"7.3 Transfers not Subject to Requirement of Consent and Preferential Right to Purchase. The following transactions shall not be subject to the requirement of consent and the preferential right to purchase set forth in Section 7.2...."

3. The last sentence of Section 7.4 of the Agreement is hereby amended to read as follows:

"The requirement of consent and the preferential right

-3-

129

of purchase as provided in Section 7.2 shall not apply to any such issuance, repurchase or redemption of the Equity Securities of a New Corporation."

4. Section 8.1 of the Agreement is amended and restated in its entirety to read as follows:

"8.1 Initial Term. This Agreement shall be in effect from the date of this Agreement and until the expiration of thirty (30) years from the Date of Commissioning, with successive five (5) year renewal terms thereafter so long as at least two Parties hereto desire to continue operations hereunder. Such initial thirty (30) year term and any such successive five (5) year renewal term are each hereinafter sometimes referred to as an "Agreement Term." If at the end of any Agreement Term, less than two Parties desire to continue operations hereunder, this Agreement shall terminate. If, at any time, any Owner shall be adjudicated bankrupt by any court of competent jurisdiction, this Agreement shall terminate."

5. This Third Amendment to the said Trans Alaska Pipeline System Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF this Third Amendment to the Trans Alaska Pipeline System Agreement is executed in several counterparts, each of which shall be considered an original, as of the day and date first appearing above.

ARCO Pipe Line Company

By _Slee L. Pilaub_

Sohio Pipe Line Company

By _____

Mobil Alaska Pipeline Company

By _____

Phillips Petroleum Company

By _____

-4-

130

of purchase as provided in Section 7.2 shall not apply to any such issuance, repurchase or redemption of the Equity Securities of a New Corporation."

4. Section 8.1 of the Agreement is amended and restated in its entirety to read as follows:

"8.1 Initial Term. This Agreement shall be in effect from the date of this Agreement and until the expiration of thirty (30) years from the Date of Commissioning, with successive five (5) year renewal terms thereafter so long as at least two Parties hereto desire to continue operations hereunder. Such initial thirty (30) year term and any such successive five (5) year renewal term are each hereinafter sometimes referred to as an "Agreement Term." If at the end of any Agreement Term, less than two Parties desire to continue operations hereunder, this Agreement shall terminate. If, at any time, any Owner shall be adjudicated bankrupt by any court of competent jurisdiction, this Agreement shall terminate."

5. This Third Amendment to the said Trans Alaska Pipeline System Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF this Third Amendment to the Trans Alaska Pipeline System Agreement is executed in several counterparts, each of which shall be considered an original, as of the day and date first appearing above.

ARCO Pipe Line Company

By _____

Sohio Pipe Line Company

_____
VICE PRESIDENT

Mobil Alaska Pipeline Company

By _____

Phillips Petroleum Company

By _____

-4-

131

of purchase as provided in Section 7.2 shall not apply to any such issuance, repurchase or redemption of the Equity Securities of a New Corporation."

4. Section 8.1 of the Agreement is amended and restated in its entirety to read as follows:

"8.1 Initial Term. This Agreement shall be in effect from the date of this Agreement and until the expiration of thirty (30) years from the Date of Commissioning, with successive five (5) year renewal terms thereafter so long as at least two Parties hereto desire to continue operations hereunder. Such initial thirty (30) year term and any such successive five (5) year renewal term are each hereinafter sometimes referred to as an "Agreement Term." If at the end of any Agreement Term, less than two Parties desire to continue operations hereunder, this Agreement shall terminate. If, at any time, any Owner shall be adjudicated bankrupt by any court of competent jurisdiction, this Agreement shall terminate."

5. This Third Amendment to the said Trans Alaska Pipeline System Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF this Third Amendment to the Trans Alaska Pipeline System Agreement is executed in several counterparts, each of which shall be considered an original, as of the day and date first appearing above.

ARCO Pipe Line Company

By _____

Mobil Alaska Pipeline Company

By _J. L. Cooper_____
          J. L. Cooper, President

Sohio Pipe Line Company

By _____

Phillips Petroleum Company

By _____

132

of purchase as provided in Section 7.2 shall not apply to any such issuance, repurchase or redemption of the Equity Securities of a New Corporation."

4. Section 8.1 of the Agreement is amended and restated in its entirety to read as follows:

"8.1 Initial Term. This Agreement shall be in effect from the date of this Agreement and until the expiration of thirty (30) years from the Date of Commissioning, with successive five (5) year renewal terms thereafter so long as at least two Parties hereto desire to continue operations hereunder. Such initial thirty (30) year term and any such successive five (5) year renewal term are each hereinafter sometimes referred to as an "Agreement Term." If at the end of any Agreement Term, less than two Parties desire to continue operations hereunder, this Agreement shall terminate. If, at any time, any Owner shall be adjudicated bankrupt by any court of competent jurisdiction, this Agreement shall terminate."

5. This Third Amendment to the said Trans Alaska Pipeline System Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF this Third Amendment to the Trans Alaska Pipeline System Agreement is executed in several counterparts, each of which shall be considered an original, as of the day and date first appearing above.

ARCO Pipe Line Company                    Mobil Alaska Pipeline Company

By _____                By _____

Sohio Pipe Line Company                   Phillips Petroleum Company

By _____                By _____

-4-

133

FOURTH AMENDMENT TO

TRANS ALASKA PIPELINE SYSTEM AGREEMENT

This Fourth Amendment to the Trans Alaska Pipeline System
Agreement entered into as of the first day of February, 1978, by
and among Amerada Hess Pipeline Corporation, Exxon Pipeline Company,
ARCO Pipe Line Company, Mobil Alaska Pipeline Company, Phillips
Alaska Pipeline Corporation, Sohio Pipe Line Company, Union Alaska
Pipeline Company and BP Pipelines Inc., (herein individually called
"Party" or "Owner" and collectively called "Parties" or "Owners"):

W I T N E S S E T H :

WHEREAS, Owners or their predecessors in interest entered into
the Trans Alaska Pipeline System Agreement as of August 27, 1970
(which agreement as supplemented and amended from time to time is
herein referred to as the "Agreement"), which provides for the
design and construction of the Trans Alaska Pipeline System consisting
of a 48 inch diameter petroleum pipeline from Prudhoe Bay to Valdez,
Alaska and related facilities (herein called "TAPS") and

WHEREAS, Owners desire to amend the Agreement as herein provided;

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS:  That in
consideration of the mutual covenants herein contained and other
good and valuable consideration the sufficiency of which is hereby
acknowledged, Owners hereby covenant and agree as follows:

134

Fourth Amendment to
Trans Alaska Pipeline System Agreement

1.    The Agreement is hereby amended by deleting
Section 7.7 thereof in its entirety.

2.    Each Owner hereby agrees: (a) that the foregoing
amendment shall be deemed to have been effective
from and after the date of the Agreement, August 27,
1970; (b) that no right of action or claim of any
nature has arisen or will arise against any Owner
for its inability or failure to perform the terms
of said Section 7.7 as it existed prior to the
execution and delivery of this Fourth Amendment; and
(c) that each Owner hereby waives any rights which
it may have due to past performance or non-performance
by any Owner of the terms of Section 7.7.

3.    This Fourth Amendment to the said Trans Alaska
Pipeline System Agreement may be executed in
counterparts, each of which shall be deemed an
original, but all of which together constitute one
and the same instrument.

-2-

135

Fourth Amendment to
Trans Alaska Pipeline System Agreement

IN WITNESS WHEREOF, this Fourth Amendment to the Trans
Alaska Pipeline System Agreement is executed in several counterparts,
each of which shall be considered an original, as of the day and
date first appearing above.


ARCO PIPE LINE COMPANY

Approved as to Form.
Legal Department

.MOBIL ALASKA PIPELINE COMPANY

By ___THEO L. POLASEK___

By _____

SOHIO PIPE LINE COMPANY

PHILLIPS ALASKA PIPELINE CORPORATION


By _____

By _____

EXXON PIPELINE COMPANY

UNION ALASKA PIPELINE COMPANY


By _____

By _____

AMERADA HESS PIPELINE CORPORATION

BP PIPELINES INC.


By _____

By _____


-3-

136

FIFTH AMENDMENT TO
TRANS ALASKA PIPELINE SYSTEM AGREEMENT

This Fifth Amendment to the Trans Alaska Pipeline System Agreement entered into as of the 15th day of March, 1979, by and between Amerada Hess Pipeline Corporation, ARCO Pipe Line Company, Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Sohio Pipe Line Company, Union Alaska Pipeline Company and BP Pipelines Inc. (herein called "Parties" or "Owners"):

W I T N E S S E T H :

WHEREAS, Owners or their predecessors in interest entered into the Trans Alaska Pipeline System Agreement as of August 27, 1970 (which agreement as amended and supplemented is herein called "Agreement"), which provides for the design and construction of the Trans Alaska Pipeline System (herein "TAPS" or "System") consisting of a 48-inch diameter petroleum pipeline from Prudhoe Bay to Valdez, Alaska, and its related facilities, with an initial design capacity of 600 M barrels per day capable of being expanded to 2 M barrels per day in two (2) economically logical expansion stages (therein "First Expansion" and "Second Expansion"), and

WHEREAS, pursuant to Subsections (a) and (b) of Section 6.6 of the Agreement, Owners have heretofore initiated and constructed the First Expansion, and

WHEREAS, Owners desire (1) to provide that the Second Expansion can be divided into substages to facilitate expansion of the design capacity of the System in smaller increments as the need therefor is anticipated by Owners and (2) to make such other changes in said Agreement as Owners deem necessary to conform other provisions thereof to the division of the Second Expansion into substages, and

WHEREAS, the principles in this Fifth Amendment, unless otherwise provided herein, are not to be considered as precedents for any subsequent amendment to the Agreement, and

WHEREAS, Owners have agreed that design capacity of the System shall hereafter be expressed in barrels per day at a temperature of 60° F, which requires modification of Table I in Section 3.1 of the Agreement and of Table II in Section 6.2 of the Agreement;

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That in consideration of the mutual covenants herein contained and other good and valuable consideration, Owners hereby covenant and agree that the Agreement shall be and is hereby amended as follows:

XR- 000039

137

Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Two

1. Table I in Section 3.1 of the said Agreement is amended
to read as follows:

### TABLE I

| (1)<br>Party | (2)<br>Percentage<br>of<br>Ownership | (3)<br>Design<br>Capacity<br>(Bbls./Day) |
|---|---|---|
| ARCO Pipe Line Company | 21.00% | 243,600 |
| Sohio Pipe Line Company | 33.34 | 386,744 |
| Exxon Pipeline Company | 20.00 | 232,000 |
| Amerada Hess Pipeline Corporation | 1.50 | 17,400 |
| Mobil Alaska Pipeline Company | 5.00 | 58,000 |
| Phillips Alaska Pipeline Corporation | 1.66 | 19,256 |
| Union Alaska Pipeline Company | 1.66 | 19,256 |
| BP Pipelines Inc. | 15.84 | 183,744 |
| | 100.00% | 1,160,000 |

2. Table II in Section 6.2 of the said Agreement is amended
to read as follows:

### TABLE II

| (1)<br>Party | (2)<br>Expansion<br>Capacity<br>(B/D) | (3)<br>Remaining<br>Expansion<br>Capacity<br>(B/D) |
|---|---|---|
| ARCO Pipe Line Company | 372,350 | 162,540 |
| Sohio Pipe Line Company | 372,350 | 258,050 |
| Exxon Pipeline Company | 338,500 | 154,800 |
| Amerada Hess Pipeline Corporation | 40,620 | 11,610 |
| Home Pipeline Company | 27,080 | -0- |
| Mobil Alaska Pipeline Company | 115,090 | 38,700 |
| Phillips Alaska Pipeline Corporation | 44,005 | 12,850 |
| Union Alaska Pipeline Company | 44,005 | 12,850 |
| BP Pipelines Inc. | -0- | 122,600 |
| | 1,354,000 | 774,000 |

XR- 000040

138

Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Three

3. Subsection (a) of Section 6.5 of the Agreement is amended by inserting the words "and Subsection (h)" after the words "Subsection (f)" in the first sentence of that Subsection (a).

4. Subsection (b) of Section 6.1 of the Agreement is amended and restated in its entirety to read as follows:

(b) Determination of Expansion Stages. It is the intention of the Parties hereto that the design capacity of TAPS will be increased in two (2) economically logical stages ("Expansions"). The First Expansion ("First Expansion") will consist of the construction of three (3) pump stations and of the related storage tanks, terminal facilities, communications system and other required facilities to result in an increase of capacity of approximately Six Hundred Thousand (600 M) barrels per day ("First Expansion Capacity"). The Second Expansion ("Second Expansion") will consist of the construction of four pump stations and of the necessary associated facilities to increase the capacity of TAPS by approximately Eight Hundred Thousand (800 M) barrels per day ("Second Expansion Capacity"); provided, that a portion of the Second Expansion may be accomplished in substages (herein "Substage(s)") as described in Exhibit "D" attached hereto and made a part of this Agreement in accord with the provisions of Subsection (h) of Section 6.6 of this Agreement. Each Substage shall be designed utilizing the engineering criteria currently applicable to the existing System in order to achieve the same operating integrity. In the event any Substage or Substages are initiated consisting of an estimated design capacity of less than 800 M barrels per day, references in other provisions of this Agreement to Expansion shall be deemed to be a reference to such Substage or Substages.

5. The first sentence of Subsection (g) of Section 6.6 of the Agreement is amended and restated in its entirety to read "Any Party may propose the balance of the Second Expansion or any substage thereof defined by unanimous agreement of the Owners at any time after the First Substage described in Exhibit D hereto has been initiated, but not necessarily completed."

6. Section 6.6 of this Agreement is amended by adding the following Subsection (h):

XR- **000041**



Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Four

(h) ˑSubstages.

(1) Initiation. Any Party may propose the initiation of one or more Substages of the Second Expansion as defined in Subsection (b) of Section 6.1. If Parties having 51% of Substage Capacity Entitlement shown below in Subsection (h)(2) agree that the Substage or Substages may be initiated, such Substage(s) may be initiated utilizing the procedures set forth in Section 6.3. If the aggregate of the desired increases of Design Capacity stated in written notices provided by the Parties exceeds the Design Capacity of the proposed Substage(s), the Design Capacity of such Substage(s) shall be apportioned among the Parties desiring to participate in such Substage(s) in proportion to their respective Substage Capacity Entitlement Percentages shown below in Subsection (h)(2) of ·this Section 6.6 rather than in proportion to their respective remaining capacities as indicated in Subsection (c) of said Section 6.3. In other respects, Section 6.3 as originally written shall remain unchanged and shall govern the initiation of all Substages.

(2) Substage Capacity Entitlement. The magnitude of each Party's right to participate in any Substage proposed is referred to as "Substage Capacity Entitlement". The Substage Capacity Entitlement of each Party, expressed as a percentage of the design capacity to be obtained from such Substage, in each and every Substage proposed (whether before or after the Date of Commissioning of the System, the completion of the First Expansion or any previously initiated Substage), shall be the percentage shown below:

| Party | Percentages |
|---|---|
| ARCO Pipe Line Company | 21.00% |
| Sohio Pipe Line Company | 33.34 |
| Exxon Pipeline Company | 20.00 |
| Amerada Hess Pipeline Corporation | 1.50 |
| Mobil Alaska Pipeline Company | 5.00 |
| Phillips Alaska Pipeline Corporation | 1.66 |
| Union Alaska Pipeline Company | 1.66 |
| BP Pipelines Inc. | 15.84 |
| | 100.00% |

XR- 000042

140

Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Five

Provided, however, that no Owner may participate
in any Substage if at the time notice of partici-
pation is required as specified in Section 6.3 (a),
such Owner has a Substage Option as to any Substage
which option has not been exercised, waived or
allowed to expire.

(3) Substage Option. In response to any proposal
for the initiation of one or more Substages, each Party
not then agreeing to take its full Substage Capacity
Entitlement therefrom may elect to retain an option to
acquire all or any part of such Substage Capacity Entitle-
ment which it does not agree to take in response to such
proposal. This option is referred to as "Substage
Option". Any Party electing to retain a Substage Option
shall so specify in its written notice given to all other
Parties in response to any proposal to initiate one or
more Substages utilizing procedures set forth in Sub-
section (a) of Section 6.3.

(4) Substage Option Capacity. The amount of design
capacity taken by a Party from any Substage in excess
of such Party's Substage Capacity Entitlement and held
subject to one or more Substage Options retained by
other Parties shall be referred to as "Substage Option
Capacity" until such Substage Options are exercised,
waived or allowed to expire.

(5) Construction of Substage. When any Substage
is initiated, the Parties shall proceed to have such
Substage accomplished pursuant to the provisions of
Article II. All costs and expenses incurred in connection
with each Substage initiated, including the cost of
rearranging existing facilities made necessary thereby,
shall be initially paid by the Parties taking all or any
part of their Substage Capacity Entitlement relating to
such Substage in accordance with the percentage distri-
bution among them of the increase in design capacity
from such Substage at the time of its initiation.

(6) Adjustment of Percentages of Ownership and
Redistribution. Each time a Substage is initiated, the
Remaining Expansion Capacity of each Party shall be
reduced by the amount of its Substage Capacity Entitle-
ment (in barrels/day of design capacity) related to

XR- 000043

141

Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Six

such Substage and Column (3) of Table II found in
Subsection (a) of Section 6.2 shall be adjusted
accordingly by a formal amendment to this Agreement
executed by all Parties. Effective as of the Date
of Completion of each Substage (and thereafter, on
the effective date of the exercising of each Sub-
stage Option related thereto) there shall be an
adjustment of Percentages of Ownership pursuant to
Subsection (g) of Section 6.3 and a redistribution
of costs pursuant to Section 6.4 as if no Substage
Options existed, except that no Party retaining a
Substage Option shall be entitled to a redistribution
of costs following completion of the Substage as to
which a Substage Option was retained unless such Sub-
stage Option has been exercised, has been waived or has
expired. The amount due upon any redistribution under
this Subsection (h) shall be determined as follows:

(i) Upon the Date of Completion of any
Substage, or upon the waiver or expiration of
any Substage Option, the amounts due shall be
determined as provided in, and including interest
during construction as provided in, Subsection (b)
of Section 6.4. Amounts due and payable upon the
Date of Completion shall bear interest from the
Date of Completion until paid. Amounts due and
payable upon the waiver or expiration of any Sub-
stage Option shall bear interest from the date of
waiver or expiration until paid.

(ii) Upon the exercising of any Substage
Option, the amounts due shall be determined as
provided in, and including interest during con-
struction as provided in, Subsection (b) of
Section 6.4 and redistribution shall be made
between the Party exercising a Substage Option
and the Party or Parties holding the Substage
Option Capacity thereby acquired as if the Per-
centage of Ownership appearing opposite their
names in Column (2) of Table I found in Section 3,
as amended pursuant to this Subsection (h)(6) of
this Section 6.6, had been owned by them upon
completion of the Substage as to which the Sub-
stage Option so exercised was retained. Such
amounts shall bear interest from the date such
exercising Party becomes the Owner of such
capacity as provided in Subsection (g)(7) of
this Section 6.6, until paid.

(iii) Upon the completion of the Review of
Capacity of any Substage(s), the amounts due, if

XR- 000044

142

Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Seven

any, shall be determined as provided in, and
including interest during construction as pro-
vided in, Subsection (b) of Section 6.4 as
necessary to put the Parties in the position,
as to payment of costs, they would have been in
had the formal amendments executed pursuant to
Subsection (h)(9) of this Section 6.6 following
the completion of such Review of Capacity been
executed effective as of the Date of Completion
of such Substage(s). Such amounts shall bear
interest from the date of review until paid.

Subsection (d) of Section 6.4 shall be controlling as
to the period within which the amounts due and payable
shall be paid and as to the interest rate which will
be applicable. Any Party obligated to make such a
payment may elect to defer such payment for an addi-
tional period of time, up to six months after the date
of the exercise, waiver or expiry of a Substage Option
to which such payment relates, at the same rate of
interest.

(7) Rules Relating to Substage Options. Substage
Options may be exercised in whole or in part; but if any
Substage Option is exercised as to less than all of the
design capacity covered thereby, that Substage Option
shall be deemed to have been waived as to the remainder
of the design capacity covered thereby. Substage Options
may be exercised only against Substage Option Capacity
obtained in the same Substage as the Substage Option
being exercised. Substage Options held by each Party
shall be exercised or waived sequentially, in the order
in which they were retained. Each Substage Option shall
be exercised or waived by notice in writing to each of
the other Parties then holding Substage Option Capacity
acquired in the same Substage as to which the Substage
Option being exercised or waived was retained. Each
such notice shall either (a) specify the amount of design
capacity the Party sending such notice is electing to
acquire, or (b) state that the Party sending such notice
is electing to waive its right to acquire design capacity
pursuant to the Substage Option which is the subject of
said notice. Any Party holding a Substage Option may
exercise or waive same at any time prior to the expiration
of two years following the Date of Completion of the Sub-
stage as to which it was retained or January 1, 1990,
whichever occurs later. Any Substage Option retained

XR- 000045



Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Eight

which is not exercised or waived within two years
following the Date of Completion of the Substage as
to which it was retained or January 1, 1990, whichever
occurs later shall be deemed to have expired at the
end of such period. Parties exercising Substage
Options shall acquire design capacity from all other
Parties then holding Substage Option Capacity subject
to the Substage Option being exercised in the pro-
portions in which such Substage Option Capacity held
by each such Party bears to the total of such Substage
Option Capacity held by all such Parties. Any Party
exercising a Substage Option shall become the Owner of
the design capacity as to which such option is exercised
as of the first day of the first calendar month which
begins after the expiration of thirty (30) days fol-
lowing the date of notice by which its Substage Option
is exercised.

(8) Revision of Table I. Following the completion
of each Substage and following the exercising of each
Substage Option, a formal amendment to this Agreement
shall be executed by the Parties revising Table I in Sec-
tion 3.1 to reflect the results of the adjustment of
Percentages of Ownership as provided for in Subsection
(h)(6) of this Section 6.6. Such amendment shall be
effective as of the Date of Completion of such Substage
or as of the effective date of transfer of ownership
resulting from the exercising of such Substage Option as
provided for in said Subsection (h)(6), whichever is
applicable.

(9) Review of Design Capacity. The Construction
Committee shall review and, if necessary, adjust the
design capacities appearing in Column (3) of Table I
of Section 3.1, not earlier than three hundred thirty-
five (335) days and no later than three hundred sixty-
five (365) days after the Date of Completion of each
Substage in the order in which such Substages are
initiated, provided the System has operated without
major disruption an aggregate of 335 days (but not
necessarily 335 consecutive days), and provided further
that if the System has not operated without major dis-
ruption for such time, such review will be delayed until
the System has so operated and will be completed within
thirty (30) days thereafter. These reviews and adjust-
ments will be in substitution for any other review

XR- 000046

Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Nine .

and adjustment related to any Substage. Upon such review the design capacity of the System and any Substage shall be determined as set out in Subsection (h)(10) of this Section 6.6. If any adjustment in design capacity is required following any such review, each Party's share of the design capacity appearing opposite its name in Column (3) of Table I in Section 3.1 will be adjusted to reflect such Party's Percentage of Ownership of the adjusted design capacity of the System, as then expanded; provided, however, any deficit or increase in additional design capacity provided by the Substage just completed as revealed by any such review, shall be deducted from or added to the capacities of the Parties acquiring the design capacity provided by such Substage in the proportions in which they have agreed to acquire such design capacity either when the Substage was initiated or by later exercise of Substage Options. A formal amendment to this Agreement will be executed by all Parties hereto to reflect the revision of the design capacity and any adjustments of Percentages of Ownership in Column (2) of Table I in Section 3.1, and a redistribution will be made in accordance with Subsection (h)(6)(iii) of this Section 6.6. If any Substage is initiated before a previously initiated Substage is completed and this fact creates significant difficulties in obtaining a satisfactory review of design capacity following completion of the earlier Substage, the Construction Committee may, in its discretion, defer the review of capacity following completion of the earlier Substage and combine same with the review of capacity following completion of the later Substage. In such event, the additional design capacity found to have been provided by both of such Substages shall be divided between and attributed to such Substages in proportion to their relative design capacities as determined at the time of the proposal pursuant to Subsection 6.6(g)(1). In the event of a deficit or increase, the design capacity covered by Substage Option Capacity reviewed and held subject to Substage options shall be adjusted by formal amendment of this Agreement, executed by all Parties, revising Columns (2) and (3) of Table III which is described below in Subsection (h)(11) of this Section 6.6 and/or the subsequently created, sequentially numbered, and similarly structured Table or Tables in which such Substage Options are recorded.

XR- 000047



145

Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Ten

(10)  Determination of Design Capacity.  Upon review
of capacity of any Substage or Substages, the design capa-
city of the System shall be the maximum daily capacity
(expressed in barrels per day and measured at Pump
Station 1) which the System is capable of achieving at
the time of the review with all facilities operational,
adjusted for seasonal variation over a year for a petro-
leum with properties as shown in Exhibit "F" attached
hereto and made a part hereof, and corrected to a 60° F
volume using ASTMD - 1250, Table 6 entitled "Reduction
of Volume to 60 Deg F against API Gravity at 60 Deg F"
dated 1952.  The adjustments required hereinabove for
seasonal variations and the petroleum properties shall
be calculated utilizing the hydraulics program of the
operator of the System.

The additional design capacity provided by any Substage
shall be the difference between the design capacity of
the System as determined in this Subsection (h)(10)
and the design capacity shown in Column (3) of Table I,
Section 3.1 prior to the adjustment made upon the Date
of Completion of such Substage.

(11)  Table III.  If one or more Substage Options
are retained by any of the Parties at the time the
First Substage is initiated, a formal amendment of
this Agreement creating Table III, will be executed
by the Parties.  Table III will be structured as set
forth in Exhibit "E" attached hereto and made a part
hereof and as to the First Substage will show in
Column (2) design capacity covered by Substage Option
Capacity held subject to Substage Options.  Similarly, if
Substage Options are retained when subsequent Substages
are initiated, formal amendments shall be executed by
the Parties creating additional Tables for each such Sub-
stage initiated, covering Substage Options retained, as
to each of these Substages, and structured in the same
manner as Table III.  As Substage Options reflected by such
Tables are exercised, waived or allowed to expire, such
Tables will be revised, by formal amendment of this
Agreement, until all Substage Options covered thereby
have been exercised, waived or allowed to expire.

XR-  000048



Fifth Amendment to
Trans Alaska Pipeline System Agreement
Page Eleven

This Amendment to the said Trans Alaska Pipeline System
Agreement may be executed in counterparts, each of which shall
be deemed an original, but all of which together constitute
one and the same instrument.

IN TESTIMONY WHEREOF this Amendment to the Trans Alaska Pipeline
System Agreement is executed in several counterparts, each of
which shall be considered an original, as of the day and date
first appearing above.

ARCO PIPE LINE COMPANY                MOBIL ALASKA PIPELINE COMPANY

By_____            By_____

SOHIO PIPE LINE COMPANY               PHILLIPS ALASKA PIPELINE
                                      CORPORATION

By_____            By_____

EXXON PIPELINE COMPANY                UNION ALASKA PIPELINE COMPANY

By_____            By_____

AMERADA HESS PIPELINE                 BP PIPELINES INC.
CORPORATION

By_____            By_____

XR-   000049

147

DESCRIPTION OF SUBSTAGES OF THE SECOND EXPANSION

|  | BASE CAPACITY (INITIAL AND FIRST EXPANSION) | FIRST SUBSTAGE | SECOND SUBSTAGE | THIRD SUBSTAGE |
|---|---|---|---|---|
| Design Capacity of System | 1,160 MBD |  |  |  |
| Additional Facilities Required |  | Pumping Unit at Pump Station 2 | PS #7 With 2 Permanent Pumping Units | PS #5 With 2 Permanent Pumping Units |
| Approximate (2) Design Capacity of System |  | 1,360 MBD(1) | 1,420 MBD | 1,520 MBD |
| Additional Miscellaneous Facilities Required | Topping Units, BWT Tankage, Vapor Recovery Compression and Berths and other ancillary facilities to be added as a part of each Substage as required for more economical operation or as required by applicable laws or regulations. | | | |

Note (1)   Contingency Pumping Unit and the third unit and repiping of Pump Station 8 which were approved by the Owners under the May 20, 1977 Agreement for the Operation and Maintenance of the Trans Alaska Pipeline System are to be included in the First Substage for the purpose of determining the Design Capacity of the First Substage but the costs of which will be included in costs of the Initial Design Capacity and the First Expansion for the purpose of any redistributions.

Note (2)   At the time each Substage is initiated, the Design Capacity to be achieved by such Substage will be determined by the Construction Committee upon review of a current study by Operator.  Such Design Capacity shall include all known capacity optimizations and fine tuning programs, other than use of drag reduction additive, which might reasonably be expected as a result of the construction of such Substage.

XR-

00000---

148

EXHIBIT E

TO FIFTH AMENDMENT TO TRANS ALASKA PIPELINE SYSTEM AGREEMENT

TABLE III

Substage Options Retained
First Substage

| (1)<br>Party | (2)<br>Design Capacity<br>Covered By Sub-<br>stage Options<br>Retained<br>(Bbls./Day) | (3)<br>Substage Option<br>Capacity Held<br>Subject To<br>Substage Option<br>(Bbls./Day) |
|---|---|---|
| ARCO Pipe Line Company<br>Sohio Pipe Line Company<br>Exxon Pipeline Company<br>Amerada Hess Pipeline Corporation<br>Mobil Alaska Pipeline Company<br>Phillips Alaska Pipeline Corporation<br>Union Alaska Pipeline Company<br>BP Pipelines Inc. | | |

XR-

000058

149



TEMPERATURE, DEGREES FAHRENHEIT

A.S.T.M. STANDARD VISCOSITY-TEMPERATURE CHARTS
FOR LIQUID PETROLEUM PRODUCTS (D 341-39)
CHART B: SAYBOLT UNIVERSAL VISCOSITY, ABRIDGED

EXHIBIT F - TAPS AGREEMENT

NORTH SLOPE DESIGN CRUDE

26.7 API AT 60°F

VISCOSITY, SAYBOLT UNIVERSAL SECONDS

XR- 000059

150

SIXTH AMENDMENT TO THE
TRANS ALASKA PIPELINE SYSTEM AGREEMENT

This Sixth Amendment to the Trans Alaska Pipeline System Agreement entered into as of the 16th day of March 1979, by and between Amerada Hess Pipeline Corporation, ARCO Pipe Line Company, Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Sohio Pipe Line Company, Union Alaska Pipeline Company and BP Pipelines Inc. (herein called "Parties" or "Owners"):

W I T N E S S E T H:

WHEREAS, Owners or their predecessors in interest entered into the Trans Alaska Pipeline System Agreement as of August 27, 1970 (which agreement as amended and supplemented is herein called "Agreement"), which provides for the design and construction of the Trans Alaska Pipeline System (herein called "TAPS" or "System") consisting of a 48-inch diameter petroleum pipeline from Prudhoe Bay to Valdez, Alaska, and its related facilities, with an initial design capacity for petroleum at a temperature of 60°F of 580,000 barrels per day capable of being expanded to 1,934,000 barrels per day.

WHEREAS, pursuant to Subsections (a) and (b) of Section 6.6 of the Agreement, Owners have heretofore initiated and constructed the First Expansion with a design capacity of 580,000 barrels per day, and

WHEREAS, Owners have done all things pursuant to the Agreement necessary to initiate, effective as of March 16, 1979, the First Substage of the Second Expansion, as generally described in Exhibit D of the Fifth Amendment, which will increase the design capacity approximately 200,000 barrels per day, and

WHEREAS, three Owners retained Substage Options in the First Substage, and

WHEREAS, the actions of Owners in connection with the First Substage require amendment of the Agreement as provided in Section 6.6 of the Agreement;

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That in consideration of the mutual covenants herein contained and other good and valuable consideration, Owners hereby covenant and agree that the Agreement shall be and is hereby amended as follows:

151

Sixth Amendment to the
Trans Alaska Pipeline System Agreement
Page Two


1.   Table II in Section 6.2 of the said Agreement is
amended to read as follows:

### TABLE II

| (1) Party | (2) Expansion Capacity (B/D) | (3) Remaining Expansion Capacity (B/D) |
|---|---|---|
| ARCO Pipe Line Company | 372,350 | 120,540 |
| Sohio Pipe Line Company | 372,350 | 191,370 |
| Exxon Pipeline Company | 338,500 | 114,800 |
| Amerada Hess Pipeline Corporation | 40,620 | 8,610 |
| Home Pipeline Company | 27,080 | -0- |
| Mobil Alaska Pipeline Company | 115,090 | 28,700 |
| Phillips Alaska Pipeline Corporation | 44,005 | 9,530 |
| Union Alaska Pipeline Company | 44,005 | 9,530 |
| BP Pipelines Inc. | -0- | 90,920 |
| | 1,354,000 | 574,000 |

2.   Table III as provided in Section 6.6 of the Agreement
and Exhibit E to the Fifth Amendment to Trans Alaska Pipeline
System Agreement is added as follows:

### TABLE III

Substage Options Retained
First Substage

| (1) Party | (2) Design Capacity Covered By Substage Options Retained (Bbls./Day) | (3) Substage Option Capacity Held Subject To Substage Options (Bbls./Day) |
|---|---|---|
| ARCO Pipe Line Company | -0- | 3,875 |
| Sohio Pipe Line Company | -0- | 6,152 |
| Exxon Pipeline Company | -0- | 3,690 |
| Amerada Hess Pipeline Corporation | -0- | -0- |
| Mobil Alaska Pipeline Company | 10,000 | -0- |
| Phillips Alaska Pipeline Corporation | 3,320 | -0- |
| Union Alaska Pipeline Company | 3,320 | -0- |
| BP Pipelines Inc. | -0- | 2,923 |
| | 16,640 | 16,640 |

152

Sixth Amendment to the
Trans Alaska Pipeline System Agreement
Page Three


    This Amendment to the said Trans Alaska Pipeline System
Agreement may be executed in counterparts, each of which shall
be deemed an original, but all of which together constitute one
and the same instrument.

    IN TESTIMONY WHEREOF this Amendment to the Trans Alaska
Pipeline System Agreement is executed in several counterparts,
each of which shall be considered an original, as of the day
and date first appearing above.


ARCO PIPE LINE COMPANY          MOBIL ALASKA PIPELINE COMPANY

By _____     By _____


SOHIO PIPE LINE COMPANY        PHILLIPS ALASKA PIPELINE CORPORATION

By _____     By _____


EXXON PIPELINE COMPANY         UNION ALASKA PIPELINE COMPANY

By _____     By _____


AMERADA HESS PIPELINE CORPORATION  BP PIPELINES INC.

By _____     By _____


153

SEVENTH AMENDMENT TO THE
TRANS ALASKA PIPELINE SYSTEM AGREEMENT

This Seventh Amendment to the Trans Alaska Pipeline System Agreement entered into as of the 22nd day of May 1979, by and between Amerada Hess Pipeline Corporation, ARCO Pipe Line Company, Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Sohio Pipe Line Company, Union Alaska Pipeline Company and BP Pipelines Inc. (herein called "Parties" or "Owners"):

W I T N E S S E T H:

WHEREAS, Owners or their predecessors in interest entered into the Trans Alaska Pipeline System Agreement as of August 27, 1970 (which agreement as amended and supplemented is herein called "Agreement"), which provides for the design and construction of the Trans Alaska Pipeline System (herein called "TAPS" or "System") consisting of a 48-inch diameter petroleum pipeline from Prudhoe Bay to Valdez, Alaska, and its related facilities, with an initial design capacity for petroleum at a temperature of 60°F of 580,000 barrels per day capable of being expanded to 1,934,000 barrels per day.

WHEREAS, pursuant to Subsections (a) and (b) of Section 6.6 of the Agreement, Owners have heretofore initiated and constructed the First Expansion with a design capacity of 580,000 barrels per day, and

WHEREAS, Owners have heretofore initiated the First Substage of the Second Expansion with a design capacity of approximately 200,000 barrels per day, and

WHEREAS, Owners have done all things pursuant to the Agreement necessary to initiate, effective as of May 22, 1979, the Second Substage of the Second Expansion, as generally described in Exhibit D of the Fifth Amendment, which will increase the design capacity approximately 60,000 barrels per day, and

WHEREAS, four Owners retained Substage Options in the Second Substage, and

WHEREAS, the actions of Owners in connection with the Second Substage require amendment of the Agreement as provided in Section 6.6 of the Agreement;

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That in consideration of the mutual covenants herein contained and other good and valuable consideration, Owners hereby covenant and agree that the Agreement shall be and is hereby amended as follows:

154

Seventh Amendment to the
Trans Alaska Pipeline System Agreement
Page Two

1.  Table II in Section 6.2 of the said Agreement is
amended to read as follows:

### TABLE II

| (1)<br>Party | (2)<br>Expansion<br>Capacity<br>(B/D) | (3)<br>Remaining<br>Expansion<br>Capacity<br>(B/D) |
|---|---|---|
| ARCO Pipe Line Company | 372,350 | 107,940 |
| Sohio Pipe Line Company | 372,350 | 171,366 |
| Exxon Pipeline Company | 338,500 | 102,800 |
| Amerada Hess Pipeline Corporation | 40,620 | 7,710 |
| Home Pipeline Company | 27,080 | -0- |
| Mobil Alaska Pipeline Company | 115,090 | 25,700 |
| Phillips Alaska Pipeline Corporation | 44,005 | 8,534 |
| Union Alaska Pipeline Company | 44,005 | 8,534 |
| BP Pipelines Inc. | -0- | 81,416 |
| | 1,354,000 | 514,000 |

2.  Table IV as provided in Section 6.6 of the Agreement
is added as follows:

### TABLE IV

#### Substage Options Retained
#### Second Substage

| (1)<br>Party | (2)<br>Design<br>Capacity<br>Covered<br>By Substage<br>Options<br>Retained<br>(Bbls./Day) | (3)<br>Substage<br>Option<br>Capacity<br>Held Subject<br>To Substage<br>Options<br>(Bbls./Day) |
|---|---|---|
| ARCO Pipe Line Company | -0- | 1,162 |
| Sohio Pipe Line Company | 20,004 | -0- |
| Exxon Pipeline Company | -0- | 1,107 |
| Amerada Hess Pipeline Corporation | -0- | -0- |
| Mobil Alaska Pipeline Company | 3,000 | -0- |
| Phillips Alaska Pipeline Corporation | 996 | -0- |
| Union Alaska Pipeline Company | 996 | -0- |
| BP Pipelines Inc. | -0- | 22,727 |
| | 24,996 | 24,996 |

155

Seventh Amendment to the
Trans Alaska Pipeline System Agreement
Page Three

    This Amendment to the said Trans Alaska Pipeline System Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

    IN TESTIMONY WHEREOF this Amendment to the Trans Alaska Pipeline System Agreement is executed in several counterparts, each of which shall be considered an original, as of the day and date first appearing above.


ARCO PIPE LINE COMPANY                    MOBIL ALASKA PIPELINE COMPANY

By _____                By _____


SOHIO PIPE LINE COMPANY                   PHILLIPS ALASKA PIPELINE CORPORATION

By _____                By _____


EXXON PIPELINE COMPANY                    UNION ALASKA PIPELINE COMPANY

By _____                By _____


AMERADA HESS PIPELINE CORPORATION   BP PIPELINES INC.

By _____                By _____

## EIGHTH AMENDMENT TO TRANS ALASKA PIPELINE SYSTEM AGREEMENT

This Eighth Amendment to the Trans Alaska Pipeline System Agreement, entered into as of the first day of September, 1980, by and among Amerada Hess Pipeline Corporation, ARCO Pipe Line Company, BP Pipelines Inc., Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Sohio Pipe Line Company and Union Alaska Pipeline Company (herein called "Parties" or "Owners")

### W I T N E S S E T H:

WHEREAS, Owners or their predecessors in interest entered into the Trans Alaska Pipeline System Agreement as of August 27, 1970 (which agreement as amended and supplemented is herein called "Agreement"), which provides for design and construction of the Trans Alaska Pipeline System (herein "TAPS" or "System") consisting of a 48-inch diameter petroleum pipeline from Prudhoe Bay to Valdez, Alaska, and its related facilities, with an initial design capacity for petroleum at a temperature of 60° F of 580,000 barrels per day capable of being expanded to 1,934,000 barrels per day in two economically logical expansion stages (therein "First Expansion" and "Second Expansion"), and

WHEREAS, Owners have heretofore initiated and constructed the First Expansion of the System and have effected redistribution of construction costs as a result of that Expansion, and

WHEREAS, Owners have provided that the Second Expansion be divided into Substages to facilitate expansion of the System in increments as the need therefor may be anticipated, and

WHEREAS, Owners have initiated the First and Second Substages of the Second Expansion, which substages are presently under construction, completion of which may require redistribution of costs according to the provisions of Section 6.4 of the Agreement, and

WHEREAS, the said Section 6.4 provides for redistribution of the costs of pre-expansion and new facilities in accordance with Owners' Percentages of Ownership in TAPS, except terminal tankage, which Percentages of Ownership, after completion of the said First and Second Substages, will differ from Owners' Percentages of Ownership in terminal tankage, and

WHEREAS, the Agreement contains no provision for dividing or allocating costs of facilities used both for operation of pipeline and for operation of terminal tankage to those two categories of facilities, and Owners desire to amend the Agreement to make provision therefor and to make other amendments related to redistribution, all as hereinafter provided;

XR- **000080**

157

Eighth Amendment to
Trans Alaska Pipeline System Agreement
Page Two

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That in consideration of the mutual covenants herein contained and other good and valuable consideration, Owners hereby covenant and agree that the Agreement shall be and is hereby amended as follows:

1. The third sentence of Subsection (b) of Section 6.4 of the Agreement is replaced with the following:

   Said cost of all facilities to be redistributed shall be determined from the accounts of the Parties (maintained by the Contractor in accordance with the Uniform System of Accounts prescribed by the Federal Energy Regulatory Commission) on the basis of the accumulated net equity of all of the Parties in the System, as shown by the books of account of Contractor as adjusted to insure that each party bears a share of operating costs commensurate with its Percentage of Ownership when such costs were incurred, including other costs and expenses paid or incurred, incident to the planning, development, design and construction of TAPS by all Parties as provided in the next succeeding paragraph of this Subsection (b). The account balances used to determine net equity shall be those reflected as of the close of the month in which redistribution is to occur. Allocation of the net equity determined in the manner and on the date specified above shall be made to each class of facilities (terminal tankage and pipeline facilities other than terminal tankage) in the proportion that the balance as of the date specified of Account 30, Carrier Property, including costs allocated pursuant to Subsection (e) herein below, for each class of facilities, as defined above, bears to the total System Carrier Property. Construction Work in Progress (Primary Property Account 187) shall be excluded in determining the proportion.

2. The fourth sentence of Subsection (b) of Section 6.4 of the Agreement shall be amended to read as follows:

   There shall be included in net equity of the parties for the purpose of the above redistributions, as interest during construction for each month preceding the commencement of construction of the Initial Design Capacity and during the period of construction of the Initial Design Capacity and each Expansion interest on the aggregate of cash advances of the Owners for capital expenditures (exclusive of interest included therein pursuant to this sentence) as of the end of the preceding month, such interest calculated at an annual rate equivalent to 125% of the prime rate of interest of Citibank N.A., of New York, New York on ninety-day loans to substantial

XR- 000081

Eighth Amendment to
Trans Alaska Pipeline System Agreement
Page Three

and responsible commercial borrowers as such rate shall change from time to time during the construction period, each such change to become effective on the date of announcement of such change by the Bank; provided that if such rate of interest shall be unlawful under applicable law, then it shall be reduced to the highest lawful rate.

3. The first paragraph of Subsection (b) of Section 6.4 of the Agreement is amended by adding thereto the following sentence:

In addition, for purposes of determining interest during construction pursuant to this Subsection (b), the periods of construction of both Initial Design Capacity and First Expansion Capacity shall be deemed to have terminated on July 31, 1977 and the total of such interest so determined shall be allocated to terminal tankage and to pipeline facilities other than terminal tankage in the proportion which the total net equity of the Parties in each (including costs allocated to each pursuant to Subsection (e) hereinbelow) bears to the total net equity of the Parties in the entire System.

4. Subsection (d) of Section 6.4 of the Agreement shall be amended by adding thereto the following:

Upon request of any Party, the Contractor shall notify all Parties, within ten (10) working days after the Date of Completion, of Contractor's estimate of amounts which will be due by all Parties upon any redistribution. Any Party obligated to pay an amount due upon redistribution shall be entitled to pay its estimate of the amount to be due from that Party and if payment of such estimated amount shall be made, no interest shall be due on the amount so paid from and after the date such amount is paid. Contractor shall notify the Parties within 45 days after the Date of Completion of the Expansion of the amount due by all Parties upon any redistribution.

5. Section 6.4 of the Agreement is amended by adding Subsection (e) as follows:

(e) Allocation of Costs. For purposes of redistribution of expansion and pre-expansion costs pursuant to this Article VI, all costs of facilities which are employed in substantial portion in the operation of the System in connection with both terminal tankage and pipeline facilities

XR- 000082

159

Eighth Amendment to
Trans Alaska Pipeline System Agreement
Page Four

other than terminal tankage shall be allocated to each class of facilities (terminal tankage or pipeline facilities other than terminal tankage) in such proportions of use as shall be determined by Contractor and approved by the Owners Committee under the Agreement for the Operation and Maintenance of the Trans Alaska Pipeline System executed by and between Owners as of May 20, 1977. Notwithstanding any other provision contained in this Agreement, each facility, the cost of which is allocated to terminal tankage and to pipeline facilities other than terminal tankage, shall be owned by the Parties with each Party's undivided interest therein being equal to the percentage of cost of such facility borne by such Party, whether borne through a portion of the initial cost of construction thereof or through redistribution of cost thereof, as the case may be.

6.  The first paragraph of Section 3.1 of the Agreement is amended to read as follows:

    Ownership of TAPS. TAPS (including but not limited to all fee titles, easements, leases, permits, right-of-way and other interests in land) shall be owned by the Parties hereto with each Party's undivided interests in TAPS, except as provided in Section 3.2 with respect to terminal tankage, being equal to its percentage of ownership ("Percentage of Ownership") in TAPS as set forth in Column (2) of Table I below, as such Percentage of Ownership may be amended from time to time as hereinafter provided, such amended percentage to be rounded and expressed in four decimals of a percent, e.g., 5.0000%. The initial Percentage of Ownership of each Party in TAPS and the estimated initial daily barrel design capacity of each Party in TAPS are set forth opposite such Party's name in Columns (2) and (3), respectively, of Table I below, with such percentages and capacities both being those which are applicable before any expansion of TAPS capacity has been made pursuant to Article VI of this Agreement.

7.  Effective as of the Date of Completion of the First Substage of the Second Expansion, Table I of Section 3.1 of the Agreement is amended to read as follows:

XR-    000083

160

Eighth Amendment to
Trans Alaska Pipeline System Agreement
Page Five

TABLE I

| (1)<br>Party | (2)<br>Percentage<br>of<br>Ownership | (3)<br>Design<br>Capacity<br>(Bbls./Day) |
|---|---|---|
| ARCO Pipe Line Company | 21.2849 | 289,475 |
| Sohio Pipe Line Company | 33.7924 | 459,576 |
| Exxon Pipeline Company | 20.2713 | 275,690 |
| Amerada Hess Pipeline Corporation | 1.5000 | 20,400 |
| Mobil Alaska Pipeline Company | 4.2647 | 58,000 |
| Phillips Alaska Pipeline Corporation | 1.4159 | 19,256 |
| Union Alaska Pipeline Company | 1.4159 | 19,256 |
| BP Pipelines Inc. | 16.0549 | 218,347 |
| | 100.0000% | 1,360,000 |

8. This Amendment to the said Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

In all other respects, the said Agreement shall continue in full force and effect.

IN TESTIMONY WHEREOF the parties hereto have caused this Eighth Amendment to the Trans Alaska Pipeline System Agreement to be executed as of the day and date first appearing above.

AMERADA HESS PIPELINE
CORPORATION

By_____

ARCO PIPE LINE COMPANY    .

By_____

MOBIL ALASKA PIPELINE COMPANY

By_____ President

PHILLIPS ALASKA PIPELINE
CORPORATION

By_____

XR- 000084

161

Eighth Amendment to
Trans Alaska Pipeline System Agreement
Page Six

BP PIPELINES INC.                          SOHIO PIPE LINE COMPANY

By _____                 By _____

EXXON PIPELINE COMPANY                      UNION ALASKA PIPELINE COMPANY

By _____                 By _____

XR-  000085

162

## NINTH AMENDMENT TO TRANS ALASKA
## PIPELINE SYSTEM AGREEMENT

This Ninth Amendment to the Trans Alaska Pipeline System Agreement, entered into as of the first day of December, 1980, by and among Amerada Hess Pipeline Corporation, ARCO Pipe Line Company, BP Pipelines Inc., Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Sohio Pipe Line Company and Union Alaska Pipeline Company (herein called "Parties" or "Owners")

## W I T N E S S E T H:

WHEREAS, Owners or their predecessors in interest entered into the Trans Alaska Pipeline System Agreement as of August 27, 1970 (which agreement as amended and supplemented is herein called "Agreement"), which provides for design and construction of the Trans Alaska Pipeline System (herein "TAPS" or "System") consisting of a 48-inch diameter petroleum pipeline from Prudhoe Bay to Valdez, Alaska, and its related facilities, with an initial design capacity for petroleum at a temperature of 60° F of 580,000 barrels per day, capable of being expanded to 1,934,000 barrels per day in two economically logical expansion stages (therein "First Expansion" and "Second Expansion"), and

WHEREAS, Owners have heretofore initiated and completed the First Expansion of the System and the First and Second Substages of the Second Expansion of the System, and have revised Table I of Section 3.1 of the Agreement as required upon completion of the said First Expansion and the said First Substage, and

WHEREAS, the Agreement requires that Table I of Section 3.1 be further revised as the result of completion of the said Second Substage;

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That, in consideration of the mutual covenants herein contained and other good and valuable consideration, Owners hereby covenant and agree that the Agreement shall be and is hereby amended as follows:

Effective as of the Date of Completion of the Second Substage of the Second Expansion, Table I of Section 3.1 of the Agreement is amended to read as follows:

163

Ninth Amendment
to Trans Alaska Pipeline System Agreement
Page Two

## TABLE I

| (1) Party | (2) Percentage of Ownership | (3) Design Capacity (Bbls./Day) |
|---|---|---|
| ARCO Pipe Line Company | 21.3547 | 303,237 |
| Sohio Pipe Line Company | 33.3363 | 473,376 |
| Exxon Pipeline Company | 20.3378 | 288,797 |
| Amerada Hess Pipeline Corporation | 1.5000 | 21,300 |
| Mobil Alaska Pipeline Company | 4.0845 | 58,000 |
| Phillips Alaska Pipeline Corporation | 1.3561 | 19,256 |
| Union Alaska Pipeline Company | 1.3561 | 19,256 |
| BP Pipelines Inc. | 16.6745 | 236,778 |
| | 100.0000% | 1,420,000 |

In all other respects, the said Agreement shall continue in full force and effect. This Amendment to the said Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

IN TESTIMONY WHEREOF the parties hereto have caused this Ninth Amendment to the Trans Alaska Pipeline System Agreement to be executed as of the day and date first appearing above.

AMERADA HESS PIPELINE
CORPORATION

By _____

ARCO PIPE LINE COMPANY

By _____

BP PIPELINES INC.

By _____

EXXON PIPELINE COMPANY

By _____

MOBIL ALASKA PIPELINE COMPANY

By _____
                    President

PHILLIPS ALASKA PIPELINE
CORPORATION

By _____

SOHIO PIPE LINE COMPANY

By _____

UNION ALASKA PIPELINE COMPANY

By _____

164

# APP. E
# TAPS Operating Agreement
# (CR524-571)

[Reflects changes made by 1st,
2d, 4th and 5th Amendments
Updated December 18, 1997]

AMENDED AND RESTATED AGREEMENT

FOR THE OPERATION AND MAINTENANCE

OF THE

TRANS ALASKA PIPELINE SYSTEM

BY AND AMONG

AMERADA HESS PIPELINE CORPORATION

ARCO TRANSPORTATION ALASKA, INC.

BP PIPELINES (ALASKA) INC.

EXXON PIPELINE COMPANY

MOBIL ALASKA PIPELINE COMPANY

PHILLIPS ALASKA PIPELINE CORPORATION

AND

UNOCAL PIPELINE COMPANY

524

# TABLE OF CONTENTS

SECTION
1   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SECTION
2   TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
2.1   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
2.2   Disposition of Properties Upon Termination . . . . . . . . . . . 8
2.3   Discontinuance of Operations by One or More Parties . . . . . . . 8

SECTION
3   DESCRIPTION OF SYSTEM AND OWNERSHIP . . . . . . . . . . . . . 8
3.1   Description of System . . . . . . . . . . . . . . . . . . . . 8
3.2   Ownership of the System . . . . . . . . . . . . . . . . . . . 8

SECTION
4   OWNERS COMMITTEE . . . . . . . . . . . . . . . . . . . . . . 9
4.1   Owners Committee . . . . . . . . . . . . . . . . . . . . . . 9
    (a)   Members and Alternates . . . . . . . . . . . . . . . . 9
    (b)   Meetings . . . . . . . . . . . . . . . . . . . . . . . 9
    (c)   Action Without Meeting . . . . . . . . . . . . . . . . 9
    (d)   Committee Secretary . . . . . . . . . . . . . . . . . 10
    (e)   Other Expenses . . . . . . . . . . . . . . . . . . . 10
4.2   Voting Procedures of the Owners Committee . . . . . . . . . . . 10
4.3   Effect of Owners Committee Action on Parties . . . . . . . . . . 10
4.4   Subcommittees . . . . . . . . . . . . . . . . . . . . . . . 10

SECTION
5   OPERATOR . . . . . . . . . . . . . . . . . . . . . . . . . . 11
5.1   Operator . . . . . . . . . . . . . . . . . . . . . . . . . 11
5.2   Term of Initial Operator . . . . . . . . . . . . . . . . . . . 11
5.3   Removal or Resignation of Operator . . . . . . . . . . . . . . 11
5.4   Selection of a Successor Operator . . . . . . . . . . . . . . . 11

SECTION
6   OPERATION . . . . . . . . . . . . . . . . . . . . . . . . . 12
6.1   Rights of Owners . . . . . . . . . . . . . . . . . . . . . . 12
6.2   Individual Common Carrier . . . . . . . . . . . . . . . . . . 12
6.3   Owners Committee — Powers and Functions . . . . . . . . . . . 13
6.4   Operator's Services . . . . . . . . . . . . . . . . . . . . . 13

525

6.5    Acquisition of Land Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

6.6    Personnel and Other Services . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

6.7    Other Plans of Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

SECTION

7      OPERATING PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

7.1    Quality and Intermixing of Petroleum . . . . . . . . . . . . . . . . . . . . . . .   15

7.2    Measurements of Receipts and Deliveries of Petroleum . . . . . . . . . . . . . .   16

      (a)     Quantity Measurements . . . . . . . . . . . . . . . . . . . . . . .   16

             (i)     Meters . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

             (ii)    Calibration of Meters . . . . . . . . . . . . . . . . . . .   17

      (b)     Quality and Characteristic Analysis . . . . . . . . . . . . . . .   17

      (c)     Reporting to Owners . . . . . . . . . . . . . . . . . . . . . . . .   17

7.3    Petroleum Losses and Gains . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

7.4    Scheduling and Use of the System . . . . . . . . . . . . . . . . . . . . . . . . .   17

      (a)     Scheduling and Use of the Pipeline . . . . . . . . . . . . . . .   18

      (b)     Scheduling and Use of Terminal . . . . . . . . . . . . . . . . .   18

             (i)     Scheduling of Liftings and Vessels . . . . . . . . . .   18

             (ii)    Preparation of Lifting Schedule . . . . . . . . . . . .   18

             (iii)   Revision of Lifting Schedule . . . . . . . . . . . . . .   19

             (iv)   Notice of Revised Lifting Schedule . . . . . . . . . . .   19

      (c)     Docks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

             (i)     Assignment of Dock Space . . . . . . . . . . . . . . . .   19

             (ii)    Lifting Time . . . . . . . . . . . . . . . . . . . . . . . .   19

      (d)     Working Capacity . . . . . . . . . . . . . . . . . . . . . . . . .   20

7.5    Manuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

7.6    Base Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

7.7    Transfers of Petroleum Within the System . . . . . . . . . . . . . . . . . . . .   21

7.8    Connections to the Pipeline . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

7.9    Operation of Standby Pumping Units . . . . . . . . . . . . . . . . . . . . . . . .   21

SECTION

8      TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

8.1    Reporting and Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . .   22

8.2    Election to be Excluded from Partnership Regulations . . . . . . . . . . . . .   22

SECTION

9      INSURANCE, CLAIMS AND PROTECTION OF OPERATOR . . . . . . . . . . . . . . .   22

9.1    Operator's Insurance Program . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

9.2    Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

      (a)     Handling by Operator . . . . . . . . . . . . . . . . . . . . . . .   23

      (b)     Notice of Claims . . . . . . . . . . . . . . . . . . . . . . . . .   23

526

(c)    Limitation of Authority .......................... 23
    (i)    Liability Claim ........................ 23
    (ii)    Recovery Claim ...................... 24
    (iii)    Other Limitations of Authority .................... 24
(d)    Reservation of Owners ...................... 24
9.3    Indemnification of Operator ........................ 24
9.4    Insurance Required by Government Regulation ..................... 24
9.5    Contractor's Insurance Program ........................ 24
9.6    Special Insurance Provisions ......................... 25
9.7    Report of Concentration of Values ....................... 25

SECTION
10    MATERIALS, EQUIPMENT AND SUPPLIES ...................... 26
10.1    Purchase ............................ 26
10.2    Disposal ............................ 26
    (a)    Division in Kind ....................... 26
    (b)    Disposal by Sale ....................... 26
10.3    Inventories of Materials and Supplies ...................... 27
    (a)    Inventory of Materials and Supplies .................... 27
    (b)    Ownership of Materials and Supplies .................... 27

SECTION
11    ACCOUNTING, BUDGETS, CHARGES AND AUTHORITIES ................. 28
11.1    Maintenance of Accounts ......................... 28
11.2    Budgets and Long-Range Plans ...................... 28
    (a)    Budgets ......................... 28
    (b)    Long-Range Plans ...................... 28
    (c)    Budget Update ....................... 28
    (d)    Additions and Other Changes ..................... 28
    (e)    Approvals ......................... 28
11.3    Authority for Expenditure ......................... 28
11.4    Charges ............................ 29
    (a)    Chargeable Items ....................... 29
    (b)    Allocation of Charges and Credits — Fixed and Capital ........ 29
    (c)    Allocation of Charges and Credits — Variable ............. 29
11.5    Reports and Information ......................... 30
11.6    Cash Calls ............................ 30
11.7    Emergency Authority ......................... 31
11.8    Policies ............................ 31
11.9    Relocation Agreements ......................... 32
11.10    Audits ............................ 32

527

SECTION

12    TECHNICAL INFORMATION, INVENTIONS AND PATENTS,
AND CONFIDENTIALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

12.1   Technical Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

12.2   Inventions and Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

12.3   Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

12.4   Rights of Owners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34


SECTION

13    ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

13.1   Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34


SECTION

14    MINERAL DISCOVERIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

14.1   Mineral Discoveries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34


SECTION

15    GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

15.1   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

15.2   Laws and Regulations and Agreements . . . . . . . . . . . . . . . . . . . . 36

15.3   Law Governing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

15.4   Entirety of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

15.5   Captions or Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

15.6   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

15.7   Termination of Interim Operating Authority . . . . . . . . . . . . . . . . . 37

## EXHIBITS

EXHIBIT A.   Operator's Insurance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

EXHIBIT B.   Contractor's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1

EXHIBIT C.   TAPS Capacity Table . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

EXHIBIT D.   [Capacity Cushion] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-1

# AMENDED AND RESTATED AGREEMENT

# FOR THE OPERATION AND MAINTENANCE

# OF THE

# TRANS ALASKA PIPELINE SYSTEM

THIS AMENDED AND RESTATED AGREEMENT (hereinafter sometimes called "Operating Agreement"), is entered into as of October 10, 1994 (herein called the "Date of this Agreement"), by and among AMERADA HESS PIPELINE CORPORATION a Delaware corporation ("Amerada Hess"), ARCO TRANSPORTATION ALASKA, INC., a Delaware corporation ("ARCO"), BP PIPELINES (ALASKA) INC., a Delaware corporation ("BP"), EXXON PIPELINE COMPANY, a Delaware corporation ("Exxon"), MOBIL ALASKA PIPELINE COMPANY, a Delaware corporation ("Mobil"), PHILLIPS ALASKA PIPELINE CORPORATION, a Delaware corporation ("Phillips"), and UNOCAL PIPELINE COMPANY, a California corporation ("Unocal"), herein sometimes referred to individually as "Party" or "Owner" and collectively as "Parties" or "Owners".

## WITNESSETH:

WHEREAS, the Owners or their predecessors in interest entered into that certain Operating Agreement (hereinafter called the "Original Agreement") on May 20, 1977, and have amended the Original Agreement on various occasions; and

WHEREAS, the Owners now desire to amend and restate the Original Agreement to incorporate all such previous amendments and to make certain additional amendments to the Original Agreement; and

WHEREAS, each Owner is the holder of an undivided interest in a forty-eight inch (48") diameter Petroleum pipeline and related facilities located in the State of Alaska as more fully described in the agreement entitled "Trans Alaska Pipeline System Agreement" between the Owners dated August 27, 1970, such pipeline and facilities being hereinafter sometimes referred to as "System"; and

WHEREAS, by reason of the Rights-of-Way Agreements and all applicable laws and regulations each Owner is obligated to conduct any operation of its undivided interest in the System as a common carrier facility and to appoint and maintain a common agent for the purposes specified in the Rights-of-Way Agreements; and

WHEREAS, to enable each Owner more efficiently to exercise its rights and to comply with all laws, regulations and agreements the Owners enter into this agreement governing the operation and maintenance of the System and the employment of an operator (herein referred to as Operator) to perform on behalf of Owners certain services related to the physical act of operating and

1

maintaining the System under the direction and control of the Owners in accordance with the terms and conditions set out herein.

Now Therefore, in consideration of the mutual covenants herein contained, the Owners hereby amend and restate the Original Agreement as follows:

## SECTION 1

### DEFINITIONS

Certain terms, as used in this Operating Agreement, are defined as follows:

**1.1    Actual Arrival Time** — the time according to Valdez, Alaska, local time, that a Vessel communicates to the Operator its readiness to commence loading after entering the Prince William Sound Vessel Traffic Service Area or an area subsequently designated by decision of the Owners through the Owners Committee.

**1.2    Actual Daily Pipeline Capacity** — for an Owner in a Month, an amount calculated by Operator after the close of that Month and equal to the sum of: (a) the TAPS Capacity for that Month, multiplied by that Owner's Percentage of Ownership in the Pipeline; (b) the Flow Improvement, if any, for that Owner for that Month; and (c) the Capacity Cushion, if any, for that Owner for that Month; such sum shall be expressed in Actual Standard Petroleum; provided, however, that if an Upset Condition shall exist in a Month, each Owner's right to utilize the Pipeline during the Upset Period shall be limited to transporting an amount of Petroleum calculated by multiplying the Petroleum actually carried by the Pipeline during the Upset Period by that Owner's Percentage of Ownership in the Pipeline. In arriving at such Actual Daily Pipeline Capacity, Operator shall add to or subtract from that calculation the portion of Adjustment Capacity added or subtracted in arriving at that Owner's Estimated Daily Pipeline Capacity for the Month for which the calculation is made.

**1.3    Actual Standard Petroleum** — A Petroleum with the same characteristics which affect throughput (such as gravity and viscosity) as is calculated to result from theoretically aggregating the Petroleum transported by all Owners during the Month for which the calculation is made. Alternatively, Operator may, subject to the approval of the Owners through the Owners Committee, designate a Petroleum transported in the System during the Month as the Actual Standard Petroleum for that Month.

**1.4    Adjustment Capacity** — the total of the amounts for the third preceding Month by which the actual average daily receipts of Petroleum at Pump Station No. 1 exceeded Actual Daily Pipeline Capacity for all Owners who had such an excess.

**1.5    Approved Budgets** — the budgets approved by the Owners through the Owners Committee in accordance with Section 11.2 hereof.

2

530

**1.6    Associated Companies.** An Associated Company of a Party means (a) any company of which at least 50% of the voting stock is owned directly or indirectly by the Party in question, (b) a company which owns directly or indirectly at least 50% of the voting stock of the Party in question, and (c) a company of which at least 50% of the voting stock is owned directly or indirectly by any company which also owns directly or indirectly at least 50% of the voting stock of the Party in question.

**1.7    Barrel** — 42 U.S. standard gallons at 60° Fahrenheit; provided that, unless otherwise specifically stated, Barrel shall be a volumetric measure, with no adjustment for characteristics of Petroleum that affect throughput (such as gravity and viscosity).

**1.8    Base Inventory** — the total Volume of Petroleum in Pipeline Base Inventory and Terminal Tankage Base Inventory.

**1.9    Calendar Year** — the period of time commencing at 0000 hours on January 1 and ending at 2400 hours on the next succeeding December 31 according to Valdez, Alaska, local time.

**1.10    Date of Commissioning** — The date when custody of the first Petroleum tendered for shipment through the System, after providing for Base Inventory, is actually accepted, which date the Owners determined for all relevant purposes to be July 31, 1977.

**1.11    Day** — the period of time commencing at 0000 hours on one day and running until 2400 hours on the same day according to Valdez, Alaska, local time.

**1.12    Design and Construction Agreement** — the agreement entitled "The Design and Construction of the Trans Alaska Pipeline System" between the Owners or their predecessors in interest and Alyeska Pipeline Service Company, dated August 27, 1970 as supplemented or amended from time to time.

**1.13    Estimated Daily Pipeline Capacity** — for an Owner in a Month, an amount estimated by Operator prior to that Month and equal to the sum of: (a) the TAPS Capacity for that Month, multiplied by that Owner's Percentage of Ownership in the Pipeline; (b) the Flow Improvement, if any, for that Owner for that Month, utilizing the Producer Estimate; and (c) the Capacity Cushion, if any, for that Owner for that Month; such sum shall be expressed in Estimated Standard Petroleum; provided, however, that if, at the time the use of the Pipeline is being scheduled under Section 7.4(a) for a Month, one or more events or circumstances are known or planned to exist during that Month that, with a high degree of certainty, can be expected to constitute an Upset Condition, then Operator shall schedule the use of the Pipeline in accordance with the allocation procedures set forth in the proviso of Section 1.2 hereof. In arriving at such Estimated Daily Pipeline Capacity, Operator shall:

(a)    add a portion of Adjustment Capacity determined by multiplying Adjustment Capacity by a fraction the numerator of which is the amount, if any, by which such

3

Owner's Actual Daily Pipeline Capacity exceeded its actual average daily receipts of Petroleum at Pump Station No. 1 during the third preceding Month and the denominator is the total of such excesses for all Owners who had such an excess; or

      (b)     subtract the portion of Adjustment Capacity equal to the amount, if any, by which such Owner's average daily receipts of Petroleum at Pump Station No. 1 exceeded its Actual Daily Pipeline Capacity during the third preceding Month.

      **1.14   Estimated Standard Petroleum** — a Petroleum with the same characteristics which affect throughput (such as gravity and viscosity) as is calculated to result from theoretically aggregating the Petroleum expected to be transported by all Owners during the Month for which the calculation is made. Alternatively, Operator may, subject to the approval of the Owners through the Owners Committee, designate a Petroleum expected to be transported in the System during the Month as the Estimated Standard Petroleum for that Month.

      **1.15   Land Rights** — easements, leases, fee titles, permits, licenses, and other interests in land required for the operation of the System.

      **1.16   Lifting Schedule** — the schedule of Vessels and liftings prepared by Operator in accordance with Section 7.4(b)(ii) hereof as revised or changed in accordance with Section 7.4(b)(iii) hereof.

      **1.17   Oil Measurement Manual** — the manual referred to in Section 7.2 hereof as approved by the Owners through the Owners Committee.

      **1.18   Operating Expense(s)** — all expense(s) incurred in connection with the operation and maintenance of the System.

      **1.19   Operator** — the operator selected by the Owners in the manner described in Section 5 hereof.

      **1.20   Owner's Base Inventory** — the Volume of Petroleum in the custody of any given Owner, at any given time, that is a part of Base Inventory.

      **1.21   Owner's Working Capacity** — an Owner's Percentage of Ownership in Terminal Tankage multiplied by Working Capacity.

      **1.22   Owner's Working Inventory** — the Volume of Petroleum in the custody of any given Owner, at any given time, that is a part of Working Inventory.

      **1.23   Petroleum** — unrefined liquid hydrocarbons including gas liquids.

      **1.24   Pipeline** — the Pipeline as defined in Section 3.1(a) hereof.

4

532

**1.25    Pipeline Base Inventory** — the total Volume of Petroleum in the Pipeline excluding Petroleum in fuel tanks.

**1.26    Pipeline Fixed Operating Expense(s)** — expense(s) incurred in connection with the operation and maintenance of the Pipeline not affected by the Volume of Pipeline throughput. All expenses not classified as variable will be considered fixed.

**1.27    Pipeline Variable Operating Expense(s)** — expense(s) incurred in connection with the operation and maintenance of the Pipeline which vary with the Volume of Pipeline throughput.

**1.28    Policies** — the policies referred to in Section 11.8 hereof as approved by the Owners through the Owners Committee.

**1.29    Port Information Manual** — the manual referred to in Section 7.4 hereof as approved by the Owners through the Owners Committee.

**1.30    Rights-of-Way Agreements** — the Right-of-Way Lease for the Trans-Alaska Pipeline between the State of Alaska and Owners dated May 3, 1974 and the Agreement and Grant of Right-of-Way for Trans-Alaska Pipeline between the United States of America and Owners dated January 23, 1974 as amended or renewed from time to time.

**1.31    Scheduled Arrival Day** — the Day, stated in a Lifting Schedule, that a Vessel is scheduled to enter the Prince William Sound Vessel Traffic Service Area or an area subsequently designated by the Owners through the Owners Committee.

**1.32    System** — the System as defined in Section 3.1 hereof.

**1.33    TAPS Agreement** — agreement among the Owners or their predecessors in interest entitled "Trans Alaska Pipeline System Agreement" dated August 27, 1970 as amended or supplemented from time to time, providing for the design, construction and ownership of the System.

**1.34    Terminal Tankage** — the Terminal Tankage as defined in Section 3.1(b) hereof.

**1.35    Terminal Tankage Base Inventory** — the total Volume of Petroleum in Terminal Tankage excluding Petroleum in fuel tanks and Working Capacity.

**1.36    Terminal Tankage Fixed Operating Expense(s)** — expense(s) incurred in connection with the operation and maintenance of Terminal Tankage not affected by the Volume of deliveries out of the System at Valdez, Alaska. All expenses not classified as variable will be considered fixed.

5

533

**1.37**   **Terminal Tankage Variable Operating Expense(s)** — expense(s) incurred in connection with the operation and maintenance of Terminal Tankage which vary with the Volume of deliveries out of the System at Valdez, Alaska.

**1.38**   **Vessel(s)** — any tanker, tank ship or vessel scheduled to call or calling at Valdez, Alaska, to load Petroleum transported through the System.

**1.39**   **Volume** — quantity expressed in Barrels.

**1.40**   **Week or Weekly** — seven consecutive days commencing on Monday at 0000 hours and running until 2400 hours on the next succeeding Sunday according to Valdez, Alaska, local time.

**1.41**   **Working Capacity** — the total capacity of all operational Terminal Tankage tanks for the handling of Petroleum at Valdez, Alaska pending loading on Vessels, between 2'6" above the bottom of the tank shell and 3'9" below the top of the tank shell, less the capacity, as determined by the Operator, required to receive the Volume of Petroleum which should be moved out of the Pipeline to prevent the internal pressure in the Pipeline from exceeding design limits in the event its operation would be shut down.

**1.42**   **Working Inventory** — the total Volume of Petroleum in Working Capacity at any given time.

**1.43**   **100 Barrel-Mile Deliveries** — the number of Barrels of Petroleum delivered out of the System multiplied by the number of miles each such Barrel was transported, divided by 100.

**1.44**   **Month or Monthly** — a calendar month commencing at 0000 hours on the first day thereof and running until 2400 hours on the last day thereof according to Valdez, Alaska, local time.

**1.45**   **Pumpability Factor** — that decimal fraction which expresses the relationship of the ability of the System to transport a given Petroleum to the ability of the System to transport Estimated Standard Petroleum or Actual Standard Petroleum, as the case may require.

**1.46**   **TAPS Capacity** — the Pipeline's capacity set forth on Exhibit C attached hereto and by this reference incorporated herein during the period of time set forth opposite such capacity on Exhibit C attached hereto.

**1.47**   **Upset Condition** — one or more events or circumstances affecting the System and resulting in a temporary decrease in the capability of the System that prevents the Pipeline from transporting Petroleum actually available for transport through the Pipeline.

**1.48**   **Upset Period** — that portion of a Month during which an Upset Condition exists, but no longer.

534

**1.49** **Flow Improvement** — the allocation among the Owners of flow improvement that exceeds TAPS Capacity, whether achieved through the use of a drag reduction agent or through other means; provided, however, that such flow improvement shall be exclusive of any Capacity Cushion and shall be allocated only to the extent that it exceeds TAPS Capacity, and that excess will be allocated among the Owners in proportion to their respective Percentages of Ownership in the Pipeline.

**1.50** **Capacity Cushion** — for the period July 1, 1998, through and including December 31, 2011:

(i)     During a Month when 105% of the Producer Estimate exceeds the TAPS Capacity, the least of: (a) 105% of the Producer Estimate less TAPS Capacity; (b) 5% of the Producer Estimate; or (c) the difference between 1,700,000 Barrels per Day, and the Producer Estimate, if the Producer Estimate is less than 1,700,000 Barrels per Day; if the Producer Estimate is 1,700,000 Barrels per Day or more, there shall be no Capacity Cushion; and

(ii)     During a Month when 105% of the Producer Estimate does not exceed the TAPS Capacity, there shall be no Capacity Cushion.

The Capacity Cushion shall be allocated among the Owners as set forth on Exhibit D attached hereto and by this reference incorporated herein. The sharing of Capacity Cushion shall have no impact on voting percentages or on any other rights or obligations under the TAPS Agreement or this Operating Agreement; provided, however, that Petroleum flowing through the Pipeline, whether by Capacity Cushion or otherwise, shall bear costs in accordance with Section II-2(f) of the 1985 Settlement Agreement with Respect to the Trans Alaska Pipeline System, as amended, among the State of Alaska and the Owners; and, provided further, that an Owner's share of Capacity Cushion shall be transferable to any other Owner, whether with or without any other asset, but any such transfer shall be subject to the provisions of Article VII of the TAPS Agreement.

**1.51** **Producer Estimate** — the number of Barrels to be carried in the Pipeline in a given Month as estimated by Operator based upon projections given to Operator by each entity responsible for a connection to TAPS.

## SECTION 2

TERM

**2.1** **Term.** This Operating Agreement shall become effective on the Date of this Agreement and shall continue in effect until the TAPS Agreement is terminated in accordance with Article VIII of the TAPS Agreement. If at any time any Owner shall be adjudicated bankrupt in any court of competent jurisdiction, this Operating Agreement shall terminate.

7

**2.2** **Disposition of Properties Upon Termination.** The provisions of Section 8.3 of the TAPS Agreement shall govern the disposition of property upon termination of this Operating Agreement.

**2.3** **Discontinuance of Operations by One or More Parties.** Section 8.2 of the TAPS Agreement shall govern the discontinuance of operations by one or more Parties.

## SECTION 3

### DESCRIPTION OF SYSTEM AND OWNERSHIP

**3.1** **Description of System.** The "System" shall consist of a Petroleum pipeline forty-eight inches (48") in diameter extending from a point at or near Prudhoe Bay, Alaska to a point near Valdez, Alaska, together with suitable pump stations, tankage (exclusive of tankage constructed by an Owner under the Fifth Supplemental Agreement to the TAPS Agreement), docks, communications facilities, and other facilities, equipment and appurtenances exclusive of intangible property but including all fee titles, easements, leases, permits, rights-of-way and other interests in land as acquired, constructed or expanded pursuant to the TAPS Agreement or this Operating Agreement.

For the purposes of ownership and operation, the System shall consist of two components:

(a) *Pipeline*. All such System property of every nature and kind, both real and personal, exclusive of Terminal Tankage. These properties include, but are not limited to, the following described property: pipelines, pump stations, topping plants, pump station surge and fuel tankage, Petroleum measurement facilities, docks, ballast water treating facilities, and other related facilities, equipment and appurtenances.

(b) *Terminal Tankage*. All such System property at Valdez, Alaska, of every nature and kind, both real and personal, associated with the holding of Petroleum pending delivery out of the System. Such facilities include, but are not limited to, the following described property: Petroleum tanks, tank farm manifolds, tank vent lines, vapor recovery system, power generation facilities and other related facilities, equipment and appurtenances.

**3.2** **Ownership of the System.** The Percentage of Ownership of each Owner in the Pipeline or in the Terminal Tankage shall be as set forth respectively opposite each Owner's name in Table I (Pipeline) or Table IA (Terminal Tankage) in Article III of the TAPS Agreement as such Tables may be revised as provided therein. Any reference in this Operating Agreement to Percentage(s) of Ownership in the Pipeline shall mean the percentage(s) set out in said Table I and any references to Percentage(s) of Ownership in Terminal Tankage shall mean the percentage(s) set out in Table IA according to the latest agreed upon revisions of Table I and IA of the TAPS Agreement at the particular time when this Operating Agreement is to be applied.

8

536

# SECTION 4

## OWNERS COMMITTEE

**4.1    Owners Committee.** In order to facilitate each Owner's individual direction and control of the operations, the Owners recognize that it is necessary and desirable to establish a committee through which, as to specific functions assigned to the committee in this Operating Agreement, each Owner individually exercises certain of its rights inherent in its ownership of an undivided interest in the System. A committee to be known as the Owners Committee is hereby established as follows.

(a)    *Members and Alternates.* Each Owner shall designate one representative as its member ("Member") on the Owners Committee and shall designate one representative as the Member's alternate ("Alternate") who shall represent the Owner on the Owners Committee only in the absence of the Member. Each Owner shall give written notice to the secretary of the Owners Committee (Committee Secretary) of the names, addresses and telephone numbers of its Member and Alternate. Each Owner reserves the right from time to time to change its Member or Alternate and their respective addresses and telephone numbers by giving written notice of any such change to the Committee Secretary, who shall be responsible for keeping each Owner advised of the names, addresses and telephone numbers of each Member and Alternate.

(b)    *Meetings.* The Owners Committee shall hold such meetings as may be requested by any Member (or in his absence by such Member's Alternate). All such requests shall be made in writing, or by telephone confirmed in writing, to the Committee Secretary and shall state the matters to be considered at such meeting. The Committee Secretary shall notify each Member in writing at least three (3) days in advance of any meeting of the date, time, place and purpose of the meeting. If such notice is given by telephone, it shall be confirmed in writing. Failure to give such notice shall not nullify any action taken at any meeting if each Owner not represented at such meeting by its Member or Alternate shall waive such notice in writing signed by said Owner's Member or Alternate, either before or after the meeting. The Owners Committee shall establish rules and procedures for the conduct of meetings, including but not limited to the selection of a chairman and the attendance of advisors, provided that such rules and procedures shall not contradict any provision of this Operating Agreement.

(c)    *Action Without Meeting.* It is recognized that matters requiring the immediate decision of the Owners Committee may arise from time to time. Any Member or the Operator may propose that any matter upon which the Owners Committee is authorized to act be decided pursuant to the informal procedure established hereunder by giving notice to the Committee Secretary, which notice may be given in writing, or by telephone, confirmed in writing. The Committee Secretary shall immediately notify each Member by telephone of the matter to be decided and shall confirm such notice in writing.

9

If the Committee Secretary is unable to contact a Member by telephone, he shall immediately notify that Member's Alternate by telephone, which notice shall be confirmed in writing to both the Member and his Alternate. Each Member or Alternate, as the case may be, shall notify the Committee Secretary in writing or by telephone confirmed in writing of his approval or disapproval of the matter for decision. As soon as the Committee Secretary shall ascertain that a matter has been approved or disapproved, he shall notify all Members of the result which notice shall be in writing, or by telephone, confirmed in writing to each Member.

(d) *Committee Secretary*. The Owners Committee shall appoint a Committee Secretary and an Assistant Committee Secretary. In addition to the functions assigned to the Committee Secretary in subdivisions (b) and (c) of this Section 4.1, the Committee Secretary shall prepare and retain custody of the original record book which will contain the minutes of all meetings, notices, written confirmations, certificates, and, as the Owners Committee shall direct, all other documents and communications relating to the Owners Committee. Duplicate copies of all materials in the record book shall be promptly mailed by the Committee Secretary to each Member. The record book shall be kept available for inspection at all times by duly authorized representatives of the Owners and, upon termination of the Owners Committee, shall be delivered to one of the Owners for safekeeping under such terms as the Owners Committee shall approve. All expenses incurred in connection with the performance of the duties of the Committee Secretary shall be borne by the Owners in proportion to their Percentages of Ownership in the Pipeline under such arrangements as the Owners Committee shall approve. The Committee Secretary and Assistant Committee Secretary shall serve at the pleasure of the Owners Committee. The Assistant Committee Secretary shall perform the duties of the Committee Secretary at the request of or in the absence of the Committee Secretary.

(e) *Other Expenses*. Except as provided in Subdivision (d) of this paragraph, each Owner shall pay all expenses incurred by it relating to its representation on the Owners Committee.

**4.2 Voting Procedures of the Owners Committee.** All matters requiring approval by the Owners through the Owners Committee in this Operating Agreement may be approved only upon the affirmative vote of Members or Alternates, as the case may be, representing three (3) or more Owners having Percentages of Ownership in the Pipeline which aggregate at least sixty-six and two-thirds percent (66⅔%).

**4.3 Effect of Owners Committee Action on Parties.** Any and all determinations which are properly made by the Owners through the Owners Committee under this Operating Agreement shall be conclusively binding on each and all of the Owners.

**4.4 Subcommittees.** The Owners through the Owners Committee may establish such subcommittees to act in an advisory capacity as the Owners Committee may deem necessary for the efficient performance of its responsibilities under this Operating Agreement. Each such

538

subcommittee shall conduct its affairs in accordance with policies and procedures established by the Owners through the Owners Committee. Each Owner shall have the right to name one representative to each subcommittee so established.

## SECTION 5

### OPERATOR

**5.1    Operator.** Each Owner will contract with an Operator selected by the Owners to perform on behalf of each Owner specific duties with regard to the physical operation and maintenance of its undivided interest in the System as assigned to Operator under the terms and provisions of this Operating Agreement, for the period of time determined under Section 5.2 hereof.

**5.2    Term of Initial Operator.** Operator shall serve for an initial term of ten (10) years commencing on the Date of this Agreement and thereafter for successive terms of five (5) years each, unless prior thereto Operator is removed or resigns pursuant to Section 5.3 hereof or this Operating Agreement is terminated, whichever occurs first.

**5.3    Removal or Resignation of Operator.** Any Owner may, at any time, submit its request to all other Owners for the removal of the Operator and if three (3) or more Owners, having Percentages of Ownership in the Pipeline which aggregate at least sixty-six and two-thirds percent (66⅔%), vote for such removal it shall be conclusively binding on all Owners and Operator. The Operator shall be removed effective as of the date specified in a notice of removal signed by the Owners who voted affirmatively for said removal and forwarded to Operator and/or other Owners, but in no event shall such removal be effective less than one (1) year from the date of the notice. Operator may resign, effective as of the last day of the initial term or any succeeding five-year term by giving notice to all Owners not less than one (1) year prior to the last day of such term.

**5.4    Selection of a Successor Operator.** Upon the removal or resignation of an Operator, all Owners will vote on the selection of a new Operator (herein called Successor Operator) and the person selected by three (3) or more Owners having Percentages of Ownership in the Pipeline which aggregate at least sixty-six and two-thirds percent (66⅔%) shall be conclusively binding on all Owners. All Owners will be advised of the person selected as the Successor Operator and if the said person accepts the selection as Successor Operator he shall execute and send to each Owner an instrument accepting such selection as Operator under the terms and provisions of this Operating Agreement (including the removal and resignation provisions herein and any other agreements referred to herein) and agreeing to discharge the duties of the Operator hereunder from and after the effective date of its selection as Operator. Such instrument shall be binding upon each Owner and shall have the same effect as the several agreements by and between each and every Owner and the Successor Operator to operate and maintain the System under the terms and provisions of this Operating Agreement from and after

11

539

the effective date of the selection of the Successor Operator as Operator. If the removal or resignation of the Operator is effective upon the expiration of the initial term or any succeeding term, the Successor Operator shall serve as Operator for the next succeeding term. If the removal or resignation shall be effective during the initial term or any succeeding term, the Successor Operator shall serve as Operator for the remainder of the then current term. In either case, the Successor Operator shall thereafter serve as Operator for each successive term unless and until such Successor Operator shall be removed or shall sooner resign as Operator under the provisions of Section 5.3 above or this Operating Agreement is terminated, whichever occurs first.

## SECTION 6

### OPERATION

**6.1   Rights of Owners.** Each Owner, as the holder of an undivided interest in the System, has and retains all the rights of ownership incident to its undivided interest subject only to any applicable laws and regulations, the TAPS Agreement, the Rights-of-Way Agreements and this Operating Agreement. To enable each Owner to exercise its rights, Operator, under the direction and control of the Owners through the Owners Committee, will perform certain duties related solely to the physical operation and maintenance of the System as set out in this Operating Agreement and will act as the Owners' common agent to the extent required by the Rights-of-Way Agreements.

**6.2   Individual Common Carrier.** Each Owner is obligated to conduct the operation of its undivided interest in the System as a common carrier facility and each Owner has agreed that, from and after the Date of Commissioning, its undivided interest in the System will be operated as an individual common carrier facility. In performance of such undertaking, each Owner on its own behalf will in accordance with all applicable laws, regulations and agreements:

(a)     separately publish and file tariffs in its own name.

(b)     separately solicit and receive tenders of Petroleum from shippers.

(c)     separately arrange with its shippers for the transportation of any such tendered Petroleum.

(d)     separately collect for its own account and freely dispose of any revenues from its individual and separate operations as a common carrier.

(e)     separately arrange for and provide funds required to pay its share of expenses for the operation and maintenance of the System.

(f)     separately exercise such other rights and perform such other functions required to operate its undivided interest as an individual common carrier facility.

12

540

Neither Operator, nor the Owners Committee, shall have any responsibility for, nor shall they take any action on, matters which relate to common carrier responsibilities as set out in this Section 6.2.

**6.3    Owners Committee — Powers and Functions.**    Each Owner will exercise supervision of the Operator's services through its representative on the Owners Committee.  The Owners through the Owners Committee shall:

(a)    approve budgets pursuant to Section 11.2 hereof.

(b)    approve the acquisition in the name of the individual Owners of Land Rights, materials, supplies and services as required through the budget approval under Section 11.2 hereof.

(c)    approve all manuals referred to in this Operating Agreement.

(d)    establish standards and procedures for connections to the Pipeline as required by Section 7.8 hereof.

(e)    approve settlement of claims, initiation of lawsuits and such other matters as required by Section 9.2 hereof.

(f)    approve the disposal of material, equipment and facilities as required by Section 10.2 hereof.

(g)    exercise such other authorities and powers as are delegated by the Owners under the terms of this Operating Agreement or as may be required to provide guidelines and policies to permit Operator to perform its services.

**6.4    Operator's Services.**    To enable each Owner to exercise its rights and to effectively discharge its obligations as an individual common carrier, Operator will perform on behalf of each Owner the services related solely to the physical operation and maintenance of the System.  As more specifically detailed in this Operating Agreement, Operator shall:

(a)    perform such mechanical activities as may be required to transport and otherwise handle Petroleum in each individual Owner's share of System capacity and load on Vessels when and as requested by each Owner consistent with the terms of this Operating Agreement.

(b)    submit to Owners recommended budgets, in accordance with Section 11.2 hereof, for their consideration and approval through the Owners Committee.

(c)    purchase or cause to be purchased for and in the name of Owners necessary materials, supplies and services and incur such expenses and commitments as required to

541

carry out the operations in accordance with Approved Budgets and within the limitations of this Operating Agreement.

(d) make timely payment of all proper charges, expenses, and liabilities incurred in connection with Approved Budgets and Section 11.3 hereof.

(e) coordinate the acquisition of Land Rights by the Owners as required for the physical operation of the System in accordance with Approved Budgets and Section 6.5 hereof.

(f) act as coordinator of Owners' contact with government agencies where required by rules, laws or regulations and/or the Rights-of-Way Agreements relating to the physical operation and maintenance of the System.

(g) dispose of materials, equipment and facilities in accordance with Section 10.2 hereof.

(h) issue only such news items or otherwise engage in public affairs as will be consistent with guidelines issued by the Owners through the Owners Committee relating to the physical operation and maintenance of the facilities within the System.

(i) perform such other activities and take such other action as may be required to carry out the Approved Budgets and other decisions made by the Owners through the Owners Committee, provided such activities or actions relate solely to the physical operation and maintenance of the System.

In performance of its activities pursuant to this Operating Agreement, Operator shall not do any work which would constitute an expansion of the System as that term is used in Article VI of the TAPS Agreement. Operator shall perform all its services under this Operating Agreement in a good and workmanlike manner as a prudent Operator would under the same or similar circumstances. Operator shall conduct all operations and maintenance of the System in accordance with generally accepted practices in the pipeline industry to the end that the System is operated within its design limitations for safe and efficient operations.

6.5    **Acquisition of Land Rights.** All Land Rights shall be acquired by the Owners pursuant to an Approved Budget. It is contemplated, however, that, for convenience, title to some of the Land Rights, such as easements, leases, licenses and permits, may be acquired by and in the name of a Trustee for all of the Owners, in which event the Trustee shall thereafter, as each Owner may individually direct, promptly execute and deliver to all Owners or to one of them as Trustee for all Owners such instruments of transfer, assignment and conveyance as may be appropriate to evidence properly the undivided interest ownership of the particular Owner or Owners. Condemnation may be used by any Owner or Owners to acquire Land Rights whenever the terms and conditions asked for such Land Rights are unreasonable. Each Owner hereby consents to join as a party plaintiff in any condemnation suit filed on conditions hereinafter defined

14

for the purpose of acquiring Land Rights needed for the operation and maintenance of the System and authorizes any attorneys retained in such condemnation suit to join it as a party plaintiff in such suit and to represent it for all purposes in such condemnation proceeding. Each Owner further agrees that it will become qualified to the extent necessary to transact business in the State of Alaska if it is necessary or desirable to do so in order to avoid delay in condemning any such Land Rights. Each Owner shall qualify as promptly as practicable after it is determined that qualification is necessary. All such Land Rights shall be acquired, whenever possible, in assignable form. The cost of all such Land Rights shall be charged to the account of each Owner in accordance with Sections 10 and 11 hereof.

**6.6    Personnel and Other Services.** Operator in performing its duties under this Operating Agreement shall engage the services of independent contractors to perform such parts of the operation and maintenance of the System which cannot be performed by Operator's employees or which can more economically and just as efficiently be performed by independent contractors as with Operator's own employees. Operator shall employ only such personnel as are required to perform its duties under this Operating Agreement and are within staffing limits established by the Owners through the Owners Committee.

**6.7    Other Plans of Operation.** Nothing in Section 6.2 hereof shall be deemed to prohibit Owners from participating in any plan of operation required, approved, or permitted by any governmental authority having jurisdiction in accordance with any valid and applicable order, rule, regulation and/or law, and which is not inconsistent with any other provision hereof or the TAPS Agreement.

## SECTION 7

### OPERATING PROCEDURES

**7.1    Quality and Intermixing of Petroleum.**

(a)      Only Petroleum will be accepted for transportation in the System. All Petroleum transported through the System will be intermixed with other Petroleum shipments and shall be subject to such changes in gravity, quality and other characteristics as may result from such intermixing. No person shall be entitled to receive the identical Petroleum delivered into the System. Delivery shall be out of the commingled stream or common stock. In order to insure that no shipper will be materially damaged or benefited by changes in gravity, quality or other characteristics due to intermixing in the System, each Owner will require shippers tendering it Petroleum for transportation in its undivided interest in the System to participate in just and nondiscriminatory adjustments among all shippers in the System for changes in gravity, quality and certain other characteristics which materially affect the value of Petroleum transported in the System. The Owners by agreement will establish, or cause to be established, a system for such adjustments (herein referred to as Quality Bank).

15

(b)     Petroleum will not be accepted for transportation in the System unless (i) it is suitable for refining or use as a fuel and contains no more than thirty-five one hundredths of 1% (0.35%) by volume of basic sediment and water, (ii) its temperature does not exceed 142°F, provided that Petroleum may be accepted for transportation at any point in the System at a temperature in excess of 142°F but only under such circumstances and during such times as Operator hereunder determines, with approval of the Owners acting through the Owners Committee under Section 4.2 hereof, will not result in violation of any design or operating requirement for the System at any point in the System or result in inequities or discrimination as between Owners or shippers, (iii) its hydrogen sulfide ($H_2S$) content in solution does not exceed 50 parts per million by weight, and (iv) it will not result in the calculated combined stream of Petroleum in the System under the custody of each Owner at any given entry point in the System at any given time exceeding ten (10) parts per million hydrogen sulfide ($H_2S$) content in solution by weight, or the vapor pressure of such combined stream exceeding the greater of atmospheric pressure or 14.7 psia at receipt temperature. In calculating the above specified characteristics of the combined stream of Petroleum at any given entry point in the System under the custody of each Owner only Petroleum delivered into the System by that Owner at the point and all points upstream shall be considered. In no event will Petroleum be accepted for transportation in the System unless its gravity, viscosity, pour point, vapor pressure and other characteristics are such that it is readily susceptible to safe and efficient transportation through the System and will not materially affect the characteristics of other Petroleum shipments for which adjustments are not or will not be available through the Quality Bank.

(c)     Before any Petroleum will be accepted for transportation through the System which is from any producing reservoir or processing plant from which Petroleum has not previously been accepted for transportation, the Owner to whom such Petroleum is tendered shall give the Operator and all other Owners written notice thereof at least thirty (30) days prior to its actual acceptance. Such notice shall include a suitable assay of the tendered Petroleum and Operator's advice as to the ability of the System to handle and transport such Petroleum safely and efficiently. During such thirty (30) day period each Owner shall advise Operator of any objections to the acceptance of such Petroleum solely on the basis of anticipated damage to the System or damage to the commingled stream of a kind for which just and reasonable compensation cannot be obtained through the Quality Bank. If any Owner so objects, the matter shall be referred to the Owners through the Owners Committee for resolution.

7.2     **Measurements of Receipts and Deliveries of Petroleum.** Operator shall ascertain and record the quantity and quality of Petroleum received into and delivered out of the System as follows:

(a)     *Quantity Measurements.*

(i)     *Meters.* Custody transfer measurement of all receipts into and deliveries out of the System shall be by meters except in instances where meters may not be operable or otherwise available in which case an alternate method provided for in the Oil Measurements Manual shall be used.

16

(ii)    *Calibration of Meters.*    Operator shall calibrate or cause to be calibrated, in accordance with the Oil Measurements Manual, all tanks, meters, and meter provers to be used in the operation of the System, and at the reasonable request of any Owner, Operator will confirm the accuracy of existing meter prover base volumes and tank tables used in connection with the System.

(b)    *Quality and Characteristic Analysis.*    Basic sediment and water (BS&W), temperature, gravity, and other Petroleum quality tests shall be made by Operator in accordance with the Oil Measurements Manual.

(c)    *Reporting to Owners.*    Operator shall report to each Owner for all Petroleum received into and delivered out of the System for the account of such Owner on the basis of standards set forth in the Oil Measurements Manual.

**7.3    Petroleum Losses and Gains.**    All losses and gains of Petroleum from or in the System shall be allocated by Operator among the Owners as hereinafter set forth:

(a)    The total amount of any loss of Petroleum in the Pipeline exceeding 4,000 Barrels occasioned by or resulting from any single identifiable event shall be allocated among all Owners based on their Percentage of Ownership in the Pipeline at the time the loss occurs.

(b)    The total amount of any loss of Petroleum in Terminal Tankage exceeding 4,000 Barrels occasioned by or resulting from any single identifiable event shall be allocated among all Owners in the proportion that the Petroleum in the custody of each Owner in Terminal Tankage at the beginning of the Day on which the loss occurs bears to total Petroleum held in Terminal Tankage at the beginning of that Day.

(c)    All gains and all other losses of Petroleum in the System or extractions from Petroleum in topping plants shall be allocated among all Owners in the proportion that the total 100 Barrel-Mile Deliveries for each Owner's account bears to the total of all 100 Barrel-Mile Deliveries.    Operator shall make such allocations monthly, but the cumulative net amount of such gains, losses or extractions shall be adjusted monthly on a Calendar-Year-to-Date basis within a Calendar Year.

**7.4    Scheduling and Use of the System.**    No Owner may transport through the System a Volume of Petroleum in excess of such Owner's Actual Daily Pipeline Capacity.    No Owner may deliver out of the System a Volume of Petroleum in excess of the amount of Petroleum held in that Owner's Working Inventory and Owner's Base Inventory.    Each Owner shall first deliver out of the System Petroleum held in its Owner's Working Inventory and may thereafter deliver Petroleum held in its Owner's Base Inventory provided:

(i)    the lifting was included in the Lifting Schedule, or will not adversely affect the scheduled lifting of any other Owner.

17

(ii)     the lifting will not impair the minimum required inventory operating levels as determined by Operator.

(iii)     the lifting Owner's Base Inventory at the commencement of each such lifting is equal to the Volume of Base Inventory such Owner is obligated to provide under Section 7.6 hereof.

In order to insure that each Owner has the opportunity to schedule and use an amount of Pipeline capacity calculated as provided in this Section 7.4, the Owners agree that the scheduling and use of the System shall be in accordance with the following provisions:

(a)     *Scheduling and Use of the Pipeline.* By notice no later than 1200 hours Valdez, Alaska, local time of the first Operator Business Day of each Month, Operator will advise each Owner (i) of the Estimated Daily Pipeline Capacity for each Owner for the succeeding Month and (ii) of the Pumpability Factor of each Petroleum anticipated to be transported in the System during such succeeding Month. By notice no later than 2400 hours Valdez, Alaska, local time of the fifteenth Day (or, if the fifteenth Day is not an Operator Business Day, then of the first succeeding Operator Business Day) of each Month, each Owner will advise Operator of its throughput schedule for the succeeding Month. In order to facilitate Pipeline operations and prevent discrimination among shippers, the Owners will approve nominations procedures for the Pipeline. Each Owner will require shippers tendering it Petroleum for transportation in its undivided interest in the System to comply with such nominations procedures. Any Owner may revise its throughput schedule as allowed by such nominations procedures, provided that no Owner shall schedule or deliver into the Pipeline more Petroleum than could be transported by the capacity allocated to such Owner for transport through the Pipeline for that Month in accordance with this Section 7.4(a). Any Owner's failure for any reason to use fully its Estimated Daily Pipeline Capacity shall not thereafter entitle it to schedule or use capacity in excess of its Estimated Daily Pipeline Capacity.

(b)     *Scheduling and Use of Terminal.*

(i)     *Scheduling of Liftings and Vessels.* Any Owner expecting to commence lifting at the Terminal for the first time shall provide a one-Week notice prior to submitting the four-Week schedule required by this section. In addition to the requirements imposed by the immediately preceding sentence, each Owner will advise Operator of the schedule of Vessels it expects to call at the Terminal during the ensuing four-Week period, specifying for each Vessel scheduled for the first Week of such four-Week schedule and to the extent possible for the last three Weeks, the Volume to be lifted, name, Scheduled Arrival Day, and such other information as required by the Port Information Manual.

(ii)     *Preparation of Lifting Schedule.* Within twenty-four (24) hours from the time Owners are required to provide the above Vessel and lifting schedule information, Operator shall prepare and submit to each Owner a preliminary composite schedule of such information together with projected daily Working Inventory for the applicable four-Week

18

546

period. If there are more proposed liftings on any Day during the first Week of such four-Week period than can be accommodated by the Terminal and such conflicts cannot be resolved voluntarily between the conflicting Owners, Operator shall resolve such conflicts in accordance with the rules provided for in Section 7.4(c)(i), Assignment of Dock Space. After resolution of all conflicts in accordance with these rules, the Lifting Schedule then established shall be issued to each Owner.

(iii)    *Revision of Lifting Schedule*.  Any changes or Vessel substitution may be made to the Lifting Schedule established in 7.4(b)(ii) by any Owner upon written notice to Operator at least seven (7) days in advance of a scheduled lifting subject to the scheduling priority rules provided for in Section 7.4(c)(i). Changes or Vessel substitution with less than seven (7) days notice may be made provided such changes or Vessel substitution will not adversely affect any other Owner's scheduled liftings, unless such other Owner's prior written consent is obtained, and the changes or substituted Vessel complies with the Port Information Manual.

(iv)    *Notice of Revised Lifting Schedule*.  When a revision or change is made to the Lifting Schedule in accordance with 7.4(b)(iii) above, the Operator will promptly notify all the Owners of the revised Lifting Schedule and the effective date of the revision.

(c)    *Docks*.

(i)    *Assignment of Dock Space*.  Vessels shall be assigned dock space by Operator in the order of Actual Arrival Time. Provided however, that:

1.    adequate and appropriate inventories designated for lifting by such Vessel have been established, and

2.    if in the Operator's prudent judgment such prioritization will optimize System deliveries.

Each Vessel shall dock when and as instructed by Operator. If any Vessel is unable to dock when instructed, Operator shall dock the next Vessel waiting to be docked based on the order of dock assignment until the Vessel that was unable to dock is able to dock.

(ii)    *Lifting Time*.  After a Vessel has been docked, it shall be allowed 24 hours, if the Vessel is of two hundred twenty-five thousand (225,000) dead weight tons or less, or 30 hours, if the Vessel is of greater than two hundred twenty-five thousand (225,000) dead weight tons, from the time that Operator gives notice of readiness to commence either loading or deballasting within which to complete its lifting and to release its last line from a mooring point at the dock. If any Vessel fails to release its last mooring line before a specified departure time contained in a notice from Operator (which specified departure time shall not be earlier than the end of such 24-hour or 30-hour period, nor earlier than four hours after Operator transmits such notice to the Vessel), the Owner scheduling such

19

Vessel shall thereafter pay a penalty of Two Thousand Dollars ($2,000) for each hour or part thereof such Vessel remains at the dock, while such dock is required to load another Vessel which has established an Actual Arrival Time. The Operating Expense account of the Owner incurring the penalty shall be debited with the full amount of any such penalty and the Operating Expense accounts of all other Owners shall be credited with a pro rata share of such penalty prorated on the basis of the percentages of Ownership of the Pipeline of such other Owners.

Any delay due to:

A. any act or omission of Operator, or

B. a local event or condition of general application (except mechanical equipment malfunction on the Vessel) not within the control of Operator, the Owner scheduling the Vessel or any other person responsible for the operation or control of such Vessel

which act, event or condition prevents the Vessel from vacating the docks shall be added to the time until a Vessel is required to vacate the dock.

(d) *Working Capacity*. If, at the beginning of any Day, Working Inventory equals or exceeds seventy-five percent (75%) of Working Capacity and any Owner's Working Inventory is in excess of such Owner's Working Capacity, such Owner shall be charged a penalty of Twenty Cents (20¢) per Day per Barrel for each Barrel in such Owner's Working Inventory in excess of such Owner's Working Capacity. The Operating Expense account of the Owner incurring the penalty shall be debited with the full amount of any such penalty and the Operating Expense accounts of the other Owners shall be credited with an amount determined by multiplying the total amount of the penalty for any Day by a percentage determined for each Owner by dividing the amount of that Owner's Working Capacity at the beginning of that Day not being used by it by the aggregate of all Owner's Working Capacity at the beginning of that Day not being used by its Owner. In calculating the penalty under this Section 7.4(d), the number of excess Barrels at the beginning of any Day shall be reduced by

(i) the number of Barrels scheduled to be lifted by a Vessel which has established an Actual Arrival Time at the beginning of any Day the penalty is applied but is unable to dock because the passage through Prince William Sound or Valdez Arm is closed to shipping due to an event or condition not within the control of the Owner incurring the penalty, and

(ii) the number of Barrels scheduled to be lifted by a Vessel which has docked but is unable to lift at the beginning of any Day due to any act or omission of Operator or due to any local event or condition of general application not within the control of Operator, the Owner scheduling such Vessel or any person responsible for the operation or control of such Vessel which does or would prevent all Vessels from loading.

20

548

**7.5    Manuals.** Owners will arrange for the preparation of all manuals referred to in this Operating Agreement and such other manuals as are required for the safe and efficient operation of the System, or the administration of this Operating Agreement or which are required by any applicable law, regulation or agreement. Any such manuals or changes thereto shall be approved by the Owners through the Owners Committee. If there are any conflicts between the provisions of such manuals and the terms of this Operating Agreement, this Operating Agreement shall control.

**7.6    Base Inventory.** Each Owner shall provide or cause to be provided a Volume of Petroleum for Pipeline Base Inventory as required to begin and maintain the operation of the System equivalent to its Percentage of Ownership in the Pipeline multiplied by the total Volume of Petroleum required for Pipeline Base Inventory. Each Owner shall also provide or cause to be provided a Volume of Petroleum for Terminal Tankage Base Inventory as required to begin and maintain the operation of the System equivalent to its Percentage of Ownership in the Terminal Tankage multiplied by the total Volume of Petroleum required for Terminal Tankage Base Inventory. Operator shall give written notice to each Owner specifying the time or times after such notice that each Owner will be required to provide its share of Base Inventory required to commence operations. Subject to the lifting of Base Inventory as provided in Section 7.4 each Owner shall provide Base Inventory required to maintain its share when and as requested by Operator. If any Owner fails to provide its share of Base Inventory when and as requested by Operator, Operator may acquire the same and charge the cost thereof to the account of such Owner.

**7.7    Transfers of Petroleum Within the System.** Except as may result from a sale, transfer or assignment of an Owners interest in the System covered in Section 13 hereof, no Owner shall transfer its custodial responsibility for Petroleum within the System. Operator shall only account for transfers of Petroleum as a ticket transaction at receipt and delivery points.

**7.8    Connections to the Pipeline.** Connections shall be made to the Pipeline in accordance with all applicable laws and regulations and in accordance with standards and procedures which may be adopted by the Owners through the Owners Committee from time to time for the safe and efficient operation of the Pipeline.

**7.9    Operation of Standby Pumping Units.** Standby pumping units may be operated from time to time in the discretion of the Operator. In the event Owners, or any of them, construct facilities qualifying as an Expansion or Substage, as those terms are used in the TAPS Agreement, and if the use of standby pumps as hereinabove authorized without the use of a drag reducing agent adds an increment of Design Capacity to that achieved by the defined Expansion facilities, the Design Capacity of the System shall include such increment attained by operating standby pumps.

21

## SECTION 8

### TAXES

#### 8.1 Reporting and Payment of Taxes.

(a)    *Taxes*. Each Owner shall separately report and pay all franchise taxes and taxes on or measured by income relative to its operations as a separate common carrier or to its undivided interest in the System. Operator, under the direction and control of Owners and as agent for each Owner, shall (i) prepare and file reports and returns, in connection with any taxes other than franchise taxes and taxes on or measured by income and (ii) pay such taxes on or before the date due. Each Owner may request Operator, under the direction and control of and acting separately as agent for each requesting Owner, to contest any such taxes subject to the provisions for handling claims as provided in Section 9.2 hereof.

(b)    *Tax Information*. Upon the request of any Owner, Operator shall promptly furnish information needed by such requesting Owner relative to preparation and payment of its taxes. Where Operator is handling the reporting and payment of any taxes for an Owner hereunder, each Owner upon request from Operator shall furnish Operator with the necessary information required to report and pay such taxes.

#### 8.2    Election to be Excluded from Partnership Regulations.
Each Owner hereby elects that it and the operations covered by this Agreement be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954, as amended, or such portion or portions thereof as the Secretary of the Treasury of the United States or his delegate shall permit by election to be excluded therefrom. Operator is hereby authorized and directed to execute on behalf of the Owners such additional evidence of the election as may be required by regulations issued under said Subchapter K. Should the regulations require each Owner to execute such additional evidence, each Owner agrees to execute or join in the execution thereof. The election hereby made and the other provisions of this paragraph shall apply in a like manner to applicable state laws, regulations, and rulings now in effect or hereafter enacted that have an effect similar to the federal provisions referred to herein. In making this election, each Owner hereby states that the income derived from the operations under this Operating Agreement can be adequately determined without computation of partnership income.

## SECTION 9

### INSURANCE, CLAIMS AND PROTECTION OF OPERATOR

#### 9.1    Operator's Insurance Program.
Operator shall carry and keep in force only the insurance coverages specified in the Exhibit A attached hereto, captioned "Operator's Insurance Program" with insurance companies acceptable to the Owners through the Owners Committee protecting Operator and each Owner. Operator shall charge all costs and expenses for such

22

550

insurance to Pipeline Fixed Operating Expenses. The insurance coverages set out in Exhibit A shall not be modified or revised except by agreement of the Owners.

### 9.2 Claims.

(a) *Handling by Operator.* Subject to the provisions of Sections 9.2(a), (b) and (c) hereof, any claim or suit which arises out of the operation and maintenance of the System of either of the following types:

(i) Any claim or suit against the Operator and/or Owners hereto (herein called a "Liability Claim") except those fully covered by insurance as provided in this Section 9 and those which are for the value of Petroleum lost covered in Section 7.3 hereof;

(ii) Any claim or suit which the Operator and/or Owners have against persons who are not parties to this Operating Agreement except condemnation proceedings covered in Section 6.5 hereof (herein called a "Recovery Claim");

shall, except as hereinafter provided, be handled by Operator, who as agent for Owners shall litigate, appeal, and/or settle same subject to Section 9.2(c) hereof. The costs of handling such Liability Claim or Recovery Claim, including, but not limited to, expenses for litigation and investigation, reasonable costs for legal counsel and court costs shall be paid by Operator and such costs or any amounts received by Operator in settlement or payment of a judgment on a Recovery Claim or any amounts paid by Operator in settlement or payment of a judgment or fine on a Liability Claim shall be credited or charged to Pipeline Fixed Operating Expenses if such amounts are related to the Pipeline or to Terminal Tankage Fixed Operating Expenses if such amounts are related to Terminal Tankage.

(b) *Notice of Claims.* Operator shall promptly notify each Owner in advance of filing any Recovery Claim and immediately upon notice of the filing of any Liability Claim. For Recovery Claims or Liability Claims estimated not to exceed $250,000, Operator shall indicate in its notice to each Owner whether the claim constitutes a Special Interest Claim. For purposes of this Subsection 9.2, a Special Interest Claim means one involving significant public, regulatory, or political implications for the Operator or the Owners, a claim likely to result in major precedent, a claim that has the potential to result in significant liability or a punitive damage award, or a claim involving patent or common carrier issues.

(c) *Limitation of Authority.* Operator's authority with respect to any Liability Claim or Recovery Claim is subject to the following:

(i) *Liability Claim.* Operator shall obtain the approval of the Owners through the Owners Committee before litigating, appealing, settling, paying, or otherwise compromising any Liability Claim estimated to exceed $250,000, any Special Interest Claim, or any claim in a case in which any Owner is named as a party.

(ii)    *Recovery Claim.* Operator shall obtain the approval of the Owners through the Owners Committee before filing, litigating, appealing, settling or otherwise compromising any Recovery Claim estimated to exceed $250,000 or any Special Interest Claim.

(iii)    *Other Limitations of Authority.* The Operator shall also comply with other more stringent limitations of its authority approved by the Owners through the Owners Committee.

(d)    *Reservation of Owners.* Notwithstanding the provisions of this Section 9, each Owner retains the right to be eliminated as a party plaintiff to any Recovery Claim except in cases where such Owner is an indispensable party to any such Recovery Claim. In the event any Owner is eliminated as a party plaintiff to any Recovery Claim said Owner shall not be responsible for any costs or expenses associated with the handling of such claim nor will said Owner participate in the proceeds of any sums recovered. In addition to counsel employed by Operator, each Owner reserves the right to be represented in any Liability Claim or Recovery Claim by counsel selected by such Owner and employed at its own expense.

**9.3    Indemnification of Operator.** To the extent that Operator or its employees are not protected by insurance carried by either Operator or other third parties, each Owner agrees to indemnify and hold harmless Operator and its employees from and against all claims and causes of actions for injury to and death of persons and all damages to and destruction of property, in whole or in part, caused by, resulting from or arising out of any act or omission of Operator or Operator's employees, servants, agents, contractors, subcontractors or two or more of them pursuant to this Operating Agreement, even though such act or omission constitutes gross negligence. The obligations of each Owner under this Section 9.3 shall be limited to an amount which is equal to the product of the total indemnity obligation of all Owners multiplied by each Owner's Percentage of Ownership in the Pipeline.

**9.4    Insurance Required by Government Regulation.** If insurance is required by any governmental body or to meet any statutory requirement and such insurance is not being carried by Operator, each Owner, as to its applicable Percentage of Ownership, will supply evidence of insurance or self insurance to meet the requirement. If none of the Owners is able, except by the purchase of new coverage, to meet such requirement, the Operator will if authorized by all the Owners arrange to purchase such insurance for all the Owners and charge the premiums to the appropriate Fixed Operating Expense account.

**9.5    Contractor's Insurance Program.**

(a)    Operator shall require all contractors to carry the minimum insurance as specified in Exhibit B, attached hereto and made a part hereof and shall take full advantage of all insurance normally carried by contractors utilized hereunder, the cost of which would ordinarily be included in contractor's contract price in any event. Operator shall not require insurance above the minimums set forth in Exhibit B. The contractor's insurance requirements as set forth in this

24

552

paragraph and Exhibit B may, however, be modified or revised for any contractor or for all contractors by action of the Owners through the Owners Committee. Also, Operator may modify such requirements on a case by case basis if in Operator's opinion either exposure does not warrant coverage to the extent set forth in Exhibit B or such insurance is not available to the contractor at a reasonable premium.

(b)    Except as stated in sections (i) and (ii) below, Operator shall use its best efforts to include in any contract entered into by Operator, as agent for each Owner, with a contractor, a provision that the contractor will be required to indemnify and save harmless Operator and each Owner against injury to or death of persons or damage to or loss of property caused in whole or in part by the joint and/or concurrent negligence of Operator, Owners, contractor, subcontractors, or third parties, or their agents, employees or representatives.

(i)    Contractors need not be required to indemnify Operator or Owners for loss or damage solely caused by the negligence of Operator or Owners or Operator and Owners.

(ii)    Contractors shall not be liable to Operator or Owners for damage to property of Owners occurring prior to the acceptance of the contractors' work, unless the contractors have insurance coverage, or are otherwise reimbursed for such damages to property.

(c)    Contractors shall not ordinarily be required to provide performance bonds: However, Operator may require a performance bond if it deems it necessary and desirable under particular circumstances.

(d)    All policies of insurance carried by contractors and their subcontractors shall contain a waiver of subrogation against Operator, its employees and stockholders, and each Owner, its employees, stockholders and affiliated companies.

9.6    **Special Insurance Provisions.**

(a)    In the event the Owners so request, Operator shall insert clauses in all contracts with contractors and subcontractors reserving the right to purchase, maintain and keep in force at its sole cost any insurance that it may therein specify.

(b)    All purchases and shipments of materials, equipment, supplies or property of any type by Operator or for Operator by any contractor or subcontractor shall be on an ex-insurance basis to the extent possible regardless of the hazards or risks assumed, provided however, this risk assumption shall not inure to the benefit of any carrier, common or contract, except an Owner in this Operating Agreement.

9.7    **Report of Concentration of Values.** Operator shall furnish each Owner with a "Concentration of Values Report" each year to meet risk management requirements.

## SECTION 10

### MATERIALS, EQUIPMENT AND SUPPLIES

**10.1    Purchase.** Operator shall purchase in the name of and on behalf of each Owner all materials, equipment and supplies required to operate and maintain the System. Provided, however, that each Owner shall provide or cause to be provided, in kind, its share of the fuel gas BTU requirements for the operation of pump stations NOS. 1 through 4 inclusive along the Pipeline. Each Owner's share of such total fuel gas BTU requirements shall be determined each month by multiplying the total requirement for that month by a fraction, the numerator of which is the estimated scheduled 100 Barrel-Mile Deliveries for such Owner's account for that month and the denominator of which is the total of such deliveries for all Owners' accounts for that month and with adjustments for differences between actual and estimated shares being made for each month during the following month. Operator will accept such fuel gas at a point near pump station NO. 1 at Prudhoe Bay, Alaska as designated by Operator. If any Owner fails to furnish its share of such fuel gas in kind, Operator may purchase the same and the cost thereof shall be for the account of such Owner.

**10.2    Disposal.** Subject to the limitations below, the Operator shall have authority to declare any materials, equipment or facilities no longer required for the operation or maintenance of the System as surplus. Operator shall notify the Owners through the Owners Committee of any declaration in which such excess materials, equipment or facilities have a Purchase Price in excess of $1,000,000. Operator's declaration that any materials, equipment or facilities with a Purchase Price in excess of $5,000,000 are surplus shall be subject to approval of the Owners through the Owners Committee.

(a)    *Division in Kind.* With regard to units of a similar kind of personalty which are susceptible of division in a manner which will enable each Owner of an undivided interest therein to receive a unit or units which would not exceed the value of that Owner's applicable Percentage of Ownership in the total number of such units, each Owner shall be entitled to receive in kind and separately dispose of its share of all such materials, equipment, or facilities purchased pursuant to this Operating Agreement.

(b)    *Disposal by Sale.* Notwithstanding Section 10.2(a), above, each Owner authorizes the Operator as agent for each Owner to dispose of for cash its undivided interest in any surplus materials, equipment and facilities purchased pursuant to this Operating Agreement subject to the following conditions:

(i)    In instances where an appraisal is required, Operator shall obtain from an independent appraiser an opinion of the fair-market value of such materials, equipment or facilities. Purchase Price as used in this Section 10.2 shall mean the original cost of any item plus the costs of any improvements or additions thereto and any costs incurred in transporting such item to Alaska.

26

554

(ii)     Operator may sell any item of materials, equipment or facilities by competitive bidding, public auction, bid invitation or long-term sales agreement. Operator may also make negotiated and special opportunity sales to third parties provided the sales price exceeds the appraised fair market value of the materials, equipment or facilities in question. Operator may also use other options to dispose of surplus materials, equipment or facilities pursuant to guidelines established by the Owners through the Owners Committee.

(iii)     A sale by any means of any items of materials, equipment or facilities having a Purchase Price or an appraised fair-market value of $1,000,000.00 or more must be approved in advance by the Owners through the Owners Committee.

(iv)     Prior to the time any item of materials, equipment or facilities is put out for bid or otherwise put up for sale, any Owner will have an opportunity to buy such materials, equipment or facilities at the appraised fair-market value. If two or more Owners are interested in the same item and such Owners cannot arrive at a mutually acceptable solution, Operator will bid such item among the interested Owners and award the sale to the Owner making the highest bid provided such bid is not less than the appraised fair-market value.

(v)     All proceeds derived from sales of materials, equipment and facilities shall be remitted by purchaser either directly to the Owners (including any Owner that purchases such equipment) in the proportion of their applicable Percentages of Ownership in such materials, equipment and facilities at the time of the sale or to a third party selected by the Owners who will distribute the proceeds as indicated above.

(vi)     The disposal authority given to Operator in this Section 10.2(b) is revocable at will by any Owner except in cases where (prior to notice of such revocation) Operator has offered for bid any item of material, equipment or facilities or has contracted to sell such property.

**10.3     Inventories of Materials and Supplies.**

(a)     *Inventory of Materials and Supplies.* Operator shall maintain inventory accounting records, as required by the Federal Energy Regulatory Commission, or any successor thereto with respect to the regulation of oil pipelines, of all inventories of materials, supplies and uninstalled spare equipment acquired or held for or in connection with operation or maintenance of the System. At least once each Calendar Year Operator shall make a physical count of such inventories. Each Owner who wishes to be represented at such count may do so. Failure of any Owner to send a representative shall bind it to accept the physical inventory as submitted.

(b)     *Ownership of Materials and Supplies.* Materials and supplies shall be owned by the Owners in proportion to their Percentages of Ownership in the Pipeline or Terminal Tankage as the case may be.

27

555

## SECTION 11

### ACCOUNTING, BUDGETS, CHARGES AND AUTHORITIES

**11.1    Maintenance of Accounts.**  Operator shall maintain accurate accounting records of all expenses, costs and liabilities incurred by it on behalf of Owners.  All accounts shall be maintained in accordance with generally accepted accounting principles, the Uniform Systems of Accounts prescribed by the Federal Energy Regulatory Commission, or any successor thereto with respect to the regulation of oil pipelines, for Oil Pipeline Companies.

**11.2    Budgets and Long-Range Plans.**

(a)    *Budgets.*  In furtherance of each Owner's effective exercise of control over the operation of its undivided interest in the System, Operator shall prepare and present to the Owners no later than July 1 of each Calendar Year for their approval through the Owners Committee no later than December 1 of each Calendar Year annual budgets as required by the Owners through the Owners Committee for the ensuing Calendar Year.

(b)    *Long-Range Plans.*  The Operator shall also prepare and submit to Owners no later than July 1 of each Calendar Year a long-range plan detailing by Calendar Year estimated Operating Expenses and Capital Expenditures for the next ensuing ten (10) Calendar Years.

(c)    *Budget Update.*  In addition to the submittals provided for in Sections 11.2(a) and (b) above, Operator shall submit for Owners' review through the Owners Committee budget updates as required by the Owners through the Owners Committee.

(d)    *·Additions and Other Changes.*  Except in accordance with procedures approved by the Owners through the Owners Committee, all additions or other changes to the Approved Budgets shall be approved by the Owners through the Owners Committee.  All additions or other changes in excess of One Million U.S. Dollars ($1,000,000.00) requested by Operator or any Owner shall be submitted to each Owner no later than thirty (30) days prior to the date such addition or other change is scheduled for review and approval.

(e)    *Approvals.*  Any Owners Committee Member (or its alternate) who is unable to attend the Owners Committee meeting at which time the budgets are scheduled for approval vote shall telecopy, employ other appropriate means of electronic communication, or mail his vote on each item scheduled for consideration so that it will be received by Operator no later than three (3) working days prior to the scheduled meeting date.  Members (or their alternates) who do not attend such committee meetings and who have not otherwise communicated their vote shall be considered to have cast an affirmative vote on each item scheduled for consideration.

**11.3    Authority for Expenditure.**  Any Authority for Expenditure ("AFE") of at least Five Million U.S. Dollars ($5,000,000), whether for capital expenditures (including retirement)

28

or for operating expenses, for which there is a detailed item in the Approved Budgets shall be approved by the Owners through the Owners Committee. In addition, any AFE of at least Two Million U.S. Dollars ($2,000,000) for capital expenditures (including retirement) or for operating expenses (i) for which there is not a detailed item in the Approved Budgets, or (ii) which is related to design and long-lead material shall be approved by the Owners through the Owners Committee. Any supplemental AFE of at least One Million U.S. Dollars ($1,000,000.00) requested by the Operator shall be approved by the Owners through the Owners Committee. Operator may also make expenditures in the case of emergencies as provided in Section 11.7 hereof.

**11.4    Charges.**  Operator shall on behalf of Owners promptly pay and discharge all expenses, costs and liabilities incurred in operating and maintaining the System or in performing Operator's service under this Operating Agreement.

(a)    *Chargeable Items.*  Any and all costs, expenses or liabilities incurred by Operator for or in connection with the operation and maintenance of the System or which are necessary in the performance of Operator's services and responsibilities under this Operating Agreement shall be considered a proper charge to the accounts of the Owners. Each Owner agrees to pay its share of all such costs, expenses or liabilities in accordance with the provisions of this Operating Agreement. While any Owner is separately paying its share of any costs, expenses, taxes or liabilities under any provisions of this Operating Agreement, such Owner shall not be charged with a pro rata share of any such costs, expenses, taxes or liabilities. If any facility which is classified as either Pipeline or Terminal Tankage under Section 3 hereof is used to provide services to the other, Operator shall make an appropriate allocation of the costs of operating and maintaining such facilities between Pipeline and Terminal Tankage based on usage.

(b)    *Allocation of Charges and Credits — Fixed and Capital.*  Except as provided elsewhere in this Operating Agreement, all capital expenditures related to the Pipeline and all Pipeline Fixed Operating Expenses and related credits shall be allocated monthly among Owners in accordance with their respective Percentages of Ownership in the Pipeline and all capital expenditures related to Terminal Tankage and all Terminal Tankage Fixed Operating Expenses and related credits shall be allocated monthly among the Owners in accordance with their respective Percentages of Ownership in Terminal Tankage. Should the Percentages of Ownership change during a month, Operator shall prorate such charges accordingly on a Calendar Day basis.

(c)    *Allocation of Charges and Credits — Variable.*

(i)    Pipeline Variable Operating Expenses and related credits shall be allocated among all Owners in the proportion that the total 100 Barrel-Mile Deliveries for each Owner's account bear to the total of all 100 Barrel-Mile Deliveries. Operator shall allocate such expenses monthly, adjusted to a Calendar Year-to-Date basis within a Calendar Year.

29

557

(ii) Terminal Tankage Variable Operating Expenses and related credits shall be allocated among Owners in the proportion that the total deliveries out of the System at Valdez, Alaska, for each Owner's account bear to the total of all deliveries out of the System at Valdez, Alaska. Operator shall allocate such expenses monthly, adjusted to a Calendar Year-to-Date basis within a Calendar Year.

**11.5 Reports and Information.** At the request of any Owner, Operator shall provide such information, records, and reports as necessary for such Owner to properly accomplish required reports to government agencies and provide such other information, records and reports relating to an Owner's undivided interest in the System as may be requested. In this connection, each Owner shall promptly notify Operator of any and all changes in or additions to reporting requirements prescribed by governmental and regulatory bodies which come to their attention and which will affect Operator's preparation of the reports covered by this Section 11.5 hereof.

**11.6 Cash Calls.**

(a) Operator shall submit to Owners by the 12th day of each month a forecast of the monthly cash requirements. Such forecast shall disclose separately the aggregate requirements for operating and capital expenditures by months for the next twelve (12) months and by Week for the first eight (8) Weeks of said twelve (12) month period.

(b) Operator shall notify each Owner by telecopy or other appropriate means of electronic communication on the last working day of each Week or Friday (whichever is earlier) of the anticipated cash requirements for the next ensuing Week. Each Owner shall arrange to deposit into Operator's designated account its share of such funds (as each Owner's share of such funds shall be determined and adjusted from time to time by the Operator using appropriate composite percentages and cash adjustments reflecting changes in actual expenditures between Terminal Tankage facilities and System other than Terminal Tankage facilities in accord with procedures approved by the Owners Committee hereunder) sufficient to meet Operator's cash requirements and maintain Operator's account at such minimum balance as shall be agreed to between the bank and the Owners.

(c) Delinquent cash deposits by any Owner shall bear interest from the day such deposit becomes delinquent and continuing until such delinquency is redressed at a rate of 125% of the prime rate of interest of the Citibank N.A., 399 Park Avenue, New York, New York, on ninety--day loans to substantial and responsible commercial borrowers as such rate shall change from time to time, each such change to become effective on the effective date of such change of said Bank, provided that if such rate of interest shall be unlawful under applicable law, then it shall be reduced to the highest lawful rate. All interest paid by a delinquent Owner shall be paid to the nondelinquent Owners in the proportions in which the nondelinquent Owners have provided funds to meet the cash calls which delinquent Owners failed to provide. If any Owner shall be delinquent for as much as thirty (30) days in any payment to Operator, Operator, as agent, and for the benefit, of all Owners who are not delinquent, shall have, in addition to any other legal or

30

equitable remedy available to the Parties, the right upon written notice to any shipper of such delinquent Owner to have all payments to be made by such shipper under the tariffs of such Owner covering its undivided interest herein to be made to Operator for application upon such Owner's accounts; and such Owner agrees no shipper shall be required to determine whether proper application is made by Operator of any payment made to Operator in accordance with this provision. If, for any reason, Operator cannot collect such tariffs, Operator shall not accept any shipments of Petroleum for the account of any delinquent Owner until such time as all delinquent amounts, including interest thereon, have been paid in full.

**11.7    Emergency Authority.**

(a)      Operator is herein authorized to make immediate commitments or expenditures up to $10,000,000 without prior approval as necessary to:

(i)      Prevent imminent escape of oil, liquids or hydrocarbon vapors from the System.

(ii)      Prevent imminent injury.

(iii)      Prevent, curtail, minimize or otherwise mitigate imminent damage to the environment or the property of Owners or third parties.

(iv)      Prevent imminent failure or unplanned shutdown of the System.

(v)      Restore the System to operating condition following any unplanned shutdown or failure.

(vi)      Comply with emergency orders of any governmental agency.

(b)      Upon the occurrence of any such events, Operator shall immediately notify each Owner by cable, telecopy, other means of electronic communication or telephone as appropriate and later confirm by letter specifying the occurrence, the action taken, estimated expenditure, any further action required, and such other details as may be required for reporting to local, state, and federal regulatory agencies.

(c)      None of the provisions of this Operating Agreement shall be construed to limit or deny the rights of Operator to take actions or expend funds as provided in this Section 11.7.

**11.8    Policies.** Operator shall prepare and submit for approval by the Owners through the Owners Committee Policies concerning, but not limited to, the following matters:

(a)      Audit.

(b)      Code of conduct/standards of professional interaction.

(c)     Compliance with right-of-way agreements, permits, laws and regulations.

(d)     Conflict of interest.

(e)     Contingency plans.

(f)     Contributions.

(g)     Environmental protection.

(h)     Organization and authority.

(i)     Political activities.

(j)     Quality program.

(k)     Records management.

(l)     Safety and loss prevention.

(m)     Security.

(n)     Substance abuse.

**11.9    Relocation Agreements.** Operator as agent for each Owner may contract on behalf of each Owner with any governmental agency or entity for lowering, adjusting, or relocating the Pipeline if (i) the project is entirely reimbursable, (ii) the nonreimbursable portion does not exceed $200,000 or (iii) the Owners are legally required to make such lowering adjusting or relocation at their own expense. If the nonreimbursable part exceeds $200,000 [as in (ii) above] or if any nonreimbursable part is for any nongovernmental third party, Operator shall secure the approval of the Owners through the Owners Committee before proceeding. Nonreimbursable expenditures will be charged to Pipeline Fixed Operating Expenses. Costs to be reimbursed shall include, but not be limited to, applicable materials, contracts, salaries and benefits of Operator's employees, and operating and administrative overhead as shall from time to time be determined and applied on a percentage of direct labor basis, less any appropriate credits for salvageable materials net of the cost of removal and disposal.

**11.10    Audits.**

(a)     As soon as practicable after the Date of Commissioning of the System, Operator shall have an audit made of its accounts; this audit shall be repeated once in each Calendar Year thereafter. Each Owner shall be furnished a copy of each Calendar Year's audit before February 15 of the Calendar Year following the Calendar Year covered by the audit. Each such audit shall

32

560

be made by a Certified Public Accounting Firm selected and approved by the Owners through the Owners Committee, and the expense thereof shall be allocated among the Owners in accordance with their Percentages of Ownership in the Pipeline.

(b)    The Owners through the Owners Committee shall establish procedures for performing all internal auditing, including, but not limited to, audits of all internal functions of the Operator, contractors and vendors supplying services or materials to the Operator. The cost of this function will be segregated on the books of the Operator and will be charged to accounts of all Owners in proportion to Percentage of Ownership in the Pipeline.

(c)    In addition to the audits provided for in this Section 11.10 hereof, each Owner may at its sole option and expense, but not more than once each Calendar Year, inspect the accounts, review the internal controls and audit the contracts and records of Operator.

## SECTION 12

### TECHNICAL INFORMATION, INVENTIONS AND PATENTS,

### AND CONFIDENTIALITY

**12.1    Technical Information.** The Operator shall furnish or make available to each Owner all technical information received by it or resulting from or utilized in the operation or maintenance of the System and agrees to assert no ownership interest in any of the said technical information against any of the Owners. In obtaining technical information from any Owner or its Associated Companies or other third party, Operator will use its best endeavors to obtain from each all such rights to disclose and use this technical information. The Operator shall not assume an obligation to keep information of an Owner or an Associated Company of an Owner or other third party confidential without the prior express approval of Owners; provided, however, that Operator may assume such an obligation in an emergency if the duration of the obligation does not exceed three (3) years, and in such event Operator shall promptly notify each Owner of the obligation.

**12.2    Inventions and Patents.** Operator shall use its best endeavors to include as a term of any research or development contract carried out for the Owners by third parties (other than Owners or their Associated Companies) that any patents or patent applications resulting from any such research or development shall be the property of the Owners. Operator shall enter into suitable agreements with each of its employees and each employee of an Owner assigned to assist the Operator (other than such Owner employees assigned to assist the Operator for a period less than six (6) months) that inventions, patents, patent applications and other improvements which relate to or are useful in the operation of the System made by such employees will be assigned to and shall become the property of the Owners.

33

561

**12.3 Confidentiality.** Operator shall maintain and keep confidential all technical information referred to in Section 12.1 above and shall not disclose any of said technical information without the written consent of Owners except as provided in Section 12.1 hereof. Operator shall also maintain and keep confidential all inventions referred to in Section 12.2 and shall not disclose any of said inventions to parties other than Owners except to the extent necessary for the filing of patent applications covering said inventions or filing of applications for government permits. The aforesaid obligations of confidence and limitations on disclosure shall no longer apply to any technical information or invention after said technical information or inventions is in the public domain.

**12.4 Rights of Owners.** The rights of Owners with respect to any technical information, inventions and patents shall be in accordance with Article XII of the TAPS Agreement.

## SECTION 13

### ASSIGNMENT

**13.1 Successors and Assigns.** Owners agree with each other that so long as this Operating Agreement remains in force and effect, all sales or other transfers or assignments of interests in the System must be made pursuant to the provisions of the TAPS Agreement and shall be made subject to this Operating Agreement. All obligation and liabilities of the selling Owner shall be assumed by the purchaser in the same manner as obligations and liabilities under the TAPS Agreement. Such purchaser shall be required to execute a ratification of this Operating Agreement and shall thereafter be one of the Owners hereunder for all purposes contemplated by this Operating Agreement. The rights, duties and responsibilities of Operator under this Operating Agreement shall not be assignable without the consent of all Owners except as herein expressly authorized.

## SECTION 14

### MINERAL DISCOVERIES

**14.1 Mineral Discoveries.** Operator shall maintain and keep confidential any information relating to the existence or discovery of mineral or other natural resource information obtained by Operator, its employees, agents, contractors, and subcontractors in connection with the performance of its services under this Operating Agreement. Upon request of any Owner, Operator shall promptly make available to or furnish to all Owners any such information. Operator shall by the establishment of appropriate policies and procedures, insure that all employees, agents, contractors, and subcontractors are contractually obligated to protect the rights of the Owners in all such mineral and other natural resources discoveries in connection with the operation or maintenance of the System.

562

# SECTION 15

## GENERAL PROVISIONS

**15.1   Notices.**   Except as otherwise provided in this Operating Agreement, all notices provided for in this Agreement to be given in writing may be given by registered mail or by telegram, cable, telecopy or other appropriate means of electronic communication confirmed by registered mail addressed to Owners, as may be required for the particular notice, at their addresses stated below or at such other address the Owners may provide by written notice to all other Owners and Operator.

AMERADA HESS

Amerada Hess Pipeline Corporation
1185 Avenue of the Americas
New York, New York 10036

ARCO

ARCO Transportation Alaska, Inc.
P.O. Box 100-360
Anchorage, Alaska 99510

BP

BP Pipelines (Alaska) Inc.
900 E. Benson Blvd.
Anchorage, Alaska 99508

EXXON

Exxon Pipeline Company
(800 Bell Street
Houston, Texas 77002)
P.O. Box 2220
Houston, Texas 77252-2220

MOBIL

Mobil Alaska Pipeline Company
P. O. Box 900
Dallas, Texas 75221

PHILLIPS

Phillips Alaska Pipeline Corporation
(6330 W. Loop South
Belaire, Texas 77401)
P. O. Box 1967
Houston, Texas 77251-1967

35

UNOCAL                                    Unocal Pipeline Company
                                          1201 West 5th Street
                                          Los Angeles, California 90017

Receipt by the sender of proof of delivery of notices hereunder shall be considered proper notice to the addressee of the contents of such letter, telegram, cable, telecopy or other appropriate means of electronic communication.

**15.2  Laws and Regulations and Agreements.**

(a)     This Operating Agreement is subject to all present and future valid orders, rules, and regulations of any regulatory body having jurisdiction and to all applicable laws of and agreements with the United States and the State of Alaska including but not limited to any orders, rules, regulations, laws or agreements specifically referred to herein.

(b)     Operator shall comply, and secure compliance by its contractors and subcontractors, with all applicable orders, rules, and regulations of any regulatory body having jurisdiction and all applicable laws of and agreements with the United States and the State of Alaska including but not limited to requirements of the Rights-of-Way Agreements.

**15.3  Law Governing.**  All matters hereunder pertaining to rights and obligations under rights-of-way and other land permits shall be governed by the laws of the State of Alaska or the laws of the United States of America, as the case may be.  All other matters pertaining to this Operating Agreement and the rights and obligations of each Owner and Operator as between them shall be governed by and construed in accordance with the laws of the State of Texas.

**15.4  Entirety of Agreement.**  This Operating Agreement and the TAPS Agreement constitute the entire agreement between Owners as to the design, construction, ownership, expansion, operation and maintenance of the System, and no variation, modification, amendment or change shall be binding upon any of them unless effectuated by an instrument in writing properly executed by the Owners.  If there are any conflicts between the provisions of this Operating Agreement and the TAPS Agreement, the provisions of this Operating Agreement shall be controlling, except on matters relating to the design, construction and expansion of the System. The TAPS Agreement shall govern all matters relating to the design, construction and expansion of the System.  Effective upon its signing of this Operating Agreement, each Owner hereby agrees that the provisions hereof fully satisfy all obligations of an Owner to enter into an Operating Agreement pursuant to Section 5.2 of the TAPS Agreement and fully satisfy the rights and obligations of each Owner under the Third Supplemental Agreement to the TAPS Agreement. Upon the signing of this Operating Agreement the Third Supplemental Agreement to the TAPS Agreement will be and is hereby cancelled.

**15.5  Captions or Headings.**  The headings appearing at the beginning of each section hereof and the Table of Contents appearing at the beginning of this Operating Agreement are both included solely for the convenience and none of them shall be considered or given any effect in

36

564

construing this Operating Agreement or any provision or provisions hereof, whether for the purpose of determining the duties, obligations or liabilities of the Operator or Owners, or their intent as to any issue, matter, or questions which may arise.

**15.6 Counterparts.** This Operating Agreement amending and supplementing the TAPS Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**15.7 Termination of Interim Operating Authority.** Upon the appointment of an Operator under this Operating Agreement and the acceptance of such appointment by that Operator, the interim authority given Alyeska Pipeline Service Company to perform services in preparation for the efficient start-up and operation of TAPS by Letter Agreement which was accepted by Alyeska Pipeline Service Company on May 11, 1976 shall terminate. All actions taken by Alyeska Pipeline Service Company with the approval of the Construction Committee pursuant to the above described Letter Agreement are hereby ratified and confirmed by each Owner and shall be binding on each Owner until revised or cancelled by the Owners through the Owners Committee.

IN TESTIMONY WHEREOF, this Operating Agreement is executed by each of the Owners on the date below such Owner's name but effective as of the Date of this Agreement.

AMERADA HESS PIPELINE CORPORATION

By_____

Date_____


ARCO TRANSPORTATION ALASKA, INC.

By_____

Date_____


BP PIPELINES (ALASKA) INC.

By_____

Date_____

EXXON PIPELINE COMPANY

By_____

Date_____


MOBIL ALASKA PIPELINE COMPANY

By_____

Date_____


PHILLIPS ALASKA PIPELINE CORPORATION

By_____

Date_____


UNOCAL PIPELINE COMPANY

By_____

Date_____

## OPERATOR'S INSURANCE PROGRAM

1.      Workers' Compensation Insurance and Employer's Liability Insurance — This insurance is to include coverage for United States Longshore and Harbor Workers' Compensation Act, Outer Continental Shelf Lands Act and amendment to Coverage "B" Endorsement — Maritime Operations to cover Admiralty Benefits and Damages under the Jones Act. Operator shall comply with the workers' compensation laws of all applicable state and federal jurisdictions by either qualifying as a self insurer in accordance with the regulations established by such jurisdictions, or by purchasing a policy of workers' compensation insurance in those jurisdictions where qualification as a self insurer cannot be reasonably obtained. In the event such insurance is purchased, it shall be underwritten with a rating and premium plan designed to develop, to the maximum extent feasible, an annual cost based upon annual incurred losses, unless the number of employees involved is too small to make this feasible, in which case a regular policy of insurance may be purchased.

2.      Commercial general liability insurance including blanket contractual liability coverage with a combined single limit of $1,000,000 for injuries to persons or damage to property each occurrence and in the aggregate annually. Operator may quality as a self insurer or insurance coverage shall be purchased under a rating and premium plan designed to develop, to the maximum extent feasible, an annual cost directly related to annual incurred losses.

3.      Business auto liability insurance, covering all owned, non-owned or hired vehicles with a combined single limit of $1,000,000 per occurrence for bodily injury and property damage liability. Operator may qualify as a self insurer or insurance coverage shall be purchased under a rating a premium plan designed to develop, to the maximum extent feasible, an annual cost directly related to annual incurred losses.

4.      Full form protection and indemnity insurance on all owned and time chartered vessels, if required, with a policy limit equal to the value of the vessel's hulls or $5,000,000, whichever is greater; and charterer's liability insurance on all vessels with a limit of $5,000,000. The protection and indemnity policy may exclude liability coverage for injuries to or death of members of the crew of insured vessels and coverage for transportation, wages, maintenance and cure, provided that such coverages are included in the liability coverage endorsements to any workers' compensation insurance purchased pursuant to paragraph 1 of this Exhibit A.

5.      Aircraft liability insurance covering liability arising out of the operation, maintenance or use of owned, non-owned or chartered aircraft, including liability to passengers, with a combined single limit of $5,000,000 for injuries to persons or damage to property each occurrence.

6.      Boiler insurance (limited form) covering all pressure vessels requiring inspection under state or federal laws. Operator shall have the discretion of determining the limit of coverage and the deductible per accident taking into consideration the primary purpose for this insurance is to obtain the inspection and certification services offered by an insurer.

7.  No insurance shall be carried by Operator covering the risks of loss to the System property in which the Owners have an undivided interest or for business interruption resulting from damage to the System.

8.  Any Owner insuring its respective interest in the System property against risk of loss or insuring its liability exposure to third parties arising out of the operation of the System, whether such liability is direct or by virtue of its obligation to indemnify Operator hereunder, hereby waives all rights of subrogation on behalf of its insurers against Operator and the other Owners and in the absence of a right to waive subrogation shall have such policies of insurance endorsed providing for such waiver.

## CONTRACTOR'S INSURANCE

1.     Workers' Compensation Insurance and Employer's Liability Insurance in accordance with the laws of the state where work is performed with limits for Employer's Liability in the minimum amount of $100,000.  This insurance is to include coverage for United States Longshore and Harbor Workers' Compensation Act, Outer Continental Shelf Lands Act and amendment to Coverage "B" Endorsement — Maritime Operations to cover Admiralty Benefits and Damages under the Jones Act.

2.     Commercial General Liability Insurance, including Contractual Liability, with minimum coverage of a combined single limit of $1,000,000 per occurrence for bodily injury and property damage liability, with a $2,000,000 annual aggregate.

3.     Business Auto Liability Insurance covering all owned, non-owned and hired automobiles, specifically endorsed to cover as "owned automobiles" Alyeska-owned or leased vehicles furnished for Contractor's use, with minimum coverage of a combined single limit of $1,000,000 per occurrence for bodily injury and property damage liability.

4.     If aircraft is owned or chartered by Contractor, Aircraft Liability including Passenger Legal Liability Insurance in the combined minimum single limit of $5,000,000.

5.     If marine vessels are employed in the operation and maintenance, Contractor shall carry or require the Owners of vessels utilized on the job to carry Protection and Indemnity Insurance with minimum limits of $5,000,000.  (Charterer's and/or Owner's limitation clause to be deleted.)

**EXHIBIT C**

**TAPS CAPACITY TABLE**

| Period | TAPS Capacity Barrels per Day |
|---|---|
| November 1, 1996 through December 31, 1996 | 1,420,000 |
| January 1, 1997 through December 31, 1997 | 1,400,000 |
| January 1, 1998 through December 31, 2002 | 1,380,000 |
| January 1, 2003 through December 31, 2003 | 1,240,000 |
| January 1, 2004 and thereafter | 1,100,000 |

Note:  Alll Volumes are in Barrels.

The Capacity Cushion shall be allocated among the Owners as follows:

| | |
|---|---|
| Amerada Hess Pipeline Corporation | 0.035625 |
| ARCO Transportation Alaska, Inc. | 0.124590 |
| BP Pipelines (Alaska) Inc. | 0.340022 |
| Exxon Pipeline Company | 0.360675 |
| Mobil Alaska Pipeline Company | 0.073256 |
| Phillips Alaska Pipeline Corporation | 0.033625 |
| Unocal Pipeline Company | 0.032207 |

F:\DL0976\TAP498\55000\OPAG-RS1.WPD

APP. F
Federal Right-of-Way
(CR166-305)

*Renewal*
*of the*
*Agreement and Grant of Right-of-Way*
*for the*
*Trans-Alaska Pipeline and Related Facilities*
*between*
*The United States of America*
*and*
*Amerada Hess Pipeline Corporation,*
*BP Pipelines (Alaska) Inc.,*
*ExxonMobil Pipeline Company,*
*Phillips Transportation Alaska, Inc.,*
*Unocal Pipeline Company, and*
*Williams Alaska Pipeline Company, L.L.C.*

**2003**

# RENEWAL
### of the
## AGREEMENT AND GRANT OF RIGHT OF WAY
### for the
## TRANS-ALASKA PIPELINE SYSTEM
## AND RELATED FACILITIES

This Renewal of the Federal Grant and Related Facilities ("Renewal") is made and entered into this 8th day of January, 2003 by and between the United States of America ("United States"), acting through the Secretary of Interior, and Amerada Hess Pipeline Corporation, BP Pipelines (Alaska) Inc., ExxonMobil Pipeline Company, Phillips Transportation Alaska, Inc., Unocal Pipeline Company, and Williams Alaska Pipeline Company, L.L.C. (collectively "Companies" or "Permittees") whose mailing address is Alyeska Pipeline Service Company, 1835 South Bragaw, MS 569, Anchorage, Alaska 99512. The United States and the Companies are sometimes referred to individually as a "party" and collectively as the "parties."

WHEREAS, the Companies, current holders of the rights of way for the Trans-Alaska Pipeline and its related facilities, as set forth below, have requested renewal of the January 23, 1974 Grant of Right-of-Way for the Trans-Alaska Pipeline, as amended ("Federal Grant"), the serial numbers, legal descriptions, and other pertinent data for which is set forth in Exhibit A Part-I hereto, and renewal of the grants for related facilities and other associated rights ("Related Facilities"), the serial numbers, legal descriptions, and other pertinent data for which is set forth in Exhibit A Part-II hereto;

WHEREAS the Secretary of the Interior has authority under the Trans-Alaska Pipeline Authorization Act of 1973, 43 U.S.C. § 1652, and section 28 of the Mineral Leasing Act, as amended, 30 U.S.C. § 185, to act upon the applications for renewal;

WHEREAS the Secretary has determined that the requirements for renewal of the Grant and Related Facilities have been met; and

WHEREAS the parties recognize and acknowledge that the State of Alaska has renewed all rights and interests held by the Companies in the Right-of-Way Lease, ADL 63574, and associated rights for the Trans-Alaska Pipeline;

NOW, therefore, the parties agree that:

A. The Federal Grant and Related Facilities are renewed for the maximum term authorized by law, thirty (30) years.

B. It is the intent of the parties that all rights and interests administered by the Department of the Interior held by the Companies are included within this Renewal. The parties shall take such reasonable actions, and execute and deliver any further instruments, agreements, documents, or other papers, as are reasonably requested by either party to affect this intent.

C. This Renewal of the Federal Grant and Related Facilities is granted unto the Companies in their undivided interests, as follows:

2

167

Amerada Hess Pipeline Corporation, an undivided interest of 1.5000% of the whole;
BP Pipelines (Alaska) Inc., an undivided interest of 46.9263% of the whole;
ExxonMobil Pipeline Company, an undivided interest of 20.3378% of the whole;
Phillips Transportation Alaska, Inc., an undivided interest of 26.7953% of the whole;
Unocal Pipeline Company, an undivided interest of 1.3561% of the whole; and
Williams Alaska Pipeline Company, L.L.C. an undivided interest of 3.0845% of the whole.

D.  Section 7(A) of the existing Federal Grant is amended to read as follows:

*The grant of the Right-of-Way as originally issued began on the 23rd day of January, 1974 and as renewed continues from the 22nd day of January, 2004, at noon, Washington, D.C. time, and shall come to an end and expire on the 22nd day of January, 2034, at noon, Washington, D.C. time, unless prior thereto it is relinquished, abandoned, or otherwise terminated pursuant to the provisions of this Agreement or any applicable Federal law or regulation.*

E.  The Exhibits that are attached to this Agreement and that are listed below in this subsection are, by this reference, incorporated into and made a part of this agreement as fully and effectually as if the Exhibits were set forth herein in their entirety:

Exhibit A: The Federal Grant dated January 23, 1974 (including its existing Exhibits C, D, and E which remain unchanged by this Renewal.)
Exhibit A-Part I: The Legal Descriptions for the Federal Grant of Right-of-Way F-12505 and AA-5847 (which, with Part II below, replace in its entirety the original Exhibit A to the Federal Grant);
Exhibit A-Part II: The current Legal Descriptions for the grants for Related Facilities (which, with Part I above, replace in its entirety the original Exhibit A to the Federal Grant); and

(4)  Exhibit B: Requirements of the Department of Defense Relating to Military Installations, as amended, with attached letters from the Director of Real Estate, Department of the Army, Office of the Chief of Engineers, dated November 14, 1973, November 23, 1973, and the Memorandum of Understanding between Alyeska Pipeline Service Company and U.S. Army Corps of Engineers. (This Exhibit B replaces, in its entirety, the original Exhibit B to the Federal Grant).

(5)  Exhibit C: Section 15 (Guaranty) as amended by January 2003 Record of Decision, Renewal of the Federal Right-of-Way for the Trans-Alaska Pipeline and Related Facilities.

F. Except as expressly amended in Subsection D and E above, all other current terms, covenants, and conditions of the existing Federal Grant, shall remain in full force and effect. As an additional requirement, to be incorporated in the Renewal as section 15.F, every three years the Authorized Officer shall conduct an audit of the financial resources of the Owner Entities, or other guarantors, that provide the Section 15 guaranties. If the Secretary determines by the audit that the Section 15 guaranties are inadequate, the Secretary may require additional financial assurances and guarantees.

168

G. This Renewal may be signed in counterpart. All such executed counterparts shall be considered an original, and the original signature pages may be attached to a single counterpart for purposes of recordation.

IN WITNESS WHEREOF, the parties have executed this Renewal and have agreed to its terms and conditions as of the date first above written.

**UNITED STATES OF AMERICA**

By _____

Name _____

Title ___ Secretary of the Interior

**AMERADA HESS PIPELINE CORPORATION**

By _____

Name ___ MARGARET A. YAEGE

Title President, Phillips Transportation Alaska, Inc. (see Note below)

**BP PIPELINES (ALASKA) INC.**

By _____

Name _____

Title _____

**EXXONMOBIL PIPELINE COMPANY**

By _____

Name ___ MICHAEL P. TUDOR

Title ___ PRESIDENT

**PHILLIPS TRANSPORTATION ALASKA, INC.**

By _____

Name ___ MARGARET A. YAEGE

Title ___ PRESIDENT

Subscribed before me on this 8th day of January, 2003.

_____

Morton Teit
Notary Public District of Columbia
My Commission Expires April 30, 2005

169

UNOCAL PIPELINE COMPANY

By: _____
Name: _____
Title: _____

WILLIAMS ALASKA PIPELINE COMPANY, L.L.C.

By: _____
Name: Michael Mages
Title: Vice President

Note: Phillips Transportation Alaska, Inc. signs as successor to the TAPS ownership interest of Amerada Hess Pipeline Corporation as approved by and in accordance with the decision of the Authorized Officer dated January 23, 2001.

170

STATE OF _Alaska_ )
_Third Judicial District_ ) ss.

THIS IS TO CERTIFY that on this 5th day of _February_, 2003, before me appeared _MARGARET A. YESSE_, the _PRESIDENT_ of Phillips Transportation Alaska, Inc., successor to the TAPS ownership interest of Amerada Hess Pipeline Corporation who executed the foregoing Renewal and acknowledged voluntarily signing the same on behalf of said corporation.

_Carol Kelly_
Notary Public in and for the State of
My Commission Expires:

STATE OF ALASKA
NOTARY PUBLIC
Carol Kelly
My Commission Expires August 18, 2004

STATE OF _Alaska_ )
_Third Judicial District_ ) ss.

THIS IS TO CERTIFY that on this 5th day of _February_, 2003, before me appeared _Albert N. Belew_, the _President_ of BP Pipelines (Alaska) Inc. who executed the foregoing Renewal and acknowledged voluntarily signing the same on behalf of said corporation.

MONICA P. BREWSTER
NOTARY PUBLIC
STATE OF ALASKA

_Monica P. Brewster_
Notary Public in and for the State of
My Commission Expires:

My Commission Expires
November 9, 2004

STATE OF _Texas_ )
_County of Harris_ ) ss.

THIS IS TO CERTIFY that on this 13th day of _February_, 2003, before me appeared _Mike L. Tudor_, the _President_ of ExxonMobil Pipeline Company who executed the foregoing Renewal and acknowledged voluntarily signing the same on behalf of said corporation.

_Laverne M. Ford_
Notary Public in and for the State of
My Commission Expires:

LAVERNE M. FORD
Notary Public, State of Texas
My Commission Expires 10-07-2004

6

171

STATE OF _Alaska_ )
_Third Judicial District_ ) ss.

THIS IS TO CERTIFY that on this _5th_ day of _February_, 2003, before me appeared _MARGARET A. HAEBE_, the _PRESIDENT_ of Phillips Transportation Alaska, Inc. who executed the foregoing Renewal and acknowledged voluntarily signing the same on behalf of said corporation.

_Carol Kelly_
Notary Public in and for the State of
My Commission Expires:

STATE OF ALASKA
NOTARY PUBLIC
Carol Kelly
My Commission Expires August 16, 2004

STATE OF _Texas_ )
_Fort Bend County_ ) ss.

THIS IS TO CERTIFY that on this _12_ day of _February_, 2003, before me appeared _John F. Oleson_, the _Vice President_ of Unocal Pipeline Company who executed the foregoing Renewal and acknowledged voluntarily signing the same on behalf of said corporation.

_Lamar Hinojosa_
Notary Public in and for the State of _Texas_
My Commission Expires: _10-8-04_

LAMAR HINOJOSA
Notary Public
State of Texas
My Commission Expires
October 8, 2004

STATE OF _Oklahoma_ )
_County of Tulsa_ ) ss.

THIS IS TO CERTIFY that on this _10th_ day of _February_, 2003, before me appeared _Michael Mears_, the _Vice President_ of Williams Alaska Pipeline Company, L.L.C. who executed the foregoing Renewal and acknowledged voluntarily signing the same on behalf of said corporation.

Notary Public Oklahoma
OFFICIAL SEAL
S DENISE GIBBINS
TULSA COUNTY
Comm. Exp. 03-15-2005

_S. Denise Gibbins_
Notary Public in and for the State of _Oklahoma_
My Commission Expires: _03-15-2005_
My Commission No.: _0100455.3_

7

172

# Exhibit A

Exhibit A: The Federal Grant dated January 23, 1974 is attached hereto.
NOTE: The existing Exhibits C, D, and E which remain unchanged by this Renewal. Exhibits A to the original Federal Grant has been replaced with Exhibit A-Part I and Exhibit A-Part II, attached hereto and referenced below;

Exhibit A-Part I: The Legal Descriptions for the Federal Grant of Right-of-Way F-12505 and AA-5847 (which, with Part II below, replace in its entirety the original Exhibit A to the Federal Grant);

Exhibit A-Part II: The current Legal Descriptions for the grants for Related Facilities (which, with part I above, replace in its entirety the original Exhibit A to the Federal Grant.

Agreement and Grant of
Right-of-Way for Trans-Alaska Pipeline
*between*
The United States of America
*and*
Amerada Hess Corporation,
ARCO Pipe Line Company,
Exxon Pipeline Company,
Mobil Alaska Pipeline Company,
Phillips Petroleum Company,
Sohio Pipe Line Company, and
Union Alaska Pipeline Company

174

# Table of Contents

**Section** — **Page**

1. Grant of Right-of-Way ... 2
2. Purpose of Grant; Limitation of Use to Permittees ... 3
3. Transportation of Oil ... 3
4. Exhibits; Incorporation of Certain Documents by Reference ... 3
5. Width of Right-of-Way ... 4
6. Location of Right-of-Way ... 4
7. Duration of Right-of-Way Grant ... 5
8. Use Charge for Right-of-Way ... 5
9. Construction Plans and Quality Assurance Program ... 5
10. Compliance with Notices to Proceed ... 8
11. Reservation of Certain Rights to the United States ... 8
12. Reimbursement of Department Expenses ... 6
13. Damage to United States Property; Repair, Replacement or Claim for Damages ... 9
14. Indemnification of the United States ... 9
15. Guaranty ... 10
16. Laws and Regulations ... 10
17. No Right of Set Off ... 11
18. Right of United States to Perform ... 11
19. Liens ... 12
20. Insolvency ... 12
21. Breach; Extent of Liability of Permittees ... 12
22. Transfer ... 13
23. Port Valdez Terminal Facility ... 14
24. Duty of Permittees to Abate ... 17
25. Temporary Suspension Orders of Authorized Officer ... 17

26. Appeal Procedure ... 18
27. Requests to Resume; Appeals ... 19
28. Nondiscrimination and Equal Employment Opportunity ... 19
29. Training of Alaska Natives ... 21
30. Native and Other Subsistence ... 22
31. Termination or Suspension of Right-of-Way ... 22
32. Release of Right-of-Way ... 23
33. Agreements Among Permittees ... 24
34. Access to Documents ... 25
35. Rights of Third Parties ... 25
36. Covenants Independent ... 26
37. Partial Invalidity ... 26
38. Waiver Not Continuing ... 26
39. Remedies Cumulative; Equitable Relief ... 26
40. Section Headings ... 26
41. Authority to Enter Agreement ... 26
Exhibit A. List of Applications and Accompanying Alignment Map and Site Location Drawings Identifying the General Route of the Pipeline ... A-1
Exhibit B. Requirements of the Department of Defense Relating to Military Installations ... B-1
Exhibit C. Requirements of the Federal Power Commission Relating to Power Sites ... C-1
Exhibit D. Stipulations for the Agreement and Grant of Right-of-Way for the Trans-Alaska Pipeline ... D-1
Exhibit E. Cooperative Agreement between United States Department of the Interior and State of Alaska regarding the Proposed Trans-Alaska Pipeline System ... E-1

# Agreement and Grant of Right-of-Way for Trans-Alaska Pipeline

This Agreement and Grant of Right-of-Way (hereinafter referred to as the "Agreement")[*] is entered into as of this 23rd day of January, 1974 (hereinafter referred to as the "Effective Date"), by the United States of America, party of the first part (hereinafter referred to as the "United States"), acting through the Secretary of the Interior, and by

Amerada Hess Corporation, a Delaware Corporation,

ARCO Pipe Line Company, a Delaware Corporation,

Exxon Pipeline Company, a Delaware Corporation,

Mobil Alaska Pipeline Company, a Delaware Corporation,

Phillips Petroleum Company, a Delaware Corporation,

Sohio Pipe Line Company, a Delaware Corporation, and

Union Alaska Pipeline Company, a California Corporation,

parties of the second part (hereinafter sometimes referred to as the "Original Permittees").

The parties have entered into this Agreement taking into consideration the national authorizations, directives, and policies expressed in applicable legislation, including Section 202 of the Trans-Alaska Pipeline Authorization Act, 87 Stat. 584, et seq. (1973).

It is the intent of the parties that, in the performance of this Agreement, the following principles shall apply:

(1) In the construction (including, but not limited to, design), operation, maintenance (including but not limited to a continuing and reasonable program of preventive maintenance), and termination of the Pipeline System, Permittees

shall employ all practicable means and measures to preserve and protect the environment, as provided in this Agreement.

(2) The parties shall balance environmental amenities and values with economic practicalities and technical capabilities, so as to be consistent with applicable national policies. In so doing, the parties shall take into account, among other considerations, the following:

(a) The benefit or detriment to persons, property and the environment that may be anticipated to result from a proposed course of conduct;

(b) The particular environmental, technical, and economical benefits or detriments reasonably expected to flow from a proposed course of conduct;

(c) The effect on the energy needs of the United States, including the possible effects of a disruption of national or regional oil supply, that may result from a particular course of conduct.

(3) Permittees shall manage, supervise and implement the construction, operation, maintenance and termination of the Pipeline System in accordance with sound engineering practice, to the extent allowed by the state of the art and the development of technology. In the exercise of these functions, Permittees consent and shall submit to such review, inspection and compliance procedures relating to construction, operation, maintenance and termination of the Pipeline System as are provided for in this Agreement and other applicable authorizations. The

[*]Note—Terms having special meaning are defined in the body of this Agreement or in Exhibit D hereof. Such terms are capitalized herein.

1

parties intend that this Agreement shall not in any way derogate from, or be construed as being inconsistent with, the provisions of Section 203(d) of the Trans-Alaska Pipeline Authorization Act, 87 Stat. 585 (1973), relating to the National Environmental Policy Act, 83 Stat. 852, 42 U.S.C. § 4321 et seq.

In consideration of the grant hereby made, and the provisions of this Agreement, the United States and Permittees agree as follows:

## 1. Grant of Right-of-Way

A. Pursuant to the provisions of the Trans-Alaska Pipeline Authorization Act, the United States hereby grants to Permittees, in the several undivided interests specified in subsection B of this Section, for the period of limited duration prescribed in Section 7 hereof and for the purpose prescribed in subsection A of Section 2 hereof, a right-of-way (hereinafter referred to as the "Right-of-Way"), the width and location thereof being subject to the provisions of Sections 5 and 6 hereof, across, through and upon the Federal Lands (as that term is defined in Section 28 of the Mineral Leasing Act of 1920, 41 Stat. 449, as amended, 30 U.S.C. § 185 et seq., including public and acquired lands, and lands withdrawn, reserved, classified, or otherwise set apart for National Forests, military purposes, power development, or other purposes) along the general route of the Pipeline, identified in the applications and accompanying alignment map and Related Facility site location drawings referred to in Exhibit A hereof.

B. The grant made hereby is of the following undivided interests in and to the Right-of-Way:

Amerada Hess Corporation, an undivided interest of 3.00% of the whole;

ARCO Pipe Line Company, an undivided interest of 28.08% of the whole;

Exxon Pipeline Company, an undivided interest of 25.52% of the whole;

Mobil Alaska Pipeline Company, an undivided interest of 8.68% of the whole;

Phillips Petroleum Company, an undivided interest of 3.32% of the whole;

Sohio Pipe Line Company, an undivided interest of 28.08% of the whole;

Union Alaska Pipeline Company, an undivided interest of 3.32% of the whole.

C. There is hereby excepted from the grant hereby made all lands selected and validly tenta-tively approved to the State of Alaska, pursuant to the Alaska Statehood Act, 72 Stat. 339, as amended, other than lands withdrawn under Section 11(a)(2) of the Alaska Native Claims Settlement Act, 85 Stat. 696, 43 USC § 1610.

D. There is hereby reserved to the United States all rights reserved, or directed to be reserved, to the United States under any applicable law or regulation of the United States or elsewhere under this Agreement.

E. The grant hereby made is subject to: (1) the provisions of this Agreement; (2) all applicable laws and regulations of the United States; (3) any valid existing rights in the lands subject to the Right-of-Way, including without limitation the valid pre-existing rights, if any, of the State of Alaska; and (4) the condition that the Right-of-Way granted hereby across Category 1(c) Lands and Category 1(d) Lands* shall take effect upon the occurrence of one of the following events, whichever shall first occur:

(a) The Commissioner of Natural Resources of the State of Alaska notifies the Secretary in writing that it is essential for the expeditious construction of the Pipeline System that the Right-of-Way in and to some or all of the Category 1(c) Lands or Category 1(d) Lands, or both, becomes effective;** or

(b) Category 1(d) Lands have not been tentatively approved to the State of Alaska and a valid right-of-way lease or other grant in and to those lands has not been issued by the State of Alaska, for the construction and operation of the Pipeline System, by March 10, 1974; or

(c) The Category 1(c) Lands have not been tentatively approved to the State of Alaska and a valid right-of-way lease or other grant in and to those lands has not been issued by the State of Alaska, for the construction and operation of the Pipeline System, by June 1, 1974.

F. With respect to the Category 1(c) Lands and the Category 1(d) Lands, the grant hereby made

---

*"Category 1(c) Lands" and "Category 1(d) Lands" are defined in Exhibit D hereto. These terms are derived from Paragraph 1 of Part I of the Cooperative Agreement between the State of Alaska and the Department, attached hereto as Exhibit E for informational purposes.

**The Secretary has received notice from the State Commissioner of Natural Resources that the expeditious construction of the Pipeline System on the Category 1(d) Lands is essential. Therefore, the Right-of-Way across these lands is hereby effective.

is further subject to the limitation and condition that upon either valid tentative approval or valid patent of any of such lands to the State of Alaska, the existence or subsequent issuance of a valid State right-of-way lease or other grant in and to those lands terminates the Right-of-Way and other Federal authorizations, if any, and the State right-of-way lease or other grant thereupon applies in all respects to those lands.

G. Permittees agree that they will not challenge the validity of the State's right-of-way lease or other grant on the basis of the existence of the Federal Right-of-Way and other authorizations or their interest therein.

## 2. Purpose of Grant; Limitation of Use to Permittees

A. The Right-of-Way is granted for the purpose of the construction, operation, and maintenance of one (1) Oil transportation pipeline, consisting of one (1) line of forty-eight (48)-inch diameter pipe and its Related Facilities (such pipeline and Related Facilities being herein referred to as the "Pipeline").

B. Permittees, their agents, contractors, and subcontractors (at any tier) shall not use the Right-of-Way or the land subject thereto for any other purpose and shall not locate or construct any other pipelines (including looping lines) or other improvements within the Right-of-Way without the prior written approval of the Secretary.

C. The Pipeline shall be used for only the transportation of Oil, and it shall not be used for any other purpose without the prior written approval of the Secretary.

D. Each Permittee shall not allow or suffer any Person or Business Entity, with the exception of the other Permittees under this Agreement, to use the Right-of-Way for the purpose set forth in subsection A of this Section.

E. Nothing above in subsection D of this Section is intended to: (1) excuse or preclude Permittees from complying with their obligations under Section 3 of this Agreement, or (2) preclude Permittees from employing agents, contractors, or subcontractors (at any tier) to effect construction, operation, maintenance or termination of the Pipeline System.

## 3. Transportation of Oil

Each Permittee shall, to the extent of its interest in the Right-of-Way, and in accordance with the provisions of Section 28 of the Mineral Leasing Act of 1920, 41 Stat. 449, as amended:

(1) Construct, operate, and maintain the the Pipeline as a common carrier;

(2) Accept, convey, transport, or purchase, without discrimination, Oil delivered to the Pipeline without regard to whether such Oil was produced on Federal or non-Federal lands; and

(3) Accept, convey, transport, or purchase, without discrimination, Oil produced from Federal lands or from the resources thereon in the vicinity of the Pipeline in such proportionate amounts as the Secretary may, after a full hearing with due notice thereof to Permittees and a proper finding of facts, determine to be reasonable.

## 4. Exhibits; Incorporation of Certain Documents by Reference

A. The Exhibits that are attached to this Agreement and that are listed below in this subsection are, by this reference, incorporated into and made a part of this Agreement as fully and effectually as if the Exhibits were set forth herein in their entirety:

(1) List of applications and accompanying alignment map and site location drawings identifying the general route of the Pipeline, attached hereto as Exhibit A.

(2) Requirements of the Department of Defense relating to military installations, with attached letters dated November 14, 1973, and November 21, 1973, from the Director of Real Estate, Department of the Army, Office of the Chief of Engineers, attached hereto as Exhibit B.

(3) Requirements of the Federal Power Commission relating to power sites, attached hereto as Exhibit C.

(4) Stipulations for the Agreement and Grant of Right-of-Way for the Trans-Alaska Pipeline, being numbered 1 through 3.11.2, inclusive, attached hereto as Exhibit D, which are sometimes referred to in this Agreement as the "Stipulations."

B. The cooperative agreement attached hereto as Exhibit E is not incorporated into, and is not intended to be made a part of, this Agreement. Said cooperative agreement is attached hereto only for informational purposes.

### 5. Width of Right-of-Way

The width of the Right-of-Way, in terms of surface measurement, is fifty (50) feet plus the ground occupied by the Pipeline; provided, however, that up to and including the date on which Permittees may file an application for modification of the Right-of-Way boundaries in accordance with subsection D of Section 6 hereof, Permittees may apply for, and the Authorized Officer may direct or authorize, increases in the width of the Right-of-Way at specified points if he finds, and records the reasons for his finding, that in his judgment a wider Right-of-Way is necessary for operation and maintenance of the Pipeline after construction, or to protect the environment or public safety.

### 5. Location of Right-of-Way

A. The site for each Construction Segment of the Pipeline shall be determined in accordance with the provisions of Stipulation 1.7.

B. After completion of construction of the Pipeline within a particular Mapping Segment, the Federal Lands subject to the Right-of-Way shall be the land occupied by the Pipeline and, in terms of surface measurement, twenty-five (25) feet on each side of the Pipeline measured from its outermost extremities. With respect to Related Facilities, the width shall be twenty-five (25) feet around the perimeter of the Related Facility.

C. Upon completion of construction of the Pipeline within a Mapping Segment, as well as upon the issuance of any authorization or directive that the Authorized Officer may issue in accordance with the provisions of Section 5 hereof, Permittees shall, if directed by the Authorized Officer, physically mark on the ground the proposed boundaries of the Right-of-Way at such locations and in such manner as is acceptable to the Authorized Officer.

D. At any time prior to the sixtieth (60th) day preceding the filing of the maps of survey as provided in subsection E hereof, Permittees may file an application for modification of the Right-of-Way boundaries provided that, after modification, the Right-of-Way will include the ground occupied by the Pipeline plus fifty (50) feet adjacent thereto and such additional land as authorized by the Authorized Officer pursuant to Section 5 hereof. Upon approval of such application for modification of boundaries and acceptance of the documents and maps required by subsection E hereof, the Right-of-Way shall be as delineated on said maps of survey.

E. Within three hundred and sixty (360) days after the date of Commissioning of the Pipeline (and, in the case of any addition, deletion or alteration of the Pipeline following the date of Commissioning, within one hundred and eighty (180) days after the addition, deletion or alteration has, in the judgment of the Authorized Officer, been fully completed), Permittees shall survey and provide adequate monumentation to locate and describe the Right-of-Way and shall file: (1) proof of construction of the Pipeline in accordance with the applicable regulations of the Department; (2) such documents of relinquishment of land not included in the modified Right-of-Way, if any, as may be required by the Authorized Officer; (3) appropriate references to applications in which requests were made for Right-of-Way widths greater than the normal limitations specified in Section 5 of this Agreement, and applications for modification of the Right-of-Way boundaries as provided in subsection D hereof; and (4) a map, or maps of survey, prepared in such manner as shall be required by the Authorized Officer, showing the final "as built" location of the completed Pipeline, including the final locations of all buried and above ground improvements, the centerline of the Right-of-Way, as definitely located, and, referenced to the centerline, the boundaries of the Right-of-Way, as definitely located. Each portion of the Pipeline as depicted on the said survey map or maps, and for which a Notice to Proceed, or an authorization, issued in accordance with Stipulation 1.7.4.4 altering either the route or the initially approved location along the route of the Right-of-Way, has been issued, shall be referenced to the relevant Notice to Proceed or authorization.

## 7. Duration of Right-of-Way Grant

A. The grant hereby made of the Right-of-Way shall come to an end and expire on the 32nd day of January, 2004, at noon, Washington, D.C. time, unless prior thereto it is relinquished, abandoned, or otherwise terminated pursuant to the provisions of this Agreement or of any applicable Federal law or regulation.

B. Upon the expiration of the initial or any subsequent grant of the Right-of-Way, or its earlier relinquishment, abandonment, or other termination, the provisions of this Agreement, to the extent applicable, shall continue in effect and shall be binding on the parties hereto, their successors or assigns, until they have fully performed their respective obligations and liabilities accruing before or on account of the expiration, or the prior termination, of the grant.

C. The Right-of-Way shall be renewed, subject to and in accordance with the provisions of the Trans-Alaska Pipeline Authorization Act.

D. Any subsequent conveyance, transfer or other disposition of any right, title or interest in the Federal Lands or any part thereto, burdened by and subservient to the Right-of-Way, shall, to the extent allowed by law and subject to the termination provision of subsection F of Section 1, be subject to the Right-of-Way and the provisions of this Agreement, including Permittees' right to renew the Right-of-Way under subsection C of this Section.

## 8. Use Charge for Right-of-Way

A. Permittees shall pay to the United States, annually and in advance, the fair market rental value of the Right-of-Way, as determined by the Secretary. (Such rental value is hereinafter called the "Use Charge".)

B. The initial Use Charge shall be One Hundred Five Thousand and 00/100 Dollars ($105,000) for each calendar year. The first annual Use Charge shall be prorated to cover that portion of the calendar year 1974 which remains after the Effective Date hereof and shall be due and payable by not later than the Effective Date hereof. The Use Charge for the first full calendar year commencing after the Effective Date hereof and for each subsequent calendar year shall be due and payable by not later than the last full business day immediately preceding the first day of January of the calendar year for which the Use Charge

is payable. The Use Charge for each calendar year shall be billed to Permittees at least thirty (30) days in advance of the due date thereof. All such payments shall be delivered to the Authorized Officer and shall be accepted subject to collection.

C. The Use Charge for the seventh (7th) and for each succeeding calendar year shall be subject to adjustment from time to time in accordance with the regulations of the Department. The Secretary also may adjust retroactively the amount of the annual Use Charge for any calendar year that is based on an appraisal which is made before the Right-of-Way is, in its entirety, finally located, surveyed and monumented; any sum determined by the Secretary to be payable (by either the United States or Permittees) in connection with an adjustment, as provided for in this sentence, shall be due and payable within thirty (30) days after notice is given of the amount due.

## 9. Construction Plans and Quality Assurance Program

A. Permittees shall submit construction (including design) plans, a quality assurance program, and other related documents as deemed necessary by the Authorized Officer, for review and approval prior to his issuing Notices to Proceed.

B. The quality assurance program shall be comprehensive and designed to assure that the environmental and technical Stipulations in this Agreement will be fully complied with throughout all phases of construction, operation, maintenance and termination of the Pipeline System.

C. The following criteria shall be included in the quality assurance program, although Permittees are not limited to these criteria:

(1) Provide adequate and appropriate means and procedures for the detection and prompt abatement of any actual or potential condition that is susceptible to abatement by Permittees which arises out of, or could affect adversely, the construction, operation, maintenance or termination of all or any part of the Pipeline System and which at any time may cause or threaten to cause: (a) a hazard to the safety of workers or to public health or safety (including but not limited to personal injury or loss of life with respect to any person or persons) or (b) serious and irreparable

180

harm or damage to the environment (including but not limited to areas of vegetation or timber, fish or other wildlife populations, or their habitats, or any other natural resource).

(2) Provide adequate and appropriate means and procedures for the repair and replacement of improved or tangible property and the rehabilitation of natural resources (including but not limited to revegetation, restocking fish or other wildlife populations and reestablishing their habitats) that shall be seriously damaged or destroyed if the immediate cause of the damage or destruction arises in connection with, or results from, the construction, operation, maintenance or termination of all or any part of the Pipeline System.

(3) Provide for component and systems quality through adequate quality control management and planning, and inspection and test procedures.

(4) Assure that the selection of Permittees' contractors, subcontractors and contract purchases of materials and services are based upon the above quality control procedures.

(5) Determine quality performance by conducting surveys and field inspections of all of the facilities of Permittees' contractors and subcontractors.

(6) Maintain quality determination records on all of the above procedures to insure satisfactory data identification and retrieval.

### 10. Compliance With Notices To Proceed

All construction of the Pipeline System undertaken by Permittees shall comply in all respects with the provisions of Notices to Proceed that are issued by the Authorized Officer.

### 11. Reservation of Certain Rights to the United States

A. The United States reserves and shall have a continuing and reasonable right of access to any part of the lands (including the subsurface of, and the air space above, such lands) that are subject to the Right-of-Way, and a continuing and reasonable right of physical entry to any part of the Pipeline, for inspection or monitoring purposes and for any other purpose or reason that is reasonably consistent with any right or obligation of the United States under any law or regulation, this Agreement, or any other agreement, permit or authorization relating in whole or in part to all or any part of the Pipeline.

B. The rights of access and entry reserved in subsection A of this Section shall extend to and be enjoyed by any contractor of the United States, any subcontractors (at any tier) of the contractor and their respective agents and employees, as well as such other persons, as may be designated from time-to-time in writing by the Authorized Officer.

C. There is reserved to the United States the right to grant additional permits or easements for rights-of-way to third parties for compatible uses on or adjacent to, the lands subject to the Right-of-Way. Before the United States grants an additional right-of-way or permit for a compatible use, the United States will notify Permittees of its intentions and shall consult with Permittees before taking final action in that regard.

### 12. Reimbursement of Department Expenses

A. Permittees shall reimburse the United States for all reasonable administrative and other costs heretofore or hereafter incurred directly or indirectly by the Department for: (1) processing applications filed by Permittees in connection with the Pipeline System; and (2) monitoring the construction, operation, maintenance and termination of all or any part of the Pipeline System, including without limitation those portions of the System that shall be located on State-owned lands.

B. Subject to collection, receipt is hereby acknowledged by the Department of the sum of Twelve Million Two Hundred Fifty Three Thousand Seven Hundred Thirty and 00/100 Dollars ($12,253,730) which has been paid to the United States by Permittees at the time of execution of this Agreement. Said sum represents the amount of the costs referred to in subsection A of this Section, which were incurred by the Department through September 30, 1973.

C. Permittees shall hereafter pay to the United States such sums as the Secretary shall determine to be required to reimburse the Department for the costs, referred to in subsection A of this Section, incurred or to be incurred by it subsequent to September 30, 1973. Such payments shall be made in

accordance with the provisions of subsection F of this Section.

D. Permittees acknowledge that the Department has employed or may employ one or more independent consultants, contractors and subcontractors and also has utilized and may utilize personnel and services of other agencies to assist it with: (1) processing applications heretofore or hereafter filed by Permittees in connection with the Pipeline System; and (2) monitoring the construction, operation, maintenance and termination of the Pipeline System. Before employing such consultants, contractors, or subcontractors, the Secretary shall notify Permittees of such employment and shall inform the Permittees of the purpose of employment, the scope of the work to be undertaken, the duration of the employment and the estimated cost thereof; *provided, however*, this notice requirement shall not limit the authority of the Secretary to enter into agreements with consultants, contractors or subcontractors. Costs incurred by the Department in connection with the employment of consultants, contractors and subcontractors and with respect to utilizing the personnel and services of other agencies shall be included in the costs for which the Department is to be reimbursed by Permittees under the provisions of subsection A of this Section.

E. Agreements entered into by the Secretary with respect to the Pipeline System which result in costs for which reimbursement is required by this Section shall be drawn to avoid unnecessary employment of personnel and needless expenditure of funds. The Department shall administer this Agreement and such other agreements to reasonably assure that unnecessary employment of personnel and needless expenditure of funds are avoided.

F. Reimbursement by Permittees, as provided for in this Section and Section 13 hereof, shall be made for each quarter ending on the last day of March, June, September and December. On or before the sixtieth (60th) day after the close of each quarter, the Authorized Officer shall submit to Permittees a written statement of the costs incurred by the Department during that quarter which are reimbursable.

G. Permittees shall have the right to conduct, at their own expense, reasonable audits by auditors or accountants, designated by Permittees, of the books, records and documents of the Department and of its independent consultants, contractors and subcontractors relating to the items on any particular statement that shall be submitted in accordance with the procedure outlined in subsection F of this Section, at the places where such books, records and documents are usually maintained and at reasonable times; *provided, however,* that written notice of a desire to conduct such an audit must be given the Authorized Officer: (1) at least fifteen (15) days prior to such audit; and (2) by not later than the seventy-fifth (75th) day after the close of the quarter for which the books, records and documents are sought to be audited; and *provided further,* that any such audits shall be completed within ninety (90) days after receipt by Permittees of the statement containing the items to be audited.

H. Nothing herein shall be deemed to require the Department, its bureaus or offices, or its independent consultants, contractors and subcontractors to maintain books, records or documents other than those usually maintained by them, provided that such books, records and documents reasonably segregate and identify the costs for which reimbursement is required by this Section. Such books, records and documents shall be preserved or caused to be preserved for a period of at least two (2) years after the Department submits a statement for reimbursement based on such books, records and documents. The auditors or accountants designated by Permittees shall have reasonable access to, and the right to copy, at their expense, all such books, records and documents, including all audit reports prepared by or furnished to the Department, together with supporting documents in the possession of the Department, concerning agreements with other agencies employed by the Department and with its independent consultants, contractors and subcontractors, which result in costs for which reimbursement is required by this Section.

I. With respect to the audits by Permittees of any books, records and documents of the Department and its independent consultants, contractors or subcontractors under agreements which result in costs for which reimbursement is required by this Section, such audits shall be conducted by independent certified public accountants, designated by Permittees. Prior to conducting any such audits, such accountants shall confer with the auditors auditing such consultants, contractors or subcontractors for the Department for the purpose of coordinating and expediting their

182

respective audits. Any such audits by such accountants shall be conducted as supplementary audits, reviewing and spot checking the audits of the Department's auditors for the purpose of determining the accuracy of costs reflected in the billings of the Department which are reimbursable under subsection A of this Section, and auditing such other matters as may be appropriate in the circumstances. The Authorized Officer may designate a representative to observe any such audits by such accountants. The Authorized Officer shall have reasonable access to, and the right to copy, all such audit reports prepared by such accountants and furnished to Permittees, together with supporting documents in the possession of the Permittees. In the event that the Authorized Officer believes that the scope of any such supplementary audit is unreasonable, he shall promptly notify Permittees and such accountants, and such supplementary audit shall be suspended pending consultation by the Authorized Officer and the Permittees of the appropriate scope of audit in the circumstances. Any complaints which Permittees may have with respect to such agreements, their performance or the statement of the Department for the reimbursement of costs based on such agreements shall be made only to the Authorized Officer.

J. Permittees shall pay to the United States, through the Authorized Officer, the total amount as shown on each statement by not later than the due date thereof, namely the ninetieth (90th) day following the close of the quarter to which the statement relates; provided, however, that if any one or more of the Permittees decides to dispute or audit any item of a statement that shall be rendered in accordance with the provisions of this Section or Section 18 hereof, Permittees, on or before the said 90th day on which the statement is due and payable, shall give the Authorized Officer written notice of each item that is disputed, accompanied by a detailed explanation of their objection, or written notice of each item to be audited, and shall pay to the United States, through the Authorized Officer, those amounts for the items that are not disputed or are not to be audited. If any item of a statement is audited, Permittees shall give the Authorized Officer prompt written notice of the completion of the audit of all the items of a statement being audited. On a date fixed by the Authorized Officer, but in any event to be within thirty (30) days after notice of a disputed

statement or after notice of the completion of the audit, as the case may be, the Authorized Officer and Permittees shall meet to discuss, and attempt to resolve, all items which are disputed or which have not been resolved by the audit. If at that time they are unable to resolve all such items, Permittees may appeal any unresolved items to the Secretary in accordance with the provisions of subsection A of Section 26 of this Agreement. Any items resolved as being payable to the United States shall be paid within thirty (30) days after being resolved, together with interest thereon up to the date of payment at a total annual percentage rate equal to the discount rate of the Federal Reserve Bank for District 12 (San Francisco) in effect on the original due date of the statement, and such interest shall accrue and be computed from, and so as to include, the aforesaid due date. The items shown on any statement that are not the subject of both: (1) a notice to the Authorized Officer of a disputed item or notice of audit, and (2) a notice of appeal as provided for in subsection A of Section 26, shall be deemed conclusively to be payable to the United States by Permittee.

K. In addition to the right to audit quarterly statements as provided in subsection G of this Section, if Permittees believe that unnecessary employment of personnel or needless expenditure of funds has occurred or is likely to occur contrary to the provisions of subsection E of this Section, Permittees may request the approval of the Authorized Officer for Permittees to conduct promptly and at their own expense a full and complete audit by auditors or accountants designated by Permittees, of the books, records and documents concerning the matters to be audited, at the places where such books, records and documents are usually maintained and at reasonable times. Such request shall be in writing, shall specify the matters to be audited and shall state the information available to Permittees upon which the request is based. The Authorized Officer shall approve or deny such request promptly, and approval of any such request shall not be unreasonably withheld. If and to the extent that any such audit concerns any agreements of the Department with independent consultants, contractors or subcontractors which have resulted or may result in costs for which reimbursement is required by this Section, such audit shall be conducted by independent certified public accountants designated by Permittees. The Authorized Officer may designate a representative

to observe any audit allowed by this subsection and the Authorized Officer may have access to, and the right to copy, the audit report prepared by such accountants and furnished to Permittees. Any complaint which Permittees may have as a result of any audit under this subsection shall be made only to the Authorized Officer and shall be governed by the procedure set forth in subsection J of this Section, to the extent applicable.

### 13. Damage to United States Property; Repair, Replacement or Claim for Damages

A. Subject to the provisions of subsection 204 (a)(2) of the Trans-Alaska Pipeline Authorization Act, at the written demand of the Authorized Officer, Permittees:

(1) shall repair or replace promptly, to the written satisfaction of the Authorized Officer, all improved or tangible property of the United States, whether real, personal or mixed, that has been seriously damaged or destroyed and is included in the demand, and

(2) shall rehabilitate (including, but not limited to, revegetation, restocking fish or other wildlife populations and reestablishing their habitats), to the written satisfaction of the Authorized Officer, any natural resource that shall be seriously damaged or destroyed,

if the immediate cause of the damage or destruction arises out of, is connected with, or results from, the construction, operation, maintenance or termination of all or any part of the Pipeline System; *provided, however*, that Permittees shall not be obligated to repair or replace any property or to rehabilitate any natural resource that was damaged or destroyed: (a) by an act of war or (b) solely by (i) the negligence of the United States and/or (ii) the negligence or willful misconduct of Persons who are authorized to enter upon, use or occupy the damaged property or areas pursuant to any Federal lease, permit, or other written authorization that is issued for any use or purpose other than in connection with the construction, operation, maintenance or termination of the Pipeline.

B. The repair or replacement by the Permittees of any improved or tangible property of the United States, as provided for in subsection A of

this Section, shall operate to preclude the United States from asserting any claim for direct (as opposed to consequential) money damages with respect to the damage or destruction that was so repaired or replaced.

C. Except to the extent that a claim by the United States for money damages against any one or more of the Permittees shall be barred in accordance with the provisions of subsections A and B of this Section, Permittees shall be liable to the United States, with respect to improved or tangible property of the United States, whether real, personal or mixed, that is damaged or destroyed in connection with or resulting from activities along or in the vicinity of the Right-of-Way in accordance with the provisions of Section 204 of the Trans-Alaska Pipeline Authorization Act.

D. In the event that a Permittee shall be liable to the United States for any damage, destruction or loss of improved or tangible property of the United States whether real, personal or mixed, the collection by the United States of money damages on account of the particular loss, damage or destruction, shall to the extent collected operate to preclude the United States from enforcing the provisions of subsection A of this Section with respect to such loss, damage or destruction.

### 14. Indemnification of the United States

A. Permittees shall indemnify and hold harmless the United States, its agents and employees, against and from any and all liabilities or damages of any nature whatsoever which the United States, its agents, employees, contractors or subcontractors (at any tier) become legally obligated to pay, and which arise out of, or are connected with, any one or more of the following: (1) the construction, operation, maintenance or termination of the Pipeline System; (2) the approval (as distinguished from the ordering of a modification pursuant to Stipulation 1.3.2.) by the United States, its agents, employees, contractors or subcontractors (at any tier), of any design, plan, Construction Mode, construction or research pertaining to the Pipeline System or any part thereof; or (3) the physical entry by any Person upon, or the use or occupancy by any Person of, any Federal Land that is the subject of any use or right which is granted or afforded to Permittees, or to their respective agents, employees, contractors or subcontractors (at any tier) in connection with the

9

Pipeline System; *provided, however,* that the provisions of items (1) and (3) of this Section shall not be deemed to apply to liabilities or damages that are caused: (a) by an act of war; or (b) solely by (i) the negligence of the United States, and/or (ii) the negligence or willful misconduct of an agent, employee, contractor or subcontractor (at any tier) of the United States not acting within the scope of his authority or employment, and/or (iii) the negligence or willful misconduct of persons who are authorized to enter upon, use or occupy the damaged property or areas pursuant to any Federal lease, permit, or other written authorization that is issued for any use or purpose other than in connection with the construction, operation, maintenance or termination of the Pipeline System.

B. Permittees shall be notified in writing of any claim for which indemnity under the provisions of this Section is sought, and such claim shall not be compromised without the written consent of Permittees, which consent Permittees agree shall not be unreasonably withheld or delayed.

C. The regulations of the Department relating to indemnification of the United States against any liability for damages to life, person or property arising from the occupancy or use of the lands under a right-of-way (43 CFR 2801.1-5(f) (1972)) shall not be applicable to this Agreement.

## 15. Guaranty

A. Upon being notified by the Secretary to do so, each Permittee shall cause to be delivered to the Secretary a valid and unconditional guaranty of the full and timely payment of all liabilities and obligations of the Permittee to the United States under or in connection with this Agreement or any other agreement, permit or authorization to be issued or granted to the Permittees by the Secretary that relates in whole or in part to all or any part of the Pipeline System.

B. It is recognized that a proposed guarantor of a Permittee may be a corporation (or an individual stockholder thereof), a partnership (or an individual partner thereof), an association that is authorized and empowered to sue and be sued and to hold the title to property in its own name (or an individual associate thereof), a joint stock company that is authorized and empowered to sue and be sued and to hold the title to property in its own name (or any individual participant therein), or a business trust (or an individual settlor

thereof), and may or may not directly or indirectly own a legal or beneficial interest in the Permittee whose liabilities and obligations are sought to be guaranteed. In the case of multiple guarantors that are acceptable to the Secretary, each shall be severally liable for only its proportionate share of any sum or payment covered by the guaranty.

C. Each guaranty shall be satisfactory to the Secretary in all respects including, without limitation, the form and substance of the guaranty, the financial capability of a proposed guarantor, the availability of such guarantor to service of process, the availability of the assets of such guarantor with respect to the enforcement of judgments against the guarantor, and the number of guarantors that will be necessary to guarantee all of the liabilities and obligations which will be covered by a particular guaranty; *provided, however,* that the Secretary shall not unreasonably withhold his approval with respect to a guaranty or guarantor.

D. The Secretary shall have the right at any time, and from time to time, to require the substitution and delivery of a new form of guaranty in the event that an outstanding guaranty is held to be invalid or unenforceable, in whole or in part, by a court of competent jurisdiction or, that the controlling law shall, by statute or judicial decision, be so altered as to impair, prevent or nullify the enforcement or exercise of any right or option of the United States under an outstanding guaranty; *provided, however,* that the outstanding guaranty (to the extent of its validity or enforceability, if any) shall continue in full force and effect with respect to any claim, suit, accrued liability or defense thereunder that exists at the time of substitution; *provided further,* that the new form of guaranty, in each such case, shall be required as to all Permittees that at the time of substitution have delivered, or are required to deliver, a guaranty.

E. Each guaranty shall be accompanied by such certificates and opinions of legal counsel as the Secretary may require to establish its validity. The guaranty shall include an appointment of an agent for service of process that is satisfactory to the Secretary.

## 16. Laws and Regulations

A. Permittees, and each of them, shall comply with all applicable Federal laws and regulations, existing or hereafter enacted or promulgated.

10

B. In any event, Permittees, and each of them, shall comply with: (1) all regulations hereafter promulgated to implement the Trans-Alaska Pipeline Authorization Act, and (2) all applicable regulations hereafter promulgated to implement Section 28 of the Mineral Leasing Act of 1920, as amended.

### 17. No Right of Set Off

A. With respect to any sum now or hereafter owing, or claimed to be owing, to the United States and that arises out of or is connected in any way with the construction, operation, maintenance or termination of all or any part of the Pipeline System, Permittees, and each of them, shall not set off against, or otherwise deduct from, any such sum:

  (1) Any claim or judgment for money of any one or more of the Permittees against the United States not arising out of the construction, operation. maintenance or termination of all or any part of the Pipeline System;

  (2) Any claim or judgment for money of any one or more of the Permittees against the United States that arises out of the construction, operation, maintenance or termination of all or any part of the Pipeline System, if the sum now or hereafter owing, or claimed to be owing, to the United States is or shall be for any sum or charge required to be paid to the United States pursuant to Section 8, Section 12 or Section 18 hereof; or

  (3) Any claim or judgment for money of any one or more of the Permittees against the United States that arises out of, or pursuant to, any statute administered by any department or agency of the United States other than the Department.

### 18. Right of United States To Perform

A. If, after thirty (30) days, or in an emergency such shorter period as shall not be unreasonable, following the making of a demand therefor by the Authorized Officer, in the manner that is provided in Stipulation 1.6 for giving written notices, Permittees, or their respective agents, employees, contractors or subcontractors (at any tier), shall fail or refuse to perform any of the actions required by the provisions listed in subsection B of this Section, the United States shall have the right, but not the obligation, to perform any or all of such actions at the sole expense of Permittees. Prior to the delivery of any such demand, the Authorized Office shall confer with Permittees, if he deems it practicable to do so, regarding the required action or actions that are included in the demand. The Authorized Officer, following the procedure outlined in subsection F of Section 12 hereof, shall submit to Permittees a statement of the expenses incurred by the United States during the preceding quarter in the performance by the United States of any required action and, in the absence of a dispute, the amounts shown to be due on each such statement shall be paid by Permittees in accordance with the provisions of the said last mentioned subsection. If any one or more of the Permittees shall dispute the amount of any item in any statement that shall be rendered in accordance with the provisions of this Section, the procedures outlined in subsection J of Section 12 shall apply with equal force and effect to any such dispute. Permittees may dispute whether the work involved an action required by a provision listed in subsection B of this Section, whether Permittees' failure or refusal to perform any such action was justified, as well as the reasonableness of the specifications for, and the cost of, such work.

B. Required Action (In General) and Reference :*

  Survey, map and mark the Right-of-Way—Sec. 6.

  Repair, replace, rehabilitate property and natural resources—Sec. 13.

  Discharge liens—Sec. 19.

  Abate any condition causing or threatening to cause a hazard, harm or damage—Sec. 24.

  Provide emergency aid—Sec. 30.

  Provide an archeologist to perform certain duties—Stip. 1.9.

  Remove improvements and equipment and restore land—Stip. 1.10.1.

  Put areas "to bed"—Stip. 1.10.2.

  Protect certain improvements; remove obstructions; repair damage to public utilities and improvements—Stip. 1.11.

  Regulate public access—Stip. 1.12.1.

  Provide alternative routes for roads and trails—Stip. 1.12.2.

*"Sec." refers to Sections of this Agreement. "Stip." refers to the Stipulations, attached as Exhibit D hereto.

11

Provide public crossings—Stip. 1.12.3.

Screen, filter, suppress electronic devices—Stip. 1.13.1.

Post the Right-of-Way against hunting, etc.—Stip. 1.14.1.

Restore survey monuments, etc.—Stip. 1.16.2.

Take measures to protect health and safety; abate hazards—Stip. 1.20.

Provide for environmental briefings—Stip. 2.1.1.

Remove waste—Stip 2.2.6.2.

Stabilize disturbed areas—Stip. 2.4.2.2.

Remove temporary fill ramps—Stip 2.4.3.2.

Seed and plant disturbed areas—Stip 2.4.4.1.

Dispose of excavated material—Stip. 2.4.5.

Provide for uninterrupted movement and safe passage of fish—Stip. 2.5.1.1.

Screen pump intakes—Stip. 2.5.1.2.

Plug, stabilize abandoned water diversion structures—Stip 2.5.1.3.

Construct levees, etc.—Stip. 2.5.1.4.

Construct new channels—Stip. 2.5.2.2.

Protect Fish Spawning Beds from sediment; construct settling basins—Stip 2.5.2.3.

Repair damage to Fish Spawning Beds—Stip. 2.5.2.4.

Assure big game passage—Stip. 2.5.4.1.

Remove certain debris—Stip. 2.7.2.5.

Dispose of slash (where "otherwise directed.")—Stip. 2.7.2.8.

Take certain mitigation measures—Stip. 2.8.1.

Restore disturbed areas—Stip. 2.12.1.

Stabilize slopes—Stip. 2.12.2.

Dispose of certain materials—Stip. 2.12.3, Stip. 2.12.4.

Remove equipment and supplies—Stip. 2.12.5.

Clean up, repair, if Oil or other pollutant is discharged—Stip. 2.14.4.

Inspect welds—Stip. 3.2.2.3.

Inspect Pipeline System construction—Stip. 3.2.2.4.

Perform seismic monitoring—Stip. 3.4.2.3.

Construct stilling basins; stabilize pool sides—Stip. 3.6.2.1.

Provide Oil spill containment structures—Stip. 3.11.1, Stip. 3.11.2.

### 19. Liens

A. Each Permittee shall, with reasonable diligence, discharge any lien against Federal Lands that results from any failure or refusal on its part to pay or satisfy any judgment or obligation that arises out of or is connected in any way with the construction, operation, maintenance or termination of all or any part of the Pipeline System.

B. However, Permittees shall prevent the foreclosure of any lien against any title, right, or interest of the United States in said lands.

C. The foregoing provisions of this Section shall not be construed to constitute the consent of the United States to the creation of any lien against Federal Lands or to be in derogation of any prohibition or limitation with respect to such liens that may now or hereafter exist.

### 20. Insolvency

If at any time there shall be filed by or against any Permittee, or any guarantor furnishing a guaranty in accordance with the provisions of Section 15 hereof, in any court of competent jurisdiction, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of the Permittee's or such guarantor's property, or if any Permittee, or any such guarantor, makes an assignment for the benefit of creditors or takes advantage of any insolvency act, and, in the case of an involuntary proceeding, within sixty (60) days after the initiation of the proceeding the Permittee or such guarantor fails to secure a discontinuance of the proceeding, the Secretary may, if the Secretary so elects, at any time thereafter, declare such to be a breach of this Agreement by the Permittee or, in cases involving a guarantor, the Permittee for which the guaranty was furnished.

### 21. Breach; Extent of Liability of Permittees

A. The liabilities and obligations of each Permittee under this Agreement are joint and several except that the liabilities and obligations of each Permittee are several under the following Sections: 2.D (Purpose of Grant; Limitation of Use to Permittees), 3 (Transportation of Oil), 8 (Use Charge for Right-of-Way), 12 (Reimbursement of Department Expenses), 13.C (Damage to United States Property; Repair, Replacement or Claim for Damages), 14 (Indemnification of United States), 15 (Guaranty), 18 (Right of the United States to Perform), 19.A (Liens), 20 (Insolvency), 22 (Transfer), 32 (Release of

Right-of-Way), 33.B and 33.C, to the extent that performance may be required by less than all of the Permittees (Agreements Among Permittees), 24. (Access to Documents), 41 (Authority to Enter Agreement), Stipulation 1.4 (Common Agent), and Stipulation 1.10.1 (Completion of Use); *provided, however,* that as to any obligation to pay money to the United States, each such Permittee shall not be liable for any greater portion thereof than an amount which is equal to the product of the total obligation or liability when multiplied by a fraction, the numerator thereof being the individual Permittee's interest in the Right-of-Way at the time of the breach (such interest being expressed as a percentage for purposes of the numerator), and the denominator thereof being the aggregate of all of the interests in the Right-of-Way that were held by all of the Permittees at the time the obligation becomes due and payable (the aggregate of such interest being expressed as a percentage for purposes of the denominator).

## 22. Transfer

A. Permittees, and each of them, shall not, without obtaining the prior written consent of the Secretary, Transfer in whole or in part any right, title or interest in this Agreement or the Right-of-Way. Any such Transfer other than with respect to an Involuntary Passage of Title, without in each instance obtaining the prior written consent thereto of the Secretary, shall be absolutely void, and, at the option of the Secretary, shall be deemed to be a breach of this Agreement by each Permittee so violating this Agreement.

B. Any Involuntary Passage of Title with respect to any right, title or interest in this Agreement or the Right-of-Way that shall be attempted or effected without in each instance obtaining the prior written consent thereto of the Secretary shall, to the extent permitted by law, be voidable at the option of the Secretary, and, in addition, at the option of the Secretary, shall be deemed to be a breach of this Agreement by the affected Permittee: *provided, however,* that nothing in this subsection shall be deemed to prohibit, or to limit in any way, the exercise of any right or option of the United States under Section 20 of this Agreement.

C. With respect to any Transfer that shall relate to this Agreement or the Right-of-Way, the Transferor, the Transferee and the guarantor or guarantors, if any, of the Transferee shall apply for the Secretary's written consent to the Transfer by filing with the Secretary all documents or other information that may be required by law or regulation, this Agreement or any other agreement, permit, or authorization of the United States relating to the Pipeline System or any part thereof and, upon request from the Secretary, such other documents and information as may be relevant to the Secretary's determination.

D. Before the Secretary acts in connection with an application for his consent with respect to the Transfer of an interest in the Right-of-Way, the Transferee shall demonstrate, to the satisfaction of the Secretary, that the Transferee is capable of performing all of the liabilities and obligations of the Transferor relating to the interest to be transferred. In considering an application for such consent, the Secretary shall make a determination, in accordance with Section 28(j) of the Mineral Leasing Act of 1920, as amended, concerning: (1) the technical capability of the Transferee, and (2) the financial capability of the Transferee, or of the Transferee together with, if any, its proposed guarantor or guarantors as approved by the Secretary, to perform all of the liabilities and obligations of the Transferor relating to the interest to be transferred.

E. In connection with any Transfer, the Secretary may request the right to audit and/or inspect, in whole or in part, the pertinent books, records, accounts, contracts, commitments, and property of the Transferee and of the proposed guarantor or guarantors, if any, of the Transferee, at the sole expense of the Transferor, which expense shall be paid to the United States upon completion of the inspection and/or audit and before the Secretary acts in connection with the application for his consent to the Transfer. If any such request shall be refused such refusal shall be deemed to be a sufficient reason for the Secretary to withhold his consent to the pertinent Transfer. The Transferee and its guarantor or guarantors, if any, shall consent in writing to the provisions of this subsection when applying for the consent of the Secretary.

F. The Secretary, shall not unreasonably withhold his consent to any Transfer hereunder, but may withhold or revoke his consent to any Transfer if:

(1) At the time of, or before, the consummation of the Transfer, there shall have oc-

188

curred any breach, by the Transferor or any predecessor of the Transferor, of this Agreement or of any other agreement, permit, or authorization relating to the Pipeline System that the United States may make with, issue to, or grant to the Transferor, and that was not cured to the satisfaction of the United States before the consummation of the Transfer, or

(2) With respect to Transfers other than those referred to in subsection H of this Section, the Transferee, or the Transferee together with, if any, its guarantor or guarantors as approved by the Secretary: (a) is not, or are not, capable, in the judgment of the Secretary, of performing all of the liabilities and obligations of the Transferor relating to the right, title or interest to be transferred, or (b) shall refuse to allow an audit and/or inspection as provided for in subsection E of this Section; or

(3) Applicable laws and regulations in effect at the time of a Transfer shall not have been complied with by the parties to the Transfer.

G. A Permittee seeking to be divested in whole or in part of its right, title, and interest in and to the Right-of-Way and this Agreement in connection with a Transfer shall be released from its liabilities and obligations (accrued, contingent, or otherwise) to the United States under this Agreement to the extent and limit that the Transferee assumes unconditionally the performance and observance of each such liability and obligation, *provided:*

(1) All of the provisions of this Agreement with respect to the approval or disapproval of the Transfer have been fully complied with to the satisfaction of the Secretary;

(2) The Secretary has consented in writing to to the Transfer; and

(3) Thereafter the Transfer and the attendant assumption agreement, if any, are in fact duly consummated on the basis of the documents previously presented to the Secretary for his review, and the Secretary is so notified in writing by the parties to the Transfer.

H. The Secretary shall consent to the Transfer of an interest in the Right-of-Way between:

(1) Any of the Original Permittees, their Affiliates or any of them, or

(2) One or more of the Original Permittees, their Affiliates or any of them, and a corporate Transferee, all of the outstanding capital stock of which Transferee at the time of the Transfer is owned by one or more of the Original Permittees or their Affiliates, or

(3) One or more of the Original Permittees, their Affiliates or any of them, and a partnership consisting of two (2) or more of the Original Permittees or their Affiliates;

*provided,* that the Transferor or Transferee are not in breach of this Agreement; *provided further,* that all applicable laws and regulations in effect at the time of Transfer are complied with; *provided further,* that the application for any such Transfer be filed with the Secretary within eight (8) years of the Effective Date hereof or prior to completion of construction of the Pipeline at its maximum design capacity (i.e. approximately two million (2,000,000) barrels per day) whichever shall first occur; and *provided further,* that no substantial reduction in the financial worth of the Transferee (or its Parent), or of the Transferee (or its Parent) together with its guarantors, if any, has occurred since the date the Transferee (or its Parent) acquired its original interest in the Right-of-Way.

### 23. Port Valdez Terminal Facility

A. The provisions of this Section shall apply to the construction and operation of the terminal facility of the Pipeline System located at Port Valdez, Alaska.

B. Permittees shall maintain and operate a waste-water treatment facility in conjunction with the terminal facility at Port Valdez. All oily-water (including, but not limited to, discharge from fuel tanks, cargo tanks, ballast tanks, and bilges) discharged from any tanker or other sea-going, bulk Oil carrier (hereinafter referred to as a "Vessel") loading at or from the terminal facility shall be received and treated by said waste-water treatment facility. Water discharged from the waste-water treatment facility shall not con-

14

tain more than 10 parts of oil per million parts of water, on a weekly (seven (7) day) average.

C. At reasonable intervals, but at least once in every five (5) year period, the Authorized Officer and Permittees, at the request of either, shall meet to review and consider in depth: (1) the operation of the waste-water treatment facility; (2) such advances and improvements in water pollution control and waste-water treatment, technology and equipment, as they relate to the terminal facility, as have taken place; and (3) the feasibility of improving the performance of the facility through installation of new or additional equipment, or modification of existing equipment. Consideration of such feasibility shall include consideration of the degree of technological advances that have occurred, costs and economic feasibility, the types of equipment commercially available, and the benefits that would be derived from the installation of new or additional equipment or the modification of existing equipment.

D. Permittees, and their respective agents, employees, contractors and subcontractors (at any tier) shall not release, or suffer to be released, from the terminal facility any Oil to be loaded on any Vessel unless the provisions of subsections E and F of this Section have, in each case, been fully complied with.

E. Prior to loading Oil on any Vessel, Permittees shall require the master thereof to provide Permittees with a legible copy, certified under oath by the master as being true and correct, of:

(1) in the case of Vessels of United States registry, that part of the oil record book of such Vessel that pertains to the voyage of the Vessel to the terminal facility from its last Oil discharge port;

(2) in the case of Vessels of foreign registry that may now or hereafter be required to maintain an oil record book, or similar records, that part of the oil record book, or said records, that pertains to the voyage of the Vessel to the terminal facility from its last Oil discharge port; and

(3) in the case of any Vessel of foreign registry that is not required to maintain an oil record book, or similar records, Permittees shall require the master thereof to provide Permittees with an affidavit, duly sworn to and signed by the master, stating any and all facts bearing upon

any discharge of Oil or oily water from the Vessel during its voyage to the terminal facility from its last Oil discharge port.

F. If the said record book entries or affidavit, as provided by the master, disclose:

(1) that the Vessel has discharged any Oil or oily water from its fuel tanks, cargo tanks, bilge, or otherwise, and

(2) that such discharge was not necessary for the safety of the Vessel or its crew,

Permittees shall promptly notify the Authorized Officer of the pertinent facts and shall not load the Vessel or suffer the Vessel to be loaded, unless at the time of such discharge:

(a) The United States Coast Guard or other agency of the United States has promulgated and implemented regulations under one or more treaties, conventions, or statutes that are designed to deter Vessels subject to such treaties, conventions or statutes from discharging any Oil or oily water at sea and that apply to, and can be enforced by the United States Coast Guard or such other agency of the United States against, the offending Vessel; or

(b) In the absence of the aforesaid regulations, or the inapplicability thereof to the offending Vessel, there shall be in effect port rules, approved in writing by the Authorized Officer for the purposes of this subsection F, for the port of Valdez or, as the case may be, the terminal facility, (which rules may provide for a demurrage charge against offending vessels) that are designed to deter any Vessel using the terminal facility from discharging Oil or oily water at sea and that apply to, and can be enforced against, the offending vessel; or

(c) If neither subsection F(a) or F(b) above in this Section shall be applicable, Permittees may proceed subject to applicable laws and regulations, to load the Vessel at the terminal facility; provided, however, that during its next return voyage to the terminal facility, one of either of the following alternatives must be complied with before the Vessel can be loaded:

(i)(AA) The Vessel shall, prior to loading, remain for ten

(10) consecutive hours (the "Standdown Period") in an area designated by the Authorized Officer, not nearer than fifty (50) nautical miles or farther than one hundred (100) nautical miles from the port of Valdez;

(BB) The Vessel's master shall enter in the ship's log the time and position of the Vessel at the commencement and termination of the Standdown Period, as well as the hourly positions of the Vessel during said period;

(CC) The Vessel's position at the point of departure, upon completion of the Standdown Period, shall not be greater than five (5) nautical miles from the Vessel's position at the commencement of such period; and

(DD) Prior to loading the Vessel, Permittees shall receive from the master of the Vessel a legible copy, certified under oath by the master as being true and correct, of the aforementioned entries in the ship's log; or

(ii) (AA) The Vessel shall proceed to Valdez at a reduced rate of speed so that the voyage to Valdez (from its last port of call before such voyage) requires at least ten (10) hours additional to the period of time the voyage would otherwise have taken; and

(BB) Prior to loading the Vessel, Permittees shall receive from the master of the Vessel a legible copy, certified as being true and correct, of the entries in the ship's log which demonstrate compli-

ance with the aforementioned return-voyage requirements.

Notwithstanding the foregoing provisions of subsections F(c)(i) and F(c)(ii), the Authorized Officer may temporarily waive compliance with the return-voyage requirements (on such terms as the Authorized Officer may prescribe) if, from the ship's log and corroborative evidence, it is clearly demonstrated that compliance would have seriously jeopardized the safety of the ship or crew.

G. If a Vessel shall have been loaded at the terminal facility without being subjected to any of the alternatives that are prescribed in subsection F of this Section, and it should later be determined that the portion of the oil record book, a copy of which was furnished to Permittees prior to such loading, or affidavit, as the case may be, contained any false or misleading statement or did not contain a required entry or statement, and if the entry or statement had been properly made the Vessel would have been subject to the aforesaid alternatives, then the Vessel shall be subject to the provisions of subsections E and F on its return voyage to the terminal facility next following the date on which the Authorized Officer notifies Permittees and the owner and/or, if any, the charterer of such Vessel of the aforementioned determination.

H. Permittees shall:

(1) Publish the restrictions placed on the loading of Vessels at the terminal facility under this Section in the port manual for the port of Valdez or, as the case may be, the terminal facility and, if legally permissible, in the tariff or tariffs pertaining to the transportation of Oil through the Pipeline; and

(2) Give the public such other notice of said restrictions as Permittees or the Authorized Officer may, from time to time, consider to be necessary or appropriate.

I. Permittees shall maintain books and records in connection with the operation of the waste-water treatment facility. Said books and records shall at least show, for each Vessel discharging into said facility, the name, tonnage (D.W.T.) and such other information as may be appropriate to identify the Vessel, the date of each discharge, the

amount of ballast water discharged on each occasion, the amount of other oily water discharged on each occasion, and the amount of Oil that was loaded on each occasion from the terminal facility.

J. Permittees shall retain, for an appropriate period, as prescribed by the Authorized Officer, all documents furnished to Permittees pursuant to subsections E and F of this Section and the books and records specified in subsection I of this Section; and the Authorized Officer shall have access thereto at all reasonable times for the purpose of inspection and copying.

K. Permittees shall comply with all Federal, State and local laws and regulations existing or hereafter enacted or promulgated affecting in any manner the construction and operation of the terminal facility. If any such law or regulation governs specifically any particular requirement or standard that is prescribed in this Section. Permittees shall comply with the requirement or standard established by such law or regulation and, so long as compliance is required, Permittees shall be relieved of any obligation to comply with the particular requirement or standard of this Section that is governed by such law or regulation.

### 24. Duty of Permittees To Abate

A. Permittees promptly shall abate, either completely or, as the case may be, as completely as possible using their best efforts, any physical or mechanical procedure, activity, event or condition, existing or occurring at any time: (1) that is susceptible to abatement by Permittees, (2) which arises out of, or could affect adversely, the construction, operation, maintenance or termination of all or any part of the Pipeline System, and (3) that causes or threatens to cause: (a) a hazard to the safety of workers or to public health or safety (including but not limited to personal injury or loss of life with respect to any Person or Persons), or (b) serious and irreparable harm or damage to the environment (including but not limited to areas of vegetation or timber, fish or other wildlife populations, or their habitats, or any other natural resource)

B. Permittees shall cause their respective agents, employees, contractors and subcontractors (at any tier) to observe and comply with the foregoing provisions of this Section.

### 25. Temporary Suspension Orders of Authorized Officer

A. The Authorized Officer may at any time order the temporary suspension of any or all construction, operation, maintenance or termination activities of Permittees, their agents, employees, contractors or subcontractors (at any tier) in connection with the Pipeline System, including but not limited to the transportation of Oil, if in the judgment of the Authorized Officer:

(1) An immediate temporary suspension of such activities is necessary to protect: (a) public health or safety (including, but not limited to, personal injury or loss of life with respect to any Person or Persons); or (b) the environment from immediate, serious, substantial and irreparable harm or damage (including, but not limited to, harm or damage to areas of vegetation or timber, fish or other wildlife populations, or their habitats, or any other natural resource); or

(2) Permittees, their respective agents, employees, contractors or subcontractors (at any tier) are failing or refusing, or have failed or refused, to comply with or observe: (a) any provision of this Agreement necessary to protect public health, safety or the environment; or (b) any order of the Authorized Officer implementing any such provision of this Agreement or of any other agreement, permit or authorization that shall have been duly approved, issued or granted by the Secretary in connection with all or any part of the Pipeline System.

B. The following shall be applicable to any temporary suspension order that may be issued in accordance with the provisions of subsection A of this Section, if the order would have the effect of suspending (1) operation of the entire Pipeline, (2) transportation of Oil through the Pipeline, (3) operation of the entire Valdez terminal facility, or (4) construction of an entire Construction Subdivision:

(a) If the order is issued in accordance with subsection A(1) of this Section, the Authorized Officer shall transmit a copy of the order, and a preliminary report with respect to the order, to the Secretary

192

within six (6) hours after the order has been issued and, thereafter, the Authorized Officer's report and the order will be reviewed promptly by the Secretary; *provided, however,* that nothing herein shall require the Secretary to take any action following such review; or

(b) If the order is to be issued in accordance with subsection A (2) of this Section, the Authorized Officer shall not issue the order unless and until the Secretary gives to the Authorized Officer the Secretary's prior written approval with respect to the order.

C. The Authorized Officer shall give Permittees prior notice of the temporary suspension order as he deems practicable. If circumstances permit, the Authorized Officer shall consult with Permittees, prior to issuing the order, to discuss appropriate measures to (1) forthwith abate or avoid the harm or threatened harm that is the reason for the issuance of the order, or (2) effect compliance with the provision or order, whichever is applicable.

D. After a temporary suspension order has been given by the Authorized Officer, Permittees shall promptly comply with all of the provisions of the order and shall not resume any activity suspended or curtailed thereby except as provided in this Agreement or pursuant to court order.

E. Any temporary suspension order which, in an emergency, is given orally shall be confirmed in writing, as provided for in Stipulation 1.5.2. Each written order or written confirmation of an order shall set forth the reasons for the suspension. Each temporary suspension order shall be limited, insofar as is practicable, to the particular area or activity that is or may be affected by the activities or conditions that are the basis of the order. Each order shall be effective as of the date and time given, unless it specifies otherwise. Each order shall remain in full force and effect until modified or revoked in writing by the Authorized Officer or the Secretary.

F. Resumption of any suspended activity shall be promptly authorized by the Authorized Officer in writing when he is satisfied that (1) the harm or threatened harm has been abated or remedied, or (2) Permittees have effected, or are ready, willing and able to effect compliance with the provision or order, whichever is applicable.

G. Any temporary suspension order that is given or issued in accordance with this Section shall be subject to the provisions of Stipulation 1.5.1.

## 26. Appeal Procedure

### A. Appeals from Temporary Suspension Orders of Authorized Officer; Appeals from Denials of Resumption of Suspended Activities

(1) Permittees may appeal directly to the Secretary: (a) any temporary suspension order issued by the Authorized Officer pursuant to Section 25 of this Agreement; and (b) any denial by the Authorized Officer of a request for resumption of activities suspended pursuant to such a temporary suspension order. If a right of appeal is to be preserved, Permittees shall file a notice of appeal with the Secretary within fifteen (15) days from the effective date of the order or denial being appealed. The notice shall set forth with particularity the order or denial being appealed. To perfect an appeal, Permittees shall file with the Secretary within thirty (30) days from the effective date of the order or denial being appealed a statement of the facts of the matter and a statement of the applicable law, supplemented by such documentation and arguments on the facts and the law as Permittees may wish to present to justify modification or reversal of the order or denial. All statements of fact shall be under oath.

(2) Except as provided hereinafter in this Section, the Secretary shall decide the appeal within thirty (30) days from the date Permittees' appeal is perfected. If the Secretary does not render a decision within that time, the appeal shall be considered to have been denied by the Secretary, and such denial shall constitute the final administrative decision of the Department.

(3) Except for any decision that may be made by the Secretary after his review as provided for in subsection B(a) of Section 25 hereof, any decisions of the Secretary, with respect to any appeal within the Department as to any matter arising out of this Agreement, shall constitute the final administrative decision of the Department.

### B. Expedited Appeals

(1) Permittees shall be entitled to an expedited appeal to the Secretary from any temporary suspension order, or order denying resumption of suspended activities (except any refusal to issue a Notice to Proceed or the issuance of a Notice to

18

193

Proceed that may not be substantially in accord with the application therefor), issued by the Authorized Officer and that suspends, or denies resumption of, the following: (a) operation of the entire Pipeline; (b) transportation of Oil through the Pipeline; (c) operation of the entire Valdez terminal facility; or (d) construction of an entire Construction Subdivision.

(2) Permittees may occasionally, from time to time, during construction of the Pipeline System, designate an order not covered by subsection B(1) of this Section but which the Permittees deem critical and which the Secretary shall consider as an expedited appeal. Such designation shall be made in the notice of appeal, and shall be supported by factual information, under oath, to confirm that the affected activity is one of critical importance.

(3) The Secretary shall render a decision so as to dispose of the expedited appeal within the shortest possible time and in all events within seven (7) days of the date of filing of the documents required to perfect an appeal. If the Secretary does not render a decision within such time, the appeal may be deemed by Permittees to have been denied by the Secretary, and such denial shall constitute the final administrative decision of the Department.

C. *Appeals with Respect to Notices to Proceed*

(1) Permittees may appeal to the Secretary if, with respect to a particular application for a Notice to Proceed: (a) the Authorized Officer has refused to issue the Notice to Proceed within the time prescribed pursuant to Stipulation 1.7.4; or (b) the Authorized Officer has issued a Notice to Proceed not substantially in accord with the application therefor. If the Authorized Officer has not acted within the prescribed time to either issue or deny the issuance of the Notice to Proceed, such failure to act shall be deemed to be a refusal by the Authorized Officer to issue the Notice to Proceed.

(2) The ground or grounds for such an appeal shall be one or more of the following:

   (a) The Authorized Officer has construed the applicable Stipulations erroneously; or

   (b) The Authorized Officer has imposed arbitrary and capricious requirements to enforce the Stipulations; or

   (c) Permittees have made a bona fide effort to meet the requirements of the Authorized Officer, but are unable to comply; or

   (d) By failing to act upon the requested Notice to Proceed, within the prescribed time, the Authorized Officer has been unreasonable.

(3) Each appeal under this subsection shall be subject to the appeal procedure set forth in subsection A of this Section.

### 27. Requests To Resume; Appeals

A. If by a temporary suspension order issued pursuant to Section 26 of this Agreement, the Authorized Officer has ordered the suspension of an activity of Permittees, Permittees may at any time thereafter file with the Authorized Officer a request for permission to resume that activity on the ground that the reason for the suspension no longer exists. The request shall contain a statement, under oath, of the facts which in Permittees' view support the propriety of resumption.

B. The Authorized Officer shall render a decision, either granting or denying the request, within five (5) days of the date that the request was filed with him. If the Authorized Officer does not render a decision within that time, the request shall be considered denied and Permittee may appeal the denial to the Secretary in accordance with the provisions of Section 26 of this Agreement.

C. If, at the time the request to resume is filed with the Authorized Officer, the Authorized Officer's order suspending the activity is pending before the Secretary pursuant to a perfected appeal, the Authorized Officer shall nonetheless proceed to act upon the request. If the Authorized Officer grants the request that action shall be determinative of both the request and the pending appeal.

### 28. Nondiscrimination and Equal Employment Opportunity

A. Permittees shall assure that no person shall, on the grounds of race, creed, color, national origin or sex be excluded from receiving or participating in any activity, including all aspects of employment and contracting, conducted under any permit, right-of-way, public land order, or other Federal authorization granted or issued under the Trans-Alaska Pipeline Authorization Act. Permittees shall comply with all regulations that shall be

194

promulgated by the Secretary to implement this provision.

B. Permittees agree that, during the period of construction of the Pipeline System and for so long as the Pipeline System, or any portion thereof, shall be in operation, or for so long as this Agreement shall be in effect, whichever is the longer:

(1) Permittees will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. Permittees will take affirmative action to ensure that applicants are employed, and that employees are equally treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. Permittees agree to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Authorized Officer setting forth the provisions of this equal opportunity clause.

(2) Permittees will, in all solicitations or advertisements for employees placed by or on behalf of Permittees, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) Permittees will send to each labor union or representative of workers with which Permittees have a collective bargaining agreement or other contract or understanding, a notice, to be provided by the Authorized Officer, advising the labor union or workers' representative of Permittees' commitments under this equal opportunity clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) Permittees will comply with Executive Order No. 11246 of September 24, 1965, as amended, and rules and regulations and relevant orders of the Secretary of Labor.

(5) Permittees will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, as amended, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to Permittees' books, records, and accounts by the Authorized Officer and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of Permittees' noncompliance with this equal opportunity clause or with any of said rules, regulations or orders, this Agreement may be terminated or suspended in whole or in part by the Secretary, in accordance with the provisions of Section 403 of the Act of November 16, 1973, 87 Stat. 590 (1973) and in the manner provided in Section 31 hereof, and Permittees may be declared ineligible for further government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, as amended, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, as amended, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) Permittees will include the provisions of an equal opportunity clause as established by regulation of the Secretary in every contract, subcontract or purchase order unless exempted so that such provisions will be binding upon each contractor, subcontractor (at any tier) or vendor. Permittees will take such action with respect to any contract, subcontract, or purchase order as the Authorized Officer may direct as a means of enforcing such provisions including sanctions for noncompliance; *provided, however*, that in the event Permittees become involved in or are threatened with litigation with a contractor, subcontractor (at any tier) or vendor as a result of such direction by the Authorized Officer, Permittees may request the United States to enter into such liti-

20

195

gation to protect the interests of the United States.

Permittees further agree that they will be bound by the equal opportunity clause (i.e., subsections (1) through (7) of this subsection B) with respect to their own employment practices when they participate in federally assisted construction work.

C. Permittees agree that they will assist and cooperate actively with the Authorized Officer and the Secretary of Labor in obtaining the compliance of contractors and subcontractors (at any tier) with the equal opportunity clause and the rules, regulations, and relevant orders of the Secretary of Labor, pursuant to the Executive Order, that they will furnish the Authorized Officer and the Secretary of Labor such information as they may require for the supervision of such compliance, and that they will otherwise assist the Authorized Officer in the discharge of the Department's primary responsibility for securing compliance.

D. Permittees further agree that they will refrain from entering into any contract or contract modification subject to Executive Order No. 11246 of September 24, 1965, with a contractor debarred from Government contracts and federally assisted construction contracts and will carry out such sanctions and penalties for violation of the equal opportunity clause as may be imposed upon contractors and subcontractors by the Authorized Officer or the Secretary of Labor pursuant to Part II, Subpart D of the Executive Order. In addition, Permittees agree that if they fail or refuse to comply with these undertakings, the Secretary may take any or all of the following actions: terminate or suspend the Right-of-Way in whole or in part, in accordance with the provisions of Section 403 of the Act of November 16, 1973, 87 Stat. 590 (1973), and in the manner provided in Section 31 hereof; refrain from extending any further assistance to Permittees under the program with respect to which the failure or refusal occurred until satisfactory assurance of future compliance has been received from Permittees; and refer the case to the Department of Justice for appropriate legal proceedings.

E. By accepting this Agreement, Permittees certify that Permittees do not and will not maintain or provide for Permittees' employees any Segregated Facilities at any of Permittees' establishments and that Permittees do not and will not permit Permittees' employees to perform their services at any location, under Permittees' control, where Segregated Facilities are maintained. Permittees agree that a breach of this certification is a violation of the equal opportunity clause of this Agreement. As used in this certification, the term "Segregated Facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms, and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom or otherwise. Permittees further agree that (except where Permittees have obtained identical certifications from proposed contractors and subcontractors (at any tier) for specific time periods) Permittees will obtain identical certifications from proposed contractors and subcontractors (at any tier) prior to the award of contracts or subcontracts exceeding $10,000 which are not exempt from the provisions of the equal opportunity clause; that Permittees will retain such certifications in Permittees' files; and that Permittees will forward the following notice to such proposed contractors and subcontractors (except where the proposed contractors or subcontractors have submitted identical certifications for specific time periods): "NOTICE TO PROSPECTIVE CONTRACTORS AND SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES." A Certification of Nonsegregated Facilities, as required by the order (32 F.R. 7439, May 19, 1967) on Elimination of Segregated Facilities, by the Secretary of Labor, must be submitted prior to the award of a contract or subcontract exceeding $10,000 which is not exempt from the provisions of the equal opportunity clause. The certification may be submitted either for each contract and subcontract or for all contracts and subcontracts during a period (i.e., quarterly, semiannually, or annually).

## 29. Training of Alaska Natives

A. Permittees shall enter into an Agreement with the Secretary regarding recruitment, testing, training, placement, employment, and job counselling of Alaska Natives.

21

B. During construction and operation of the Pipeline System, Permittees shall conduct a pre-employment and on-the-job training program for Alaska Natives designed to qualify them for initial employment in connection with the Pipeline System and for advancement to higher paying positions thereafter.

C. Permittees shall do everything practicable to secure the employment, in connection with the Pipeline System, of those Alaska Natives who successfully complete Permittees' training program. Permittees shall inform the Authorized Officer of the discharge from such employment of each and every Alaska Native and of the reason therefor, in advance of such discharge whenever possible or, if advance notice is impossible, as soon thereafter as is practicable.

D. Permittees shall furnish such information and reports concerning Alaska Native employment as the Authorized Officer shall require from time to time.

### 30. Native and Other Subsistence

A. To the extent practicable, Permittees shall not damage any fish, wildlife or biotic resources in the general area of the Right-of-Way upon which Persons living in the area rely for subsistence purposes; and Permittees will comply promptly with all requirements and orders of the Secretary to protect the interests of Persons living in the general area of the Right-of-Way who rely on the fish, wildlife and biotic resources of the area for subsistence purposes.

B. Upon the order of the Secretary, Permittees shall provide emergency subsistence and other aid, as required by the Secretary, to any affected Alaska Native, Native organization or other Person pending expeditious filing of, and determination of, a claim by such Alaska Native, Native organization or other Person under Section 204(a) of the Trans-Alaska Pipeline Authorization Act. The Secretary's decision to issue an order may be based on statements, made under oath, by such Alaska Native, Native organization or other Person seeking emergency aid.

### 31. Termination or Suspension of Right-of-Way

A. Any failure or refusal of any Permittee, its agents, employees, contractors or subcontractors (at any tier), or any of them, to observe or comply substantially with any applicable provision of Section 28 of the Mineral Leasing Act of 1920, as amended, the Trans-Alaska Pipeline Authorization Act, the regulations of the Secretary implementative thereof, or any provision of this Agreement required or authorized by such statutes, shall be deemed to constitute a breach of this Agreement, said breach being determined to be joint and several or several according to the provisions of Section 21 hereof, and, at the option of the Secretary, may be grounds for termination or formal suspension of such Permittee's interest in the Right-of-Way; provided, however, if, as determined in accordance with the provisions of Section 21 hereof, the breach results in several (as opposed to joint and several) liability, the interest in the Right-of-Way of a Permittee which is not liable for the breach shall not be subject to termination or formal suspension on account of the breach.

B. The failure or refusal of Permittees to proceed with reasonable diligence to construct the Pipeline shall be grounds for termination or formal suspension of the Right-of-Way in a proceeding brought under Section 28(o) of the Mineral Leasing Act, as amended; provided, however, that the Right-of-Way shall not be terminated or suspended if the failure to proceed to construct the Pipeline is due to circumstances beyond the control of the Permittees.

C. Abandonment of the Right-of-Way shall not constitute a breach of this Agreement but may, at the option of the Secretary, be grounds for termination of the Right-of-Way. Deliberate failure of Permittees, for any continuous two-year period (whether or not calculated on a calendar-year basis), to use the Right-of-Way for the purpose for which it was granted shall constitute a rebuttable presumption of abandonment of the Right-of-Way. However, where such failure to use the Right-of-Way is due to circumstances not within Permittees' control, the Secretary is not required to commence proceedings under Section 28(o) of the Mineral Leasing Act of 1920, as amended.

D. Administrative proceedings to terminate or formally suspend the Right-of-Way under subsections A and B of this Section shall be conducted pursuant to Title 5, United States Code, Section 554, and the applicable regulations of the Secretary.

E. Before the Secretary authorizes the commencement of any administrative proceeding un-

22

197

der Title 5, United States Code, Section 554, for the termination or formal suspension of any interest in the Right-of-Way, the Authorized Officer shall give the affected Permittee or Permittees notice in writing of the alleged ground or grounds for termination or formal suspension, with sufficient particularity to enable the Permittee or Permittees to cure if the ground or grounds that are alleged constitute a breach of this Agreement. The Permittee or Permittees shall have:

(a) thirty (30) days, in the case of any failure or refusal to pay money, and

(b) sixty (60) days in all other cases, — from (and not including) the date of delivery of the notice within which to cure the alleged breach or breaches of this Agreement. If the alleged breach or breaches (other than with respect to the payment of money) cannot be cured within sixty (60) days, the Permittee or Permittees shall be entitled to such additional time as may be necessary to cure; *provided, however,* that the affected Permittee or Permittees (whose interest in the Right-of-Way would be terminated or formally suspended if the United States prevailed in a proceeding to terminate or formally suspend the interest on the ground or grounds asserted in the notice) first demonstrate to the satisfaction of the Authorized Officer that the necessary curative actions were undertaken promptly and have been diligently prosecuted towards completion; *provided further,* that the aforesaid additional time to cure shall not exceed ninety (90) days from (and not including) the last day of the said sixty (60) day period, without the prior written consent of the Authorized Officer, which shall specify the last day (to be determined by the Authorized Officer) upon which the curative action must be completed to the satisfaction of the Authorized Officer. The consent of the Authorized Officer to additional time (in excess of the said ninety (90) day period) to cure shall not be unreasonably withheld, and shall normally be given in situations involving physical activities of Permittees in connection with construction, maintenance, operation or termination of the Pipeline which Permittees can demonstrate require more time.

F. The foregoing provisions of subsection E. of this Section shall not apply with respect to a breach under any one or more of the following Sections of the Agreement: 20 (Insolvency), 24 (Duty of Permittees to Abate), 25 (Temporary Suspension of Activities).

## 32. Release of Right-of-Way

A. In connection with the relinquishment, abandonment or other termination before the expiration of the grant of the Right-of-Way, of any right or interest in the Right-of-Way, and/or in the use of all or any part of the lands subject to the Right-of-Way, each Permittee holding such right or interest shall promptly execute and deliver to the United States, through the Authorized Officer, a valid instrument of release in recordable form, which shall be executed and acknowledged with the same formalities as a deed. The instrument of release shall contain, among other things, appropriate recitals, a description of the pertinent rights and interests, and, for the benefit of the United States and its grantees or assigns, express representations and warranties by the Permittee that it is the sole owner and holder of the rights or interests described therein and that such rights or interests are free and clear of all liens, equities or claims of any kind requiring or that may require the consent of a third party, claiming in whole or in part by, through or under the Permittee, for the valid release or extinguishment thereof, except for such that are owned or claimed by third parties which have joined in the execution of the release. The form and substantive content of each instrument of release shall be approved by the Authorized Officer but, except as otherwise expressly provided for above in this subsection in no event shall any such instrument operate to increase the then-existing liabilities and obligations of the Permittee furnishing the release.

B. Each release shall be accompanied by such resolutions and certifications as the Authorized Officer may require in connection with the power or the authority of the Permittee, or of any officer or agent acting on its behalf, to execute, acknowledge or deliver the release.

C. Neither the tender, nor the approval and/or acceptance, of any such release shall operate as an estoppel or waiver of any claim or judgment against a Permittee or to relieve or discharge, in whole or in part, any Permittee of and from any of its then-existing liabilities or obligations (accrued, contingent or otherwise); and, notwithstanding any such tender or delivery, or any approval of the Authorized Officer, if a release shall contain any provision that operates, or that by implication might operate, to discharge or relieve,

198

in whole or in part, a Permittee of and from any of its liabilities or obligations (accrued, contingent or otherwise) or that operates or might operate as an estoppel or waiver of any claim or judgment against a Permittee, or as a covenant not to sue, such provision shall be, and shall be deemed to be, void and of no effect whatsoever insofar as it would have the effect of so discharging or relieving a Permittee or operating as an estoppel, waiver or covenant not to sue.

## 33. Agreements Among Permittees

A. The Original Permittees, and each of them, represent and covenant with the United States that they have entered into only the following agreements, and no other agreements, written or oral (excluding prior agreements that no longer have any force or effect), which establish each Original Permittee's interest in the Pipeline System venture and each Original Permittee's relationships with the common agent, as referred to in Stipulation 1.4, for all or any phase of the construction, operation, maintenance and termination of the Pipeline System or any part thereof:

(1) Agreement entitled "Trans-Alaska Pipeline System Agreement", dated as of August 27, 1970, by and among Atlantic Pipe Line Company,* BP Pipe Line Corporation,* Humble Pipe Line Company,* Amerada Hess Corporation, Home Pipe Line Company, Mobil Pipe Line Company, Phillips Petroleum Company, and Union Oil Company of California, with Exhibit "C", entitled "Enabling Agreement", annexed thereto;

(2) Agreement entitled "First Supplemental Agreement", dated as of August 27, 1970, by the same parties;

(3) Agreement entitled "Second Supplemental Agreement", dated as of August 27, 1970, by the same parties;

(4) Agreement entitled "Third Supplemental Agreement", dated as of August 27, 1970, by the same parties;

*ARCO Pipe Line Company, a Delaware corporation, represents and covenants, that it is the successor by merger to all of the rights and obligations of Atlantic Pipe Line Company. Sohio Pipe Line Company, a Delaware corporation, represents and covenants that it is the successor by merger to all of the rights and obligations of BP Pipe Line Corporation. Exxon Pipeline Company, a Delaware corporation, represents and covenants that it is the same corporation as Humble Pipe Line Company, but that its name has been duly changed to "Exxon Pipeline Company."

(5) Agreement entitled "Fourth Supplemental Agreement", dated as of August 27, 1970, by the same parties;

(6) Agreement entitled "Fifth Supplemental Agreement", dated as of August 27, 1970, by the same parties;

(7) Agreement entitled "Agreement for the Design and Construction of the Trans-Alaska Pipeline System", dated as of August 27, 1970, by and among Atlantic Pipe Line Company, BP Pipe Line Corporation, Humble Pipe Line Company, Amerada Hess Corporation, Home Pipe Line Company, Mobil Pipe Line Company, Phillips Petroleum Company, Union Oil Company of California, and Alyeska Pipeline Service Company;

(8) Agreement entitled "Shareholders Agreement for Alyeska Pipeline Service Company", dated as of August 27, 1970, by the same parties as those listed with respect to the agreement referred to immediately above;

(9) Assignment, Assumption, Release and Consent Agreement, dated as of August 28, 1970, in connection with the transfer by Home Pipe Line Company to the other participating companies of all of its rights, title, and interest in the Pipeline System and in the foregoing agreements, and as a shareholder in and to Alyeska Pipeline Service Company;

(10) Assignment, Conveyance, and Transfer Agreement, dated December 11, 1973, in connection with the transfer by Mobil Pipe Line Company to Mobil Alaska Pipeline Company, a Delaware Corporation, of all of the former company's rights under all agreements relating to the Trans-Alaska Pipeline System, to which the former company is a party, and all real or personal property in which the former company may have acquired an ownership interest pursuant to such agreements, and under which Assignment, Conveyance and Transfer Agreement Mobil Alaska Pipeline Company assumes all undischarged obligations of Mobil Pipe Line Company under any and all of the above mentioned Trans-Alaska Pipeline System agreements, together with certain supporting documents, (five in

number) each dated December 11, 1973; and

(11) Assignment, Conveyance, and Transfer Agreement, dated January 8, 1974, in connection with the transfer by Union Oil Company of California to Union Alaska Pipeline Company, a California Corporation, of all of the former company's rights under all agreements relating to the Trans-Alaska Pipeline System to which the former company is a party, and all real or personal property in which the former company may have acquired an ownership interest pursuant to such agreements, and under which Assignment, Conveyance and Transfer Agreement Union Alaska Pipeline Company assumes all undischarged obligations of Union Oil Company of California under any and all of the above mentioned Trans-Alaska Pipeline System agreements.

B. Said agreements are referred to collectively as the "Ownership Agreements." Each affected Permittee shall file promptly with the Authorized Officer true and complete copies of all modifications of the Ownership Agreements and of all instruments superseding, supplementing, cancelling or rescinding, in whole or in part, any one or more of the Ownership Agreements.

C. In the event Permittees execute an "Operating Agreement", as contemplated in Section 5.1 of the agreement described in subsection A(1) above in this Section, or any like or similar agreement with respect to the operation, maintenance, or termination of all or any part of the Pipeline System, Permittees shall file promptly with the Authorized Officer a true and complete copy thereof, together with like copies of all modifications of, and all agreements superseding, supplementing, cancelling or rescinding, in whole or in part, the Operating Agreement or any such like or similar agreement.

## 34. Access to Documents

A. As to any documents or records not filed (or required to be filed under any other provision of this Agreement) with the Secretary or the Authorized Officer that shall be relevant to the exercise or enforcement by the Secretary of his authority or the rights of the United States under or in connection with this Agreement or with respect to all or any part of the Pipeline System, the Secretary shall have the right, after notice to the affected Permittee, to inspect and copy: (1) any document or record which a Permittee is required by this Agreement to make or maintain, (2) any document or record that at any time has been filed by a Permittee with any governmental department or agency, access to which is not prohibited or limited by law or regulation, or (3) any abstract, summary or other document that may have been prepared by any governmental department or agency in connection with any document or record referred to in (2) above.

B. Subject to the requirement that the documents or records, herein below referred to, shall be relevant to the exercise or enforcement by the Secretary of his authority or the rights of the United States under or in connection with this Agreement or with respect to all or any part of the Pipeline System, the Secretary, after notice to the affected Permittee, may inspect and, with the consent of the affected Permittee (which consent each Permittee agrees will not be unreasonably withheld or delayed), may copy any document or record that has been or may hereafter be filed by a Permittee with any governmental agency, access to which is prohibited or limited by law or regulation, and any abstract, summary or other document that may have been prepared by a governmental department or agency in connection with any such document or record; *provided, however*, that the rights of the Secretary under this subsection may be exercised only if, and to the extent that, this provision constitutes a valid waiver of any such prohibition or limitation.

C. Nothing in this Section shall be deemed to limit, prohibit, or waive any right or privilege of the United States, and particularly of the Secretary, to inspect or copy any document or record under any authority granted pursuant to law or regulations.

## 35. Rights of Third Parties

The parties hereto do not intend to create any rights under this Agreement that may be enforced by third parties for their own benefit or for the benefit of others.

200

## 36. Covenants Independent

Each and every covenant contained in this Agreement is, and shall be deemed to be, separate and independent of, and not dependent on, any other covenant contained in this Agreement.

## 37. Partial Invalidity

If any part of this Agreement is held invalid or unenforceable, the remainder of this Agreement shall not be affected and shall be valid and enforced to the fullest extent permitted by law.

## 38. Waiver Not Continuing

The waiver by any party hereto of any breach of any provision of this Agreement by any other party hereto, whether such waiver be expressed or implied, shall not be construed to be a continuing waiver or a waiver of, or consent to, any subsequent or prior breach on the part of such other party, of the same or any other provision of this Agreement.

## 39. Remedies Cumulative; Equitable Relief

Except as otherwise expressly provided in subsections B and D of Section 13 of this Agreement, no remedy conferred by this Agreement upon or reserved to the United States or to Permittees is intended to be exclusive of any other remedy provided for by this Agreement or by law, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing in equity or at law; and the United States, in a proper action instituted by it, may seek a decree against a Permittee or Permittees for specific performance, injunctive or other equitable relief, as may be appropriate.

## 40. Section Headings

The section headings in this Agreement are for convenience only, and do not purport to, and shall not be deemed to, define, limit or extend the scope or intent of the section to which they pertain.

## 41. Authority to Enter Agreement

Each Original Permittee represents and warrants to the United States that: (1) it is duly authorized and empowered under the applicable laws of the State of its incorporation and by its charter and by-laws to enter into and perform this Agreement in accordance with the provisions hereof; (2) its board of directors, or duly authorized executive committee, has duly approved, and has duly authorized, the execution, delivery and performance by it of this Agreement; (3) all corporate and shareholder action that may be necessary or incidental to the approval of this Agreement, and the due execution, delivery and performance hereof by Permittee, has been taken; and (4) that all of the foregoing approvals, authorizations and actions are in full force and effect at the time of the execution and delivery of this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

UNITED STATES OF AMERICA
By /s/ ROGERS C. B. MORTON
*Secretary of the Interior*

AMERADA HESS CORPORATION
By /s/ BERNARD T. DEVERIN
*Senior Vice President*

ARCO PIPE LINE COMPANY
By /s/ C. T. CARTER
*President*

EXXON PIPELINE COMPANY
By /s/ W. S. SPANGLER
*President*

MOBIL ALASKA PIPELINE COMPANY
By /s/ E. J. WACKER, JR.
*Vice President*

PHILLIPS PETROLEUM COMPANY
By /s/ CARSTENS SLACK
*Vice President*

SOHIO PIPE LINE COMPANY
By /s/ ALLEN D. DORRIS
*President*

UNION ALASKA PIPELINE COMPANY
By /s/ SAM A. SNYDER
*Vice President*

# Exhibit A - Part I

## TAPS Renewal Legal Descriptions

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

Those lands within the Trans Alaska Pipeline System ("TAPS") Right-of-Way as described in:

Plats 81-1 (TAPS Centerline Monumentation Survey) filed January 7, 1981 in the Barrow, Fairbanks, Fort Gibbon and Rampart Recording Districts, respectively, and filed on January 12, 1981 in the Chitina and Valdez Recording Districts, respectively.

Plats 2001-8 and 2001-5 (TAPS Centerline Monumentation Survey at Atigun Reroute, MP 200 Reroute and Pump Station ["P.S."] 6 vicinity) filed January 10, 2001 in the Barrow and Fairbanks Recording Districts, respectively.

Plats 95-1 (P.S. 2), 95-2 (P.S. 3), and 95-3 (P.S. 4) filed February 23, 1995 in the Barrow Recording District.

Plats 95-11 (P.S. 5), 95-10 (P.S. 6) and 95-12 (P.S. 7) and 95-14 (P.S. 10) filed February 23, 1995 in the Fairbanks Recording District.

Plat 95-1 (P.S. 6) filed February 23, 1995 in the Rampart Recording District.

Plat 95-04 (P.S. 11) filed February 27, 1995 in the Chitina Recording District.

Plat 95-04 (P.S. 12) filed February 21, 1995 in the Valdez Recording District.

Plats 2001-6 (C.S. Atigun), 2001-3 (Communication Site ["C.S."] Costa Hill), 2001-4 (C.S. Slope) and 2001-5 (C.S. Galbraith Lake) and 2001-7 (C.S. Margaret Hill) filed January 10, 2001 in the Barrow Recording District.

Plats 2000-14 (C.S. Gakona), 2000-13 (C.S. Round Top) and 2000-15 (C.S. Stock) filed December 27, 2000 in the Chitina Recording District.

Plats 2001-6 (C.S. Kaaruk), 2001-7 (C.S. Coldfoot), 2001-8 (C.S. Eagle), 2001-9 (C.S. Fish), 2001-11 (C.S. Aggie), 2001-12 (C.S. Donnelly), 2001-13 (C.S. Nicole Knob), 2001-10 (C.S. Livengood) and 2001-14 (C.S. Yost) filed January 10, 2001 in the Fairbanks Recording District.

Plat 2001-1 (C.S. Bench) filed January 10, 2001 in the Rampart Recording District.

Plats 2001-17 (C.S. Kimball Pass), 2001-19 (C.S. Tiekel), 2001-18 (C.S. Passive) and 2001-20 (C.S. Tsina) filed December 28, 2000 in the Valdez Recording District.

And further described in the TAPS Right-of-Way Boundary Description Report, Alyeska Manual No. ROW 214, as amended.

204

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

And as further described in the following land parcel descriptions:

PARCEL DESCRIPTION

**F-12505 BEGINS**

**UMIAT MERIDIAN**

T. 1 S., R. 14 E., U.M.
Sec. 2 E½, 10 SE¼, 11, 15 NE¼

T. 9 S., R. 13 E., U.M.
Sec. 4, 5, 7, 8

T. 9 S., R. 12 E., U.M.
Sec. 11, 12, 14, 15, 16, 17, 19, 20, 30

T. 9 S., R. 11 E., U.M.
Sec. 25, 35, 36

T. 10 S., R. 11 E., U.M.
Sec. 2, 3, 10, 11, 14, 23, 26, 35

T. 11 S., R. 11 E., U.M.
Sec. 1, 2, 12, 13, 24

T. 11 S., R. 12 E., U.M.
19, 29, 30, 32

T. 12 S., R. 12 E., U.M.
Sec. 5, 8, 9, 16, 21, 28, 33

T. 13 S., R. 12 E., U.M.
Sec. 3, 9, 10, 15, 16, 21, 28, 32, 33

T. 14 S., R. 12 E., U.M.
Sec. 5, 7, 8, 17, 20, 29, 32

T. 15 S., R. 12 E., U.M.
Sec. 5, 6, 7, 18, 19
Sec. 8, 17 (C.S. Atigun)

T. 15 S., R. 11 E., U.M.
Sec. 23, 24, 26, 34, 35

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way F-12505 and AA-5847

T. 16 S., R. 11 E., U.M.
Sec. 2, 3, 9, 10, 16, 19, 20, 21, 29, 30

T. 16 S., R. 10 E., U.M.
Sec. 25, 35, 36
Sec. 33 NE¼, 34 NW¼ (C.S. Margaret Hill)

T. 17 S., R. 10 E., U.M.
Sec. 2

**FAIRBANKS MERIDIAN**

T. 37 N., R. 10 W., F.M.
Sec. 25, 26, 35

T. 36 N., R. 10 W., F.M.
Sec. 2, 3, 10, 15, 16, 21, 28, 33

T. 35 N., R. 10 W., F.M.
Sec. 4, 9, 16, 21, 28, 33

T. 34 N., R. 10 W., F.M.
Sec. 4, 9, 10, 15, 22, 26, 27, 35

T. 33 N., R. 10 W., F.M.
Sec. 2, 11, 13, 14, 24, 25, 26, 34, 35
Sec. 21 SW¼ (C.S. Kaaruk)

T. 32 N., R. 10 W., F.M.
Sec. 4, 9, 16, 20, 21, 29, 31, 32

T. 31 N., R. 10 W., F.M.
Sec. 6, 7, 8, 18, 19

T. 31 N., R. 11 W., F.M.
Sec. 25, 26, 32, 33, 34, 35

T. 30 N., R. 11 W., F.M.
Sec. 5, 6, 7, 18, 19, 30

T. 30 N., R. 12 W., F.M.
Sec. 25, 36

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way F-12505 and AA-5847

<u>T. 29 N., R. 12 W., F.M.</u>
Sec. 1, 11, 12, 13, 14

<u>T. 28 N., R. 12 W., F.M.</u>
Sec. 6 SE¼ (C.S. Coldfoot)
Sec. 15 and 16, those portions
    within federal mining claim
    F-63334
Sec. 29, 30, 31

<u>T. 27 N., R. 12 W., F.M.</u>
Sec. 6

<u>T. 27 N., R. 13 W., F.M.</u>
Sec. 1, 11, 12, 14, 23, 26, 35

<u>T. 26 N., R. 13 W., F.M.</u>
Sec. 2, 11, 14, 23, 25, 26, 36

<u>T. 25 N., R. 14 W., F.M.</u>
Sec. 35 NW¼ (C.S. Eagle)

<u>T. 25 N., R. 13 W., F.M.</u>
Sec. 1, 12, 13, 23, 24, 26, 27, 33, 34

<u>T. 25 N., R. 12 W., F.M.</u>
Sec. 6, 7

<u>T. 24 N., R. 13 W., F.M.</u>
Sec. 5, 7, 8, 18

<u>T. 24 N., R. 14 W., F.M.</u>
Sec. 13, 23, 24, 26, 27, 34

<u>T. 23 N., R. 14 W., F.M.</u>
Sec. 3, 4, 8, 9, 17, 18, 19, 30, 31

<u>T. 22 N., R. 14 W., F.M.</u>
Sec. 6, 7, 18, 19, 20, 29, 32

<u>T. 21 N., R. 14 W., F.M.</u>
Sec. 5, 6, 7, 18, 19, 30, 31

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

T. 20 N., R. 13 W., F.M.
Sec. 30 SW¼ (C.S. Fish)

T. 20 N., R. 15 W., F.M.
Sec. 2, 10, 11, 15, 22, 26, 27, 35

T. 19 N., R. 15 W., F.M.
Sec. 2, 11, 12, 13, 24

T. 19 N., R. 14 W., F.M.
Sec. 19, 30, 31, 32

T. 18 N., R. 14 W., F.M.
Sec. 4, 5, 9, 10, 14, 15, 23, 25, 26, 36
United States Survey 6892, Lot 6 (in Sec. 9)

T. 17 N., R. 14 W., F.M.
Sec. 1

T. 17 N., R. 13 W., F.M.
Sec. 6, 7, 8, 17, 20, 21, 28, 33, 34

T. 16 N., R. 13 W., F.M.
Sec. 3, 4, 10, 11, 14, 15, 23, 24, 25, 36

T. 16 N., R. 12 W., F.M.
Sec. 31

T. 15 N., R. 12 W., F.M.
Sec. 6, 7, 17, 18, 20, 29, 30, 31

T. 14 N., R. 11 W., F.M.
Sec. 26 (C.S. Bench)

T. 14 N., R. 12 W., F.M.
Sec. 6, 7, 8, 17, 20, 21, 27, 28, 34, 35

T. 13 N., R. 12 W., F.M.
Sec. 1, 2, 12

T. 13 N., R. 11 W., F.M.
Sec. 7, 17, 18, 20, 21, 22, 26, 27, 35, 36

208

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

T. 12 N., R. 11 W., F.M.
Sec. 1

T. 12 N., R. 10 W., F.M.
Sec. 6
Sec. 7, those portions above the
    Ordinary High Water ("OHW")
    line on the north bank of the
    Yukon River

T. 5 N., R. 3 W., F.M.
Sec. 36 SE¼, those portions within
    the White Mountains National
    Recreation Area (C.S. Aggie)

T. 2 N., R. 1 W., F.M.
Sec. 3 and 10, those portions within federal
    mining claims F-52189, F-52176,
    F-52172 and F-52185

T. 1 S., R. 2 E., F.M.
Sec. 22, 26, 27

T. 2 S., R. 2 E., F.M.
Sec. 13 and 24, those portions
    within the Chena River Lakes
    Flood Control Project

T. 2 S., R. 3 E., F.M.
Sec. 19 excluding USS 9074,
    Lots 2 & 3
USS 9074, Lots 2 & 3 (in Section 19)
Sec. 20
Sec. 21, those portions
        within the Chena River Lakes
        Flood Control Project
Sec. 26, 27E¼, 35, 36

T. 3 S., R. 3 E., F.M.
Sec. 1, 12

T. 3 S., R. 4 E., F.M.
Sec. 7, 17, 18, 20, 21, 28, 33, 34

209

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way F-12505 and AA-5847

T. 4 S., R. 4 E., F.M.
 Sec. 2 NW¼, N½SW¼, 3 NE¼

T. 10 S., R. 10 E., F.M.
 Sec. 2 NE¼SW¼
 Sec. 11 SW¼SE¼NE¼, NE¼SE¼
 USS 3293 A and B, Federal Reserve, Block 18 (in Section 24)
  Including federal reversionary interests in adjoining streets and alleys
 USS 2626, Lot 2 (in Sec. 25, 26, 35)

T. 11 S., R. 10 E., F.M.
 USS 2626, Lot 2 (in Sec. 2, 11)
 Sec. 10, 11, 15, 22, 27 N½N½N½, 34 NE¼NW¼, S½NW¼

T. 12 S., R. 10 E., F.M.
 Sec. 3, 10
 Sec. 15 SW¼NW¼, excluding Lot 20,
  NW¼SW¼
 Sec. 16, 21, 28, 32, 33

T. 13 S., R. 10 E., F.M.
 Sec. 4, 9, 16, 20 SW¼, 21
 Sec. 28 and 29, those portions lying
  north of a line ½ mile north
  of the Richardson Highway
  (including C.S. Donnelly Dome)

## F-12505 ENDS, AA-5847 BEGINS

T. 14 S., R. 10 E., F.M.
 Sec. 5, 8, 17, 20, 29, 32

T. 15 S., R. 9 E., F.M.
 Sec. 27 (C.S. Nicole Knob)

T. 15 S., R. 10 E., F.M.
 Sec. 6 S½, 7, 18, 19, 29, 30, 32

T. 16 S., R. 10 E., F.M.
 Sec. 5, 8, 17, 20, 29, 32

T. 17 S., R. 10 E., F.M.
 Sec. 4, 9, 10, 14, 15, 23, 24, 25, 36

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

<u>T. 18 S., R. 10 E., F.M.</u>
 Sec. 1, 12, 13, 24, 25, 36

<u>T. 19 S., R. 10 E., F.M.</u>
 Sec. 1, 12, 13

<u>T. 19 S., R. 11 E., F.M.</u>
 Sec. 18, 19, 20, 29, 32
 Sec. 21 (C.S. Yost)

<u>T. 22 S., R. 12 E., F.M.</u>
 Sec. 4, 9, 16, 21, 28, 29, 32

## COPPER RIVER MERIDIAN

<u>T. 14 N., R. 1 W., C.R.M.</u>
 Sec. 31

<u>T. 13 N., R. 1 W., C.R.M.</u>
 Sec. 5, 6, 8, 17, 18, 20, 29, 32

<u>T. 12 N., R. 1 W., C.R.M.</u>
 Sec. 5, 8, 17, 20, 29, 32, 33

<u>T. 11 N., R. 1 W., C.R.M.</u>
 Sec. 4, 9, 16, 21, 28, 32, 33

<u>T. 10 N., R. 1 W., C.R.M.</u>
 Sec. 5, 7, 8, 17, 18, 20, 29, 31, 32

<u>T. 9 N., R. 1 W., C.R.M.</u>
 Sec. 6, 7

<u>T. 9 N., R. 2 W., C.R.M.</u>
 Sec. 12, 13
 Sec. 23, Lot 6
 Sec. 24
 Sec. 25 NW¼NW¼
 Sec. 26, 35

<u>T. 8 N., R. 2 W., C.R.M.</u>
 Sec. 2, 11, 14, 23, 24, 25, 36

211

# EXHIBIT A   Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

T. 7 N., R. 2 W., C.R.M.
Sec. 1, 12, 13, 24, 25, 36.

T. 7 N., R. 1 W., C.R.M.
Tract B within Sec. 6
Sec. 35 NW¼, those portions east of
    the Richardson Highway (C.S. Gakona)

T. 6 N., R. 2 W., C.R.M.
Sec. 1, 12, 13, 24, 25, 36.

T. 5 N., R. 2 W., C.R.M.
Sec. 1, 12, 13, 24, 25, 36
USS 10679, Lot 2 (in Sec. 25, 36)

T. 4 N., R. 2 W., C.R.M.
Sec. 1, 12, 13
Sec. 24 N½S½ and Lots 43 and 44
Sec. 25

T. 4 N., R. 1 W., C.R.M.
Sec. 30 Lot 2, Lot 3, E½W½
Sec. 31

T. 2 N., R. 1 W., C.R.M.
Sec. 3, 10, 11, 24, 25

T. 2 N., R. 1 E., C.R.M.
Sec. 30 Lot 5
Sec. 31 Lots 1, 2, 3, 4, E½SW¼

T. 1 N., R. 1 E., C.R.M.
Sec. 6 Lot 3, SE¼NW¼, SE¼

212

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way F-12505 and AA-5847

T. 1 S., R. 1 E., C.R.M.
 Sec. 3 Lot 4, S½NW¼, E½SE¼SW¼,
  SW¼SW¼SE¼
 Sec. 4 Lot 1
 Sec. 8 SE¼ (C.S. Stuck)
 Sec. 10, 14, 15
 Sec. 23 excluding E½SW¼NW¼NE¼
  and S½SE¼SE¼
 Sec. 25 SW¼NW¼
 Sec. 26 E½SE¼NE¼, E½E½SE¼
 Sec. 35 NE¼

T. 2 S., R. 1 E., C.R.M.
 Sec. 2 Lot 2, SW¼NE¼, Lot 6,
  Lot 7, E½SW¼
 Sec. 11 W½NE¼NW¼, Lot 2,
  Lot 4, W½SW¼
 Sec. 14 W½NW¼
 Sec. 15, 22, 27, 34

T. 3 S., R. 1 E., C.R.M.
 Sec. 3 Lot 3
 Sec. 4, 9, 16, 21, 28, 29, 32, 33

T. 4 S., R. 1 E., C.R.M.
 Sec. 5, 8, 16, 17, 21, 22, 25, 26, 27, 36

T. 5 S., R. 1 E., C.R.M.
 Sec. 1, 12, 13, 23, 24, 26, 27, 32, 33, 34

T. 5 S., R. 2 E., C.R.M.
 Sec. 6, 7

T. 6 S., R. 1 E., C.R.M.
 Sec. 5, 7, 8, 7, 18
 Sec. 17 (C.S. Tiekel)

T. 6 S., R. 1 W., C.R.M.
 Sec. 13, 24, 25

T. 6 S., R. 1 E., C.R.M.
 Sec. 29, 30, 32

213

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

T. 7 S., R. 1 E., C.R.M.
Sec. 5, 8, 17, 18

T. 7 S., R. 1 W., C.R.M.
Sec. 13, 23, 24, 26, 27, 34
Sec. 35 NE¼ (C.S. Tsaina)

T. 8 S., R. 1 W., C.R.M.
Sec. 3, 4, 5, 6

AA-5847 ENDS

# EXHIBIT A   Part I

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way F-12505 and AA-5847

The following lands have been the subject of conveyances from the United States to the State of Alaska since May 3, 1974:

**Umiat Meridian**

<u>T. 1 N., R. 15 E., U.M.</u>
Sec. 6, 7, 18, 19

<u>T. 1 N., R. 14 E., U.M.</u>
Sec. 12, 13

<u>T. 1 N., R. 14 E., U.M.</u>
Sec. 24, 25, 26, 34, 35

<u>T. 1 S., R. 14 E., U.M.</u>
Sec. 1, 14, 15 S½, 22, 23, 27, 34

<u>T. 2 S., R. 14 E., U.M.</u>
Sec. 3, 4, 9, 10, 16, 21, 28, 32, 33

<u>T. 3 S., R. 14 E., U.M.</u>
Sec. 4, 8, 9, 16, 17, 20, 29, 32

<u>T. 4 S., R. 13 E., U.M.</u>
Sec. 2 SW¼, 11 NW¼

<u>T. 4 S., R. 14 E., U.M.</u>
Sec. 5, 7, 8, 17, 18, 20, 29, 32

<u>T. 5 S., R. 14 E., U.M.</u>
Sec. 4, 5, 8, 16, 17, 21, 28, 29, 32

<u>T. 6 S., R. 14 E., U.M.</u>
Sec. 5, 6, 7, 18, 19, 30, 31, 32

<u>T. 7 S., R. 14 E., U.M.</u>
Sec. 5, 8, 9, 16, 17, 21, 28, 29, 32

<u>T. 8 S., R. 13 E., U.M.</u>
Sec. 12, 13, 14, 16 SW¼, 17 SE¼, 23, 26, 27, 28, 32, 33

<u>T. 8 S., R. 14 E., U.M.</u>
Sec. 5, 6, 7

215

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way F-12505 and AA-5847

T. 11 S., R. 10 E., U.M.
Sec. 12

Fairbanks Meridian

T. 29 N., R. 12 W., F.M.
Sec. 23, 26, 35

T. 28 N., R. 12 W., F.M.
Sec. 3, 10, 15, 16, 21 and 20, excluding
federal mining claims F-57168,
F-63334, and F-63341 through F-63346

T. 12 N., R. 11 W., F.M.
Sec. 13, 24

T. 12 N., R. 10 W., F.M.
Sec. 18, those portions above the
OHW line, Yukon River
Sec. 19, 28, 29, 30, 33, 34, 35

T. 11 N., R. 10 W., F.M.
Sec. 1, 2, 12

T. 11 N., R. 9 W., F.M.
Sec. 7, 8, 15, 16, 17, 22, 23, 25, 26

T. 11 N., R. 8 W., F.M.
Sec. 30, 31, 32

T. 10 N., R. 8 W., F.M.
Sec. 3, 4, 5, 10, 11, 13, 14

T. 10 N., R. 7 W., F.M.
Sec. 18, 19, 20, 28, 29, 33

T. 9 N., R. 7 W., F.M.
Sec. 2, 3, 4, 11, 13, 14, 24

T. 9 N., R. 6 W., F.M.
Sec. 19, 30, 31, 32

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

T. 9 N., R. 5 W., F.M.
Sec. 24 SE¼

T. 8 N., R. 6 W., F.M.
Sec. 5, 8, 9, 15, 16, 22, 23, 24, 25

T. 8 N., R. 5 W., F.M.
Sec. 30, 31, 32

T. 7 N., R. 5 W., F.M.
Sec. 5, 8, 9, 15, 16, 22, 23, 25, 26

T. 7 N., R. 4 W., F.M.
Sec. 30, 31, 32

T. 6 N., R. 4 W., F.M.
Sec. 5, 8, 9, 15, 16, 22, 23, 25, 26, 36

T. 6 N., R. 3 W., F.M.
Sec. 31

T. 5 N., R. 3 W., F.M.
Sec. 5, 6, 8, 9, 15, 16, 22, 27, 34
Sec. 36 SE¼, those portions not within
    the White Mountains National
    Recreation Area

T. 4 N., R. 3 W., F.M.
Sec. 3, 10
Sec. 11 west of the Elliott Highway
Sec. 13 south of the Elliott Highway
Sec. 14, 24

T. 4 N., R. 2 W., F.M.
Sec. 19, 29, 30, 32, 33

T. 2 S., R. 3 E., F.M.
Sec. 21 those portions of SE¼ outside of the
    Chena River Lakes Flood Control
    Project
Sec. 28 those portions of N½NE¼ outside of
    the Chena River Lakes Flood Control Project

217

# EXHIBIT A – Part I

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way F-12505 and AA-5847

**Copper River Meridian**

<u>T. 13 N., R. 1 W., C.R.M.</u>
Sec. 29, 32

<u>T. 12 N., R. 1 W., C.R.M.</u>
Sec. 24 SE¼

<u>T. 4 S., R. 2 E., C.R.M.</u>
Tract A (those portions
   comprising Sec. 15
   and 22)
Tract A (those portions
   comprising Sec. 28)

<u>T. 8 S., R. 2 W., C.R.M.</u>
Tract A (those portions comprising
   Sec. 1, 2, 3, 4, 7, 8, 9)

<u>T. 8 S., R. 3 W., C.R.M.</u>
Tract B (those portions comprising
   Sec. 12, 13, 14, 22, 23, 27, 34)

# EXHIBIT A – Part II

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

Those rights covered by the rights-of-way described in the grants referenced below:

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 108-APL-8 | | F-64648 | 33 | T. 16 S., R. 10 E., U.M. Sec. 25 |
| 107-APL-2A | | F-64647 | 34 | T. 36 N., R. 10 W., F.M. Sec. 33 |
| 106-APL-2B | 106-APL/AMS-2B | F-64646 | 35 | T. 35 N., R. 10 W., F.M. Sec. 16 |
| 96-APL-3 | | F-64645 | 45 | T. 27 N., R. 13 W., F.M. Sec. 26 |
| 85-APL-3 | | F-64644 | 56 | T. 18 N., R. 14 W., F.M. Sec. 23 |
| 78-APL-1A | | F-64643 | 63 | T. 12 N., R. 10 W., F.M. Sec. 7 |
| 95-APL-4A | | F-22978 | 46 | T. 26 N., R. 13 W., F.M. Sec. 26 |
| 116-APL-6 | | F-22386 | 23 | T. 9 S., R. 12 E., U.M. Sec. 19 |
| 91-APL-1B | | F-22365 | 50 | T. 23 N., R. 14 W., F.M. Sec. 19, 30 |
| 97-APL-5 | | F-21763 | 44 | T. 28 N., R. 12 W., F.M. Sec. 31 |
| 39-APL-4 | 39-APL/AMS-4 | F-21759 | 103 | T. 16 S., R. 10 E., F.M. Sec. 32 |
| 38-APL-1A | | F-21756 | 105 | T. 17 S., R. 10 E., F.M. Sec. 25 |
| 56-APL-3 | | F-21740 | 85 | T. 2 S., R. 3 E., F.M. Sec. 34, 35 |

219

# EXHIBIT A – Part II

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 756-APL-3 | | F-21740 | 85 | T. 3 S., R. 3 E., F.M. Sec. 2, 11, 12, 13 |
| 56-APL-3 | | F-21740 | 85 | T. 3 S., R. 4 E., F.M. Sec. 17, 18 |
| 112-APL-3A | | F-21727 | 28 | T. 13 S., R. 12 E., U.M. Sec. 21 |
| 91-APL-3 | 91-APL/AMS-3 | F-21693 | 50 | T. 23 N., R. 14 W., F.M. Sec. 5 |
| 114-APL-2B | | F-21656 | 27 | T. 11 S., R. 12 E., U.M. Sec. 32 |
| 109-APL-1A | | F-21653 | 32 | T. 16 S., R. 11 E., U.M. Sec. 16, 21 |
| 105-APL-1A | 105-APL/AMS-1A | F-21652 | 36 | T. 34 N., R. 10 W., F.M. Sec. 26 |
| 57-APL-3 | | F-21650 | 84 | T. 2 S., R. 3 E., F.M. Sec. 19 |
| 108-APL-7 | 108-APL/AMS-7 | F-21640 | 33 | T. 16 S., R. 10 E., U.M. Sec. 36 |
| 103-APL-1A | 103-APL/AMS-1A | F-21638 | 38 | T. 32 N., R. 10 W., F.M. Sec. 20, 21 |
| 98-APL-1 | | F-21625 | | T. 28 N., R. 12 W., F.M. Sec. 29 |
| 107-APL-1A | 107-APL/AMS-1A | F-21623 | 34 | T. 35 N., R. 10 W., F.M. Sec. 4 |
| 106-APL-1A | 106-APL/AMS-1A | F-21618 | 35 | T. 35 N., R. 10 W., F.M. Sec. 28 |

220

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 110-APL-1B | | F-21617 | 31 | T. 15 S., R. 11 E., U.M. Sec. 24 |
| 45-APL-4 | | F-21591 | 97 | T. 10 S., R. 10 E., F.M. Sec. 26 |
| 116-APL-1 | 116-APL/AMS-1 | F-21586 | 24 | T. 10 S., R. 11 E., U.M. Sec. 3 |
| 115-APL-3 | 115-APL/AMS-3 | F-21585 | 25 | T. 10 S., R. 11 E., U.M. Sec. 23 |
| 110-APL-1 | | F-21583 | 31 | T. 15 S., R. 11 E., U.M. Sec. 26 |
| 87-APL-3B | 87-APL/AMS-3B | F-21582 | 54 | T. 20 N., R. 15 W., F.M. Sec. 34, 35 |
| 80-APL-2A | | F-21581 | 61 | T. 14 N., R. 12 W., F.M. Sec. 27, 28 |
| 93-APL-1 | 93-APL/AMS-1 | F-21570 | 48 | T. 24 N., R. 13 W., F.M. Sec. 8 |
| 90-APL-4A | 90-APL/AMS-4A | F-21568 | 51 | T. 22 N., R. 14 W., F.M. Sec. 7 |
| 88-APL-2 | 88-APL/AMS-2 | F-21567 | 53 | T. 20 N., R. 15 W., F.M. Sec. 3, 4, 10 |
| 81-APL-1B | | F-21565 | 60 | T. 14 N., R. 12 W., F.M. Sec. 7 |
| 94-APL-1A | 94-APL/AMS-1A | F-21553 | 47 | T. 25 N., R. 13 W., F.M. Sec. 13 |
| 92-APL-0 | | F-21552 | 49 | T. 23 N., R. 14 W., F.M. Sec. 4, 9 |
| 93-APL-4 | | F-21551 | 47 | T. 25 N., R. 13 W., F.M. Sec. 23, 26 |

221

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 87-APL-4 | | F-21549 | 54 | T. 20 N., R. 15 W., F.M. Sec. 27, 28 |
| 80-APL-3A | 80-APL/AMS-3A | F-21546 | 61 | T. 14 N., R. 12 W., F.M. Sec. 20, 21 |
| 109-APL-3A | | F-21535 | 32 | T. 16 S., R. 11 E., U.M. Sec. 3, 10 |
| 114A-APL-5 | 114-APL-5 | F-21467 | 26 | T. 11 S., R. 11 E., U.M. Sec. 13 |
| 114-APL-3 | | F-21465 | 26 | T. 11 S., R. 12 E., U.M. Sec. 29 |
| 104-APL-1A | | F-21429 | 37 | T. 33 N., R. 10 W., F.M. Sec. 35 |
| 118-APL-1 | 118-APL/AMS-1 | F-20780 | 22 | T. 9 S., R. 13 E., U.M. Sec. 7 |
| 115-APL-1 | | F-20776 | 25 | T. 11 S., R. 11 E., U.M. Sec. 1, 2 |
| 89-APL-6 | | F-20773 | 52 | T. 22 N., R. 14 W., F.M. Sec. 31, 32 |
| 114-APL-1 | 114-APL/AMS-1 | F-20719 | 27 | T. 12 S., R. 12 E., U.M. Sec. 16 |
| 113-APL-1 | | F-20717 | 28 | T. 13 S., R. 12 E., U.M. Sec. 3, 4 |
| 112-APL-1 | | F-20715 | 29 | T. 13 S., R. 12 E., U.M. Sec. 32 |
| 111-APL-3 | 111-APL/AMS-3 | F-20714 | 29 | T. 14 S., R. 12 E., U.M. Sec. 7, 8 |

# EXHIBIT A – Part II

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER., SECTIONS |
|---|---|---|---|---|
| 110-APL-2 | | F-20713 | 30 | T. 15 S., R. 12 E., U.M. Sec. 6 |
| 108-APL-6 | | F-20707 | 32 | T. 16 S., R. 11 E., U.M. Sec. 30 |
| 107-APL-3 | | F-20699 | 34 | T. 36 N., R. 10 W., F.M. Sec. 28 |
| 105-APL-4 | | F-20694 | 35 | T. 34 N., R. 10 W., F.M. Sec. 4 |
| 105-APL-3 | | F-20693 | 36 | T. 34 N., R. 10 W., F.M. Sec. 15 |
| 105-APL-2 | | F-20692 | 36 | T. 34 N., R. 10 W., F.M. Sec. 22, 23 |
| 104-APL-3 | | F-20688 | 37 | T. 33 N., R. 10 W., F.M. Sec. 24 |
| 103-APL-4 | | F-20683 | 38 | T. 32 N., R. 10 W., F.M. Sec. 4 |
| 102-APL-5 | | F-20679 | 39 | T. 32 N., R. 10 W., F.M. Sec. 31 |
| 102-APL-5 | | F-20679 | 39 | T. 31 N., R. 10 W., F.M. Sec. 6 |
| 102-APL-4 | | F-20678 | 39 | T. 31 N., R. 10 W., F.M. Sec. 7, 8 |
| 102-APL-3 | 102-APL/AMS-3 | F-20677 | 39 | T. 31 N., R. 10 W., F.M. Sec. 18 |
| 102-APL-2 | | F-20676 | 39 | T. 31 N., R. 10 W., F.M. Sec. 18 |
| 102-APL-1 | | F-20675 | 39 | T. 31 N., R. 10 W., F.M. Sec. 19 |

# EXHIBIT A – Part II

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 101-APL-3 | | F-20673 | 40 | T. 31 N., R. 11 W., F.M. Sec. 35 |
| 101-APL-1 | | F-20671 | 40 | T. 30 N., R. 11 W., F.M. Sec. 5 |
| 100-APL-2A | | F-20669 | 41 | T. 30 N., R. 11 W., F.M. Sec. 18 |
| 100-APL-2 | 100-APL/AMS-2 | F-20668 | 41 | T. 30 N., R. 11 W., F.M. Sec. 19 |
| 99-APL-4 | 99-APL/AMS-4 | F-20666 | 42 | T. 29 N., R. 12 W., F.M. Sec. 1 |
| 99-APL-3 | | F-20665 | 42 | T. 29 N., R. 12 W., F.M. Sec. 13, 14 |
| 97-APL-3 | 97-APL/AMS-3 | F-20657 | 44 | T. 27 N., R. 12 W., F.M. Sec. 6 |
| 97-APL-1 | 97-APL/AMS-1 | F-20656 | 44 | T. 27 N., R. 13 W., F.M. Sec. 14 |
| 96-APL-2A | | F-20654 | 45 | T. 26 N., R. 13 W., F.M. Sec. 2 |
| 96-APL-1 | 96-APL/AMS-1 | F-20653 | 46 | T. 26 N., R. 13 W., F.M. Sec. 14 |
| 95-APL-5 | 95-APL/AMS-5 | F-20652 | 46 | T. 26 N., R. 13 W., F.M. Sec. 23 |
| 93-APL-2 | 93-APL/AMS-2 | F-20645 | 48 | T. 24 N., R. 13 W., F.M. Sec. 5 |
| 92-APL-6 | 92-APL/AMS-6 | F-20642 | 49 | T. 24 N., R. 14 W., F.M. Sec. 23 |

224

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 92-APL-4 | | F-20640 | 49 | T. 24 N., R. 14 W., F.M. Sec. 26 |
| 92-APL-2 | 92-APL/AMS-2 | F-20638 | 49 | T. 24 N., R. 14 W., F.M. Sec. 34 |
| 92-APL-1 | 92-APL/AMS-1 | F-20637 | 49 | T. 23 N., R. 14 W., F.M. Sec. 3 |
| 91-APL-1 | 91-APL/AMS-1 | F-20633 | 50 | T. 23 N., R. 14 W., F.M. Sec. 31 |
| 89-APL-4 | 89-APL/AMS-4 | F-20628 | 52 | T. 21 N., R. 14 W., F.M. Sec. 7 |
| 89-APL-3 | | F-20627 | 52 | T. 21 N., R. 14 W., F.M. Sec. 7 |
| 89-APL-1 | 89-APL/AMS-1 | F-20625 | 52 | T. 21 N., R. 14 W., F.M. Sec. 19 |
| 88-APL-1 | 88-APL/AMS-1 | F-20623 | 53 | T. 20 N., R. 15 W., F.M. Sec. 15, 16, 17 |
| 87-APL-2 | | F-20622 | 54 | T. 19 N., R. 15 W., F.M. Sec. 11 |
| 86-APL-5 | 86-APL/AMS-5 | F-20621 | 55 | T. 19 N., R. 14 W., F.M. Sec. 19 |
| 86-APL-5 | 86-APL/AMS-5 | F-20621 | 55 | T. 19 N., R. 15 W., F.M. Sec. 24 |
| 86-APL-3A | 86-APL/AMS-3A | F-20618 | 55 | T. 19 N., R. 14 W., F.M. Sec. 31 |
| 86-APL-2 | | F-20616 | 55 | T. 18 N., R. 14 W., F.M. Sec. 4 |
| 86-APL-1 | | F-20615 | 55 | T. 18 N., R. 14 W., F.M. Sec. 9 |

225

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 84-APL-2 | | F-20611 | 57 | T. 17 N., R. 13 W., F.M. Sec. 28 |
| 84-APL-1 | | F-20610 | 57 | T. 17 N., R. 13 W., F.M. Sec. 28 |
| 83-APL-3 | 83-APL/AMS-3 | F-20609 | 58 | T. 16 N., R. 13 W., F.M. Sec. 4 |
| 83-APL-2 | 83-APL/AMS-2 | F-20608 | 58 | T. 16 N., R. 13 W., F.M. Sec. 14 |
| 82-APL-2 | 82-APL/AMS-2 | F-20606 | 59 | T. 15 N., R. 12 W., F.M. Sec. 7 |
| 81-APL-4 | | F-20605 | 60 | T. 15 N., R. 12 W., F.M. Sec. 29 |
| 81-APL-3 | 81-APL/AMS-3 | F-20604 | 60 | T. 15 N., R. 12 W., F.M. Sec. 31 |
| 80-APL-2 | | F-20600 | 61 | T. 14 N., R. 12 W., F.M. Sec. 34 |
| 79-APL-3 | | F-20598 | 62 | T. 13 N., R. 12 W. F.M. Sec. 12 |
| 79-APL-2 | 79-APL/AMS-2 | F-20597 | 62 | T. 13 N., R. 11 W., F.M. Sec. 17, 18 |
| 79-APL-1 | 79-APL/AMS-1 | F-20596 | 62 | T. 13 N., R. 11 W., F.M. Sec. 22 |
| 78-APL-3 | 78-APL/AMS-3 | F-20595 | 63 | T. 13 N., R. 11 W., F.M. Sec. 36 |
| 78-APL-1 | | F-20594 | 63 | T. 12 N., R. 11 W., F.M. Sec. 1 |

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 62-APL-1 | | F-20564 | 79 | T. 2 N., R. 1 W., F.M. Sec. 3 those portions within unpatented federal mining claims |
| 45-APL-3 | | F-20557 | 97 | T. 10 S., R. 10 E., F.M. Sec. 26 |
| 44-APL-6 | | F-20554 | 98 | T. 11 S., R. 10 E., F.M. Sec. 22 |
| 44-APL-3 | | F-20553 | 98 | T. 11 S., R. 10 E., F.M. Sec. 33, 34 |
| 40-APL-4 | 40-APL/AMS-4 | F-20545 | 102 | T. 15 S., R. 10 E., F.M. Sec. 19 |
| 40-APL-1 | 40-APL/AMS-1 | F-20542 | 102 | T. 16 S., R. 10 E., F.M. Sec. 5 |
| 39-APL-7 | | F-20541 | 103 | T. 16 S., R. 10 E., F.M. Sec. 8 |
| 39-APL-2 | | F-20536 | 103 | T. 16 S., R. 10 E., F.M. Sec. 32 |
| 39-APL-1 | 39-APL/AMS-1 | F-20535 | 103 | T. 17 S., R. 10 E., F.M. Sec. 4 |
| 38-APL-9 | | F-20534 | 104 | T. 17 S., R. 10 E., F.M. Sec. 4 |
| 38-APL-7 | | F-20532 | 104 | T. 17 S., R. 10 E., F.M. Sec. 15 |
| 38-APL-5 | | F-20530 | 104 | T. 17 S., R. 10 E., F.M. Sec. 14 |
| 37-APL-4 | | F-20526 | 105 | T. 17 S., R. 10 E., F.M. Sec. 36 |

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 108-APL-5 | | F-88485 | 33 | T. 16 S., R. 10 E., U.M. Sec. 36 |
| 108-APL-1A | | F-88223 | 33 | T. 37 N., R. 10 W., F.M. Sec. 25 |
| Pipeline Mile Post ("PLMP") 216.3 | 102-APL-2A | F-88222 | 39 | T. 31 N., R. 10 W., F.M. Sec. 18 |
| Atigun Boat Ramp | 114-APL/AMS-2C | F-88221 | 26 | T. 11 S., R. 12 E., U.M. Sec. 32 |
| 104-APL-0 | | F-88220 | 37 | T. 33 N., R. 10 W., F.M. Sec. 35 |
| 86-APL-4B | | F-88219 | 55 | T. 19 N., R. 14 W., F.M. Sec. 30 |
| 104-APL-1 | | F-88218 | 37 | T. 33 N., R. 10 W., F.M. Sec. 35 |
| 113-APL/AMS-2 | 113-APL-2 | F-88197 | 27 | T. 12 S., R. 12 E., U.M. Sec. 28 |
| 112-AMS-2 | 112-APL-2 | F-88195 | 29 | T. 13 S., R. 12 E., U.M. Sec. 28 |
| 108-APL-1 | | F-88194 | 33 | T. 36 N., R. 10 W., F.M. Sec. 3 |
| 112-APL-4B | | F-88193 | 28 | T. 13 S., R. 12 E., U.M. Sec. 9 |
| 107-APL/AMS-4 | | F-88192 | 34 | T. 36 N., R. 10 W., F.M. Sec. 21 |
| 103-APL-3A | | F-88191 | 38 | T. 32 N., R. 10 W., F.M. Sec. 9 |
| 102-APL-3A | 102-AMS-3A | F-88190 | 40 | T. 31 N., R. 10 W., F.M. Sec. 18 |

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 101-APL-2 | 101-APL/AMS-2 | F-88189 | 40 | T. 31 N., R. 11 W., F.M. Sec. 33 |
| 101-APL-1B | 101-AMS-1B | F-88188 | 40 | T. 31 N., R. 11 W., F.M. Sec. 33 |
| 101-APL-1A | | F-88187 | 40 | T. 31 N., R. 11 W., F.M. Sec. 32 |
| 90-APL/AMS-1 | 90-APL-1 | F-88186 | 51 | T. 22 N., R. 14 W., F.M. Sec. 29, 31, 32 |
| 86-APL-4A | | F-88185 | 55 | T. 19 N., R. 14 W., F.M. Sec. 30 |
| 86-APL-4 | | F-88184 | 55 | T. 19 N., R. 14 W., F.M. Sec. 30 |
| 101-APL/AMS-4 | | F-87266 | 40 | T. 31 N., R. 11 W., F.M. Sec. 25 |
| 103-APL-3 | | F-84277 | 38 | T. 32 N., R. 10 W., F.M. Sec. 9 |
| 90-APL-2 | | F-81337 | 51 | T. 22 N., R. 14 W., F.M. Sec. 19 |
| 9-APL-3B | 9-AMS-3B | AA-75690 | 135 | T. 7 S., R. 1 E., C.R.M. Sec. 17, 18 |
| 10-APL-0 | | AA-37895 | 134 | T. 7 S., R. 1 E., C.R.M. Sec. 5 |
| 37-APL-3 | | AA-37894 | 105 | T. 18 S., R. 10 E., F.M. Sec. 1 |
| 27-APL/AMR-3 | 27-APL-3 | AA-11185 | 116 | T. 10 N., R. 1 W., C.R.M. Sec. 29 |

# EXHIBIT A – Part II

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 9-APL-3A | | AA-9602 | 135 | T. 7 S., R. 1 W., C.R.M. Sec. 24 |
| 8-APL-. | | AA-9589 | 136 | T. 8 S., R. 1 W., C.R.M. Sec. 6 |
| 35-APL-6 | 35-APL/AMS-6 | AA-9213 | 107 | T. 19 S., R. 11 E., F.M. Sec. 28, 29 |
| 29-APL-1 | | AA-9198 | 114 | T. 11 N., R. 1 W., C.R.M. Sec. 16, 21 |
| 23-APL-1A | | AA-9189 | 120 | T. 6 N., R. 1 W., C.R.M. Sec. 27, 28, 29, 30 |
| 23-APL-1A | | AA-9189 | 120 | T. 6 N., R. 2 W., C.R.M. Sec. 25 |
| 19-APL-3 | | AA-9166 | 125 | T. 2 N., R. 1 W., C.R.M. Sec. 12 |
| 31-APL-3 | | AA-8871 | 111 & 112 | T. 13 N., R. 1 W., C.R.M. Sec. 6 |
| 31-APL-3 | | AA-8871 | 111 & 112 | T. 13 N., R. 2 W., C.R.M. Sec. 1 |
| 31-APL-3 | | AA-8871 | 111 & 112 | T. 14 N., R. 1 W., C.R.M. Sec. 31 |
| 30-APL-1 | | AA-8870 | 113 | T. 12 N., R. 1 W., C.R.M. Sec. 7, 8 |
| 26-APL/AMR-3 | 26-APL-3 | AA-8867 | 117 | T. 9 N., R. 2 W., C.R.M. Sec. 23, 24, 25 |
| 26-APL-2 | 26-APL/AMS-2 | AA-8866 | 117 | T. 9 N., R. 2 W., C.R.M. Sec. 26, 35 |
| 22-APL-1 | | AA-8863 | 122 | T. 5 N., R. 2 W., C.R.M. Sec. 36 |

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 20-APL-1 | | AA-8862 | 123 | T. 3 N., R. 1 W., C.R.M. Sec. 17 E1/2 |
| 37-APL-2 | | AA-8857 | 105 | T. 18 S., R. 10 E., F.M. Sec. 12 |
| 37-APL-1 | | AA-8855 | 105 | T. 18 S., R. 10 E., F.M. Sec. 24 |
| 36A-APL-1 | | AA-8854 | 106 | T. 18 S., R. 10 E., F.M. Sec. 25 |
| 36-APL-1A | | AA-8853 | 107 | T. 19 S., R. 11 E., F.M. Sec. 19, 20 |
| 31-APL-1 | | AA-8851 | 112 | T. 13 N., R. 1 W., C.R.M. Sec. 19, 20 |
| 28-APL-1C | | AA-8849 | 115 | T. 11 N., R. 1 W., C.R.M. Sec. 32 |
| 28-APL-1 | 28-APL/AMS-1 | AA-8848 | 115 | T. 11 N., R. 1 W., C.R.M. Sec. 33 |
| 19-APL-1 | | AA-8845 | 125 | T. 2 N., R. 1 E., C.R.M. Sec. 30 |
| 19-APL-1 | | AA-8845 | 125 | T. 2 N., R. 1 W., C.R.M. Sec. 25 |
| 17-APL-7 | | AA-8843 | 127 | T. 1 S., R. 1 E., C.R.M. Sec. 3 |
| 17-APL-5 | | AA-8842 | 127 | T. 1 S., R. 1 E., C.R.M. Sec. 10 |
| 17-APL-3 | | AA-8840 | 128 | T. 1 S., R. 1 E., C.R.M. Sec. 25 |

# EXHIBIT A – Part II

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 12-APL-1 | | AA-8829 | 132 | T. 5 S., R. 1 E., C.R.M. Sec. 26, 27 |
| 11-APL-1 | | AA-8827 | 133 | T. 6 S., R. 1 E., C.R.M. Sec. 8 |
| 10-APL-3 | | AA-8825 | 134 | T. 6 S., R. 1 E., C.R.M. Sec. 19 |
| 10-APL-3 | | AA-8825 | 134 | T. 6 S., R. 1 W., C.R.M. Sec. 24 |
| 9-APL-4 | 9-APL/AMS-4 | AA-8822 | 135 | T. 7 S., R. 1 E., C.R.M. Sec. 8 |
| 9-APL-2 | | AA-8820 | 135 | T. 7 S., R. 1 W., C.R.M. Sec. 26 |
| 8-APL-2 | | AA-8817 | 135 & 136 | T. 7 S., R. 1 W., C.R.M. Sec. 34 |

232

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

Those rights covered by the rights-of-way described in the grants referenced below, which have been the subject of conveyances from the United States to the State of Alaska since May 3, 1974:

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 77-APL-2 | | ADL 415247 F-20592 | 64 | T. 12 N., R. 10 W., F.M. Sec. 19 |
| 77-APL-1 | | ADL 415246 F-20591 | 64 | T. 12 N., R. 10 W., F.M. Sec. 35 |
| 77-APL-1 | | ADL 415246 F-20591 | 64 | T. 11 N., R. 10 W., F.M. Sec. 2 |
| 75-APL-2 | | ADL 415138 F-20587 | 66 | T. 11 N., R. 8 W., F.M. Sec. 31 |
| 74-APL-5 | | ADL 415137 F-20585 | 67 | T. 10 N., R. 8 W., F.M. Sec. 4 |
| 74-APL-3A | 74-APL/AMS-3A | ADL 415136 F-21692 | 67 | T. 10 N., R. 8 W., F.M. Sec. 10, 11 |
| 73-APL-1 | | ADL 415135 F-20580 | 68 | T. 10 N., R. 7 W., F.M. Sec. 29, 30 |
| 128-APL-1 | | ADL 415108 F-86446 | 11 | T. 1 N., R. 15 E., U.M. Sec. 7 |
| 127-APL-3 | 127-AMS-3&4A | ADL 415107 F-87269 | 12 | T. 1 N., R. 14 E., U.M. Sec. 24 |
| 127-APL-3 | 127-AMS-3&4A | ADL 415107 F-87269 | | T. 1 N., R. 15 E., U.M. Sec. 19 |
| 127-APL-2 | | ADL 415106 F-87320 | 12 | T. 1 N., R. 14 E., U.M. Sec. 26 |
| 126-APL/AMS-1A | | ADL 415105 F-87249 | 13 | T. 1 S., R. 14 E., U.M. Sec. 34 |

# EXHIBIT A   Part II

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 126-APL-1 | 126-APL/AMS-1 | ADL 415104 F-20733 | 13 | T. 1 S., R. 14 E., U.M. Sec. 34 |
| 125-APL-4 | 125-APL/AMS-4 | ADL 415103 F-20732 | 14 | T. 2 S., R. 14 E., U.M. Sec. 9, 10 |
| 125-APL-3 | 125-APL/AMS-3 | ADL 415102 F-20731 | 14 | T. 2 S., R. 14 E., U.M. Sec. 21 |
| 125-APL/AMS-2 | | ADL 415101 F-87382 | 14 | T. 2 S., R. 14 E., U.M. Sec. 28 |
| 125-APL-1 | 125-APL/AMS-1 | ADL 415100 F-87268 | 14 | T. 2 S., R. 14 E., U.M. Sec. 32, 33 |
| 123-APL-2 | 123-APL/AMS-2 | ADL 415099 F-20728 | 16 | T. 4 S., R. 14 E., U.M. Sec. 17, 18 |
| 122-APL-5A | | ADL 415098 F-22960 | 17 | T. 5 S., R. 14 E., U.M. Sec. 4 |
| 122-APL-5 | | ADL 415097 F-22959 | 17 | T. 5 S., R. 14 E., U.M. Sec. 4, 5 |
| 122-AMS-3 | 122-AMS-3A | ADL 415096 F-87383 | 17 | T. 5 S., R. 14 E., U.M. Sec. 9, 16 |
| 122-APL-3 | | ADL 415095 F-21632 | 17 | T. 5 S., R. 14 E., U.M. Sec. 16 |
| 122-APL/AMS-1 | | ADL 415094 F-87251 | 18 | T. 5 S., R. 14 E., U.M. Sec. 32 |
| 122-APL/AMS-1 | | ADL 415094 F-87251 | 18 | T. 6 S., R. 14 E., U.M. Sec. 5 |
| 121-APL-5 | | ADL 415093 F-21588 | 18 | T. 6 S., R. 14 E., U.M. Sec. 5, 6 |
| 121-AMS-3 | | ADL 415092 F-87219 | 18 | T. 6 S., R. 14 E., U.M. Sec. 17 |

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 121-APL-1A | | ADL 415091 F-21587 | 19 | T. 6 S., R. 14 E., U.M. Sec. 29, 30 |
| 121-APL-1 | 121-APL/AMS- | ADL 415090 F-20721 | 19 | T. 6 S., R. 14 E., U.M. Sec. 32 |
| 120-APS-3 | | ADL 415089 F-87218 | 19 | T. 7 S., R. 14 E., U.M. Sec. 16 |
| 120-AMS-2B | | ADL 415088 F-87835 | 19 | T. 7 S., R. 14 E., U.M. Sec. 4, 5 |
| 120-AMS-1A | | ADL 415087 F-87217 | 19 | T. 7 S., R. 14 E., U.M. Sec. 16 |
| 119A-APL-3 | | ADL 415086 F-21537 | 20, 21 | T. 8 S., R. 14 E., U.M. Sec. 7, 8 |
| 119-APL-1 | | ADL 415085 F-64649 | 21 | T. 8 S., R. 13 E., U.M. Sec. 27 |
| 99-APL-0 | 99-APL-1 | ADL 415084 F-88246 | 42 | T. 29 N., R. 12 W., F.M. Sec. 23 |
| 98-APL-4A | | ADL 415083 F-21619 | 43 | T. 29 N., R. 12 W., F.M. Sec. 35 |
| 98-APL-4 | | ADL 415082 F-20661 | 43 | T. 28 N., R. 12 W., F.M. Sec. 3 |
| 98-APL-1 | | ADL 415081 F-21625 | 43, 44 | T. 28 N., R. 12 W., F.M. Sec. 20, 21 |
| 78-APL-0 | | ADL 415080 F-22363 | 64 | T. 12 N., R. 11 W., F.M. Sec. 13 |
| 76-APL-1A | | ADL 413423 F-20590 | 65 | T. 11 N., R. 9 W., F.M. Sec. 16 |

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 75-APL-3 | 75-APL/AMS-3 | ADL 413422 F-20588 | 66 | T. 11 N., R. 9 W., F.M. Sec. 25, 26 |
| 74-APL-2 | | ADL 413421 F-20582 | 67 | T. 10 N., R. 8 W., F.M. Sec. 13 |
| 71-APL-2 | | ADL 413420 F-20579 | 70 | T. 8 N., R. 6 W., F.M. Sec. 5, 8, 7 |
| 71-APL-1 | | ADL 413419 F-20578 | 70 | T. 8 N., R. 6 W., F.M. Sec. 9, 16 |
| 70-APL-1M | 70-APL-1 | ADL 413418 F-21544 | 71 | T. 8 N., R. 6 W., F.M. Sec. 25 |
| 69-APL-1 | | ADL 413417 F-20577 | 73 | T. 7 N., R. 4 W., F.M. Sec. 11, 12, 14, 15, 21, 22, 28, 29, 30 |
| 69-APL-1 | | ADL 413417 F-20577 | 73 | T. 7 N., R. 3 W., F.M. Sec. 7 |
| 67-APL-1 | | ADL 413416 F-20573 | 74 | T. 6 N., R. 3 W., F.M. Sec. 32 |
| 67-APL-1 | | ADL 413416 F-20573 | 74 | T. 5 N., R. 3 W., F.M. Sec. 5, 6 |
| 66-APL-2 | | ADL 413415 F-20572 | 75 | T. 5 N., R. 3 W., F.M. Sec. 22 |
| 66-APL-1 | | ADL 413414 F-20571 | 75 | T. 5 N., R. 3 W., F.M. Sec. 34 |
| 65-APL-3 | | ADL 413413 F-20570 | 76 | T. 4 N., R. 3 W., F.M. Sec. 2, 3 |
| 65-APL-1 | | ADL 413412 F-20569 | 76 | T. 4 N., R. 3 W., F.M. Sec. 13, 14 |

236

# EXHIBIT A – Part II

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way, Related Facilities

| ACCESS ROAD | A/K/A ACCESS ROAD | SERIAL NUMBER | ALG. SHT. | TOWNSHIP, RANGE, MER. SECTIONS |
|---|---|---|---|---|
| 64-APL-2 | | ADL 413411 F-20568 | 77 | T. 4 N., R. 2 W., F.M. Sec. 22, 26, 27, 33, 34 |
| 67-APL-5 | 67-APL-5C | ADL 403074 F-20576 | 74 | T. 6 N., R. 4 W., F.M. Sec. 23 |

## TAPS Renewal Legal Descriptions
Federal Grant of Right-of-Way, Related Facilities

Those lands within the TAPS fuel gas pipeline right-of-way described in Plat 2001-2 (Fuel Gas Line Monumentation Survey) filed January 10, 2001 in the Barrow Recording District,

And further described in the TAPS Right-of-Way Boundary Description Report, Alyeska Manual No. ROW 214, as amended,

And as further described in the following land parcel descriptions:

PARCEL DESCRIPTION

**UMIAT MERIDIAN**

T. 9 S., R. 13 E., U.M.
Sec. 3, 4, 5, 7, 8

T. 9 S., R. 12 E., U.M.
Sec. 12, 13, 14, 15, 19, 20, 21, 22

T. 9 S., R. 11 E., U.M.
Sec. 22, 23, 24, 27, 28, 33

T. 10 S., R. 11 E., U.M.
Sec. 3, 4, 10, 14, 15, 23, 26, 35

T. 11 S., R. 11 E., U.M.
Sec. 2, 11, 12, 13, 24

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

Those lands within the TAPS fuel gas pipeline right-of-way described in Plat 2001-2 (Fuel Gas Line Monumentation Survey) filed January 10, 2001 in the Barrow Recording District,

And further described in the TAPS Right-of-Way Boundary Description Report, Alyeska Manual No. ROW 214, as amended,

As it pertains to the following lands that have been the subject of conveyances from the United States to the State of Alaska since May 3, 1974:

PARCEL DESCRIPTION

**Umiat Meridian**

T. 1 N., R. 15 E., U.M.
 Sec. 6, 7

T. 1 N., R. 14 E., U.M.
 Sec. 11, 12, 14, 15, 21, 22, 28, 32, 33

T. 1 S., R. 14 E., U.M.
 Sec. 3, 4, 9, 16, 21, 22, 27, 34

T. 2 S., R. 14 E., U.M.
 Sec. 3, 4, 9, 16, 21, 28, 32, 33

T. 3 S., R. 14 E., U.M.
 Sec. 5, 7, 8, 18, 19, 30, 31

T. 4 S., R. 14 E., U.M.
 Sec. 6, 7, 17, 18, 19, 20, 29, 30, 31, 32

T. 5 S., R. 14 E., U.M.
 Sec. 4, 5, 8, 16, 17, 21, 28, 29, 32

T. 6 S., R. 14 E., U.M.
 Sec. 5, 6, 7, 18, 19, 30, 31, 32

T. 7 S., R. 14 E., U.M.
 Sec. 5, 8, 9, 16, 21, 28, 29, 32

# EXHIBIT A    Part II

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

T. 8 S., R. 14 E., U.M.
 Sec. 5, 6, 7, 8, 18

T. 8 S., R. 13 E., U.M.
 Sec. 13, 23, 24, 26, 27, 28, 33, 34

240

# EXHIBIT A – Part II

## TAPS Renewal Legal Descriptions
### Federal Grant of Right-of-Way, Related Facilities

Federal Grant of Right of Way, F-84966
Prospect Power & Communication Line

Those Bureau of Land Management lands described in Alyeska Drawing No. D-47-P2979-E5, Rev. 1 dated 6-85, and attached as Exhibit "A" to the above-referenced Federal Grant, located within the following described lands:

T. 23 N., R. 14 W., F.M.
Sec. 17 SW¼


Federal Grant of Right of Way, AA-31239
Gulkana Communication Site & Access Road

Those Bureau of Land Management lands described in the drawings attached as Exhibit "A" to the above-referenced Federal Grant, located within the following described lands:

T. 9 N., R. 2 W., C.R.M.
Sec. 26 SW¼SE¼
Sec. 35 NW¼NE¼

## EXHIBIT A
## List of Applications and Accompanying Alignment Map and Site Location Drawings Identifying the General Route of the Pipeline

# EXHIBIT A

# List of Applications and Accompanying Alignment Map and Site Location Drawings Identifying the General Route of the Pipeline

A. The general route of the Pipeline is identified in the following applications, alignment map and site location drawings, filed with the Bureau of Land Management:

(1) Alignment of the centerline of the line pipe—

(a) *Applications*
BLM serial numbers
AA–5847—sheets 1 to 26 inclusive
F–12505—sheets 26 to 138 inclusive

(b) *Description of Alignment Map*
Alyeska Pipeline Service Company
Trans Alaska Pipeline System
Dwg. No. AL–00–G2
Sheets 1–138, inclusive (143 sheets in all, including 25A, 36A, 53A, 114A and 119A)
Prudhoe Bay to Valdez
48" Oil Pipeline Alignment Map
Scale: 1" = 1,000'

(c) *Date of Survey*
Engineer's Statement attached to Sheet 1 indicates that survey was made commencing August 19, 1970 through February 16, 1973 (and continuing as minor realignments occur) and that such survey is accurately represented upon the aforesaid sheets of the map with certain exceptions that are noted on individual engineer's statements.

(d) *Date Alignment Map was filed*
September 19, 1973

(e) *BLM office where filed*
Alaska State Office
Bureau of Land Management
555 Cordova Street
Anchorage, Alaska

(2) Locations of certain Related Facilities—

| Related facility | Applications BLM serial # | Alyeska site location drawing # | Drawing date |
|---|---|---|---|
| **(a) Pump Stations:** | | | |
| #2 | F–15422 | D–32–L 500 | 1–12–72 |
| #3 | F–15424 | D–33–L 500 | 1–12–72 |
| #4 | F–15426 | D–34–L 500 | 1–12–72 |
| #5 | F–15428 | D–35–L 500 | 1–12–72 |
| #6 | F–15430 | D–36–L 501 | 1–12–72 |
| #7 | F–15432 | D–37–L 502 | 1–12–72 |
| #8 | F–15434 | D–38–L 501 | 1–12–72 |
| #10 | F–15436 | D–40–L 500 | 1–12–72 |
| #11 | AA–6990 | D–41–L 500 | 1–12–72 |
| #12 | AA–6991 | D–42–L 500 | 1–12–72 |
| **(b) Mechanical Refrigeration Equipment Sites:** | | | |
| #1 | | D–50–L 96 | No Date |
| #2 | | D–00–L 97 | No Date |
| #3 | | D–90–L 98 | No Date |
| #4 | | D–00–L 99 | No Date |
| #5 | | D–00–L 100 | No Date |
| #6 | | D–00–L 101 | No Date |

| Related facility | Application BLM serial # | Alyeska site location drawing # | Drawing date |
|---|---|---|---|
| **(b) Mechanical Refrigeration Equipment Sites—Continued** | | | |
| #7 | | D-00-L 102 | No Date |
| #8 | | D-00-L 103 | No Date |
| #9 | | D-00-L 104 | No Date |
| **(c) Pump Station Communication Sites:** | | | |
| #2 | F-15423 | D-32-L 501 | 1-12-72 |
| #3 | F-15425 | D-33-L 501 | 1-12-72 |
| #4 | F-15427 | D-34-L 501 | 1-12-72 |
| #5 | F-15429 | D-35-L 501 | 1-12-72 |
| #6 | F-15431 | D-36-L 502 | 1-12-72 |
| #7 | F-15433 | D-37-L 503 | 6-29-72 |
| #8 | F-15435 | D-38-L 502 | 1-12-72 |
| #10 | F-15437 | D-40-L 501 | 1-12-72 |
| #11 | AA-6992 | D-41-L 501 | 1-12-72 |
| #12 | AA-6993 | D-42-L 501 | 1-12-72 |
| **(d) Basic Communication Sites:** | | | |
| Valdez Terminal | | D-60-L 559 | 12-17-73 |
| Keystone | | D-60-L 531 | 6-22-73 |
| Ptarmigan | | D-60-L 540 | 11-3-73 |
| Tsina | | D-60-L 513 | 6-22-73 |
| Tiekel | | D-60-L 541 | 11-3-73 |
| PS No. 12 Passive | | D-60-L 543 | 11-5-73 |
| Kimball | | D-60-L 542 | 11-5-73 |
| Stuck | | D-60-L 544 | 11-3-73 |
| Gakona | | D-60-L 515 | 6-22-73 |
| Round Top | | D-60-L 545 | 11-3-73 |
| Yost | | D-60-L 546 | 10-31-73 |
| Nicole Knot | | D-60-L 547 | 11-1-73 |
| Donnelly No. 2 | | D-60-L 548 | 11-4-73 |
| Aggie | | D-60-L 549 | 11-3-73 |
| West | | D-60-L 522 | 6-22-73 |
| Livengood | | D-60-L 550 | 11-4-73 |
| Bench | | D-60-L 551 | 11-3-73 |
| Hamlin | | D-60-L 524 | 6-22-73 |
| Fish | | D-60-L 552 | 10-31-73 |
| Eagle | | D-60-L 526 | 6-22-73 |
| Coldfoot | | D-60-L 527 | 6-22-73 |
| Kaanuk | | D-60-L 553 | 11-3-73 |
| Table Mountain | | D-60-L 529 | 6-22-73 |
| Margaret Hill | | D-60-L 554 | 10-26-73 |
| Atigun | | D-60-L 555 | 11-3-73 |
| Twin Glacier | | D-60-L 533 | 6-22-73 |
| Tea Lake | | D-60-L 556 | 11-27-73 |
| Galbraith | | D-60-L 557 | 11-27-73 |
| Slope | | D-60-L 535 | 6-22-73 |
| Costa Hill | | D-60-L 558 | 10-30-73 |
| Franklin Bluffs | | D-60-L 537 | 6-22-73 |
| Stuart | | D-60-L 504 | 6-22-73 |
| Ross Dome | F-12139 | D-60-L 560 | 12-17-73 |
| **(e) Remote Control Block Valve Equipment Sites:** | | | |
| #98 | | D-00-L 32 | 5-16-73 |
| #100 | | D-00-L 31 | 5-16-73 |
| #101 | | D-00-L 29 | 5-16-73 |
| #102 | | D-00-L 27 | 5-16-73 |
| #103 | | D-00-L 26 | 5-16-73 |
| #104 | | D-00-L 25 | 5-16-73 |

A-2

244

| Related facility | Accompanying BLM serial # | Alyeska site location drawing # | Drawing date |
|---|---|---|---|

**(e) Remote Control Block Valve Equipment Sites—Continued**

| Related facility | Accompanying BLM serial # | Alyeska site location drawing # | Drawing date |
|---|---|---|---|
| #109 | | D-00-L 21 | 5-16-73 |
| #113 | | D-00-L 19 | 5-16-73 |
| #115 | | D-00-L 17 | 5-16-73 |
| #116 | | D-00-L 15 | 5-16-73 |
| #117 | | D-00-L 13 | 5-16-73 |
| #118 | | D-00-L 11 | 5-16-73 |
| #119 | | D-00-L 9 | 5-16-73 |
| #123 | | D-00-L 7 | 5-17-73 |
| #125 | | D-00-L 5 | 5-17-73 |
| #51 | | D-00-L 65 | 5-16-73 |
| #53 | | D-00-L 63 | 5-16-73 |
| #54 | | D-00-L 61 | 5-16-73 |
| #56 | | D-00-L 59 | 5-16-73 |
| #58 | | D-00-L 55 | 5-16-73 |
| #57 | | D-00-L 57 | 5-16-73 |
| #59 | | D-00-L 53 | 5-16-73 |
| #60 | | D-00-L 51 | 5-16-73 |
| #63 | | D-00-L 49 | 5-16-73 |
| #65 | | D-00-L 47 | 5-16-73 |
| #67 | | D-00-L 45 | 5-16-73 |
| #68 | | D-00-L 43 | 5-16-73 |
| #89 | | D-00-L 41 | 5-16-73 |
| #91 | | D-00-L 39 | 5-16-73 |
| #95 | | D-00-L 37 | 5-16-73 |
| #97 | | D-00-L 35 | 5-16-73 |
| #31 | | D-00-L 95 | 5-16-73 |
| #32 | | D-00-L 93 | 5-16-73 |
| #33 | | D-00-L 91 | 5-16-73 |
| #34 | | D-00-L 89 | 5-16-73 |
| #35 | | D-00-L 87 | 5-16-73 |
| #36 | | D-00-L 85 | 5-16-73 |
| #37 | | D-00-L 83 | 5-16-73 |
| #39 | | D-00-L 81 | 5-16-73 |
| #40 | | D-00-L 79 | 5-16-73 |
| #42 | | D-00-L 77 | 5-16-73 |
| #43 | | D-00-L 75 | 5-16-73 |
| #44 | | D-00-L 73 | 5-16-73 |
| #45 | | D-00-L 71 | 5-16-73 |
| #47 | | D-00-L 69 | 5-16-73 |
| #49 | | D-00-L 67 | 5-16-72 |

**(f) Communication Facilities at Valve Sites:**

| Related facility | Accompanying BLM serial # | Alyeska site location drawing # | Drawing date |
|---|---|---|---|
| #31 | F-19621 | D-00-L 94 | No Date |
| #32 | F-19622 | D-00-L 92 | No Date |
| #33 | F-19623 | D-00-L 90 | No Date |
| #34 | F-19624 | D-00-L 88 | No Date |
| #35 | F-19625 | D-00-L 86 | No Date |
| #36 | F-19626 | D-00-L 84 | No Date |
| #37 | F-19627 | D-00-L 82 | No Date |
| #39 | F-19628 | D-00-L 80 | No Date |
| #40 | F-19629 | D-00-L 78 | No Date |
| #42 | F-19630 | D-00-L 76 | No Date |
| #43 | F-19631 | D-00-L 74 | No Date |
| #44 | F-19632 | D-00-L 72 | No Date |
| #45 | F-19633 | D-00-L 70 | No Date |
| #47 | F-19634 | D-00-L 68 | No Date |

A-3

| Related facility | Application BLM serial # | Alternate site location drawing # | Drawing date |
|---|---|---|---|

**(f) Communication Facilities at Valve Sites—Continued**

| Related facility | Application BLM serial # | Alternate site location drawing # | Drawing date |
|---|---|---|---|
| #49 | F-19532 | D-00-L 66 | No Date |
| #51 | F-19536 | D-00-L 64 | No Date |
| #53 | F-19537 | D-00-L 62 | No Date |
| #54 | F-19638 | D-00-L 60 | No Date |
| #56 | F-19639 | D-00-L 58 | No Date |
| #57 | F-19640 | D-00-L 56 | No Date |
| #58 | F-19641 | D-00-L 54 | No Date |
| #59 | F-19642 | D-00-L 52 | No Date |
| #60 | F-19643 | D-00-L 50 | No Date |
| #62 | F-19644 | D-00-L 48 | No Date |
| #65 | F-19645 | D-00-L 46 | No Date |
| #67 | F-19646 | D-00-L 44 | No Date |
| #68 | F-19647 | D-00-L 42 | No Date |
| #88 | F-19648 | D-00-L 40 | No Date |
| #91 | F-19649 | D-00-L 38 | No Date |
| #96 | F-19650 | D-00-L 36 | No Date |
| #97 | F-19651 | D-00-L 34 | No Date |
| #98 | F-19652 | D-00-L 32 | No Date |
| #100 | AA-8499 | D-00-L 30 | No Date |
| #101 | AA-8500 | D-00-L 28 | No Date |
| #102 | AA-8501 | D-00-L 26 | No Date |
| #103 | AA-8502 | D-00-L 24 | No Date |
| #104 | AA-8503 | D-00-L 22 | No Date |
| #109 | AA-8504 | D-00-L 20 | No Date |
| #113 | AA-8505 | D-00-L 18 | No Date |
| #115 | AA-8506 | D-00-L 16 | No Date |
| #116 | AA-8507 | D-00-L 14 | No Date |
| #117 | AA-8508 | D-00-L 12 | No Date |
| #118 | AA-8509 | D-00-L 10 | No Date |
| #119 | AA-8510 | D-00-L 8 | No Date |
| #123 | AA-8511 | D-00-L 6 | No Date |
| #125 | AA-8512 | D-00-L 4 | No Date |

**(g) Erosion Control Structure Sites:**

| Related facility | Application BLM serial # | Alternate site location drawing # | Drawing date |
|---|---|---|---|
| Unnamed Creek | | C-00-L 1041 | 8-31-73 |
| Brown Creek | | C-00-L 1042 | 8-31-73 |
| Lowe River | | C-00-L 1043 | 8-31-73 |
| Sheep Creek | | C-00-L 1044 | 8-31-73 |
| Tsina River #1 | | C-00-L 1045 | 8-31-73 |
| Tsina River #1 | | C-00-L 1046 | 8-31-73 |
| Tsina River #3 | | C-00-L 1047 | 8-31-73 |
| Tiekel River #1 | | C-00-L 1048 | 8-31-73 |
| Tiekel River #3 | | C-00-L 1049 | 8-31-73 |
| Tiekel River | | C-00-L 1050 | 8-31-73 |
| McCallum Creek | | C-00-L 1051 | 8-31-73 |
| Phelan Creek | | C-00-L 1052 | 8-31-73 |
| Phelan Creek #2 | | C-00-L 1053 | 8-31-73 |
| Phelan Creek #2 | | C-00-L 1054 | 8-31-73 |
| Phelan Creek #2 | | C-00-L 1055 | 8-31-73 |
| Phelan Creek #2 | | C-00-L 1056 | 8-31-73 |
| Phelan Creek #2 | | C-00-L 1057 | 8-31-73 |
| Phelan Creek | | C-00-L 1058 | 8-31-73 |
| Phelan Creek | | C-00-L 1059 | 8-31-73 |
| Phelan Creek #2 | | C-00-L 1060 | 8-31-73 |
| Phelan Creek #2 | | C-00-L 1061 | 8-31-73 |
| Phelan Creek | | C-00-L 1062 | 8-31-73 |

A-4

| Related facility | Applications BLM series # | Alyeska site location Drawing # | Drawing date |
|---|---|---|---|

(g) Erosion Control Structure Sites—Continued

| Related facility | Applications BLM series # | Alyeska site location Drawing # | Drawing date |
|---|---|---|---|
| Phelan Creek | | C-00-L 1063 | 8-31-73 |
| Phelan Creek | | C-00-L 1064 | 8-31-73 |
| Phelan Creek | | C-00-L 1065 | 8-31-73 |
| Phelan Creek | | C-00-L 1066 | 8-31-73 |
| Delta River #1 | | C-00-L 1067 | 8-31-73 |
| Delta River #1 | | C-00-L 1068 | 8-31-73 |
| Delta River #1 | | C-00-L 1069 | 8-31-73 |
| Delta River #1 | | C-00-L 1070 | 8-31-73 |
| Delta River #1 | | C-00-L 1071 | 8-31-73 |
| Delta River #2 | | C-00-L 1072 | 8-31-73 |
| Delta River #2 | | C-00-L 1073 | 8-31-73 |
| Delta River #2 | | C-00-L 1074 | 8-31-73 |
| Delta River #2 | | C-00-L 1075 | 8-31-73 |
| Delta River #2 | | C-00-L 1076 | 8-31-73 |
| Delta River #3 | | C-00-L 1077 | 8-31-73 |
| Delta River #3 | | C-00-L 1078 | 8-31-73 |
| Delta River #3 | | C-00-L 1079 | 8-31-73 |
| Delta River #3 | | C-00-L 1080 | 8-31-73 |
| Delta River #3 | | C-00-L 1081 | 8-31-73 |
| Delta River #3 | | C-00-L 1082 | 8-31-73 |
| Delta River #3 | | C-00-L 1083 | 8-31-73 |
| Delta River #3 | | C-00-L 1084 | 8-31-73 |
| Trims Creek | | C-00-L 1085 | 8-31-73 |
| Boulder Creek | | C-00-L 1086 | 8-31-73 |
| Lower Suzy-Q Creek | | C-00-L 1087 | 8-31-73 |
| Darling Creek | | C-00-L 1088 | 8-31-73 |
| N. Fork Bonanza | | C-00-L 1090 | 8-31-73 |
| Jim River | | C-00-L 1091 | 8-31-73 |
| Jim River | | C-00-L 1092 | 8-31-73 |
| S. Fork Koyukuk | | C-00-L 1093 | 8-31-73 |
| Middle Fork Koyukuk | | C-00-L 1094 | 8-31-73 |
| Middle Fork Koyukuk | | C-00-L 1095 | 8-31-73 |
| Middle Fork Koyukuk | | C-00-L 1096 | 8-31-73 |
| Middle Fork Koyukuk | | C-00-L 1097 | 8-31-73 |
| Middle Fork Koyukuk | | C-00-L 1098 | 8-31-73 |
| Middle Fork Koyukuk | | C-00-L 1099 | 8-31-73 |
| Middle Fork Koyukuk | | C-00-L 1100 | 8-31-73 |
| Middle Fork Koyukuk | | C-00-L 1101 | 8-31-73 |
| Dietrich River | | C-00-L 1102 | 8-31-73 |
| Dietrich River | | C-00-L 1103 | 8-31-73 |
| Dietrich River | | C-00-L 1104 | 8-31-73 |
| Dietrich River | | C-00-L 1105 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1106 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1107 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1108 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1109 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1110 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1111 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1112 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1113 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1114 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1115 | 8-31-73 |
| Sagavanirktok River | | C-00-L 1116 | 8-31-73 |

(h) Valdez Terminal Site

| Related facility | Applications BLM series # | Alyeska site location Drawing # | Drawing date |
|---|---|---|---|
| Valdez Terminal Site | AA-5847 | N-00-L-501 | 12-10-73 |

B. The provisions of subsection A above in this Exhibit are subject to the following:

(1) All alignments, boundaries, sites and proposed improvements that may be described or depicted in any application, map or drawing referred to above are subject to the written approval of the Secretary or Authorized Officer, in accordance with the provisions of this Agreement, and the inclusion of a particular type of Related Facility does not necessarily connote approval by the Secretary or the Authorized Officer of any concept, mode or design with respect to the facility.

(2) Any conflict, either expressed or implied, between any provision of this Exhibit (or of any application, map, drawing, or other document filed with or in support of the application, map or drawing), on the one hand, and, on the other hand, any provision found elsewhere in this Agreement, shall be resolved in favor of the provision found elsewhere in this Agreement.

# Exhibit B

# Requirements of the Department of Defense Relating to Military Installations

Exhibit B to the original Federal Grant, dated January 3, 1974, has been replaced in its entirety with this Exhibit B.

# EXHIBIT B

## Requirements of the Department of Defense
## Relating to Military Installations

A.     General Requirements

1.     Entry upon military land for construction and routine operations and maintenance shall be fully coordinated ten (10) days in advance of entry with the appropriate Installation Commander/Garrison Commander having immediate jurisdiction over the property. Entry under emergency conditions shall be coordinated expeditiously with the Installation Commander/Garrison Commander.

Due to the increased security measures and required coordination procedures at Eielson AFB, notification of entry onto Eielson AFB for routine operations and maintenance shall be coordinated at least 14 days in advance. If for construction outside of the existing right-of-way, notification shall be coordinated at least 60 days prior to entry. Adjusting the advance notification requirement will also allow the appropriate offices to provide authorization in an expeditious manner.

2.     Entry for all activities conducted by Permittees upon all military installations shall be in strict compliance with post/base regulations, both existing or hereafter promulgated. Permittees shall obtain copies of such regulations from the affected Installation Commanders/Garrison Commanders.

3.     Ingress and egress to military installation shall be confined to routes designated by the Installation Commander/Garrison Commander. Such commander shall have the right to modify or change the designated routes without advance notice to Permittees. Use of existing military roads or other access routes across subject lands shall be non-exclusive.

4.     Permittees shall reimburse the United States, through the Army or Air Force installation affected, for any increased maintenance costs of existing military roads resulting from or attributable to usage by Permittees. These costs shall be in addition to those contemplated by Section 12 of this Agreement.

5.     Permittees may construct permanent access and maintenance roads within the Right-of-Way, provided such roads do not interfere with the surface use of the area by the military, except during the construction phase.

6.     Roads designated by the Installation Commander/Garrison Commander to require intermittent military usage may be closed. The Installation Commander/Garrison Commander shall approve in advance all such closures. Any extended closure shall cause the road to be treated as stated in Section 3 of these General Requirements.

7.     Any overhead construction relating to the Pipeline shall provide for a minimum of eighteen (18) feet of clearance above the existing road surface.

250

8. Crossover road ramp construction relative to ramp grades, pipeline cover, sleeves, bridging, signs and the like will conform to the extent practical to the standards of the Alaska State Highway Department.

9. Final route selection, as mapped, and any subsequent changes thereto across military lands will be approved by the affected Installation Commander/Garrison Commander prior to construction. The route of the Pipeline shall be located so as to avoid military improvements and the Pipeline shall be constructed a minimum distance of three hundred and twenty-five (325) feet from perimeter fences surrounding ammunition and fuel storage areas.

10. No surface projection of the Pipeline shall be permitted within the drop zone area west of the main development at Fort Greely.

11. Crossing of Army Petroleum Oil and Lubricant (POL) lines will be coordinated with the affected Installation Commander/Garrison Commander and the Defense Energy Support Center Commander, Alaska, 10470 22nd St, Elmendorf AFB AK 99506, and the Director of Public Works, Real Estate Office on Fort Richardson, AK 99505.

12. The Pipeline traversing subject lands shall be buried from stations 8400+00 and to 8511+51 and from Stations 8554+70 to 8562+46 as shown on Alyeska Pipeline Service Company Trans Alaska Pipeline System Drawing AL-00-G2, Sheet 45 of 138, Prudhoe Bay to Valdez. Burial depth and technique shall be sufficient to permit surface crossing of the Right-of-Way by heavy tracked and wheeled vehicles at designated locations of existing roads and runways. In the event that subsurface construction cannot be accomplished to the satisfaction of the Installation Commander/Garrison Commander, the Pipeline shall be relocated to an area or areas where burial is permissible, or where surface construction can by authorized without interruption of the military mission. Mode of construction between the aforementioned stations shall require the prior consent of the Installation Commander/Garrison Commander.

13. Disruption of, or interference with the operation and maintenance of any military pipelines, utility and communication lines is prohibited except by authorization by the Installation Commander/Garrison Commander. The Pipeline shall cross all existing intersecting pipelines, conduits, and cables with a minimum clearance of twelve (12) inches.

14. Maximum length of open trench or trenches during construction of the Pipeline over and across the subject land shall not exceed one (1) mile at any given time without the prior approval of the Installation Commander/Garrison Commander.

15. Suitable bridged crossings over open trenches shall be provided and maintained where necessary to permit passage of military personnel and vehicles; timely notice of requirements to be furnished by Installation Commander/Garrison Commander.

16. In connection with Permittees' duties to repair, replace, and rehabilitate as provided for in Section 13 of this Agreement, where borrowed soil material is necessary to perform such duties, the location and method of obtaining the borrowed material shall be

251

approved by the Installation Commander/Garrison Commander. All surplus material not required for fill, backfill or grading shall be spread and leveled in an area designated by said commander.

17. Permittees shall submit legal descriptions of the centerline of the Right-of-Way and permanent access and maintenance roads as constructed in, upon, over and across military-controlled lands to the Installation Commander/Garrison Commander within ninety (90) days of the completion of construction within a given military installation. Separate legal descriptions shall be written for each noncontiguous tract of military-controlled land. Said legal descriptions shall be accompanied by preliminary "as built" drawings (and final "as built" drawings shall be furnished within three hundred and sixty (360) days) of said completion of the Pipeline and all permanent access and maintenance roads, together with separate real estate maps in the event sufficient survey information necessary to verify legal descriptions is not contained on the "as built" drawings.

18. Permittees shall install mainline valves sufficient to control Oil flow in the vicinity of populated area, ammunition/explosive and fuel storage areas.

19. Electrically operated devices installed as part of the Pipeline System which are capable of producing radiations, electromagnetic or other interference, shall be screened, filtered or otherwise suppressed to the extent that such devices will not adversely affect the function of existing communication systems. In the event that physical obstructions, such as towers or buildings are to be erected as part of the Pipeline System, their positioning shall be such that they will not obstruct radiation patterns of line-of-site communication, navigation aids or other communications, electronic or meteorological services.

20. Entry for construction and routine maintenance upon installations or crossings of utility facilities under the control of or utilized by Air Force Communications System/White Alice will be coordinated at least ten (10) days prior to entry with Alaska Communications Region through Headquarters, Alaskan Air Command, Elmendorf Air Force Base. Entry under emergency conditions will be coordinated expeditiously with the Region.

21. Should the Pipeline cross high voltage power transmission lines on Eielson Air Force Base, adequate precaution to the satisfaction of the Installation Commander/Garrison Commander will be taken to insure that excessive sag or accidental power line breakage does not create a safety hazard.

22. In the event unexploded munitions are discovered by Permittees during construction activities, the construction activities shall immediately cease in that area. Permittees shall notify the Installation Commander/Garrison Commander who will immediately proceed to dispose of the munitions. Construction shall not proceed until authorized by the Installation Commander/Garrison Commander.

23. The United States reserves to itself the right to construct, use and maintain across, over and/or under the Right-off-Way, oil and sewer lines, and other facilities, in such manner as not to create an unreasonable interference with the use of the Right-of-Way.

24.    Any authorized use or occupation of the subject military lands in connection with the construction, operation, maintenance or termination of the Pipeline System shall be subject to such rules and regulations as the Installation Commanders/Garrison Commanders may from time to time prescribe. The military departments reserve the right to modify or change conditions to protect military interests as circumstances may from time to time warrant.

25.    Transportation, storage and use of explosives during construction of the Pipeline System shall be permitted only in conformance with the applicable installation regulations. Permittees shall secure copies of these regulations from the Installation Commanders/Garrison Commanders. Use of all explosives on military reservations shall be in strict conformance with U.S. Army Corps of Engineers Safety Manual, and Permittees shall secure copies of this manual from the Installation Commander/Garrison Commander. At least thirty (30) days in advance of any underwater blasting, Permittees shall submit to the Installation Commander/Garrison Commander a plan for such blasting. The plan shall set forth blasting locations, types and amounts of explosives, date or dates of blasting, and the reason for blasting.

26.    The use of pesticides and herbicides shall be in accordance with applicable military regulations. An approved list of pesticides and herbicides, together with application constraints shall be obtained from the Installation Commander/Garrison Commander.

27.    Permittees shall locate and/or install the Pipeline System in such manner so as to preclude the creation of ground fog and/or ice fog conditions which will in any way decrease the operational capability of the air fields located on Eielson Air Force Base, Fort Wainwright and Fort Greely. Studies or other data supporting the location or construction techniques utilized by Permittees to accomplish the requirements of this condition shall be submitted to the Installation Commander/Garrison Commander for review and approval thirty (30) days prior to commencement of construction on the lands herein described.

28.    Prior to commencement of construction, Permittees shall submit a schedule of their construction activities on the military installation involved. This schedule shall be in such detail as may be required by the Installation Commander/Garrison Commander and during the course of construction this schedule shall be updated and resubmitted as may be required by the Installation Commander/Garrison Commander.

29.    All required notifications pertaining to U.S. Army military should be addressed to the Garrison Commander and the Director of Public Works.

## B.    Definitions

As used above, the following items have the meanings indicated

> "Installation Commander/Garrison Commander": The Commanding Officer of a military installation, E.g., Fort Wainwright, Fort Greely, Eielson Air Force Base.

253

2.   "District Engineer": The District Engineer, U.S. Army Engineer District, Alaska, Anchorage, Alaska

Mr. DAVID E. LINDGREEN
Deputy Solicitor
Department of the Interior,
Washington, D.C.


DEAR MR. LINDGREEN: By letter dated 14 November 1973 we furnished you certain provisions to be included in the right-of-way permit for the construction of the Trans-Alaska Pipeline. These provisions protect military interests where the pipeline right-of-way crosses or otherwise affects military installations.

In this letter we reserved the right to make reasonable modifications or changes from time to time. We are furnishing herewith a revision of Exhibit E which clarifies the intent of various paragraphs and eliminates certain paragraphs in which the provision is already adequately covered in the stipulations of the Final Environmental Impact Statement.

It is the intention of the Department of the Army and the Department of the Air Force to permit the construction, operation, maintenance, and termination of the Trans-Alaska Pipeline in a way that is compatible with both military operations and the Pipeline System, and that the necessary approvals requested by the Pipeline System will not be unreasonably withheld.

Sincerely,
WOODROW BERGE
Director of Real Estate.


Note--The "revision" referred to above in this letter was modified in certain respects before being incorporated into this Agreement and the Director of Real Estate, D.O.A., Office of Chief of Engineers, has been apprised of the modifications in all material respects.

DEPARTMENT OF THE ARMY
OFFICE OF THE CHIEF OF ENGINEERS,
Washington, D.C., November 14, 1973

MR. DAVID E. LINDGREEN
Deputy Solicitor
Department of the Interior
Washington, D.C.

DEAR MR. LINDGREEN: This refers to our DAEN-CWZ-W letter dated 9 November 1973 concerning review of your 20 July 1973 draft permit on the construction of the Trans-Alaska Pipeline. We indicated then that the permit should contain conditions to protect military interests where the pipeline right-of-way crosses or otherwise affects military installations.

We have prepared and are inclosing a set of such provisions to be incorporated in the draft permit as Exhibit E.

While these conditions are as accurate as we can foresee at this time, military exigencies and local circumstances may require that reasonable modifications or changes be made from time to time and the discretion to make such changes has been reserved in our proposed Exhibit E.

Sincerely,
WOODROW BERGE
Director of Real Estate.

# Memorandum of Understanding

WHEREAS, the United States of America, acting by and through the U.S. Army, Corps of Engineers (hereinafter called the "Corps of Engineers"), is developing the Chena River Lakes Project for the flood protection of the Fairbanks, Alaska area; and

WHEREAS, the Alyeska Pipeline Service Company, as agent for and on behalf of the owners thereof, listed below,

Amerada Hess Pipeline Corporation
Arco Pipe Line Company
BP Pipelines, Inc.
Exxon Pipeline Company
Mobil Alaska Pipeline Company
Phillips Alaska Pipeline Corporation
Sohio Pipe Line Company
Union Alaska Pipeline Company

(hereafter called the "Company") has constructed the Trans-Alaska Pipeline over and across a part of the area which is required for the construction, maintenance and operation of the Chena River Lakes Project; and

WHEREAS, the Trans-Alaska Pipeline across the Chena River Lakes Project area has been constructed so that it will not interfere with the operation, maintenance, or repair of the Project; and.

WHEREAS, the Chena River Lakes Project, upon its completion, will have been constructed in such a manner that the Corps of Engineers considers the integrity of the Trans-Alaska Pipeline will not be imperiled by Project operation or maintenance; and,

WHEREAS, it is imperative that both of the parties hereto cooperate in the maintenance and operation of their respective facilities to avoid interference with each other;

NOW, THEREFORE, it is agreed as follows:

1. Without consultation with the official of the United States in charge of the Project the facilities of the Company within the Chena River Lakes Project boundaries shall not be altered or modified, nor shall other facilities be constructed by the Company so as to interfere with the maintenance or operation of the Chena River Lakes Project, except any alteration or modification or facilities constructed by order of the Department of Interior.

257

2. Any routine excavation work which the Company performs, or causes to be performed within the boundaries of said Project, shall be first coordinated with and shall have the approval of the official of the United States in charge of the Project. (*)

3. Any excavation work which the Company performs, or causes to be performed within the boundaries of said project, which must be done on an emergency basis, may be performed after notification of the official (or such official's office) of the United States in charge of the Project, provided, the Company may proceed with emergency work as long as attemps (sic) to notify have been or are being made.

4. Any excavation work which the Corps of Engineers performs, or causes to be performed within that portion of the right-of-way for the Trans-Alaska Pipeline which lies within the Chena River Lakes Project, shall be first coordinated with and have the approval of the official of said firm in charge of the involved section of the pipeline.

5. The Company recognizes that operation of the Project will result occasionally in the overflowing, flooding, and submerging of portions of its right-of-way through the Chena River Lakes Project, and that said overflowing, flooding, and submerging of its right-of-way, may obstruct passage along or otherwise preclude the Company's full and unrestricted use of said right-of-way, and the Company hereby consents thereto; provided, however, that such consent by the Company shall in no way relieve the United States of America from any liability arising out of any activity incident to the construction, operation, or maintenance by it of the Chena River Lakes Project except as herein provided.

6. The Company shall be notified as soon as possible prior to or after any flooding affecting the Pipeline right-of-way.

---

* unless previously authorized by the Authorized Officer of the Office of Special Projects, Bureau of Land Management.

258

DATED this 2nd day of May, 1980

ALYESKA PIPELINE SERVICE COMPANY
Agent for:

Amerada Hess Pipeline Corporation
ARCO Pipe Line Company
BP Pipelines Inc.
Exxon Pipeline Company
Mobil Alaska Pipeline Company
Phillips Alaska Pipeline Company
Sohio Pipe Line Company
Union Alaska Pipeline Company

By:  /s/

UNITED STATES OF AMERICA
U.S. Army, Corps of Engineers

By:  /s/
     District Engineer
     Alaska District



December 10, 2002

Real Estate Division

Henri Bisson
State Director
Bureau of Land Management
Alaska State Office
222 West 7th Ave #13
Anchorage, Alaska 99513-7599

Dear Mr. Bisson:

On behalf of the Department of Defense, the U.S. Army Engineer District, Alaska, hereby grants its nonobjection to the 30-year renewal of the right-of-way grant for the Trans-Alaska Pipeline System and related facilities on Forts Wainwright and Greely, Chena River Lakes Project and Eielson Air Force Base. The Bureau of Land Management file numbers for the applicable right-of-way grant: AA-5847, F-12503, F-21650, F-21740, F-20557, F-21591 and F-20534.

We request that the following Department of Defense documents be included in the renewal grant:

Requirements of the Department of Defense Relating to Military Installations (Exhibit B of the current grant).

- Memorandum of Understanding dated May 2, 1980, between Alyeska Pipeline Service Company and the Corps of Engineers, Alaska District.

Revised points of contact and notification time (attached).

The point of contact for this renewal action is Angie Gori, she can be reached at 753-2843.

Sincerely,

Harold D. Hopson
Chief, Real Estate Division

Attachment

260

**DOD REQUESTED CHANGES TO REQUIREMENTS OF THE DOD RELATING TO MILITARY INSTALLATIONS (EXHIBIT B OF THE CURRENT GRANT)**

A. General requirements:

Item 1: Due to the increased security measures and required coordination procedures at Eielson AFB, notification of entry onto Eielson AFB for routine operations and maintenance shall be coordinated at least 14 days in advance. If for construction outside of the existing right-of-way, notification shall be coordinated at least 60 days prior to entry. Adjusting the advance notification requirement will allow the appropriate offices to provide authorization in an expeditious manner.

Item 11: Crossing of Army Petroleum Oil and Lubricant (POL) lines will be coordinated with the affected installation commander and the Defense Energy Support Center Commander, Alaska, 10470 22nd St, Elmendorf AFB AK 99506, and the Director of Public Works, Real Estate Office on Fort Richardson, AK 99505.

All references to installation commander should be revised to read "Installation Commander/Garrison Commander" as the Army no longer has installation commanders

All required notifications pertaining to U.S. Army military should be addressed to the Garrison Commander and the Director of Public Works.



# EXHIBIT B
# Requirements of the Department of Defense
# Relating to Military Installations

# EXHIBIT B

# Requirements of the Department of Defense Relating to Military Installations

## A. General Requirements

1. Entry upon military land for construction and routine operations and maintenance shall be fully coordinated ten (10) days in advance of entry with the appropriate installation commander having immediate jurisdiction over the property. Entry under emergency conditions shall be coordinated expeditiously with the installation commander.

2. Entry for all activities conducted by Permittees upon all military installations shall be in strict compliance with post/base regulations, both existing or hereafter promulgated. Permittees shall obtain copies of such regulations from the affected installation commanders.

3. Ingress and egress to military installations shall be confined to routes designated by the installation commander. Such commander shall have the right to modify or change the designated routes without advance notice to Permittees. Use of existing military roads or other access routes across subject lands shall be non-exclusive.

4. Permittees shall reimburse the United States, through the Army or Air Force installation affected, for any increased maintenance costs of existing military roads resulting from or attributable to usage by Permittees. These costs shall be in addition to those contemplated by Section 12 of this Agreement.

5. Permittees may construct permanent access and maintenance roads within the Right-of-Way, provided such roads do not interfere with the surface use of the area by the military, except during the construction phase.

6. Roads designated by the installation commander to require intermittent military usage may be closed. The installation commander shall approve in advance all such closures. Any extended closure shall cause the road to be treated as stated in Section 3 of these General Requirements.

7. Any overhead construction relating to the Pipeline shall provide for a minimum of eighteen (18) feet of clearance above the existing road surface.

8. Crossover road ramp construction relative to ramp grades, pipeline cover, sleeves, bridging, signs and the like will conform to the extent practical to the standards of the Alaska State Highway Department.

9. Final route selection, as mapped, and any subsequent changes thereto across military lands will be approved by the affected installation commander prior to construction. The route of the Pipeline shall be located so as to avoid military improvements and the Pipeline shall be constructed a minimum distance of three hundred and twenty-five (325) feet from perimeter fences surrounding ammunition and fuel storage areas.

10. No surface projection of the Pipeline shall be permitted within the drop zone area west of the main development at Fort Greely.

11. Crossing of Army Petroleum Oil and Lubricant (POL) lines will be coordinated with the affected installation commander and the Petroleum Distribution Office (PDO), Support Command, U.S. Army, Alaska (USARAL), Fort Richardson, Alaska.

12. The Pipeline traversing subject lands shall be buried from stations 8400+00 and to 8511+51 and from Stations 8554+70 to 8562+46 as shown on Alyeska Pipeline Service Company Trans Alaska Pipeline System Drawing AL-00-G2, Sheet 45 of 135, Prudhoe Bay to Valdez. Burial depth and technique shall be sufficient to permit surface crossing of the Right-of-Way by heavy tracked and wheeled vehicles at designated locations of existing roads and runways. In the event

263

that subsurface construction cannot be accomplished to the satisfaction of the installation commander, the Pipeline shall be relocated to an area or areas where burial is permissible, or where surface construction can be authorized without interruption of the military mission. Mode of construction between the aforementioned stations shall require the prior consent of the installation commander.

12. Disruption of, or interference with the operation and maintenance of any military pipelines, utility and communication lines is prohibited except by authorization by the installation commander. The Pipeline shall cross all existing intersecting pipelines, conduits, and cables with a minimum clearance of twelve (12) inches.

14. Maximum length of open trench or trenches during construction of the Pipeline over and across the subject land shall not exceed one (1) mile at any given time without the prior approval of the installation commander.

15. Suitable bridged crossings over open trenches shall be provided and maintained where necessary to permit passage of military personnel and vehicles; timely notice of requirements to be furnished by installation commander.

16. In connection with Permittees' duties to repair, replace, and rehabilitate as provided for in Section 13 of this Agreement, where borrowed soil material is necessary to perform such duties, the location and method of obtaining the borrowed material shall be approved by the installation commander. All surplus material not required for fill, backfill or grading shall be spread and leveled in an area designated by said commander.

17. Permittees shall submit legal descriptions of the centerline of the Right-of-Way and permanent access and maintenance roads as constructed in, upon, over and across military-controlled lands to the installation commander within ninety (90) days of the completion of construction within a given military installation. Separate legal descriptions shall be written for each noncontiguous tract of military-controlled land. Said legal descriptions shall be accompanied by preliminary "as built" drawings (and final "as built" drawings shall be furnished within three hundred and sixty (360) days) of said completion of the Pipeline and all permanent access and maintenance roads, together with separate real estate maps in the event sufficient survey information necessary to verify legal descriptions is not contained on the "as built" drawings.

18. Permittees shall install mainline valves sufficient to control Oil flow in the vicinity of populated areas, ammunition/explosive and fuel storage areas.

19. Electrically operated devices installed as part of the Pipeline System which are capable of producing radiations, electromagnetic or other interference, shall be screened, filtered or otherwise suppressed to the extent that such devices will not adversely affect the function of existing communication systems. In the event that physical obstructions, such as towers or buildings are to be erected as part of the Pipeline System, their positioning shall be such that they will not obstruct radiation patterns of line-of-site communication, navigation aids or other communications, electronic or meteorological services.

20. Entry for construction and routine maintenance upon installations or crossings of utility facilities under the control of or utilized by Air Force Communications System/White Alice will be coordinated at least ten (10) days prior to entry with Alaska Communications Region through Headquarters, Alaskan Air Command, Elmendorf Air Force Base. Entry under emergency conditions will be coordinated expeditiously with the Region.

21. Should the Pipeline cross high voltage power transmission lines on Eielson Air Force Base, adequate precaution to the satisfaction of the installation commander will be taken to insure that excessive sag or accidental power line breakage does not create a safety hazard.

22. In the event unexploded munitions are discovered by Permittees during construction activities, the construction activities shall immediately cease in that area. Permittees shall notify the installation commander who will immediately proceed to dispose of the munitions. Construction shall not proceed until authorized by the installation commander.

23. The United States reserves to itself the right to construct, use and maintain across, over and/or

264

under the Right-of-Way, oil and sewer lines, and other facilities, in such manner as not to create an unreasonable interference with the use of the Right-of-Way.

24. Any authorized use or occupation of the subject military lands in connection with the construction, operation, maintenance or termination of the Pipeline System shall be subject to such rules and regulations as the installation commanders may from time to time prescribe. The military departments reserve the right to modify or change conditions to protect military interests as circumstances may from time to time warrant.

25. Transportation, storage and use of explosives during construction of the Pipeline System shall be permitted only in conformance with the applicable installation regulations. Permittees shall secure copies of these regulations from the installation commanders. Use of all explosives on military reservations shall be in strict conformance with U.S. Army Corps of Engineers Safety Manual, and Permittees shall secure copies of this manual from the installation commander. At least thirty (30) days in advance of any underwater blasting, Permittees shall submit to the installation commander a plan for such blasting. The plan shall set forth blasting locations, types and amounts of explosives, date or dates of blasting, and the reason for blasting.

26. The use of pesticides and herbicides shall be in accordance with applicable military regulations. An approved list of pesticides and herbicides, together with application constraints shall be obtained from the installation commander.

27. Permittees shall locate and/or install the Pipeline System in such manner so as to preclude the creation of ground fog and/or ice fog conditions which will in any way decrease the operational capability of the air fields located on Eielson Air Force Base, Fort Wainwright and Fort Greely. Studies or other data supporting the location or construction techniques utilized by Permittees to accomplish the requirements of this condition shall be submitted to the installation commander for review and approval thirty (30) days prior to commencement of construction on the lands herein described.

28. Prior to commencement of construction, Permittees shall submit a schedule of their construction activities on the military installation involved. This schedule shall be in such detail as may be required by the installation commander and during the course of construction this schedule shall be updated and resubmitted as may be required by the installation commander.

## B. Definitions

As used above, the following terms have the meanings indicated:

1. "Installation Commander": The Commanding Officer of a military installation, e.g., Fort Wainwright, Fort Greely, Eielson Air Force Base.

2. "District Engineer": The District Engineer, U.S. Army Engineer District, Alaska, Anchorage, Alaska.

DEPARTMENT OF THE ARMY,
OFFICE OF THE CHIEF OF ENGINEERS,
Washington, D.C., November 23, 1973.

Mr. DAVID E. LINDGREN,
Deputy Solicitor,
Department of the Interior,
Washington, D.C.

DEAR MR. LINDGREN: By letter dated 14 November 1973 we furnished you certain provisions to be included in the right-of-way permit for the construction of the Trans-Alaska Pipeline. These provisions protect military interests where the pipeline right-of-way crosses or otherwise affects military installations.

In this letter we reserved the right to make reasonable modifications or changes from time to time. We are furnishing herewith a revision of Exhibit B which clarifies the intent of various paragraphs and eliminates certain paragraphs in which the provision is already adequately covered in the stipulations of the Final Environmental Impact Statement.

It is the intention of the Department of the Army and the Department of the Air Force to permit the construction, operation, maintenance, and termination of the Trans-Alaska

Pipeline in a way that is compatible with both military operations and the Pipeline System, and that the necessary approvals requested by the Pipeline System will not be unreasonably withheld.

Sincerely,

WOODROW BERGE,
*Director of Real Estate.*

NOTE.—The "revision" referred to above in this letter was modified in certain respects before being incorporated into this Agreement and the Director of Real Estate, D.O.A., Office of Chief of Engineers, has been apprised of the modifications in all material respects.

DEPARTMENT OF THE ARMY,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, D.C., November 14, 1973.*

Mr. DAVID E. LINDGREN,
*Deputy Solicitor,*
*Department of the Interior,*
*Washington, D.C.*

DEAR MR. LINDGREN: This refers to our DAEN–CWZ–W letter dated 9 November 1973 concerning review of your 20 July 1973 draft permit on the construction of the Trans-Alaska Pipeline. We indicated then that the permit should contain conditions to protect military interests where the pipeline right-of-way crosses or otherwise affects military installations.

We have prepared and are inclosing a set of such provisions to be incorporated in the draft permit as Exhibit E.

While these conditions are as accurate as we can foresee at this time, military exigencies and local circumstances may require that reasonable modifications or changes be made from time to time and the discretion to make such changes has been reserved in our proposed Exhibit E.

Sincerely,

WOODROW BERGE,
*Director of Real Estate.*

# EXHIBIT C
# Requirements of the Federal Power Commission
# Relating to Power Sites

# Exhibit C

# Guaranty

as amended by January 2003 Record of Decision, Renewal of the Federal Right-of-Way for the Trans-Alaska Pipeline and Related Facilities

1

## 15. Guaranty

A. Upon being notified by the Secretary to do so, each Permittee shall cause to be delivered to the Secretary a valid and unconditional guaranty of the full and timely payment of all liabilities and obligations of the Permittee to the United States under or in connection with this Agreement or any other agreement, permit or authorization to be issued or granted to the Permittees by the Secretary that relates in whole or in part to all or any part of the Pipeline System.

B. It is recognized that a proposed guarantor of a Permittee may be a corporation (or an individual stockholder thereof), a partnership (or an individual partner thereof), an association that is authorized and empowered to sue and be sued and to hold the title to property in its own name (or an individual associate thereof), a joint stock company that is authorized and empowered to sue and be sued and to hold the title to property in its own name (or any individual participant therein), or a business trust (or an individual settlor thereof), and may or may not directly or indirectly own a legal or beneficial interest in the Permittee whose liabilities and obligations are sought to be guaranteed. In the case of multiple guarantors that are acceptable to the Secretary, each shall be severally liable for only its proportionate share of any sum or payment covered by the guaranty.

C. Each guaranty shall be satisfactory to the Secretary in all respects including, without limitation, the form and substance of the guaranty, the financial capability of a proposed guarantor, the availability of such guarantor to service of process, the availability of the assets of such guarantor with respect to the enforcement of judgments against the guarantor, and the number of guarantors that will be necessary to guarantee all of the liabilities and obligations which will be covered by a particular guaranty; provided, however, that the Secretary shall not unreasonably withhold his approval with respect to a guaranty or guarantor.

D. The Secretary shall have the right at any time, and from time to time, to require the substitution and delivery of a new form of guaranty in the event that an outstanding guaranty is held to be invalid or unenforceable, in whole or in part, by a court of competent jurisdiction or, that the controlling law shall, by statute or judicial decision, be so altered as to impair, prevent or nullify the enforcement or exercise of any right or option of the United States under an outstanding guaranty; provided, however, that the outstanding guaranty (to the extent of its validity or enforceability, if any) shall continue in full force and effect with respect to any claim, suit, accrued liability or defense thereunder that exists at the time of substitution; provided further, that the new form of guaranty, in each such case, shall be required as to all Permittees that at the time of substitution have delivered, or are required to deliver, a guaranty.

E. Each guaranty shall be accompanied by such certificates and opinions of legal counsel as the Secretary may require to establish its validity. The guaranty shall include an appointment of an agent for service of process that is satisfactory to the Secretary.

F. Once every three years and more frequently if, in the opinion of the Secretary, the circumstances so warrant, the Authorized Officer shall conduct an audit of the financial resources at the disposal of the Owner Entities, or other guarantors, that provide the Section 15 guaranties. If the Secretary determines by the audit that the Section 15 guaranties are inadequate, the Secretary may require additional financial assurances and guaranties.

3

# EXHIBIT C
# Requirements of the Federal Power Commission Relating to Power Sites

A. With respect to any Federal Lands that are classified, withdrawn or reserved for power purposes, the grant of the Right-of-Way is, in accordance with the findings of the Federal Power Commission (Docket No. DA–112–Alaska, U.S. Department of the Interior, issued on December 6, 1973), made subject to:

* * * the retention of prior rights for reservoir or power development, and subject to the condition that in the event the said land is required for such purposes, any improvements or structures placed thereon which shall be found to interfere with such development shall be removed or relocated as may be necessary to eliminate interference with reservoir or power development at no cost to the United States, its permittees or licensees.

B. The Permittees herein shall not be deemed to be "permittees or licensees" within the meaning of the aforesaid findings of the Federal Power Commission.

C–1

# EXHIBIT D
# Stipulations for the Agreement and Grant of Right-of-Way
# for the Trans-Alaska Pipeline

# EXHIBIT D

# Stipulations for the Agreement and Grant of Right-of-Way for the Trans-Alaska Pipeline

Table of Contents

| | | Page |
|---|---|---|
| 1 | GENERAL | |
| 1.1 | Definitions | D-2 |
| 1.2 | Responsibilities | D-4 |
| 1.3 | Authorized Officer | D-5 |
| 1.4 | Common Agent of Permitees | D-5 |
| 1.5 | Authority of Representatives of Authorized Officer and Common Agent; Orders of Authorized Officer | D-5 |
| 1.6 | Orders and Notices | D-6 |
| 1.7 | Notices To Proceed | D-6 |
| 1.8 | Changes in Conditions | D-8 |
| 1.9 | Antiquities and Historical Sites | D-8 |
| 1.10 | Completion of Use | D-8 |
| 1.11 | Public Improvements | D-9 |
| 1.12 | Regulation of Public Access | D-9 |
| 1.13 | Electronically Operated Devices | D-9 |
| 1.14 | Camping, Hunting, Fishing, and Trapping | D-9 |
| 1.15 | Small Craft Passage | D-9 |
| 1.16 | Protection of Survey Monuments | D-9 |
| 1.17 | Fire Prevention and Suppression | D-10 |
| 1.18 | Surveillance and Maintenance | D-10 |
| 1.19 | Housing and Quarters | D-10 |
| 1.20 | Health and Safety | D-10 |
| 1.21 | Conduct of Operations | D-10 |
| 1.22 | Applicability of Stipulations | D-10 |
| 2 | ENVIRONMENTAL | |
| 2.1 | Environmental Briefing | D-10 |
| 2.2 | Pollution Control | D-11 |
| 2.3 | Buffer Strips | D-11 |
| 2.4 | Erosion Control | D-11 |
| 2.5 | Fish and Wildlife Protection | D-12 |
| 2.6 | Material Sites | D-13 |
| 2.7 | Clearing | D-13 |
| 2.8 | Disturbance of Natural Waters | D-13 |
| 2.9 | Off Right-of-Way Traffic | D-13 |
| 2.10 | Aesthetics | D-13 |
| 2.11 | Use of Explosives | D-14 |
| 2.12 | Restoration | D-14 |
| 2.13 | Reporting of Oil Discharges | D-14 |
| 2.14 | Contingency Plans | D-14 |
| 3 | TECHNICAL | |
| 3.1 | General | D-15 |
| 3.2 | Pipeline System Standards | D-15 |
| 3.3 | Construction Mode Requirements | D-15 |
| 3.4 | Earthquakes and Fault Displacements | D-16 |
| 3.5 | Slope Stability | D-17 |
| 3.6 | Stream and Flood Plain Crossings and Erosion | D-17 |
| 3.7 | Sea Waves | D-17 |
| 3.8 | Glacier Surges | D-17 |
| 3.9 | Construction and Operation | D-18 |
| 3.10 | Pipeline Corrosion | D-18 |
| 3.11 | Containment of Oil Spills | D-18 |

## 1. GENERAL

### 1.1. Definitions

1.1.1. As used in these Stipulations and elsewhere in this "Agreement and Grant of Right-of-Way for Trans-Alaska Pipeline", the following terms have the following meanings:

1.1.1.1. "Access Roads" means the roads constructed or used by Permittees within, or for ingress to and egress from, the Pipeline System. It does not include the proposed State highway from the Yukon River to Prudhoe Bay, Alaska, or any other State highway.

1.1.1.2. "Affiliate" means (a) a Subsidiary of a Parent, or (b) the Parent of the Subsidiary, or (c) in the case of a corporate Subsidiary, one or more corporations that share the Parent with the Subsidiary by reason of the fact that all of the outstanding capital stock of each of the corporations that share the Parent is owned directly or indirectly by the Parent, or (d) in the case of Sohio Pipe Line Company, any corporation of which all of the outstanding capital stock is owned directly or indirectly by The Standard Oil Company, an Ohio corporation, or The British Petroleum Company, Limited, a United Kingdom corporation, or both.

1.1.1.3. "Authorized Officer" means the employee of the Department, designated by the Secretary, to whom the Secretary delegates the authority to act on behalf of the Secretary pursuant to this Agreement or such other Person to whom the Authorized Officer redelegates his authority pursuant to the delegation of authority to the Authorized Officer from the Secretary.

1.1.1.4. "Business Entity" means an artificial legal entity, formed to conduct one or more ventures for profit, or not for profit, that is duly authorized and empowered to sue and be sued, and to hold the title to property, in its own name.

1.1.1.5. "Category 1(c) Lands" means lands selected by the State and not tentatively approved and not withdrawn under section 11(a)(2) of the Alaska Native Claims Settlement Act.

1.1.1.6. "Category 1(d) Lands" means lands selected by the State and not tentatively approved and which were withdrawn under section 11(a)(2) of the Alaska Native Claims Settlement Act but which are not available for village or regional selection under section 22(1) of the Alaska Native Claims Settlement Act, 85 Stat. 713, 43 U.S.C. § 1621 (1970).

1.1.1.7. "Commissioning" means the acceptance and custody by Permittees of the first Oil tendered for shipment through the Pipeline after provision for line fill and tank bottoms. Permittees shall, by written notice, promptly advise the Authorized Officer of the date upon which such acceptance and custody takes place.

1.1.1.8. "Construction Mode" means the type of construction to be employed generally with regard to the Pipeline (e.g., whether the pipe will be buried or elevated).

1.1.1.9. "Construction Segment" means a portion of the Pipeline System that constitutes a complete physical entity or stage, in and of itself, which can be constructed, independently of any other portion or stage of the Pipeline System, in a designated area or between two given geographical points reasonably proximate to one another. It is not to be construed as referring to the entirety of the Pipeline or of the Pipeline System.

1.1.1.10. "Construction Subdivision" means any one of approximately six (6) large, lineal sections of the route of the Pipeline as determined by the Authorized Officer after consulting with Permittees.

1.1.1.11. "Department" means the Department of the Interior of the United States, or any successor department or agency.

1.1.1.12. "Final Design" comprises completed design documents. It shall include contract plans and specifications; proposed Construction Modes; operational requirements necessary to justify designs; schedules; design analysis (including sample calculations for each particular design feature); all functional and engineering criteria; summaries of tests conducted and their results; and other considerations pertinent to design and project life expectancy.

1.1.1.13. "Involuntary Passage of Title" means a Transfer that is made by the exercise of a power of sale primarily for the benefit of creditors, or in accordance with the judgment, order or decree of a court in bankruptcy, eminent domain or other similar proceedings, or pursuant to any act or resolution of a sovereign legislative body directing a lawful taking of property.

1.1.1.14. "Mapping Segment" means a Construction Subdivision, or any part thereof, as determined by the Authorized Officer; provided, however, that with respect to a pump station, basic communication site, remote control valve site, mechanical refrigeration equipment site and

any other like Related Facility, a Mapping Segment means the entire site.

**1.1.1.15.** "Notice to Proceed" means a permission to initiate Pipeline System construction that is issued in accordance with Stipulation 1.7.

**1.1.1.16.** "Oil" means unrefined liquid hydrocarbons, including gas liquids.

**1.1.1.17.** "Parent" means a Person or Business Entity whose direct or indirect legal or beneficial ownership interest in, or with respect to, a Transferee or Permittee enables that Person or Business Entity to control the Transferee's or the Permittee's management or policies.

**1.1.1.18.** "Permittee" means any one of the Permittees.

**1.1.1.19.** "Permittees" means the Original Permittees, or their respective successors or assigns holding an undivided ownership interest in the Right-of-Way to the extent sanctioned by the Secretary in accordance with the provisions of this Agreement.

**1.1.1.20.** "Person" means a natural person.

**1.1.1.21.** "Persons" means more than one Person.

**1.1.1.22.** "Pipeline System" means all facilities located in Alaska used by Permittees in connection with the construction, operation, maintenance or termination of the Pipeline. This includes, but is not limited to, the Pipeline, storage tanks, Access Roads, communications sites, airfields, construction camps, materials sites, bridges, construction equipment and facilities at the origin station and at the Valdez terminal. This does not include facilities used in connection with production of oil or gathering systems, nor does it include such things as urban administrative offices and similar facilities which are only indirectly involved.

**1.1.1.23.** "Preliminary Design" means the establishment of project criteria (i.e., construction, including design, and operational concepts) necessary to delineate the project to be constructed. As a minimum it includes the following: design criteria and project concepts; evaluation of field data used to establish the design criteria; drawings showing functional and technical requirements; reports of all test data compiled during the data collection and preliminary design evaluation; standard drawings (if applicable) or drawings to support structural design concepts of each typical facility or structure; proposed Construction Modes; outline project specifications; sample

computations to support the design concepts and bases for project siting.

**1.1.1.24. A.** "Related Facilities" means those structures, devices, improvements, and sites, the substantially continuous use of which is necessary for the operation or maintenance of the Oil transportation pipeline, including:

   (1) line pipe and supporting structures;

   (2) pump stations, including associated buildings, heliports, structures, yards and fences;

   (3) valves and other control devices, and structures housing them;

   (4) monitoring and communications devices, and structures housing them;

   (5) surge and storage tanks, and related containment structures;

   (6) bridges;

   (7) terminals, including associated buildings, heliports, structures, yards, docks, and fences;

   (8) a gas fuel line and electrical power lines necessary to serve the Pipeline;

   (9) retaining walls, berms, dikes, ditches, cuts and fills, including hydraulic control structures;

   (10) storage buildings and structures, and areas for storage of supplies and equipment;

   (11) administrative buildings;

   (12) cathodic protection devices;

   (13) mechanical refrigeration equipment; and

   (14) such other facilities as the Authorized Officer shall determine to be Related Facilities.

**B.** "Related Facilities" not authorized by this Agreement include roads and airports. Authorizations for such Related Facilities shall be given by other instruments.

**C.** "Related Facilities" does not mean those structures, devices, improvements, sites, facilities or areas, the use of which is temporary in nature such as those used only for construction purposes. Among such are: temporary camps; temporary landing strips; temporary bridges; temporary Access Roads; temporary communications sites; temporary storage sites; disposal sites; and construction use areas.

D–3

275

**1.1.1.25.** "Secretary" means the Secretary of the Interior of the United States, his delegate or lawful successor.

**1.1.1.26.** "Secretary of Labor" means the Secretary of Labor of the United States, his delegate or lawful successor.

**1.1.1.27.** "Subsidiary" means a Business Entity, that may or may not be a Permittee; the management and policies of which are controlled by a Parent directly or indirectly through one or more intermediaries.

**1.1.1.28.** "Transfer" means the passage of any right, title or interest in property (real, personal or mixed) by sale, grant, assignment, operation of law or otherwise, and whether voluntary or not.

**1.1.1.29.** "Transferee" means any Person, Business Entity or governmental or quasi-governmental body or authority in which there is, or there is proposed to be, vested any right, title, or interest of a Permittee in the Agreement or the Right-of-Way pursuant to a Transfer.

**1.1.1.30.** "Transferor" means any Permittee that makes, or that seeks to make, a Transfer of any right, title or interest in this Agreement or the Right-of-Way.

**1.1.2.** Terms defined elsewhere in this Agreement:

| Term | Page |
|---|---|
| 1. Agreement | 1 |
| 2. District Engineer | B-3 |
| 3. Effective Date | 1 |
| 4. Federal Lands | 2 |
| 5. Fish Spawning Beds | D-12 |
| 6. Installation Commander | B-3 |
| 7. Oil Spill Control | D-14 |
| 8. Operating Agreement | 25 |
| 9. Operational Design Level | D-16 |
| 10. Original Permittees | 1 |
| 11. Ownership Agreements | 25 |
| 12. Pipeline | 3 |
| 13. Put-to-Bed | D-9 |
| 14. Right-of-Way | 2 |
| 15. Segregated Facilities | 21 |
| 16. Standard Project Flood | D-17 |
| 17. Standdown Period | 16 |
| 18. Stipulations | 3 |
| 19. Thaw Stable Sand and Gravel | D-15 |
| 20. Use Charge | 5 |
| 21. Vessel | 14 |
| 22. Waste | D-11 |

## 1.2. Responsibilities

**1.2.1.** Except where the approval of the Authorized Officer is required before Permittees may commence a particular operation, neither the United States nor any of its agents or employees agrees, or is in any way obligated, to examine or review any plan, design, specification, or other document which may be filed with the Authorized Officer by Permittees pursuant to these Stipulations.

**1.2.2.** The absence of any comment by the Authorized Officer or any other agent or employee or contractor of the United States with respect to any plan, design, specification, or other document which may be filed by Permittees with the Authorized Officer shall not be deemed to represent in any way whatever any assent to, approval of, or concurrence in such plan, design, specification, or other document or of any action proposed therein.

**1.2.3.** With regard to the construction, operation, maintenance and termination of the Pipeline System: (1) Permittees shall ensure full compliance with the provisions of this Agreement, including these Stipulations, by their agents, employees and contractors (including subcontractors of any tier), and the employees of each of them. (2) Unless clearly inapplicable, the requirements and prohibitions imposed upon Permittees by these Stipulations are also imposed upon each Permittee's agents, employees, contractors, and subcontractors, and the employees of each of them. (3) Failure or refusal of a Permittee's agents, employees, contractors, subcontractors, or their employees to comply with these Stipulations shall be deemed to be the failure or refusal of the Permittee. (4) Each Permittee shall require its agents, contractors and subcontractors to include these Stipulations in all contracts and subcontracts which are entered into by any of them, together with a provision that the other contracting party, together with its agents, employees, contractors and subcontractors, and the employees of each of them, shall likewise be bound to comply with these Stipulations.

**1.2.4.** Permittees shall make separate application, under applicable statutes and regulations, for authorization to use or occupy Federal Lands in connection with the Pipeline System where the lands are not within the Right-of-Way granted by this Agreement.

D-4

276

### 1.3. Authorized Officer

1.3.1. For purposes of information and review, the Authorized Officer may call upon Permittees at any time to furnish any or all data related to construction, operation, maintenance and termination activities undertaken in connection with the Pipeline System.

1.3.2. The Authorized Officer may require Permittees to make such modification of the Pipeline System, without liability or expense to the United States, as he deems necessary to: protect or maintain stability of geologic materials; protect or maintain integrity of the Pipeline System; prevent serious and irreparable harm to the environment (including but not limited to fish or wildlife populations, or their habitats); or remove hazards to public health and safety.

### 1.4. Common Agent of Permittees

1.4.1. Permittees, and each of them, have appointed Alyeska Pipeline Service Company as their common agent to design and construct the Pipeline System under and pursuant to an agreement entitled "Agreement for the Design and Construction of the Trans Alaska Pipeline System," dated August 27, 1970, and intend to appoint Alyeska Pipeline Service Company as their common agent to operate, maintain and terminate the Pipeline System under and generally pursuant to an Operating Agreement referred to in Section 5.1 of the "Trans Alaska Pipeline System Agreement," dated August 27, 1970. A Power of Attorney has been filed with the Department of the Interior by each Permittee appointing Alyeska Pipeline Service Company the true and lawful agent and attorney-in-fact on behalf of each Permittee with full power and authority to execute and deliver any and all instruments in connection with the design, construction, or operation of the Pipeline System. Within the scope of such contractual authority, such agent shall represent Permittees, and each of them, with respect to this Agreement. Such agent is and shall be empowered on behalf of Permittees, and each of them, to accept service of any process, pleadings or other documents in connection with any court or administrative proceeding relating in whole or in part to this Agreement or to all or any part of the Pipeline System and to which the United States shall be a party.

1.4.2. Permittees shall maintain a common agent for the construction, operation, maintenance and termination of the Pipeline System at all times during this Agreement. Such agent shall be a citizen of the United States, or if a corporation, a domestic corporation. Such agent shall be a resident of Alaska, or if a corporation, shall be duly authorized to conduct business in Alaska. Permittees shall cause such agent to maintain in the City of Anchorage, Alaska, at all times during this Agreement an office for the delivery of all documents, orders, notices and other written communications, as provided for in Stipulations 1.4.1. and 1.6.

1.4.3. In the event Permittees substitute a new common agent at any time, Permittees shall give prompt written notice to the Authorized Officer of such substitution, the name and office address in Anchorage, Alaska, of the new agent, and a copy of Permittees' agreement with the new agent. The United States shall be entitled to rely on each appointment until such time as a notice of the substitution of a new common agent takes effect. Each such notice shall not take effect until two (2) full working days after (and not including) the date that it was received by the Authorized Officer.

1.4.4. Upon the Transfer by any Permittee of any right, title or interest of Permittee in the Right-of-Way or this Agreement, the Transferee shall promptly execute and deliver to the Authorized Officer such documents as may be required to evidence the Transferee's appointment and ratification of the then-acting common agent.

### 1.5. Authority of Representatives of Authorized Officer and Common Agent; Orders of Authorized Officer.

1.5.1. No order or notice given to Permittees on behalf of the Secretary by the Authorized Officer or any other Person shall be effective as to Permittees unless prior written notice of the delegation of authority to issue such order or notice has been given to Permittees in the manner provided in Stipulation 1.6.

1.5.2. Permittees shall comply with each and every lawful order directed to them and that is issued by the Secretary, the Authorized Officer or by any duly authorized representative of the Authorized Officer.

1.5.3. Permittees shall cause the common agent of Permittees to maintain a sufficient number of its duly authorized representatives to allow for the prompt delivery to Permittees, or any of them, of all notices, orders and other communications,

written or oral, of the Secretary or Authorized Officer. Each of the said representatives shall be registered with the Authorized Officer, and shall be appropriately identified in such manner and on such terms as the Authorized Officer shall prescribe. Permittees shall cause the common agent of Permittees to consult with the Authorized Officer at any time regarding the number and location of such representatives of the common agent.

### 1.6. Orders and Notices

1.6.1. All decisions, determinations, authorizations, approvals, consents, demands or directions that shall be made or given by the Secretary or the Authorized Officer to any one or more of Permittees in connection with the enforcement or administration of this Agreement, any applicable law or regulation, or any other agreement, permit or authorization relating in whole or in part to all or any part of the Pipeline System shall, except as otherwise provided in Stipulation 1.6.2. of this Stipulation, be in the form of a written order or notice.

1.6.2. If, in the judgment of the Secretary or the Authorized Officer, there is an emergency that necessitates the immediate issuance to any one or more of Permittees of an order or notice, such order or notice may be given orally, *provided, however*, that subsequent confirmation of the order or notice shall be given in writing as rapidly as is practicable under the circumstances.

1.6.3. All written orders, notices or other written communications, including telegrams, relating to any subject (and regardless of whether they do or do not relate to the design or construction of the Pipeline System) that are addressed to any one or more of Permittees shall be deemed to have been delivered to and received by the addressee or addressees when the order, notice or other communication has been delivered: (1) either by messenger during normal business hours or by means of registered or certified United States mail, postage prepaid, return receipt requested, to the office of the common agent of Permittees at 1815 South Bragaw Street, Anchorage, Alaska 99504, or (2) personally to any authorized representative of the common agent.

1.6.4. All written notices and communications, including telegrams, of any one or more of Permittees that are addressed to the Secretary shall be deemed to have been delivered to and received by the Secretary when the notice or communication

has been delivered, either by messenger during normal business hours or by means of registered or certified United States mail, postage prepaid, return receipt requested, to the Secretary personally or to Office Room No. 6151 in the Department of the Interior Building, 18th & C Streets, Northwest, Washington, D.C. 20240.

1.6.5. All written notices and communications of any one or more of Permittees that are addressed to the Authorized Officer shall be deemed to have been delivered and received by the addressee when the notice or communication has been delivered, either by messenger during normal business hours or by means of registered or certified United States mail, postage prepaid, return receipt requested, to the Authorized Officer personally or to Office Room No. 405, 555 Cordova Street, Anchorage, Alaska 99504.

1.6.6. The United States or Permittees, by written notice to the other, may change the office address to which written notices, orders, or other written communications may be addressed and delivered thereafter, subject, however, to the provisions of Stipulation 1.4.

1.6.7. The regulations of the Department relating to notices or other communications by mail (43 CFR 1810.2) shall not be applicable to this Agreement.

### 1.7. Notices To Proceed

1.7.1. Permission to construct.

1.7.1.1. Permittees shall not initiate any construction of the Pipeline System without prior written permission of the Authorized Officer. Such permission shall be given solely by means of a written Notice to Proceed issued by the Authorized Officer. Each Notice to Proceed shall authorize construction only as therein expressly stated and only for the particular Construction Segment therein described.

1.7.1.2. The Authorized Officer shall issue a Notice to Proceed only when in his judgment the construction (including design) and operation proposals are in conformity with the provisions of these Stipulations.

1.7.1.3. By written notice, the Authorized Officer may revoke in whole or in part any Notice to Proceed which has been issued when in his judgment unforeseen conditions later arising require alterations in the Notice to Proceed in order to: protect or maintain stability of geologic materials; protect or maintain integrity of the Pipeline System; prevent serious and irreparable harm to the

D-6

environment (including but not limited to fish or wildlife populations, or their habitats) ; or remove hazards to public health and safety.

1.7.1.4. Prior to submission of any Preliminary Designs or applications for any Notice to Proceed, Permittees and the Authorized Officer shall agree to a schedule for the time, scope and quantity of such submissions and applications. The purpose of such schedule is to assure that Permittees' submissions and applications shall be reasonable in scope, and filed in a reasonable time frame, insofar as the workload thereby imposed on the Authorized Officer is concerned. Submittals and applications shall be filed in accordance with said schedule, and the Authorized Officer may refuse to consider any that are not so filed. The schedule may be reviewed and revised from time to time as may be agreed upon by Permittees and the Authorized Officer.

1.7.2. Preliminary Design Submissions

1.7.2.1. Prior to applying for a Notice to Proceed for any Construction Segment, Permittees shall submit the Preliminary Design for that Segment to the Authorized Officer for approval. Where appropriate, each submission shall include the criteria which justify the selection of the Construction Modes. The Authorized Officer shall expeditiously review each submission and shall do so within thirty (30) days from the date of his receipt of the submission. The Authorized Officer may request additional information if he deems it necessary.

1.7.2.2. In appropriate cases, the Authorized Officer may waive the requirement that a Preliminary Design be submitted. In this circumstance, Permittees may proceed to apply for a Notice to Proceed in accordance with Stipulation 1.7.4.

1.7.3. Summary Network Analysis Diagram

1.7.3.1. Prior to Final Design submissions, Permittees shall submit a summary network analysis diagram for the entire project to the Authorized Officer. The summary network analysis diagram shall be time-scaled and shall include all activities and contingencies which may reasonably be anticipated in connection with the project. The summary network analysis diagram shall include:

(1) Data collection activities;
(2) Submittal and approval activities;
(3) Pre-construction, construction and post-construction activities; and
(4) Other pertinent data.

1.7.3.2. The summary network analysis diagram shall be updated at thirty (30) day intervals, as significant changes occur, or as otherwise approved in writing by the Authorized Officer.

1.7.4. Application for Notice to Proceed

1.7.4.1. Permittees may apply for a Notice to Proceed for only those Construction Segments for which the Preliminary Design has been approved in writing by the Authorized Officer or a waiver pursuant to Stipulation 1.7.2.2 has been issued in writing by the Authorized Officer.

1.7.4.2. Before applying for a Notice to Proceed for a Construction Segment, Permittees shall, in such manner as shall be acceptable to the Authorized Officer, by survey, locate and clearly mark on the ground the proposed centerline of the line pipe to be located in the Mapping Segment within which the Construction Segment is to be constructed and the location of all Related Facilities proposed to be constructed in the Mapping Segment.

1.7.4.3. Each application for a Notice to Proceed shall be supported by:

(1) A Final Design.
(2) All reports and results of environmental studies conducted or considered by Permittees.
(3) All data necessary to demonstrate compliance with the terms and conditions of these Stipulations with respect to that particular Construction Segment.
(4) A detailed network analysis diagram for the Construction Segment, including: Permittees' work schedules; consents, permits or authorizations required by State and Federal agencies and their interrelationships; design and review periods; data collection activities; and construction sequencing. The detailed network analysis diagram shall be updated as required to reflect current status of the project.
(5) A map or maps, prepared in such manner as shall be acceptable to the Authorized Officer, depicting the proposed location in the Mapping Segment within which the Construction Segment is to be constructed of: (1) the boundaries of all contiguous temporary use areas, and (2) all improvements, buried or above-ground, that are to be constructed within the Mapping Segment. The Authorized

Officer shall not issue a Notice to Proceed with construction until he has approved all relevant locations on the ground and temporary boundary markers have been set by Permittees to the satisfaction of the Authorized Officer.

(6) Such other data as may be requested by the Authorized Officer either before submission of the application for a Notice to Proceed or at any time during the review period.

1.7.4.4. During review of an application for a Notice to Proceed, the relevant portion of the route of the Pipeline may be modified by the Authorized Officer, if, in his judgment, environmental conditions or new technological developments warrant the modifications. If, during construction, adverse physical conditions are encountered that were not known to exist, or that were known to exist but their significance was not fully appreciated when the Authorized Officer issued a Notice to Proceed for the portion of the Mapping Segment in which the physical conditions are encountered, the Authorized Officer may authorize deviations from the initially approved location of the Pipeline to another location along the same general route of the Pipeline at the point or points where the physical conditions are encountered, including adequate room for structurally sound transition. A deviation shall not be constructed without the prior written approval of the Authorized Officer and, if so approved, shall conform in all respects to the provisions of the approval.

1.7.4.5. The Authorized Officer shall review each application for a Notice to Proceed and all data submitted in connection therewith within ninety (90) days. Said ninety (90) day period shall begin from the later of the following dates:

(1) Date of receipt by the Authorized Officer of an application for a Notice to Proceed.

(2) Date of receipt by the Authorized Officer of the last submittal of additional data pursuant to this Stipulation.

1.7.4.6. If the Authorized Officer requires Permittees to submit additional data on one or more occasions, the review period shall begin from the date of receipt by the Authorized Officer of the last submittal.

### 1.8. Changes in Conditions

1.8.1. Unforeseen conditions arising during construction, operation, maintenance or termination of the Pipeline System may make it necessary to revise or amend these Stipulations to control or prevent damage to the environment or hazards to public health and safety. In that event, Permittees and the Authorized Officer shall agree as to what revisions or amendments shall be made. If they are unable to agree, the Secretary shall have final authority to determine the matter.

### 1.9. Antiquities and Historical Sites

1.9.1. Permittees shall engage an archeologist approved by the Authorized Officer to provide surveillance and inspection of the Pipeline System for archeological values.

1.9.2. If, in connection with any operation under this Agreement, or any other Agreement issued in connection with the Pipeline System, Permittees encounter known or previously unknown paleontological, archeological, or historical sites, Permittees shall immediately notify the Authorized Officer and said archeologist. Permittees' archeologist shall investigate and provide an on-the-ground opinion regarding the protection measures to be undertaken by Permittees. The Authorized Officer may suspend that portion of Permittees' operations necessary to preserve evidence pending investigation of the site.

1.9.3. Six copies of all survey and excavation reports shall be filed with the Authorized Officer.

### 1.10. Completion of Use

1.10.1. Upon completion of the use of all, or a very substantial part, of the Right-of-Way or other portion of the Pipeline System, Permittees shall promptly remove all improvements and equipment, except as otherwise approved in writing by the Authorized Officer, and shall restore the land to a condition that is satisfactory to the Authorized Officer or at the option of Permittees pay the cost of such removal and restoration. The satisfaction of the Authorized Officer shall be stated in writing. Where approved in writing by the Authorized Officer, buried pipe may be left in place, provided all oil and residue are removed from the pipe and the ends are suitably capped.

1.10.2. All areas that do not constitute all, or a very substantial part of the Right-of-Way or other portion of the Pipeline System, utilized pursuant to authorizations issued in connection with the

Pipeline System, shall be Put-to-Bed by Permittees upon completion of their use unless otherwise directed by the Authorized Officer. Put-to-Bed is used herein to mean that Access Roads, material sites and other areas shall be left in such stabilized condition that erosion will be minimized through the use of adequately designed and constructed waterbars, revegetation and chemical surface control; that culverts and bridges shall be removed by Permittees in a manner satisfactory to the Authorized Officer, and that such roads, sites and areas shall be closed to use. Permittees' rehabilitation plans shall be approved in writing by the Authorized Officer prior to termination of use of any such road, or any part thereof, in accordance with Stipulation 2.12.

### 1.11. Public Improvements

1.11.1. Permittees shall protect existing telephone, telegraph and transmission lines, roads, trails, fences, ditches and like improvements during construction, operation, maintenance and termination of the Pipeline System. Permittees shall not obstruct any road or trail with logs, slash, or debris. Damage caused by Permittees to public utilities and improvements shall be promptly repaired by Permittees to a condition which is satisfactory to the Authorized Officer.

### 1.12. Regulation of Public Access

1.12.1. During construction or termination activities, Permittees may regulate or prohibit public access to or upon any Access Road being used for such activity. At all other times, Permittees shall permit free and unrestricted public access to and upon Access Roads, except that with the written consent of the Authorized Officer, Permittees may regulate or prohibit public access and vehicular traffic on Access Roads as required to facilitate operations or to protect the public, wildlife and livestock from hazards associated with operation and maintenance of the Pipeline System. Permittees shall provide appropriate warnings, flagmen, barricades, and other safety measures when Permittees are using Access Roads, or regulating or prohibiting public access to or upon Access Roads.

1.12.2. During construction of the Pipeline System, Permittees shall provide alternative routes for existing roads and trails as determined by the Authorized Officer whether or not these roads or trails are recorded.

1.12.3. Permittees shall make provisions for suitable permanent crossings for the public where the Right-of-Way or Access Roads cross existing roads, foot-trails, winter trails, or other rights-of-way.

1.12.4. After completion of construction of the Pipeline System, and with the concurrence of Permittee, the Authorized Officer may designate areas of the Right-of-Way to which the public shall have free and unrestricted access.

### 1.13. Electronically Operated Devices

1.13.1. Permittee shall screen, filter, or otherwise suppress any electronically operated devices that are installed as part of the Pipeline System which are capable of producing electromagnetic interference radiations so that such devices will not adversely affect the functioning of existing communications systems or navigational aids. In the event that structures such as towers or buildings are to be erected as a part of the Pipeline System, their positioning shall be such that they will not obstruct radiation patterns of line-of-sight communications systems, navigational aids, or similar systems.

### 1.14. Camping, Hunting, Fishing and Trapping

1.14.1. Permittees shall post the Right-of-Way against camping, hunting, fishing, trapping and shooting within the Right-of-Way. Permittees shall prohibit their employees, agents, contractors, subcontractors, and their employees, from engaging in such activities.

1.14.2. Permittees shall inform their employees, agents, contractors, subcontractors, and their employees, of applicable laws and regulations relating to hunting, fishing, and trapping.

### 1.15. Small Craft Passage

1.15.1. The creation of any permanent obstruction to the passage of small craft in streams is prohibited.

### 1.16. Protection of Survey Monuments

1.16.1. Permittees shall mark and protect all geodetic survey monuments encountered during the construction, operation, maintenance and termination of the Pipeline System. These monuments are not to be disturbed; however, if such a disturbance occurs, the Authorized Officer shall be immediately notified thereof in writing.

1.16.2. If any land survey monuments, corners, or accessories (excluding geodetic survey monuments) are destroyed, obliterated or damaged, Permittees shall employ a qualified land surveyor to reestablish or restore same in accordance with the "Manual of Instruction for the Survey of Pub-

lic Lands" and shall record such survey in the appropriate records. Additional requirements for the protection of monuments, corners, and bearing trees may be prescribed by the Authorized Officer.

1.17. Fire Prevention and Suppression

1.17.1. Permittees shall promptly notify the Authorized Officer and take all measures necessary or appropriate for the prevention and suppression of fires in accordance with 43 CFR 2801.1–5(d). Permittees shall comply with the instructions and directions of the Authorized Officer concerning the use, prevention and suppression of fires. Use of open fires in connection with construction of the Pipeline System is prohibited unless authorized in writing by the Authorized Officer.

1.18. Surveillance and Maintenance

1.18.1. During the construction, operation, maintenance and termination of the Pipeline System, Permittees shall conduct a surveillance and maintenance program applicable to the subarctic and arctic environment. This program shall be designed to: (1) provide for public health and safety; (2) prevent damage to natural resources; (3) prevent erosion; and (4) maintain Pipeline System integrity.

1.18.2. Permittees shall have a communication system that ensures the transmission of information required for the safe operation of the Pipeline System.

1.18.3. Permittees shall maintain complete and up-to-date records on construction, operation, maintenance and termination activities performed in connection with the Pipeline System. Such records shall include surveillance data, leak and break records, necessary operational data, modification records and such other data as the Authorized Officer may require.

1.18.4. Permittees shall provide and maintain Access Roads and airstrips, the number and location of which shall be approved by the Authorized Officer, to ensure that Permittees' maintenance crews and Federal and State representatives shall have continuing access to the Pipeline System.

1.19. Housing and Quarters

1.19.1. Permittees shall furnish, on a reimbursable basis, such representatives of the United States as may be designated by the Authorized Officer with adequate meals, living quarters and office space, reasonable use of Permittees' communica-

tions systems, and reasonable surface and air transportation during the construction, operation, maintenance and termination of the Pipeline System. Whenever possible, Permittees shall be notified in writing by the Authorized Officer in advance regarding the number of persons for whom such services and facilities will be required.

1.20. Health and Safety

1.20.1. Permittees shall take all measures necessary to protect the health and safety of all persons affected by their activities performed in connection with the construction, operation, maintenance or termination of the Pipeline System, and shall immediately abate any health or safety hazards. Permittees shall immediately notify the Authorized Officer of all serious accidents which occur in connection with such activities.

1.21. Conduct of Operations

1.21.1. Permittees shall perform all Pipeline System operations in a safe and workmanlike manner so as to ensure the safety and integrity of the Pipeline System, and shall at all times employ and maintain personnel and equipment sufficient for that purpose. Permittees shall immediately notify the Authorized Officer of any condition, problem, malfunction, or other occurrence which in any way threatens the integrity of the Pipeline System.

1.22. Applicability of Stipulations

1.22.1. Nothing in these Stipulations shall be construed as applying to activities of Permittees that have no relation to the Pipeline System.

1.22.2. Nothing in these Stipulations shall be construed to affect any right or cause of action that otherwise would be available to Permittees against any person other than the United States.

2. ENVIRONMENTAL

2.1. Environmental Briefing

2.1.1. Prior to, and during, construction of the Pipeline System, Permittees shall provide for environmental and other pertinent briefings for construction and other personnel by such Federal employees as may be designated by the Authorized Officer. Permittees shall arrange the time, place and attendance for such briefings upon request by the Authorized Officer. Permittees shall bear all costs of such briefings other than salary, per diem, subsistence, and travel costs of Federal employees. In addition, Permittees shall separately arrange with the State of Alaska for such similar briefings as the State may desire.

## 2.2. Pollution Control

### 2.2.1. General

2.2.1.1. Permittees shall conduct all activities associated with the Pipeline System in a manner that will avoid or minimize degradation of air, land and water quality. In the construction, operation, maintenance and termination of the Pipeline System, Permittees shall perform their activities in accordance with applicable air and water quality standards, related facility siting standards, and related plans of implementation, including but not limited to standards adopted pursuant to the Clean Air Act, as amended, 42 U.S.C. § 1857 *et seq.*, and the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1321 *et seq.*

### 2.2.2. Water and Land Pollution

2.2.2.1. Permittees shall comply with applicable "Water Quality Standards" of the State of Alaska as approved by the Environmental Protection Agency.

2.2.2.2. Mobile ground equipment shall not be operated in lakes, streams or rivers unless such operation is approved in writing by the Authorized Officer.

### 2.2.3. Thermal Pollution

2.2.3.1. Permittees shall comply with the standards set for thermal pollution in the State of Alaska "Water Quality Standards," as approved by the Environmental Protection Agency.

### 2.2.4. Air Pollution and Ice Fog

2.2.4.1. Permittees shall utilize and operate all facilities and devices used in connection with the Pipeline System so as to avoid or minimize air pollution and ice fog. Facilities and devices which cannot be prevented from producing ice fog shall be located so as not to interfere with airfields, communities or roads.

2.2.4.2. Emissions from equipment, installations and burning materials shall meet applicable Federal and State air quality standards.

### 2.2.5. Pesticides, Herbicides and other Chemicals

2.2.5.1. Permittees shall use only non-persistent and immobile types of pesticides, herbicides and other chemicals. Each chemical to be used and its application constraint shall be approved in writing by the Authorized Officer prior to use.

### 2.2.6. Sanitation and Waste Disposal

2.2.6.1. "Waste" means all discarded matter, including but not limited to human waste, trash, garbage, refuse, oil drums, petroleum products, ashes and equipment.

2.2.6.2. All waste generated in construction, operation, maintenance and termination of the Pipeline System shall be removed or otherwise disposed of in a manner acceptable to the Authorized Officer. All applicable standards and guidelines of the Alaska State Department of Environmental Conservation, the United States Public Health Service, the Environmental Protection Agency, and other Federal and State agencies shall be adhered to by Permittees. All incinerators shall meet the requirements of applicable Federal and State laws and regulations and shall be used with maximum precautions to prevent forest and tundra fires. After incineration, material not consumed in the incinerator shall be disposed of in a manner approved in writing by the Authorized Officer. Portable or permanent waste disposal systems to be used shall be approved in writing by the Authorized Officer.

## 2.3. Buffer Strips

### 2.3.1. Public Interest Areas

2.3.1.1. No construction activity in connection with the Pipeline System shall be conducted within one-half (½) mile of any officially designated Federal, State or municipal park, wildlife refuge, research natural area, recreation area, recreation site, or any registered National Historic Site or National Landmark, unless such activity is approved in writing by the Authorized Officer.

### 2.3.2. Vegetative Screen

2.3.2.1. Permittees shall not cut or remove any vegetative cover within a minimum five hundred (500) foot strip between State highways and material sites unless such cutting or removal is approved in writing by the Authorized Officer.

2.3.2.2. Where the Right-of-way crosses State highways, a screen of vegetation native to the specific setting shall be established over disturbed areas unless otherwise approved in writing by the Authorized Officer.

### 2.3.3. Streams

2.3.3.1. The Pipeline System shall be located so as to provide three hundred (300) foot minimum buffer strips of undisturbed land along streams unless otherwise approved in writing by the Authorized Officer.

## 2.4. Erosion Control

### 2.4.1. General

2.4.1.1. Permittees shall perform all Pipeline System construction, operation, maintenance and termination activities so as to avoid or minimize disturbance to vegetation.

D–11

283

2.4.1.2. The design of the Pipeline System shall provide for the construction of control facilities that will avoid or minimize erosion.

2.4.1.3. The erosion control facilities shall be constructed to avoid induced and accelerated erosion and to lessen the possibility of forming new drainage channels resulting from Pipeline System activities. The facilities shall be designed and operations conducted in such a way as to avoid or minimize disturbance to the thermal regime.

2.4.2. Stabilization

2.4.2.1. Surface materials taken from disturbed areas shall be stockpiled and utilized during restoration unless otherwise approved in writing by the Authorized Officer. Stabilization practices, as determined by the needs for specific sites, shall include but shall not be limited to seeding, planting, mulching, and the placement of mat binders, soil binders, rock or gravel blankets, or structures.

2.4.2.2. All disturbed areas shall be left in a stabilized condition satisfactory to the Authorized Officer. Such satisfaction shall be stated in writing by the Authorized Officer.

2.4.3. Crossing of Streams, Rivers or Flood Plains

2.4.3.1. Permittees shall prevent or minimize erosion at stream and river crossings and those parts of the Pipeline System within flood plains, as defined in Stipulation 3.6.

2.4.3.2. Temporary access over stream banks shall be made through use of fill ramps rather than by cutting through stream banks, unless otherwise approved in writing by the Authorized Officer. Permittees shall remove such ramps upon termination of seasonal or final use. Ramp materials shall be disposed of in a manner approved in writing by the Authorized Officer.

2.4.4. Seeding and Planting.

2.4.4.1. Seeding and planting of disturbed areas shall be conducted as soon as practicable and, if necessary, shall be repeated until vegetation is successful, unless otherwise approved in writing by the Authorized Officer. All other restoration shall be completed as soon as possible.

2.4.5. Excavated Material

2.4.5.1. Excavated material in excess of that required to backfill around any structure, including the pipe, shall be disposed of in a manner approved in writing by the Authorized Officer.

2.5. Fish and Wildlife Protection

2.5.1. Passage of Fish

2.5.1.1. Permittees shall provide for uninterrupted movement and safe passage of fish. Any artificial structure or any stream channel change that would cause a blockage to fish shall be provided with a fish passage structure or facility that meets all Federal and State requirements. The proposed design shall be submitted to the Authorized Officer in accordance with Stipulation 1.7.

2.5.1.2. Pump intakes shall be screened to prevent harm to fish.

2.5.1.3. Abandoned water diversion structures shall be plugged and stabilized to prevent trapping or stranding of fish.

2.5.1.4. If material sites are approved adjacent to or in certain lakes, rivers, or streams, the Authorized Officer may require Permittees to construct levees, berms or other suitable means to protect fish and fish passage and to prevent siltation of streams or lakes.

2.5.2. Fish Spawning Beds

2.5.2.1. "Fish Spawning Beds" means the areas where anadromous and resident fish deposit their eggs.

2.5.2.2. Permittees shall avoid channel changes in Fish Spawning Beds designated by the Authorized Officer; however, where channel changes cannot be avoided in such beds, new channels shall be constructed according to written standards supplied by the Authorized Officer.

2.5.2.3. Fish Spawning Beds shall be protected from sediment where soil material is expected to be suspended in water as a result of construction activities. Settling basins shall be constructed to intercept silt before it reaches streams or lakes.

2.5.2.4. Permittees shall comply with any special requirements made by the Authorized Officer for a stream system in order to protect Fish Spawning Beds. Permittees shall repair all damage to Fish Spawning Beds caused by construction, operation, maintenance or termination of the Pipeline System.

2.5.3. Zones of Restricted Activities

2.5.3.1. Permittees' activities in connection with the Pipeline System in key fish and wildlife areas may be restricted by the Authorized Officer during periods of fish and wildlife breeding, nesting, spawning, lambing or calving activity and during major migrations of fish and wildlife. The Authorized Officer shall give Permittees written notice of such restrictive action. From time to time, the Authorized Officer shall furnish Permittees

284

a list of areas where such actions may be required, together with anticipated dates of restriction.

2.5.4. Big Game Movements

2.5.4.1. Permittees shall construct and maintain the Pipeline, both buried and above ground sections, so as to assure free passage and movement of big game animals.

2.6. Materials Sites

2.6.1. Purchase of Materials

2.6.1.1. If Permittees require materials from the public lands, Permittees shall make application to purchase such materials in accordance with 43 CFR, Part 3610. Permittees shall submit a mining plan in accordance with 43 CFR, Part 23. No materials may be removed by Permittees without the written approval of the Authorized Officer.

2.6.1.2. Insofar as possible, use of existing materials sites will be authorized in preference to new sites.

2.6.1.3. Gravel and other construction materials shall not be taken from stream beds, river beds, lake shores or other outlets of lakes, unless the taking is approved in writing by the Authorized Officer.

2.6.2. Layout of Materials Sites

2.6.2.1. Materials site boundaries shall be shaped in such a manner as to blend with surrounding natural land patterns. Regardless of the layout of materials sites, primary emphasis shall be placed on prevention of soil erosion and damage to vegetation.

2.7. Clearing

2.7.1. Boundaries

2.7.1.1. Permittees shall identify approved clearing boundaries on the ground for each Construction Segment prior to beginning clearing operations. All timber and other vegetative material outside clearing boundaries and all blazed, painted or posted trees which are on or mark clearing boundaries are reserved from cutting and removal with the exception of danger trees or snags designated as such by the Authorized Officer.

2.7.2. Timber

2.7.2.1. Prior to initiating clearing operations, Permittees shall notify the Authorized Officer of the amount of merchantable timber, if any, which will be cut, removed or destroyed in the construction and maintenance of the Pipeline System, and shall pay the United States in advance of such construction or maintenance activity, such sum of money as the Authorized Officer determines to be

the full stumpage value of the timber to be cut, removed or destroyed.

2.7.2.2. All trees, snags, and other woody material cut in connection with clearing operations shall be cut so that the resulting stumps shall not be higher than six (6) inches measured from the ground on the uphill side.

2.7.2.3. All trees, snags and other woody material cut in connection with clearing operations shall be felled into the area within the clearing boundaries and away from water courses.

2.7.2.4. Hand clearing shall be used in areas where the Authorized Officer determines that use of heavy equipment would be detrimental to existing conditions.

2.7.2.5. All debris resulting from clearing operations and construction that may block stream flow, delay fish passage, contribute to flood damage, or result in stream bed scour or erosion shall be removed.

2.7.2.6. Logs shall not be skidded or yarded across any stream without the written approval of the Authorized Officer.

2.7.2.7. No log landing shall be located within three-hundred (300) feet of any water course.

2.7.2.8. All slash shall be disposed of in construction pads or Access Roads unless otherwise directed in writing by the Authorized Officer.

2.8. Disturbance of Natural Water

2.8.1. All activities of Permittees in connection with the Pipeline System that may create new lakes, drain existing lakes, significantly divert natural drainages, permanently alter stream hydraulics, or disturb significant areas of stream beds are prohibited unless such activities along with necessary mitigation measures are approved in writing by the Authorized Officer.

2.9. Off Right-of-Way Traffic

2.9.1. Permittees shall not operate mobile ground equipment off the Right-of-Way, Access Roads, State highways, or authorized areas, unless approved in writing by the Authorized Officer or when necessary to prevent harm to any Person.

2.10. Aesthetics

2.10.1. Permittees shall consider aesthetic values in planning, construction and operation of the Pipeline System. Where the Right-of-Way crosses a State highway in forested terrain, the straight length of the Pipeline Right-of-Way visible from the highway shall not exceed six hundred (600) feet in length, unless otherwise approved in writing by the Authorized Officer. The Authorized Of-

ficer may impose such other requirements as he deems necessary to protect aesthetic values.

### 2.11. Use of Explosives

2.11.1. Permittees shall submit a plan for use of explosives, including but not limited to blasting techniques, to the Authorized Officer in accordance with Stipulation 1.7.

2.11.2. No blasting shall be done under water or within one quarter (¼) mile of streams or lakes without a permit from the Alaska Department of Fish and Game, when such a permit is required by State law or regulation.

### 2.12. Restoration

2.12.1. Areas disturbed by Permittees shall be restored by Permittees to the satisfaction of the Authorized Officer as stated in writing.

2.12.2. All cut and fill slopes shall be left in a stable condition.

2.12.3. Materials from Access Roads, haul ramps, berms, dikes, and other earthen structures shall be disposed of as directed in writing by the Authorized Officer.

2.12.4. Vegetation, overburden and other materials removed during clearing operations shall be disposed of by Permittees in a manner approved in writing by the Authorized Officer.

2.12.5. Upon completion of restoration, Permittees shall immediately remove all equipment and supplies from the site.

### 2.13. Reporting of Oil Discharges

2.13.1. A discharge of Oil by Permittees into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone in violation of the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1321 *et seq.* and the regulations issued thereunder, or in violation of applicable laws of the State of Alaska and regulations issued thereunder, is prohibited. Permittees shall give immediate notice of any such discharge to: (1) the Authorized Officer; and (2) such other Federal and State officials as are required by law to be given such notice.

2.13.2. Permittees shall give immediate notice of any spill or leakage of Oil or other pollutant from the Pipeline, the Valdez terminal facility, or any storage facility to: (1) the Authorized Officer; and (2) such other Federal and State officials as are required by law to be given such notice. Any oral notice shall be confirmed in writing as soon as possible.

### 2.14. Contingency Plans

2.14.1. It is the policy of the Department of the Interior that there should be no discharge of Oil or other pollutant into or upon lands or waters. Permittees must therefore recognize their prime responsibility for the protection of the public and environment from the effects of spillage.

2.14.2. Permittees shall submit their contingency plans to the Authorized Officer at least one-hundred and eighty (180) days prior to scheduled start-up. The plans shall conform to this Stipulation and the National Oil Hazardous Substances Pollution Contingency Plan, 36 F.R. 16215, August 20, 1971, and shall: (1) include provisions for Oil Spill Control [1]; (2) specify that the action agencies responsible for contingency plans in Alaska shall be among the first to be notified in the event of any Pipeline System failure resulting in an Oil spill; (3) provide for immediate corrective action including Oil Spill Control and restoration of the affected resource; (4) provide that the Authorized Officer shall approve any materials or devices used for Oil Spill Control and shall approve any disposal sites or techniques selected to handle oily matter; and (5) include separate and specific techniques and schedules for cleanup of Oil spills on land, lakes, rivers and streams, sea, and estuaries.

2.14.3. Prior to Pipeline start-up, such plans shall be approved in writing by the Authorized Officer, and Permittees shall demonstrate their capability and readiness to execute the plans. Permittees shall update as appropriate the plans and methods of implementation thereof, which shall be submitted annually to the Authorized Officer for his written approval.

2.14.4. If during any phase of the construction, operation, maintenance or termination of the Pipeline, any Oil or other pollutant should be discharged from the Pipeline System, the control and total removal, disposal and cleaning up of such Oil or other pollutant, wherever found, shall be the responsibility of Permittees, regardless of fault. Upon failure of Permittees to control, dispose of, or clean up such discharge, the Authorized Officer may take such measures as he deems necessary to control and clean up the discharge

[1] As used in this Stipulation 2.14.2, Oil Spill Control is defined as: (1) detection of the spill; (2) location of the spill; (3) confinement of the spill; and (4) cleanup of the spill.

D–14

at the full expense of Permittees. Such action by the Authorized Officer shall not relieve Permittees of any responsibility as provided herein.

## 3. TECHNICAL

### 3.1. General

3.1.1. The following standards shall be complied with in design, construction, operation and termination of the Pipeline System.

### 3.2. Pipeline System Standards

3.2.1. General Standards

3.2.1.1. All design, material and construction, operation, maintenance and termination practices employed in the Pipeline System shall be in accordance with safe and proven engineering practice and shall meet or exceed the following standards:

(1) U.S.A. Standard Code for Pressure Piping, ANSI B 31.4, "Liquid Petroleum Transportation Piping System."

(2) Department of Transportation Regulations, 49 CFR, Part 195, "Transportation of Liqiuds by Pipeline."

(3) ASME Gas Piping Standard Committee, 15 Dec. 1970: "Guide for Gas Transmission and Distribution Piping System."

(4) Department of Transportation Regulations, 49 CFR, Part 192, "Transportation of Natural and Other Gas by Pipelines: Minimum Federal Safety Standards."

3.2.1.2. Requirements in addition to those set forth in the above minimum standards may be imposed by the Authorized Officer as necessary to reflect the impact of subarctic and arctic environments. If any standard contains a provision which is inconsistent with a provision in another standard, the more stringent shall apply.

3.2.2. Special Standards

3.2.2.1. The design shall also provide for remotely controlled shutoff valves at each pump station; remotely controlled mainline block valves (intended to control spills); and additional valves located with the best judgment regarding wildlife habitat, fish habitat, and potentially hazardous areas.

3.2.2.2. All practicable means shall be utilized to minimize injury to the ground organic layer.

3.2.2.3. Radiographic inspection of all main line girth welds and pressure testing of the Pipeline shall be conducted by Permittees prior to placing the system in operation.

3.2.2.4. Permittees shall provide for continuous inspection of Pipeline System construction to ensure compliance with the approved design specifications and these Stipulations.

3.2.2.5. Welder qualification tests shall be by destructive means, except that operators of automatic welding equipment for girth welding of tank seams shall be tested by radiography in accordance with ASME Boiler and Pressure Vessel Code, Section 9, Subsection Q-21(b).

3.2.2.6. Lightning protection shall conform to the requirements of ANSI C5.1—1969, "Lightning Protection Code—1968."

3.2.3. Standards for Access Roads

3.2.3.1. Design, materials and construction practices employed for Access Roads shall be in accordance with safe and proven engineering practice and in accordance with the principles of construction for secondary roads for the subarctic and arctic environments.

3.2.3.2. Permittees shall submit a layout of each proposed Access Road for approval by the Authorized Officer in accordance with Stipulation 1.7.

3.2.3.3. Access Roads shall be constructed to widths suitable for safe operation of equipment at the travel speeds proposed by Permittees.

3.2.3.4. The maximum allowable grade shall be 12 percent unless otherwise approved in writing by the Authorized Officer.

### 3.3. Construction Mode Requirements

3.3.1. The selection of the Construction Mode (elevated or buried) shall be governed by the following criteria: (1) There shall be an unobstructed air space of at least two feet between the pipe and ground surface; or (2) There shall be no greater heat transfer from the pipe to the ground than results from the use of an unobstructed air space of at least two (2) feet between the pipe and ground surface; or (3) Below the level of the pipe axis the ground shall consist of competent bedrock, soil naturally devoid of permafrost, or if frozen, of Thaw-Stable Sand and Gravel.[1] Above the level of the pipe axis other materials may be present but it must be shown that they will remain stable under all credible conditions; or (4) Results of a detailed field exploration program and analysis indicate that pipe rupture and major terrain

[1] Thaw-Stable Sand and Gravel is defined as material meeting the following requirements: (a) Material lies within the classes GW, GP, SW, and SP, (Unified Soil Classification) but with up to 6% by weight passing the #200 U.S. standard sieve; if an inorganic granular soil contains more than 6% fines than the #200 sieve, its thaw-stability must be justified. (b) There is no excess (segregated or massive) ice. (c) Thawing of the material *in situ* will not result in excess pore-pressure.

disruption will not occur at any place from soil instability. Effects and their interaction, which are to be analyzed on a mile by mile basis to justify the proposed Construction Mode, shall include but not be limited to, thaw plug stability, differential settlement, seismic loading and weakening, and possible movement resulting from slope instability.[3]

As a prerequisite for the use of this criterion, an acceptable comprehensive monitoring system of the Pipeline shall be developed which will include but not be limited to making deformation measurements sufficiently sensitive and prompt to detect the approach to operational tolerance limits (which shall be clearly specified) of the Pipeline; design specifications, operational requirements, and feasibility analysis of such monitoring system shall be submitted in accordance with Stipulation 1.7. Such system shall be operational prior to transmission of Oil through the Pipeline.

### 3.4. Earthquakes and Fault Displacements

#### 3.4.1. Earthquakes

3.4.1.1. The Pipeline System shall be designed, where technically feasible, by appropriate application of modern, state-of-the-art seismic design procedures to prevent any Oil leakage from the effects (including seismic shaking, ground deformation and earthquake-induced mass movements) of earthquakes distributed along the route as follows:

| Zone: | Richter magnitude |
|---|---|
| Valdez to Willow Lake | 8.5 |
| Willow Lake to Paxson | 7.0 |
| Paxson to Donnelly Dome | 8.0 |
| Donnelly Dome to 67 deg. N | 7.5 |
| 67 deg. N. to Prudhoe Bay | 5.5 |

3.4.1.2. Where such design is not technically feasible, the potential damage from an Oil spill shall be minimized by special design provisions that shall include, but shall not be limited to: (1) a network of ground-motion detectors that continuously monitor, record and instantaneously signal the occurrence of ground motion in the vicinity of the Pipeline reaching the Operational Design Level [4] (the critical levels of ground mo-

[3] Because of soil variability and/or unique hydrologic conditions in active flood plains, some of the requirements of Stipulation 3.5.1 may not be met in those locations. In such cases proposed designs including special design and/or construction procedures where required by these conditions must be submitted with justification to the Authorized Officer for approval in accordance with Stipulation 1.7.

[4] Highest level that would not produce general pipe deformation sufficient to limit operations.

tions shall be approved in writing by the Authorized Officer); (2) rapid programmed shutdown and prompt close inspection of system integrity in the event of ground motion reaching the Operational Design Level; and (3) a special contingency plan for Oil Spill Control for each such seismically hazardous area which shall be filed in accordance with Stipulation 2.14. This plan shall specifically consider expected field conditions in the particular area in the aftermath of a destructive earthquake.

#### 3.4.2. Fault Displacements

3.4.2.1. Prior to applying for a Notice to Proceed for any Construction Segment, Permittees shall satisfy the Authorized Officer that all recognizable or reasonably inferred faults or fault zones along the alignment within that segment have been identified and delineated, and that the risk of Oil leakage resulting from fault movement and ground deformation has been adequately assessed and provided for in the design of the Pipeline for that segment. Evaluation of said risk shall be based on geologic, geomorphic, geodetic, seismic, and other appropriate scientific evidence of past or present fault behavior and shall be compatible with the design earthquakes tabulated above and with observed relationships between earthquake magnitude and extent and amount of deformation and fault slip within the fault zone.

3.4.2.2. Minimum design criteria for a segment of the Pipeline traversing a fault zone that is reasonably interpreted as active, shall be: (1) that the Pipeline resist failure resulting in leakage from two feet of horizontal and/or vertical displacement in the foundation material anywhere within the fault zone; and (2) that no storage tank or pump station be located within the fault zone.

3.4.2.3. Where the Pipeline crosses a fault or lies within a fault zone that is reasonably interpreted as active, Permittees shall monitor crustal deformation in the vicinity of the Pipeline. Such monitoring shall include annual geodetic observation of permanent reference marks established on stable ground. Said reference marks shall be positioned so as to form closed figures and to provide for detection of relative horizontal and vertical displacements as small as 0.10 ft. across principal individual faults within the fault zone and to provide for monitoring of crustal strain with an absolute error of two parts per million within the fault zone. Further, where annual slip on a fault exceeds 0.10 ft. for two successive years,

288

Permittees shall install recording or telemetering slip-meters. Data obtained from the monitoring shall be provided to the Authorized Officer at specified regular intervals throughout the operational life of the Pipeline. Said data shall be used by the Permittees to aid in the initiation of corrective measures to protect the Pipeline from failure caused by tectonic deformation that would result in leakage.

### 3.5. Slope Stability

3.5.1. Areas subject to mudflows, landslides, avalanches, rock falls and other types of mass movements shall be avoided where practicable in locating the Pipeline. Where such avoidance is not practicable, the Pipeline design, based upon detailed field investigations and analysis, shall provide measures to prevent the occurrence of, or protect the Pipeline against, the effects of mass movements.

### 3.6. Stream and Flood Plain Crossings and Erosion

### 3.6.1. General

3.6.1.1. For each region through which the Pipeline passes, the Pipeline shall be designed to withstand or accommodate the effects (including runoff, stream and flood plain erosion, meander cutoffs, lateral migration, ice-jams, and icings) of those meteorologic, hydrologic (including surface and subsurface) and hydraulic conditions considered reasonably possible for the region. The following standards shall apply to such Pipeline design:

3.6.1.1.1. For stream crossings and portions of the Pipeline within the flood plain.

3.6.1.1.1.1. The Pipeline shall cross streams underground unless a different means of crossing is approved in writing by the Authorized Officer.

3.6.1.1.1.2. The design flood shall be based on the concept of the "Standard Project Flood" as defined in Corps of Engineers Bulletin 52–8, Part 1.

3.6.1.1.1.3. The depth of channel scour shall be established by appropriate field investigations and theoretical calculations using those combinations of water velocity and depth that yield the maximum value. At the point of maximum scour, the cover over the pipe shall be at least twenty (20) percent of the computed scour, but not less than four (4) feet.

3.6.1.1.1.4. For overhead crossings comparable analysis shall be made to ensure that support structures are adequately protected from the effects of scour, channel migration, undercutting, ice forces and degradation of permafrost.

3.6.1.1.1.5. In flood plains, appropriate construction procedures shall be used wherever there is potential channelization along the pipe.

3.6.1.1.1.6. The pipe trench excavation shall stop an adequate distance from the water crossing to leave a protective plug (unexcavated material) at each bank. These plugs shall be left in place until the stream bed excavation is complete and the pipe laying operation is begun. The plugs shall not be completely removed until absolutely necessary. The trench shall be backfilled with stable material as soon as the pipe is laid.

3.6.1.2. Culverts and Bridges.

3.6.1.2.1. Culverts and bridges necessary for maintenance of the Pipeline shall be designed to accommodate a fifty (50)-year flood in accordance with criteria established by the American Association of State Highway Officials and the Federal Highway Administration and endorsed by the State of Alaska Department of Highways.

### 3.6.2. Erosion

3.6.2.1. Where necessary because of outfall erosion, stilling basins shall be constructed at the outflow end of culverts. To prevent erosion the pool sides shall be stabilized by appropriate methods; e.g., by the use of riprap.

3.6.2.2. Slopes of cuts through stream banks shall be designed and constructed to minimize erosion and prevent slides.

3.6.2.3. Erosion control procedures shall accommodate and be based on the runoff produced by the maximum rainfall rate and snow melt rate combination reasonably characteristic of the region. The procedures shall also accommodate effects that result from thawing produced by flowing or ponded water on permafrost terrain.

### 3.7. Sea Waves

3.7.1. Oil transfer facilities at the Valdez terminal shall be protected by cut-off devices designed and located to prevent major Oil leakage from breaking of pipes by destructive sea waves comparable to those generated in Port Valdez by the March 27, 1964 earthquake. Design for such protective features shall be submitted in accordance with Stipulation 1.7.

### 3.8. Glacier Surges

3.8.1. Surveillance systems sufficient to give adequate warning of impending surges on any glacier that could damage the Pipeline shall be instituted prior to transmission of Oil through the pipe. Pro-

cedures for initiation and operation of such surveillance systems and protective procedures in the event of such surges shall be submitted in accordance with Stipulation 1.7.

### 3.9. Construction and Operation

3.9.1. All construction, operation, maintenance, and termination activities in connection with the Pipeline System shall be conducted so as to avoid or minimize thermal and other environmental changes and to provide maximum protection to fish and wildlife and their habitat, and people. All working platforms, pads, fills and other surface modifications shall be planned and executed in such a way that any resulting degradation of permafrost will not jeopardize the Pipeline foundations.

3.9.2. Acceptable plans, procedures and quality controls that ensure compliance with Stipulation 3.9.1 shall be submitted in accordance with Stipulation 1.7.

### 3.10. Pipeline Corrosion

3.10.1. Permittees shall provide detailed plans for corrosion resistant design and methods for early detection of corrosion. These shall include: (1) pipe material and welding techniques to be used and information on their particular suitability for the environment involved; (2) details on the external pipe protection to be provided (coating, wrapping, etc.), including information on variation of the coating process to cope with variations in environmental factors along the Pipeline route; (3) plans for cathodic protection including details of impressed ground sources and controls to ensure continuous maintenance of adequate pro-

tection over the entire surface of the pipe; (4) details of plans for monitoring cathodic protection current including spacing of current monitors; (5) provision for periodic intensive surveys of trouble spots, regular preventive maintenance surveys and special provisions for abnormal potential patterns resulting from the crossing of the Pipeline by other pipelines or cables; and (6) information on precautions to be taken to prevent internal corrosion of the Pipeline. Permittees shall also provide for periodic internal pitting surveys by electro-magnetic or other means.

### 3.11. Containment of Oil Spills

3.11.1. Permittees shall provide Oil spill containment dikes or other structures around storage tanks at pump stations and at the Valdez terminal. The volume of the containment structures shall be at least: (1) one-hundred ten (110) percent of the total storage volume of the storage tanks in the relevant area, plus (2) a volume sufficient for maximum trapped precipitation and runoff which might be impounded at the time of the spill. Such structures shall be constructed to withstand failure from earthquakes in accordance with Stipulation 3.4 and shall be impervious so as to provide seepage-free storage until disposal of their contents can be effected safely without contamination of the surrounding area.

3.11.2. Permittees shall provide containment dikes or other structures to minimize effects of Oil spills at critical locations along the Pipeline in accordance with Stipulation 2.14.

290

AMENDMENT #1 - 1976   REFERENCE 1.8 OF EXHIBIT D

3.11.3

Permittees shall provide containment dikes or other structures around any other permanent or temporary point of storage, transfer or handling of fuel or lubricants and shall also provide containment dikes or other structures around permanent or temporary points of storage, transfer or handling of other substances when directed to do so by the Authorized Officer

# EXHIBIT E

# COOPERATIVE AGREEMENT

*between*

# UNITED STATES DEPARTMENT OF THE INTERIOR

*and*

# STATE OF ALASKA

*regarding the*

# PROPOSED TRANS-ALASKA PIPELINE

292

# EXHIBIT E
# COOPERATIVE AGREEMENT
## *between*
# UNITED STATES DEPARTMENT OF THE INTERIOR
## *and*
# STATE OF ALASKA
## *regarding the*
# PROPOSED TRANS-ALASKA PIPELINE

THIS AGREEMENT, effective this 8th day of January, 1974, by and between the United States Department of the Interior (hereinafter referred to as the "Department") and the State of Alaska (hereinafter referred to as the "State"), which together are hereinafter referred to jointly as "Parties,"

### WITNESSETH

WHEREAS, the State has the authority pursuant to AS 38.05.020 to enter into this agreement with the Department in order to protect the lands, waters and natural environment of Alaska;

WHEREAS, the Secretary of the Interior (hereinafter referred to as the "Secretary") has the authority to enter into agreements involving the improvement, management, use and protection of the public lands and their resources pursuant to Section 102 of the Public Land Administration Act, 74 Stat. 506 (1960), 43 U.S.C. § 1363 (1970);

WHEREAS, the Parties have been requested to issue rights-of-way and other authorizations for the construction of an oil pipeline system from Prudhoe Bay to Valdez, Alaska;

WHEREAS, the Congress of the United States has determined that early construction of such an oil pipeline system is in the national interest and has authorized and directed the Secretary and other appropriate Federal officers and agencies to issue and take all necessary action to administer and enforce rights-of-way and other authorizations that are necessary for or related to the construction of the Trans-Alaska oil pipeline system;

WHEREAS, the Legislature of Alaska, in special session, has enacted legislation to establish authority and guidelines for a right-of-way lease for that system;

WHEREAS, the Secretary will designate a Federal Authorized Officer and the Governor of Alaska will appoint a State Pipeline Coordinator who will, respectively, have general supervision and control over the functions in Alaska of the Department and the State with respect to the construction of the pipeline system;

WHEREAS, it is anticipated that detailed technical and environmental stipulations relating to construction of the pipeline system will be incorporated in the right-of-way and other authorizations of each of the Parties, and that the State and Federal stipulations will be similar in all major respects;

WHEREAS, it is necessary to provide for review and approval of designs and surveillance of construction activities in order to assure compliance with the aforesaid stipulations; and

WHEREAS, it is the purpose of this agreement to promote an effective working relationship between the Parties in order to provide maximum

protection for the environment without unnecessary delays in construction of the pipeline system;

NOW, THEREFORE, the Parties agree as follows:

## I. LANDS—LEASE AND PERMIT

1. The State and Department recognize the following categories of land to be made subject to the rights-of-way and other authorizations of the State or the Department and that such lands constitute all of the land along the proposed pipeline right-of-way that is not owned by private parties and therefore is subject to the authority of either the Department or the State to authorize rights-of-way.

   (a) Lands patented to the State.
   (b) Lands selected by and tentatively approved to the State and not withdrawn under section 11(a)(2) of the Alaska Native Claims Settlement Act, 85 Stat. 696, 43 U.S.C. § 1610 (1970).
   (c) Lands selected by the State and not tentatively approved and not withdrawn under section 11(a)(2) of the Alaska Native Claims Settlement Act.
   (d) Lands selected by the State and not tentatively approved and which were withdrawn under section 11(a)(2) of the Alaska Native Claims Settlement Act but which are not available for village or regional selection under section 22(l) of the Alaska Native Claims Settlement Act, 85 Stat. 713, 43 U.S.C. § 1621 (1970).
   (e) Lands selected by the State, both tentatively approved and not tentatively approved, and withdrawn under section 11(a)(2) of the Alaska Native Claims Settlement Act.
   (f) Lands beneath navigable waters as defined in Section 2 of the Submerged Lands Act, 67 Stat. 29, 43 U.S.C. § 1301 (1970).
   (g) Lands in Federal ownership that have not been selected by the State.

2. The State will issue its right-of-way and other authorizations for lands in categories 1(a), 1(b), and 1(f). The Department will issue its rights-of-way and other authorizations for lands in categories 1(e) and 1(g).

3. Both the State right-of-way lease or other grant and the Federal right-of-way authorization will include the lands in categories 1(c) and 1(d) and each will be effective in accordance with the following terms:

   (a) Lands in category 1(c) will be tentatively approved or patented to the State no later than fifteen (15) days after compliance by the Parties with all applicable regulations. The Parties will immediately initiate and expeditiously complete such compliance. The State will thereupon immediately proceed to issue a right-of-way lease or other grant and such authorizations as are necessary for construction and operation of the pipeline system on said lands.
   (b) The Department will take all necessary action preparatory to tentatively approving or patenting the lands in category 1(d) to the State within twenty-five (25) days from the effective date of this agreement and will tentatively approve or patent those lands promptly upon receipt of notice from the Commissioner of Natural Resources that the State is prepared to issue a right-of-way lease or other grant and such other authorizations as are necessary for construction and operation of the pipeline system on said lands.
   (c) The Federal right-of-way in and to lands in categories 1(c) or 1(d), or both, will vest in the Parties receiving it on the date it is issued by the Department but only upon the occurrence of one of the following events, whichever occurs first:
      (i) The Commissioner of Natural Resources notifies the Secretary in writing that it is essential for the expeditious construction of the pipeline system that the Federal right-of-way in and to some or all of the lands in categories 1(c) or 1(d), or both, vest in the Parties receiving it; or
      (ii) The lands in category 1(d) have not been tentatively approved to the State and a valid State right-of-way lease or other grant in and to those lands has not been issued for the construction and operation of the pipeline system by March 10, 1974; or

(iii) The lands in category 1(c) have not been tentatively approved to the State and a valid State right-of-way lease or other grant in and to those lands has not been issued for the construction and operation of the pipeline system by June 1, 1974;

*Provided as conditions:* First, that the Federal right-of-way is made subject to the State's valid pre-existing rights, if any, in and to those lands; Second, that upon either valid tentative approval or valid patent of any of those lands to the State, the existence or subsequent issuance of a valid State right-of-way lease or other grant in and to those lands terminates the Federal right-of-way and other authorizations, and the State right-of-way lease or other grant thereupon applies in all respects to those lands; Third, that the parties who receive the Federal right-of-way and other authorizations agree in writing to the first and second conditions herein and that they will not challenge the validity of the State's right-of-way lease or other grant on the basis of the existence of the Federal right-of-way and other authorizations or their interest therein, and the Federal right-of-way recites these three conditions; and, Fourth, that the Department will make every reasonable effort to tentatively approve and patent the lands to the State expeditiously.

## II. SURVEILLANCE

1. While the Parties will establish and maintain separate organizations to assure compliance with the terms and stipulations of their respective right-of-way authorizations and with their respective statutes and regulations, they will seek to coordinate the activities of these organizations as fully as possible. In the execution of their respective responsibilities the Parties will seek to provide maximum protection for the environment without unnecessary delays in construction of the pipeline. Pursuant to this general agreement, it is further agreed that:

(a) The Parties will endeavor, both in central offices and in the field, to locate all personnel in the surveillance effort, including agents and third party contractors, in common locations and to utilize, insofar as possible, common logistical support, with the objective of maximizing communication between the two organizations.

(b) Except as prohibited by law or by the Department's pipeline right-of-way agreement with the owners of the Trans-Alaska pipeline, (but the owners will be required by the State right-of-way lease to make the same available to the State), the Parties will share fully all information concerning the construction of the pipeline system and the surveillance thereof. The State and the Federal organizations will have complete and immediate access to the information of the other, on request, and there will be regular exchange of information regarding design reviews, application for and issuances of notices to proceed, temporary suspension orders, modification orders, reports on compliance in the field, construction change recommendations, all submissions by the holders of the rights-of-way, all third party contractor reports, applications for and issuance of permission to resume activity, and all other similar information. The timing, location, method and type of information exchanged shall be governed by the objective of the fullest possible access to information practical in order to maximize the decision-making capability of the Parties.

(c) The Parties will have full and free access to the lands of each other for all purposes relating to the surveillance of the pipeline system and the enforcement of all State and Federal statutes and regulations.

2. All applications for notices to proceed, together with supporting documents, will be reviewed by both the State Pipeline Coordinator and the Federal Authorized Officer.

The State right-of-way lease will contain provisions regarding notices to proceed that assure review by the Pipeline Coordinator within the same time period as provided in the Department's right-of-way authorizations. The Authorized Officer or his designee, on behalf of the Department, may issue notices to proceed involving construction of any portion of the pipeline system. The Pipeline Coordinator or his designee, on behalf of the State, may issue notices to proceed with respect to any construction of the pipeline system on State lands, and no notice to proceed on lands

subject to the State right-of-way lease will be effective unless signed by the State Pipeline Coordinator.

3. On lands subject to the Federal right-of-way authorizations, the Department will determine compliance with the terms and stipulations regulating the construction of the pipeline system. On lands subject to the Federal right-of-way authorization, where applicable statutes and regulations of the State providing for the protection of resources, the environment, or public health, safety or general welfare, impose additional requirements to, or more stringent standards than, those required by the Federal terms and stipulations for pipeline construction, operation or maintenance, the State law will control.

4. On lands subject to the State right-of-way lease, the determination of compliance with those terms and stipulations regulating the construction of the pipeline system which do not directly affect the physical integrity of the pipeline, but which are necessary for the protection of State lands and resources shall be made exclusively by the State. On such lands the State or the Department may issue any orders necessary to assure compliance with those terms and stipulations regulating the construction of the pipeline system that are necessary to protect the physical integrity of the pipeline.

5. The Parties recognize that the unique characteristics of the arctic and subarctic environment require special efforts to provide it with optimum protection. The Parties will make every reasonable effort to ensure that construction and operation methods and activities will be planned and executed so as to minimize environmental degradation.

6. Fish and wildlife protection is regarded by the Parties as a special responsibility of the surveillance effort which extends with common concern over the length of the pipeline. The Parties will encourage the formation, to the extent practicable, of a cooperative effort for such protection, sharing the fish and game personnel and information resources of both the State and Federal Governments, and the application of this cooperative effort over both State and Federal lands.

7. The Department shall have full and free access at all times to the Valdez terminal site for the purpose of enforcing the Department's stipulations at that facility. The State will assure such access to the Department by making appropriate provisions therefor in any lease or conveyance it may issue or grant with respect to the lands embraced in the Valdez terminal site.

## III. STATE HIGHWAY AND STATE AIRPORTS

1. The Department agrees to take such action pursuant to the Trans-Alaska Pipeline Authorization Act of November 16, 1973, P.L. 93–153, as are necessary for the State to construct a public highway from the Yukon River to Prudhoe Bay. The State agrees to construct the highway according to the Highway and Airport Stipulations attached hereto as Exhibit "A" and, if the State contracts to build the highway, to include said stipulations as a part of any agreement with its contractors.

2. The State has furnished the Department a map of the intended location of the highway, and upon completion of construction of the highway will file with the Department a map of definite location of the highway of similar scale.

3. The Department agrees to lease three sites for public airports pursuant to the Trans-Alaska Pipeline Authorization Act (supra). The State agrees to build the airports according to those provisions of the Highway and Airport Stipulations that are pertinent to airport construction, and if the State contracts to build the airports, to include said stipulations as a part of any agreement with such contractors.

4. The Department agrees to take all actions necessary to provide to the State, under nonexclusive permits, the free use of gravel or other materials necessary for construction of the State highway and the State airports pursuant to the Trans-Alaska Pipeline Authorization Act (supra). All free use permits issued by the Department for such material sites shall include provisions of the Highway and Airport Stipulations applicable to material sites.

5. The State shall have the right and responsibility to enforce the applicable provisions of the Highway and Airport Stipulations referring to the construction of the State highway and State airports.

## IV. MISCELLANEOUS

1. The Federal Authorized Officer and the State Pipeline Coordinator will develop procedures to implement the provisions of this agreement.

E–4

296

2. In the implementation of this agreement, each Party will avoid unnecessary employment of personnel and needless expenditure of funds.

3. This agreement shall remain in effect until construction of the Trans-Alaska pipeline is completed. However, in the event that either Party deems it necessary or desirable to terminate this agreement at an earlier time, it may do so after giving the other Party sixty (60) days advance written notice thereof.

IN WITNESS WHEREOF, the Parties hereto have executed this agreement as of the date shown below:

STATE OF ALASKA
/s/ WILLIAM A. EGAN
   Title: Governor
       State of Alaska
       January 8, 1974

UNITED STATES OF AMERICA
DEPARTMENT OF THE INTERIOR
/s/ ROGERS C. B. MORTON
   Title: Secretary of the
       Interior

# EXHIBIT A

## Highway and Airport Stipulations

### 1. DEFINITIONS

1.1. "Highway" means the State highway from the Yukon River to Prudhoe Bay, Alaska; and includes all permanent roads, bridges, tunnels, drainage structures, signs, guardrails, protective structures, and appurtenances related thereto or used in connection therewith.

1.2. "Airports" means the three public airports for which the State of Alaska made application on March 20, 1970, under 49 U.S.C. §§ 211–214 (1970).

1.3. "State Pipeline Coordinator" means that individual designated by the State of Alaska with authority over and responsibility for the supervision of design review and construction of the Pipeline System or his designee.

1.4. "Federal Authorized Officer" means the Secretary of the Interior, or a person delegated to exercise his authority with respect to the Pipeline System.

1.5. "Contractor" means the individual, corporation, or other entity, or the subcontractor or agent of such individual, corporation or other entity, with which the State of Alaska contracts to build the Highway or Airports. In the event that the State undertakes to build the Highway or Airports itself, "Contractor" shall mean the State of Alaska.

1.6. "Notice to Proceed" means a document signed by the State Pipeline Coordinator authorizing some aspect of the construction of the Highway or Airports.

### 2. PROCEDURES

2.1. Regulation of Public Access

2.1.1. During construction of the Highway, the State shall provide alternative routes for existing roads and trails across public lands.

2.1.2. The State shall make provisions for suitable permanent crossings for the public where the Highway right-of-way crosses existing roads, foot-trails, winter trails, or other rights-of-way.

2.2. Applicability of Stipulations

2.2.1. Nothing in these Stipulations shall be construed as applying to activities of the State that have no relation to the Highway or Airports.

2.2.2. Nothing in these Stipulations shall be construed to affect any right or cause of action that otherwise would be available to the State against any person other than the United States.

2.3. Responsibilities

2.3.1. With regard to the construction of the Highway and Airports: (1) The State shall ensure full compliance with the terms and conditions of these Stipulations by its agents, employees and contractors (including subcontractors of any tier), and the employees of each of them. (2) Unless clearly inapplicable, the requirements and prohibitions imposed upon the State by these Stipulations are also imposed upon the State's agents, employees, contractors, and subcontractors, and the employees of each of them. (3) Failure or refusal of the State's agents, employees, contractors, subcontractors, or their employees to comply with these Stipulations shall be deemed to be the failure or refusal of the State. (4) The State shall require its agents, contractors, and subcontractors to include these Stipulations in all contracts and sub-

contracts which are entered into by any of them, together with a provision that the other contracting party, together with its agents, employees, contractors, subcontractors, and the employees of each of them, shall likewise be bound to comply with these Stipulations.

2.3.2. The State shall make separate application, under applicable statutes and regulations, for authorization to use or occupy Federal lands in connection with the Highway or Airports where the lands are not within the Highway right-of-way or Airport leases. This shall include material sites, camp sites, waste areas, storage areas, access roads, etc.

2.3.3. The Federal Authorized Officer may require modification of the Highway or Airports, without liability or expense to the United States, as necessary to protect the integrity of the Trans-Alaska Pipeline.

### 2.4. Highway Design Approval

2.4.1. The State shall require detailed design submittals from Contractor for all river and stream crossings.

2.4.2. All such submittals shall be reviewed by the State Pipeline Coordinator for conformity with the Stipulations set forth herein.

2.4.3. Upon approval of such design, a Notice to Proceed shall be executed and transmitted to the Contractor. Such document shall authorize the commencement of construction on the element of the Highway for which design is approved.

### 2.5. Suspension of Construction

2.5.1. In the event the State Pipeline Coordinator determines that the Contractor is in violation of these Stipulations, he may order suspension of that portion of the work in violation.

2.5.2. In the event that the Federal Authorized Officer determines that the Contractor is in violation of these Stipulations, he may recommend that the State Pipeline Coordinator order suspension of that portion of the work he deems to be in violation.

### 2.6. Changes in Conditions

Unforeseen conditions arising during design or construction of the Highway or Airports may make it necessary to revise or amend these Stipulations to protect the environment and the public interest. In that event, the Federal Authorized Officer and the State Pipeline Coordinator, shall agree as to what revisions or amendments shall be made. If they are unable to agree, the Federal Authorized Officer shall have final authority to determine the matter if the Airports are involved, and the State Pipeline Coordinator shall have final authority to determine the matter if the Highway is involved.

### 3. CONTRACTOR STIPULATIONS—GENERAL

#### 3.1. Equal Employment Opportunity

By accepting this contract, Contractor agrees that, during the period of construction of the Highway and Airports, or for so long as this permit shall be in effect, whichever is the longer, he shall comply with this Stipulation.

3.1.1. Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. Contractor will take affirmative action to ensure that applicants are employed, and that employees are equally treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be approved by the Authorized Officer setting forth the provision of this equal opportunity clause.

3.1.2. Contractor will, in all solicitations or advertisements for employees placed by or on behalf of Contractor, state that all qualified applicants will receive consideration for employment without regard to race, religion, sex, color or national origin.

3.1.3. Contractor will send to each labor union or representative of workers with which Contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the Authorized Officer, advising the labor union or worker's representatives of Contractor commitments under this equal opportunity clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

3.1.4. Contractor will comply with Executive Order No. 11246 of September 24, 1965, as amended, and rules and regulations and relevant orders of the Secretary of Labor.

E–6

298

**3.1.5.** Contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, as amended, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to Contractor's books, records, and accounts by the State Pipeline Coordinator and the Federal Authorized Officer and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

**3.1.6.** In the event of Contractor's noncompliance with this equal opportunity clause or with any of said rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and Contractor may be declared ineligible for further government contracts or permits in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, as amended, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, as amended, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

**3.1.7.** Contractor will include the provisions of this equal opportunity clause in every contract, subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, as amended, so that such provisions will be binding upon each contractor, subcontractor or vendor. Contractor will take such action with respect to any contract, subcontract, or purchase order as the Authorized Officer may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event Contractor becomes involved in, or is threatened with, litigation with a contractor, subcontractor or vendor as a result of such direction by the State Pipeline Coordinator, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

**3.1.8.** Contractor further agrees that it will be bound by the above equal opportunity clause with respect to its own employment practices when it participates in federally assisted construction work.

**3.1.9.** Contractor agrees that it will assist and cooperate actively with the State Pipeline Coordinator and the Federal Authorized Officer and the Secretary of Labor in obtaining the compliance of Contractors and subcontractors with the equal opportunity clause and the rules, regulations, and relevant orders of the Secretary of Labor, that it will furnish the State Pipeline Coordinator and the Federal Authorized Officer and the Secretary of Labor such information as they may require for the supervision of such compliance, and that it will otherwise assist the State Pipeline Coordinator in securing compliance.

**3.1.10.** Contractor further agrees that it will refrain from entering into any contract or contract modification subject to Executive Order No. 11246 of September 24, 1965, as amended, with a Contractor debarred from, or who has not demonstrated eligibility for, Government contracts and federally assisted construction contracts pursuant to the Executive Order and will carry out such sanctions and penalties for violation of the equal opportunity clause as may be imposed upon Contractors and subcontractors by the Federal Authorized Officer or the Secretary of Labor, pursuant to Part II, Subpart D, of the Executive Order. In addition, Contractor agrees that if it fails or refuses to comply with these undertakings, the State Pipeline Coordinator may take any or all of the following actions: Cancel, terminate, or suspend in whole or in part this contract; refrain from extending any further assistance to Contractor under the program with respect to which the failure or refusal occurred until satisfactory assurance of future compliance has been received from the Contractor; and refer the case to the Department of Justice for legal proceedings.

**3.1.11. Certification of Nonsegregated Facilities**

By accepting this contract, Contractor certifies that Contractor does not and will not maintain or provide for Contractor's employees any segregated facilities at any of Contractor's establishments, and that Contractor does not and will not permit Contractor's employees to perform their services at any location, under Contractor's control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the equal opportunity clause of this permit. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains,

recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom or otherwise. Contractor further agrees that (except where Contractor has obtained identical certifications from proposed Contractors and subcontractors for specific time periods) Contractor will obtain identical certifications from proposed Contractors and subcontractors prior to the award of contracts or subcontracts exceeding $10,000 which are not exempt from the provisions of the equal opportunity clause; the Contractor will retain such certifications in Contractor's files; and the Contractor will forward the following notice to such proposed Contractors and subcontractors (except where the proposed Contractors or subcontractors have submitted identical certifications for specific time periods): "NOTICE TO PROSPECTIVE CONTRACTORS AND SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATION OF NON-SEGREGATED FACILITIES." A Certification of Nonsegregated Facilities, as required by the order (32 F.R. 7439, May 19, 1967) on Elimination of Segregated Facilities, by the Secretary of Labor, must be submitted prior to the award of a contract or subcontract exceeding $10,000 which is not exempt from the provisions of the equal opportunity clause. The certification may be submitted either for each contract and subcontract or for all contracts and subcontracts during a period (i.e., quarterly, semi-annually, or annually).

### 3.2. Liabilities and Responsibilities of Contractor

Contractor shall abate any condition existing with respect to the construction of the Highway or Airport that causes or threatens to cause serious and irreparable harm or damage to any person, structure, property, land, fish and wildlife and their habitats, or other resource. Any State or Federal property and fish and wildlife habitat harmed or damaged by the Contractor in connection with the construction of the Highway or Airports, regardless of fault, shall be reconstructed, repaired and rehabilitated by the Contractor to the written satisfaction of the State Pipeline Coordinator. Contractor shall be liable in accordance with applicable laws for loss or damage to property of others or for bodily injuries to or the death of any person arising from or connected with the construction of the Highway or Airports.

### 3.3. Federal, State and Local Laws and Regulations

Contractor shall comply with applicable Federal and State laws and all regulations issued thereunder, existing or hereafter enacted or promulgated, affecting in any manner construction of the Highway or Airports.

### 3.4. Antiquities and Historical Sites

Contractor shall engage an archeologist approved by the Federal Authorized Officer to provide surveillance and inspection of the Highway and Airport sites for archeological values. If, in connection with any operation under this contract, or any other contract entered in connection with the Highway or Airports, Contractor encounters known or previously unknown paleontological, archeological, or historical sites, Contractor shall immediately notify the Federal Authorized Officer and the State Pipeline Coordinator and said archeologist. Contractor's archeologist shall investigate and provide an on-the-ground opinion regarding the protective measures to be undertaken by Contractor. The Federal Authorized Officer may suspend that portion of Contractor's operations necessary to preserve evidence pending investigation of the site.

Six (6) copies of all survey and excavation reports shall be filed with the Federal Authorized Officer and the State Pipeline Coordinator.

### 3.5. Termination of Use

Upon termination of use of any part of the Highway or Airports, Contractor shall remove all improvements and equipment, except as otherwise approved in writing by the State Pipeline Coordinator as to the Highway, and the Federal Authorized Officer as to the Airports, and shall restore the land to a condition that is satisfactory to them. The satisfaction of the State Pipeline Coordinator and Federal Authorized Officer shall be stated in writing.

All Access Roads shall be "put-to-bed" by Contractor upon completion of their use unless otherwise directed by the Federal Authorized Officer. "Put-to-bed" is used herein to mean that such roads shall be left in such stabilized condition that erosion will be minimized through the use of adequately designed and constructed waterbars, revegetation, and chemical surface control; that culverts and bridges shall be removed by Contractor in a manner satisfactory to the Federal Author-

ized Officer; and that such roads shall be closed to use. Contractor's rehabilitation plan shall be approved in writing by the State Pipeline Coordinator and the Federal Authorized Officer prior to termination of use of any such road or any part thereof.

### 3.6. Public Improvements

Contractor shall protect existing improvements on Federal and State lands during construction of the Highway or Airports. Except as authorized for temporary purposes by the State Pipeline Coordinator and Federal Authorized Officer, the Contractor shall not obstruct any road or trail with logs, slash, or debris.

### 3.7. Camping, Hunting, Fishing, and Trapping

Contractor shall satisfy the State Pipeline Coordinator that it has and will adequately inform its employees, agents, contractors, subcontractors, and their employees, of applicable laws and regulations relating to hunting, fishing, and trapping.

### 3.8. Small Craft Passage

The creation of any permanent obstruction to the navigation of small craft in streams is prohibited.

### 3.9. Survey Monuments

Contractor shall mark and protect all geodetic survey monuments encountered during the construction of the Highway or Airports. These monuments are not to be disturbed; however, if such a disturbance occurs, the Federal Authorized Officer shall be immediately notified thereof in writing.

If any land survey monuments, corners, or accessories (excluding geodetic survey monuments) are destroyed, obliterated or damaged, Contractor shall employ a qualified land surveyor to reestablish or restore same in accordance with the "Manual of Instructions for the Survey of Public Lands" and shall record such survey in the appropriate records. Additional requirements for the protection of monuments, corners, and bearing trees may be prescribed by the Federal Authorized Officer.

### 3.10. Fire Prevention and Suppression

Contractor shall promptly notify the State Pipeline Coordinator and the Federal Authorized Officer and take all measures necessary and appropriate for the prevention and suppression of fires in accordance with 43 CFR 2801.1–5(d). Contractor shall comply with their instructions and directions concerning the use, prevention and sup-

pression of fires. Use of open fire in connection with construction of the Highway or Airports is prohibited unless authorized in writing by the State Pipeline Coordinator as to the Highway or the Federal Authorized Officer as o the Airports.

### 3.11. Health and Safety

Contractor shall take all measures necessary to protect the health and safety of all persons affected by its activities performed in connection with the construction of the Highway or Airports and shall immediately abate any health or safety hazards. Contractor shall immediately notify the State Pipeline Coordinator of all serious accidents which occur in connection with such activities.

## 4. CONTRACTOR STIPULATIONS—ENVIRONMENTAL

### 4.1. Environmental Briefing

Prior to and during construction of the Highway and Airports, Contractor shall provide for environmental and other pertinent briefings of construction and other personnel y such Federal and State employees as may be designated by the Federal Authorized Officer and the State Pipeline Coordinator. Contractor shall arrange the time, place and attendance for such briefings upon their request.

### 4.2. Pollution Control

#### 4.2.1. General

Contractor shall conduct all activities associated with the Highway and Airports in a manner that will avoid or minimize degradation of air, land and water quality. In the construction of the Highway and Airports, Contractor shall perform its activities in accordance with applicable air and water quality standards and related plans of implementation, including emission standards, adopted pursuant to the Clean Air Act, as amended (42 U.S.C., sec. 1857, et seq.), and the Federal Water Pollution Control Act, as amended (33 U.S.C., sec. 1160).

#### 4.2.2. Water and Land Pollution

4.2.2.1. Contractor shall comply with applicable "Water Quality Standards" of the State of Alaska as approved by the Environmental Protection Agency.

4.2.2.2. Mobile ground equipment shall not be operated in lakes, streams, or rivers unless such operation is approved in writing by the State Pipeline Coordinator.

E–9

301

**4.2.3. Air Pollution and Ice Fog**

**4.2.3.1.** Contractor shall utilize and operate all facilities and devices used in connection with the construction of the Highway and Airports in such a way so as to avoid or minimize air pollution and ice fog.

**4.2.3.2.** Emissions from equipment, installations, and burning materials shall meet applicable Federal and State air quality standards.

**4.2.4.** Pesticides, Herbicides, and other Chemicals

Contractor shall use only non-persistent and immobile types of pesticides, herbicides and other chemicals. Each chemical to be used and its application constraint shall be approved in writing by the State Pipeline Coordinator prior to use.

**4.2.5.** Sanitation and Waste Disposal

**4.2.5.1.** "Waste" means all discarded matter, including but not limited to human waste, trash, garbage, refuse, oil drums, petroleum products, ashes and equipment.

**4.2.5.2.** All waste generated in construction of the Highway and Airports shall be removed or otherwise disposed of in a manner acceptable to the State Pipeline Coordinator. All applicable standards and guidelines of the Alaska State Department of Environmental Conservation, the United States Public Health Service, the Environmental Protection Agency, and other Federal and State agencies shall be adhered to by Contractor. All incinerators shall meet the requirements of applicable Federal and State laws and regulations and shall be used with maximum precautions to prevent forest and tundra fires. After incineration, material not consumed in the incinerator shall be disposed of in a manner approved in writing by the State Pipeline Coordinator. Portable or permanent waste disposal systems to be used shall be approved in writing by the State Pipeline Coordinator.

**4.3. Buffer Strips**

**4.3.1.** Public Interest Areas

No construction activity in connection with the Highway or Airports shall be conducted within one-half (½) mile of any officially designated Federal, State or municipal park, wildlife refuge, research natural area, recreation area, recreation site, or any registered National Historic Site or National Landmark, unless such activity is approved in writing by the Federal Authorized Officer as to Federal areas or the State Pipeline Coordinator as to State areas.

**4.3.2.** Streams

The Highway clearing limits shall be limited so as to provide three hundred (300) foot minimum buffer strips of undisturbed land along streams unless otherwise approved under 2.4 herein.

**4.4. Erosion Control**

**4.4.1.** Contractor shall conduct all Highway and Airport construction activities so as to avoid or minimize disturbance to vegetation.

**4.4.2.** The design of the Highway and Airports shall provide for the construction of erosion control facilities that will avoid or minimize erosion.

**4.4.3.** The erosion control facilities shall be constructed to avoid erosion and to lessen the possibility of forming new drainage channels resulting from Highway or Airport construction activities. The facilities shall be designed and constructed in such a way as to avoid or minimize disturbance to the thermal regime.

**4.4.4.** Stabilization

**4.4.4.1.** Surface materials taken from disturbed areas shall be stockpiled and utilized during restoration unless otherwise approved in writing by the State Pipeline Coordinator as to the Highway and by the Federal Authorized Officer as to the Airports. Stabilization practices, as determined by the needs for specific sites, shall include but shall not be limited to seeding, planting, mulching, and the placement of mat binders, soil binders, rock or gravel blankets, or structures.

**4.4.4.2.** All disturbed areas shall be left in a stabilized condition satisfactory to the State Pipeline Coordinator as to the Highway and the Federal Authorized Officer as to the Airports. Such satisfaction shall be stated in writing.

**4.4.5.** Crossings of Streams, Rivers or Flood Plains

**4.4.5.1.** Contractor shall prevent or minimize erosion at streams and river crossings and those parts of the Highway or Airports within flood plains.

**4.4.5.2.** Temporary access over stream banks shall be made through use of fill ramps rather than by cutting through stream banks, unless otherwise approved in writing by the State Pipeline Coordinator.

**4.4.5.3.** Timing and methods of crossings shall be subject to control and alteration by the State Pipeline Coordinator to protect fish passage and spawning and aquatic resources generally.

**4.4.6. Seeding and Planting**

Seeding and planting of disturbed areas shall be conducted as soon as practicable and, if necessary, shall be repeated until vegetation is successful, unless otherwise approved in writing by the State Pipeline Coordinator. All other restoration shall be completed as soon as possible.

**4.4.7. Excavated Material**

Excavated material not utilized for Highway or Airport construction shall be disposed of in a manner approved in writing by the Federal Authorized Officer, if wasted outside of the facility right-of-way.

**4.5. Fish and Wildlife Protection**

**4.5.1. Passage of Fish**

**4.5.1.1.** Contractor shall provide for uninterrupted movement and safe passage of fish. Any artificial structure or any stream channel change that would cause a blockage of fish shall be provided with a fish passage structure or facility that meets all Federal and State requirements. The proposed design shall be submitted to the State Pipeline Coordinator in accordance with Stipulation 2.4.1.

**4.5.1.2.** Pump intakes shall be screened to prevent harm to fish.

**4.5.1.3.** Abandoned water diversion structures shall be removed or filled to prevent trapping or stranding of fish.

**4.5.1.4.** If material sites are approved adjacent to or in certain lakes, rivers, or streams, the State Pipeline Coordinator, either on his own initiative or at the request of the Federal Authorized Officer, may require the Contractor to construct levees, berms, or other suitable means to protect fish and fish passage and to prevent siltation of streams or lakes.

**4.5.2. Fish Spawning Beds**

**4.5.2.1.** "Fish Spawning Beds" means the areas where anadromous and resident fish deposit their eggs.

**4.5.2.2.** Contractor shall avoid channel changes in Fish Spawning Beds designated by the State Pipeline Coordinator; however, where channel changes cannot be avoided in such beds, new channels shall be constructed according to written standards supplied by the State Pipeline Coordinator.

**4.5.2.3.** Fish Spawning Beds shall be protected from sediment where soil material is expected to be suspended in water as a result of construction activities. Settling basins shall be constructed to intercept silt before it reaches streams or lakes.

**4.5.2.4.** Contractor shall comply with any special requirements made by the State Pipeline Coordinator for a stream system in order to protect Fish Spawning Beds. Contractor shall repair all damage to Fish Spawning Beds caused by construction of the Highway or Airports.

**4.5.3. Zones of Restricted Activities**

Contractor's activities in connection with the construction of the Highway or Airports in key fish and wildlife areas may be restricted by the State Pipeline Coordinator during periods of fish and wildlife breeding, nesting, spawning, lambing or calving activity and during major migrations of fish and wildlife. The State Pipeline Coordinator shall provide Contractor written notice of such restrictive action. From time to time, the State Pipeline Coordinator shall furnish Contractor a list of areas where such actions may be required, together with anticipated dates of restriction.

**4.6. Material Sites**

**4.6.1. Acquisition of Materials**

**4.6.1.1.** If Contractor requires materials from the public lands, Contractor shall request the State of Alaska to make application, in accordance with 43 CFR, Part 3621, "Free Use of Mineral Materials." Contractor shall submit a mining plan in accordance with 43 CFR, Part 23. No materials may be removed by Contractor without the written approval of the Federal Authorized Officer.

**4.6.1.2.** Insofar as possible, use of existing material sites will be authorized in preference to new sites.

**4.6.2. Layout of Material Sites**

Material site boundaries should be shaped in such a manner as to blend with surrounding natural land patterns. Regardless of the layout of material sites, primary emphasis shall be placed on prevention of soil erosion and damage to vegetation.

**4.7. Clearing**

**4.7.1. Boundaries**

Contractor shall identify approved clearing boundaries on the ground prior to beginning clearing operations. All timber and other vegetative material outside clearing boundaries and all blazed, painted or posted trees which are on or mark clearing boundaries are reserved from cutting and removal with the exception of danger

trees or snags designated as such by the State Pipeline Coordinator.

4.7.2. Timber

4.7.2.1. Prior to initiating clearing operations, Contractor shall notify the Federal Authorized Officer of the amount of merchantable timber, if any, which will be cut, removed, or destroyed in the construction of the Highway or Airports, and shall request that the State make separate application for the free use of such timber in accordance with 43 CFR, Part 5510.

4.7.2.2. All trees, snags, or other woody material cut in connection with clearing operations shall be cut so the resulting stumps shall not be higher than six (6) inches measured from the ground on the uphill side.

4.7.2.3. All trees, snags, and other woody material cut in connection with clearing operations shall be felled into the area within the clearing boundaries and away from water courses.

4.7.2.4. Hand clearing shall be used in areas where the State Pipeline Coordinator as to the Highway and the Federal Authorized Officer as to the Airports, determine that use of heavy equipment would be detrimental to existing conditions.

4.7.2.5. All debris resulting from clearing operations and construction that may block stream flow, delay fish passage, contribute to flood damage, or result in stream bed scour or erosion shall be removed.

4.7.2.6. Logs shall not be skidded or yarded across any stream without the written approval of the State Pipeline Contractor.

4.7.2.7. No log landing shall be located within three hundred (300) feet of any water course, except where impractical, then only with the written approval of the State Pipeline Coordinator.

4.7.2.8. All slash shall be disposed of within the Highway right-of-way or Airport lease unless otherwise directed in writing by the Federal Authorized Officer as to the Airports or the State Pipeline Coordinator as to the Highway.

4.8. Disturbance of Natural Waters

All activities of Contractor in connection with the construction of the Highway or Airports that may create new lakes, drain existing lakes, significantly divert natural drainages, permanently alter stream hydraulics, or disturb significant areas of stream beds are prohibited unless such activities along with necessary mitigation measures are approved in writing by the Federal Au-

thorized Officer as to the Airports and the State Pipeline Coordinator as to the Highway.

4.9. Off Right-of-Way Traffic

Contractor shall not operate mobile ground equipment off the Highway or Airport constructions limits or authorized areas unless approved in writing by the Federal Authorized Officer as to the Airports and the State Pipeline Coordinator as to the Highway, or when necessary to prevent harm to any person.

4.10. Aesthetics

The Federal Authorized Officer or State Pipeline Coordinator may impose such requirements as he deems necessary to protect aesthetic values.

4.11. Restoration

4.11.1. Areas disturbed by Contractor shall be restored by Contractor to the satisfaction of the State Pipeline Coordinator as to the Highway, and the Federal Authorized Officer as to the Airports, as stated in writing.

4.11.2. All cut and fill slopes shall be left in a stable condition.

4.11.3. Materials from the Highway and Airports, haul ramps, berms, dikes, and other earthen structures shall be disposed of as directed by the State Pipeline Coordinator as to the Highway and the Federal Authorized Officer as to the Airport.

4.11.4. Vegetation, overburden, and other materials removed during clearing operations shall be disposed of by Contractor in a manner approved in writing by the State Pipeline Coordinator as to the Highway and the Federal Authorized Officer as to the Airports.

4.11.5. Upon completion of restoration, Contractor immediately shall remove all equipment and supplies from the site.

5. CONTRACTOR STIPULATIONS—TECHNICAL

The following requirements shall be complied with in design and construction of Highways and Airports.

5.1. Special Standards

5.1.1. All preconstruction, construction, and post-construction operations shall be conducted to minimize permafrost degradation and damage to the environment, and to provide maximum protection to wildlife and human beings.

5.1.2. Temporary bridges shall be located so as to reserve the superior site and alignment for future permanent bridges.

**5.1.3.** Embankment sections shall be used in preference to excavated sections wherever practicable and, in general, the Highway shall follow terrain features.

**5.1.4.** Unless otherwise approved by the State Pipeline Coordinator, organic material resulting from clearing operations shall not be incorporated in the road prism, but may be used as a mat overlay below the road prism.

## 5.2. Permanent Culverts and Bridges

Culverts and bridges shall be designed to accommodate a 50-year flood in accordance with criteria established by the American Association of State Highway Officials and the Federal Highway Administration.

## 5.3. Erosion

**5.3.1.** Erosion control procedures shall accommodate and be based on the runoff produced by storm and snow melt conditions having a 50-year occurrence interval. The procedure shall also accommodate effects that result from thawing produced by flowing or ponded water on permafrost terrain.

**5.3.2.** Slopes of cuts through stream banks shall be designed and constructed to minimize erosion and prevent slides.

**5.3.3.** Where necessary because of outfall erosion, stilling basins shall be constructed at the outflow end of culverts. To prevent erosion the pool sides shall be established by appropriate methods; e.g., by the use of riprap.

## 5.4. Slope Stability

Areas subject to mudflows, landslides, mudslides, avalanches, rock falls, and other types of mass movements shall be avoided where practicable in locating the Highway and Airports. Where such avoidance is not practical, the Highway or Airport design, based upon detailed field investigations and analysis, shall provide measures to prevent the occurrence of, or protect the Highway or Airports against the effects of mass movements.

## 5.5. Construction Operations

**5.1.1.** All pre-construction and construction activities shall be conducted so as to avoid or minimize thermal and other environmental changes and to provide maximum protection to fish and wildlife and their habitat, and people. All surface modifications shall be planned and executed in such a way that any resulting degradation of permafrost will not jeopardize adjoining structure foundations.

**5.5.2.** Acceptable plans, procedures and quality controls that ensure compliance with these Stipulations shall be submitted in accordance with Stipulation 2.4.1.